1  Marc A. Lieberman, Esq. (Bar No. 157318)
2  Alan W. Forsley, Esq. (Bar No. 180958)
   **FREDMAN LIEBERMAN PEARL LLP**
3  1875 Century Park East, Suite 2230
   Los Angeles, California 90067-2523
4  Telephone:    (310) 284-7350
5  Facsimile:    (310) 432-5999

6  Attorneys for plaintiffs Kathleen Ruigomez, Jamie
7  Ruigomez & Joseph Ruigomez

8              **UNITED STATES BANKRUPTCY COURT**

9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

11 | In re                                    )Case No. 2:20-BK-21022-BR
12 |                                          )
   | GIRARDI KEESE                            )Chapter 7
13 |                                          )
14 |                                          )Adv. Proc. No. 2:22-ap-        -BR
   |                              Debtor.)
15 | _____)
   |                                          )**COMPLAINT FOR:**
16 | JOSEPH RUIGOMEZ, an individual;          )
17 | KATHLEEN RUIGOMEZ, an individual; )**(1) DECLARATORY RELIEF**
   | JAMIE RUIGOMEZ, an individual;           )**REGARDING THE VALIDITY,**
18 |                                          )**PRIORITY AND EXTENT OF**
   |                              Plaintiffs,)**PURPORTED UCC-1 AND JUDGMENT**
19 |                                          )**LIENS AGAINST PROPERTY OF THE**
20 |                  v.                      )**BANKRUPTCY ESTATE; AND**
   |                                          )
21 | ELISSA D. MILLER, in her capacity as     )**(2) EQUITABLE SUBORDINATION OF**
22 | chapter 7 trustee for the Bankruptcy Estate )**CLAIMS**
   | of GIRARDI KEESE; CALIFORNIA             )
23 | ATTORNEY LENDING II, INC.;               )
24 | STILLWELL MADISON, LLC; VIRAGE )
   | SPV 1, LLC; NANO BANK; KCC               )
25 | CLASS ACTION SERVICES, LLC               )
   |                                          )
26 |                              Defendants)
27 |                                          )
28 | _____)

1    Plaintiffs Joseph Ruigomez, Kathleen Ruigomez, and Jamie Ruigomez (the

2    "**Ruigomezes**"), judgment creditors of debtor Girardi Keese ("**Debtor**"), hereby file this

3    action for the Court to determine the validity, priority and extent of certain judgment and

4    California Commercial Code UCC-1 liens on personal property of Debtor's bankruptcy

5    estate ("**Estate**").

6    The Ruigomezes also request that the Court subordinate defendants' proofs of claim

7    to the extent that they engaged in pre-petition inequitable conduct to obtain payments on

8    amounts owed by Debtor.

9

10    **JURISDICTION**

11    1.    On December 18, 2020, certain creditors caused an involuntary bankruptcy

12    petition to be filed against Debtor under Chapter 7 of title 11 of the United States Code

13    commencing *In re Girardi Keese*, Central District of California, Case No. 2:20-bk-21022-

14    BR (the "**Bankruptcy Case**").  On January 13, 2021, the Bankruptcy Court entered its

15    order for relief in the Bankruptcy Case.

16    2.    This court's jurisdiction over this adversary proceeding is based on 28

17    U.S.C. §§ 1334(b) and (e) in that it arises in or is related to the Bankruptcy Case.

18    3.    This action is a "core proceeding" which may be referred to the United

19    States Bankruptcy Court pursuant to title 28 U.S.C. § 157(b) because it is a proceeding to

20    determine the validity, priority and extent of alleged liens upon property of the Estate.

21    Federal Rule of Bankruptcy Procedure 7001(a)(2) states an adversary proceeding is

22    necessary "to determine the validity, priority, or extent of a lien or other interest in

23    property …."  The Court further has jurisdiction because this is a matter concerning the

24    administration of the Estate.  28 U.S.C. § 157(b)(2)(A).

25    4.    This action has been referred to the Bankruptcy Court by operation of

26    General Order 13-05 of the United States District Court, Central District of California.

27    ///

28    ///

## VENUE

5.      Venue of this action is proper under 28 U.S.C. § 1409 in that it arises in and relates to the Bankruptcy Case.

## THE PARTIES

6.      The Ruigomezes are Debtor's creditors based on an $11,000,000 judgment against Debtor and filed proofs of claim ("**Claim**") Nos. 23, 24 and 25 in the Bankruptcy Case in the amount of $11,747,245.95 (and interest continues to accrue).

7.      Defendant Elissa D. Miller, in her capacity as Chapter 7 trustee for the Estate, is the duly appointed and acting Chapter 7 Trustee for the Bankruptcy Case.

8.      Defendant California Attorney Lending II, Inc. ("**CA Lending**"), a New York corporation, is a creditor in the Bankruptcy Case because it filed a secured Claim for $6,668,484.21 as Claim No. 71-1.

9.      Defendant Stillwell Madison, LLC ("**Stillwell**") is creditor in the Bankruptcy Case because it filed a secured Claim for $7,456,773.04 as Claim No. 75-1.

10.     Defendant Virage SPV, LLC ("**Virage**") is a creditor in the Bankruptcy Case because it filed a secured Claim for $11,302,622.87 as Claim No. 77-1.

11.     Defendant Nano Banc ("**Nano**") is a creditor in the Bankruptcy Case because it filed a secured Claim for $4,281,638.89 as Claim No. 70-1.

12.     Defendant KCC Class Action Services, LLC ("**KCC**") is a creditor of Debtor as it obtained a $7,504,109.59 judgment against Debtor.

## GENERAL ALLEGATIONS

**A.      CA Lending's Security Agreement, UCC-1 Financing Statement & Amendments.**

13.     On or about July 6, 2011, CA Lending purportedly loaned Debtor money and entered into a security agreement ("**Security Agreement**"). The Security Agreement purportedly gave CA Lending liens on Debtor's right to contingency fees earned

representing clients in cases against defendants Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and Zimmer, Inc., and Zimmer Holdings, Inc. (the "**CA Lending Pharmaceutical Case Collateral**").  Attached as **Exhibit "1"** is a copy of the Security Agreement.

14.    On July 6, 2011, in connection with the Security Agreement, CA Lending purportedly recorded a UCC-1 identified as document number 11-7275806299 with the California Secretary of State ("**Secretary of State**") to perfect its lien in the CA Lending Pharmaceutical Collateral.  Attached as **Exhibit "2"** is a copy of the UCC-1.

15.    On August 18, 2011, CA Lending recorded another UCC-1 identified as document number 11-72814762 with the Secretary of State to purportedly further perfect its lien on the CA Lending Pharmaceutical Collateral and to expand its collateral to include contingency fees Debtor would earn in the Southern California Regional Rail Authority, and Connex Railroad, LLC and Metrolink cases (the "**Metrolink Case Collateral**").  Attached as **Exhibit "3"** is a copy of the UCC-1.

16.    On August 28, 2013, CA Lending recorded a further UCC-1 with the Secretary of State identified as document number 1373755925 wherein it restates its purported lien on the CA Lending Pharmaceutical Case Collateral, but no longer lists the Metrolink Case Collateral.  The UCC-1 also "restated collateral description" to add language to purportedly place a lien on "all of Debtor's" personal property.  Attached as **Exhibit "4"** is a copy of the UCC-1.  A controversy exists, however, *as to whether:*

*(i)    Debtor agreed to the increased collateral of "all of Debtor's" personal property through an amended security agreement;*

*(ii)    Consideration was given for the additional security;*

*(iii)    If Debtor did not agree or give consideration for the increased collateral, whether the collateral only includes the Pharmaceutical Case Collateral and whether any such collateral remains in the Estate; and*

    *(iv)    Whether CA Lending has a partial or complete priority lien over all other secured creditors, and the amount of its lien.*

**B.    Stillwell's Loan, Security Agreement and UCC-1 Financing Statement.**

    17.    On March 31, 2016, Stillwell and Debtor purportedly entered into a "Law Firm Legal Funding, Consensual Equitable Lien, Assignment and Security Agreement and Personal Guarantee" ("**Stillwell Security Agreement**") which purportedly gave Stillwell a security interest on cases listed on Exhibit "B-1" to the Stillwell Security Agreement: (i) Shell v. Acosta, (ii) Barclay Hollander, (iii) Avandia, (iv) TXI Riverside Cement, (v) Byetta, (vi) Zometa, and (vi) Actos (the "**Stillwell Collateral**").  Attached as **Exhibit "5"** is a copy of the Stillwell Security Agreement with Exhibit "B-1" attached as the last page.

    18.    On April 11, 2016, Stillwell filed a UCC-1 with the Secretary of State identified as document number 16-7519369916 to purportedly perfect its lien on the Stillwell Collateral.  Attached as **Exhibit "6"** is a copy of the UCC-1.  A controversy exists *as to whether:*

    *(i)    The UCC-1 sufficiently described Stillwell's Collateral to perfect its lien because the UCC-1 does not identify the cases but simply describes the collateral as "ALL CASES NOW OR LATER SET FORTH IN EXHIBIT B-1 OF SECURED PARTY'S AGREEMENT";*

    *(ii)    Whether any Stillwell Collateral remains in the Estate and the amount of that collateral; and*

    *(iii)    Whether Stillwell has a first, second or some other lien on the Stillwell Collateral or some other collateral and the amount of its lien.*

**C. CA Lending files a UCC-1 Financing Statement Amendment.**

    19.    On June 10, 2016, CA Lending filed a continuation of its first lien with the Secretary of State as document No. 16-75306737.  Attached as **Exhibit "7"** is a copy of the filed continuation statement.

1      20.    On July 19, 2017, CA Lending filed a UCC-1 Amendment to include

2  Thomas Girardi.  Attached as **Exhibit "8"** is a copy of the UCC Amendment.

3

4  **D. Virage's Promissory Note, Amended Restated Loan Agreement and UCC-1.**

5      21.    On November 1, 2017, Virage and "Girardi Keese, a law firm" purportedly

6  entered into a promissory note for Virage to loan Debtor $10,675,000.  Attached as

7  **Exhibit "9"** is a copy of the Promissory Note.

8      22.    On November 1, 2017, Virage and Debtor "a California partnership" also

9  entered into a Security Agreement (the "**Virage Security Agreement**") wherein Debtor

10  gave Virage a security interest in proceeds arising out of any "Eligible Case" or any

11  "Eligible Collateral Case" ("**Virage Collateral**") as defined in an Amended and Restated

12  Loan Agreement (the "**Loan Agreement**").   Attached as **Exhibit "10"** is a copy of the

13  Virage Security Agreement, see Section 1(a).

14      23.    On November 1, 2017, Virage and Debtor "a California partnership"

15  purportedly entered into the Loan Agreement regarding the $10,675,000 loan to Debtor,

16  which defines "Eligible Case" or any "Eligible Collateral Case," for security purposes, as

17  listed on Schedules 1.1 and 1.2..  The Loan Agreement attached to Virage's Claim,

18  however, was unsigned and did not attach Schedules 1.1 and 1.2.  Attached as **Exhibit**

19  **"11"** is a copy of the unsigned Loan Agreement that is attached to Virage's Claim.

20      24.    On November 6, 2017, Virage filed a UCC-1 with the Secretary of State

21  identified as document number 17-7614819640 wherein it states it has a security interest in

22  the Virage Collateral.  Attached as **Exhibit "12"** is a copy of the filed UCC-1.

23      25.    On February 26, 2018, Virage and Debtor "Girardi Keese, a law firm"

24  purportedly entered into a second promissory note for Virage to loan Debtor $4,070,000.

25  Attached as **Exhibit "13"** is a copy of the Promissory Note.

26      26.    On February 26, 2018, Virage and Debtor "a California partnership"

27  purportedly entered into a Loan Agreement regarding the $4,070,000 which likewise

28  defines "Eligible Case" or any "Eligible Collateral Case," for security purposes, as listed

on Schedules 1.1 and 1.2. Attached as **Exhibit "14"** is a copy of the Loan Agreement which again did not include the Schedules.

27.    On February 26, 2018, Virage and Debtor "Girardi Keese, a law firm" entered into a further Security Agreement wherein Debtor again gave Virage a second security interest in the Virage Collateral. Attached as **Exhibit "15"** is a copy of the second security agreement.

28.    On March 1, 2018, Virage filed a UCC-1 with the Secretary of State identified as document number 18-7635620856 wherein it states it has a security interest in the Virage Collateral. Attached as **Exhibit "16"** is a copy of the filed UCC-1. But a controversy exists *as to whether:*

(i)    *Schedule 1.2A listing the Virage Collateral was included as part of the Loan Agreements and if so whether Schedule 1.2A sufficiently described the collateral to create a security interest;*

(ii)    *The UCC-1's sufficiently described Virage's Collateral to perfect its lien because none of the UCC-1's list collateral and only state it is in the Loan Agreement;*

(iii)    *Whether any Virage Collateral remains in the Estate and the amount of that collateral; and*

(iv)    *Whether Virage has a lien on the Virage Collateral or some other collateral, and the amount and priority of its lien.*

**E. Nano Business Loan Agreement, Promissory Note, Security Agreement, and UCC-1.**

29.    On August 20, 2018, Nano and Debtor purportedly executed a "Business Loan Agreement, wherein Nano agreed to lend Debtor $4,250,000. Attached as **Exhibit "17"** is a copy of the Business Loan Agreement.

30.    On August 20, 2018, Nano and Debtor purportedly entered into a Promissory Note wherein Debtor agreed to pay Nano $4,250,000. Attached as **Exhibit "18"** is a copy of the Promissory Note.

31.     On August 20, 2018 Nano and Debtor purportedly entered into a Commercial Security Agreement wherein Debtor pledged personal and real property collateral ("**Nano Collateral**") to secure the $4,250,000 loan.  Attached as **Exhibit "19"** is a copy of the security agreement.

32.     On August 20, 2018, Nano and 1126 Wilshire Partnership (the "**Partnership**") entered into a Commercial Guaranty wherein the Partnership guaranteed the $4,250,000 loan and granted a deed of trust to be recorded against the Partnership's 1126 Wilshire Blvd., L.A., CA 90017 property.  Attached as **Exhibit "20"** is a copy of the guaranty, and attached as **Exhibit "21"** is a copy of the deed of trust.

33.     On August 31, 2018 Nano filed a UCC-1 Financing Statement with the Secretary of State as document number 18-7666662169 wherein its collateral is listed on the UCC-1.  Attached as **Exhibit "22"** is a copy of the filed UCC-1.

34.     Thereafter, Debtor entered into four (4) Change in Terms Agreements wherein the terms of the Promissory Note were changed.  Attached as **Exhibit "23"** are copies of the Change in Terms Agreements.

35.     On August 20, 2018, Nano Banc and Thomas V. Girardi (the "**Girardi**") entered into a Commercial Guaranty wherein Girardi also personally guaranteed the $4,250,000 loan.  Attached as **Exhibit "24"** is a copy of the guaranty.  *A controversy exists as to whether:*

    *(i)     The Nano security agreement sufficiently describes the Nano Collateral to create a security interest in Debtor's contingency fee cases;*

    *(ii)     The UCC-1 sufficiently describes Nano's Collateral to perfect its lien in Debtor's contingency fee cases;*

    *(iii)     Nano has received, or will receive, any money from the Partnership or Girardi guarantees or the deed of trust, which would then reduce the amount owed to Nano; and*

    *(iv)     The priority of Nano's lien on the Nano Collateral and the amount of its lien.*

**F. CA Lending files a Further UCC-1 Financing Statement.**

36.    On November 14, 2019, CA Lending filed a new UCC-1 with the Secretary of State as document No. 19-7746713843. Attached as **Exhibit "25"** is a copy of the UCC-1.[1] Again, the same controversies above exist here.

**G. The Ruigomez Judgment and Lien.**

37.    On April 20, 2020, the Ruigomezes obtained an $11,000,000 judgment against Debtor and Girardi in the matter of *Ruigomez et al. v. Girardi*, Los Angeles County Superior Court Case No. 19STCV22296 ("**State Case**"). Attached as **Exhibit "26"** is a copy of the judgment.

38.    On May 7, 2020, the court in the State Case issued its "Order to Appear for Examination" ("**ORAP Order**") as to "Thomas V. Girardi, as Person Most Knowledgeable for Girardi Keese." Attached as **Exhibit "27"** is a copy of the ORAP Order.

39.    On May 20, 2020, the ORAP Order was personally served upon "Thomas V. Girardi, as Person Most Knowledgeable for Girardi Keese." Attached as **Exhibit "28"** is a copy of the proof of service. Personal service of the ORAP Order caused a lien to be created and perfected on all of Debtor's Property (the "**Ruigomez Lien**"). *In Hilde*, 120 F.3d 950 (9th Cir. 1997).

40.    The Ruigomezes also have a claim in the Girardi bankruptcy case No. 2:20-bk-21020-BR and have received monies from that bankruptcy estate. A controversy exists **as to whether:**

**(i)    The Ruigomez Lien has priority over some or all of the defendant creditors;**

**(ii)    The Ruigomez Lien includes all of Debtor's property; and**

---

[1] On November 2, 2020, CA Lending also filed a Notice of Judgment Lien with the Secretary of State, but it was not part of CA Lending's proof of claim and that was recorded within 90 days of the Petition Date and thus is likely avoidable.

**(iii)**     The amount due to the Ruigomezes on their Claim.

## H. KCC Class Action Services LLC ("KCC") Judgment and Lien.

41.     On December 15, 2020, two days after the Petition Date, KCC obtained a judgment for $7,504,109.59 against Debtor. On December 17, 2020, KCC purportedly recorded its Notice of Judgment Lien (the "**KCC Lien**") with the California Secretary of State as document No. U200037891132. Attached as **Exhibit "29"** is a copy of the filed Notice of Judgment Lien. A controversy exists **as to whether:**

**(i)**     The KCC Lien has priority over some or all of the defendant creditors;

**(ii)**     The KCC Lien includes all of Debtor's property; and

**(iii)**     The amount due KCC on its claim.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief against all defendants)

42.     The Ruigomezes incorporate herein by reference paragraphs 1 through 41 above as though set forth fully herein.

43.     An actual controversy has arisen between the Ruigomezes, the Trustee and all other defendants regarding the validity, extent and priority of above purported liens.

44.     The Ruigomezes assert that (i) some liens did not attach and/or were not perfected, (ii) some liens only attached and were perfected as to contingency fees in certain cases, and (iii) some of the contingency fees may no longer be property of the Estate.

45.     The Ruigomezes are entitled to a judgment from the Court declaring which property of the Estate the parties have liens on, and the amount, validity, extent and priority of those liens.

///

///

///

## SECOND CLAIM FOR RELIEF

### (Subordination of Claims under 11 U.S.C. §§ 510(c) & 105(a)

### Against CA Lending, Stillwell & Virage)

46.    Remares incorporates herein by reference paragraphs 1 through 41 above as though set forth fully herein.

47.    The Ruigomezes are informed and believe that CA Lending, Stillwell and/or Virage pressured Debtor to receive, and did receive, payments directly from the settling defendants and/or directly from Debtor's client trust account instead of waiting to receive funds directly from Debtor's general account after proper disbursements from the client trust account had been made (i.e., the clients' lienholders, Debtor's clients, and then Debtor's contingency fee to Debtor's general account).

48.    As a result, CA Lending, Stillwell and/or Virage engaged in illegal and inequitable conduct, and acted in bad faith by improperly receiving monies belonging to Debtor's clients and/or their lienholders.    This inequitable conduct harmed Debtor's creditor clients because monies that belonged to the clients and/or their lienholders were improperly paid to the defendants, and make it less likely creditors will recover the full amounts owed to them because of the defendants' misconduct.

49.    As a result, the equities in this case dictate that some or all of the amounts that Debtor allegedly owes to CA Lending, Stillwell and/or Virage, should be subordinated to all other claims pursuant to sections 510(c) and 105(a) of the Bankruptcy Code.

50.    Defendants improper and inequitable conduct has resulted in injury to the Debtor's creditors, including former Debtor clients, and was intentionally undertaken by defendants, against the interests of Debtor's clients and to the sole benefit of defendants.

**WHEREFORE,** the Ruigomezes pray for judgment against each defendant as follows:

**AS TO THE FIRST CAUSE OF ACTION:**

1.    For entry of judgment declaring the amount, validity, extent and priority of all of the defendants' liens and the Ruigomezes' lien;

2.    For costs of suit; and

3.    For such other and further relief as the court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION:**

1.    For an order subordinating some or all of each defendant's Claim to all other claims;

2.    For costs of suit; and

3.    For such other and further relief as the court deems just and proper.

DATED:  August 29, 2022                              FREDMAN LIEBERMAN PEARL LLP

By: _____
                                                   Marc A. Lieberman, Esq.
                                                   Alan W. Forsley, Esq.
                                                   Attorneys for plaintiffs the Ruigomezes

# EXHIBIT 1

000013

## SECURITY AGREEMENT
## CALIFORNIA ATTORNEY LENDING II, INC.

In consideration of California Attorney Lending II, Inc., a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221 (the "Secured Party") heretofore or hereafter (1) extending or agreeing to extend any credit or other financial accommodation to or relying on any guaranty, endorsement or other assurance of payment of Girardi Keese, a California general partnership having an office at 1126 Wilshire Blvd., Los Angeles, CA 90017 ("Borrower") or (2) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation to Borrower, and for other valuable consideration, the receipt and adequacy of which is acknowledged, **Girardi Keese** (the "Debtor"), agrees with the Secured Party as follows:

1.    **DEFINITIONS.** In this Agreement:

a.    **Account Debtor.** An "Account Debtor" means any person or entity with an obligation to pay or transfer cash, property or proceeds to any Debtor on an account, chattel paper or general intangible regardless whether such obligation arises from business or personal matters or assets of such Debtor.

b.    **Collateral.** The "Collateral" means:

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; and (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

c.    **Event of Default.** An "Event of Default" occurs or exists if

(i)    there occurs or exists any event or condition of default under any Revolving Promissory Note or other instrument (A) now or hereafter evidencing any of the Obligations or (B) the payment of which is now or hereinafter guaranteed by the Debtor (including, but not limited to, a Revolving Promissory Note, dated the date of this Agreement, issued by Borrower to the Secured Party, or any direct or indirect extension, renewal, refinancing or other modification or replacement of such Revolving Promissory Note); or

(ii)    there occurs or exists any event or condition of default under any guaranty of the Obligations; or

19

Initials

**035**
000014

(iii)   the Secured Party deems itself insecure with respect to the Obligations or is of the opinion that the Collateral is or may not be sufficient or has decreased or may decrease in value, whether or not the Secured Party has sought any Other Collateral from the Debtor or any Guarantor.

d.    **Obligations.** The "Obligations" means collectively all obligations to the Secured Party for the payment of any money (whether for the payment of any principal, interest, fee, charge, cost or expense or otherwise) or the performance of any other obligation (including, but not limited to, pursuant to this Agreement), however evidenced, regardless of kind, class or form, incurred for any business or commercial purpose or otherwise, now existing or hereafter arising or accruing, created directly or by any assignment or other transfer, direct or indirect, absolute or contingent (whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise), similar or dissimilar or related or unrelated and whether or not arising or accrued subsequent to any commencement of, or made, proved, voted or allowed as a claim in any case or other proceeding pursuant to, any bankruptcy, insolvency or similar statute, that have been heretofore or are hereafter incurred by, whether alone or otherwise, the Debtor, the Borrower, any direct or indirect successor of the Debtor or the Borrower or any direct or indirect assignee or other transferee of all or substantially all of the assets of the Debtor or the Borrower.

e.    **Other Collateral.** "Other Collateral" means, other than the Collateral, any collateral, subordination, guaranty, endorsement or other security or assurance of payment, whether now existing or hereafter arising or accruing, that now or hereafter secures the payment of or is otherwise applicable to any of the Obligations.

f.    **Guarantor.** "Guarantor" means any Person, including Thomas V. Girardi, who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Obligations.

g.    **Permitted Liens.** "Permitted Liens" means (i) whether now existing or hereafter arising or accruing, any security interest in or other lien on any of the Collateral in favor of the Secured Party or (ii) any security interest in or other lien on any of the Collateral existing on this date that is (A) fully and accurately described in the response to question 6 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement or (B) consented to in writing by the Secured Party.

h.    **Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated association, government or political subdivision, (ii) any court, agency or other governmental body or (iii) any other entity, body, organization or group.

i.    **Record.** "Record" means any information that is now or hereafter (i) inscribed on a tangible medium or (ii) stored in an electronic or other medium and retrievable in perceivable form, except to the extent constituting confidential information (whether contained in any client file of the Debtor or otherwise) that the Debtor is not permitted to disclose to the Secured Party by reason of any ethical or disciplinary rule, regulation or law governing the Debtor's conduct.

j.    **Security Interest.** "Security Interest" means any security interest or other lien granted or otherwise created pursuant to the first sentence of Section 2 of this Agreement.

k.    **Uniform Commercial Code.** "Uniform Commercial Code" means the Uniform Commercial Code in effect at any time in the State of New York.

l.    **Other Terms.** All capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Uniform Commercial Code..

2.    **GRANT OF SECURITY INTEREST.** To secure the payment and performance of the Obligations, the

20

Initials

Debtor grants to the Secured Party a security interest in and assigns, pledges and hypothecates to the Secured Party the Collateral. Each Security Interest is a continuing, absolute and unconditional security interest or other lien.

3.    **REINSTATEMENT OF OBLIGATIONS.** Each portion of the Obligations heretofore or hereafter paid or satisfied by any of the Collateral, or any money or Other Collateral, heretofore or hereafter received, applied or retained by the Secured Party and later recovered from the Secured Party as a result of any claim (including, but not limited to, any claim involving any allegation that any money constituted trust funds or that the receipt, application or retention of any of the Collateral or any money or Other Collateral or the grant, perfection or other creation or protection of any security interest in or other lien on any of the Collateral or any Other Collateral constituted a preference or fraudulent conveyance or transfer), however asserted and whether now existing or hereafter arising or accruing, shall be reinstated as part of the Obligations for purposes of this Agreement as of the date it originally arose or accrued.

4.    **COVENANTS.**

a.    **Affirmative Covenants.** The Debtor shall (i) maintain complete and accurate Records relating to the Collateral, (ii) before the end of any applicable grace period, pay each tax, assessment, fee and charge imposed by any government or political subdivision upon any of the Collateral, this Agreement or any agreement, instrument or other Record evidencing any of the Collateral or any of the Obligations, (iii) defend the Collateral against each demand, claim, counterclaim, setoff and defense asserted by any Person (including, but not limited to, any Account Debtor) other than the Secured Party and (iv) promptly notify the Secured Party of (A) any threat or commencement of any action or other legal proceeding, any entry of any judgment or order of any court, agency or other governmental body, or any assertion by any Person (including, but not limited to, any Account Debtor) other than the Secured Party of any demand, claim, counterclaim, setoff or defense, relating to any of the Collateral, (B) any occurrence or existence of any Event of Default, any event or condition that, after notice, lapse of time or both notice and lapse of time, would constitute any Event of Default or any event or condition that has or will or might have any material adverse effect on (I) any of the Collateral, (II) the Debtor, (III) any Guarantor or (IV) the business, operations, assets, affairs or condition (financial or other) of the Debtor or any Guarantor and (C) any change in the location of the chief executive office of the Debtor.

b.    **Negative Covenants.** Without the prior written consent of the Secured Party, the Debtor shall not (i) sell or otherwise dispose of any of the Collateral or any interest or right in any of the Collateral except in the ordinary course of business, or (ii) provide to the Secured Party or permit to be provided to the Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect, (iii) execute or otherwise authenticate or permit to be filed or remain on file in any public office any financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than the Secured Party as a secured party, except for any financing statement or amendment of any financing statement heretofore consented to by the Secured Party in writing or relating solely to any Permitted Liens, or (iv) upon or at any time after any occurrence or existence of any Event of Default, (A) enforce, extend, renew, refinance or otherwise modify or replace, request, demand, accept, collect or otherwise realize upon, compromise, cancel, discharge, subordinate, accelerate, give any receipt, release or discharge relating to, commence, prosecute or settle any action or other legal proceeding relating to, waive or forbear from exercising any right or remedy relating to or adversely affect any obligation of any Person (including, but not limited to, any Account Debtor obligated with respect to any of the Collateral) relating to any of the Collateral, or (B) agree or otherwise incur any obligation to do anything described in clause (iv)(A) of this sentence, or (v) without giving the Secured Party at least 30 days' prior written notice (A) change its location for purposes of Article 9 of the Uniform Commercial Code (including, but not limited to, its jurisdiction of organization if it is a Registered Organization), (B) make any change in its name, identity or structure or (C)

<center>21</center>

<div align="right">Initials</div>

Case 2:20-bk-21022-BR   Doc 1329   Filed 08/30/22   Entered 08/30/22 09:31:51   Desc
Main Document   Page 17 of 244

Case 2:20-bk-21022-BR   Doc 14-1   Filed 12/24/20   Entered 12/24/20 12:30:05   Desc
Exhibit Exhibits 1 through 7 To Declaration of Paul Cody With Proof of Service   Page 24 of 114

participate in any merger, consolidation or other absorption, or (vi) grant or otherwise create, permit to exist or agree or otherwise incur any obligation to grant or otherwise create or permit to exist any security interest in or other lien on any of the Collateral other than Permitted Liens, or (vii) use any money of the Borrower, funds in any Deposit Account of the Borrower or funds represented by any certificate of deposit of the Borrower in partial or complete satisfaction of any obligation of the Borrower except for obligations incurred in the ordinary course of the business of the Borrower, or (viii) create, incur, assume or have any indebtedness or other obligation (A) arising from the borrowing of any money or (B) pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations (I) to the Secured Party, (II) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of its business, (III) arising from the endorsement in the ordinary course of its business of any check or other negotiable instrument for deposit or collection or (IV) secured by a Permitted Lien.

c.   **Additional Covenants Triggered by Request of Secured Party.** Promptly upon the request of the Secured Party, the Debtor shall (i) deliver to the Secured Party each financing statement, amendment of any financing statement and other Record, and take each other action (including, but not limited to, making any endorsement), requested by the Secured Party to perfect, maintain the validity, perfection or priority of, or enforce, any Security Interest, otherwise protect the interest of the Secured Party in or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral, whether under applicable law or otherwise, verify any of the Collateral or otherwise accomplish any purpose of this Agreement, (ii) deliver to the Secured Party each Record included in the Collateral, together with each endorsement, instrument of assignment and other Record that the Secured Party requests to accomplish the assignment or other transfer of such Record to the Secured Party, and, until such delivery, hold such Record in trust for the Secured Party, (iii) cause each Instrument representing Proceeds or other proceeds of any of the Collateral to be made payable, as requested by the Secured Party, to the Secured Party alone or the Secured Party and the Debtor jointly, (iv) provide to the Secured Party all information requested by the Secured Party and relating to (A) any of the Collateral, (B) any Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral, (C) the Debtor, (D) any Guarantor or (E) the business, operations, assets, affairs or condition (financial or other) of the Debtor or any Guarantor (including, but not limited to, financial statements prepared in a form satisfactory to the Secured Party and, if requested by the Secured Party, audited, reviewed or compiled by an independent certified public accountant satisfactory to the Secured Party) and (v) permit each officer, employee, accountant, attorney and other agent of the Secured Party to inspect the Collateral and audit, copy and extract each Record included in the Collateral.

d.   **Collateral Collections.** After an Event of Default shall have occurred, Secured Party shall have the right at any and all times to enforce Debtor's rights against Account Debtors and other parties obligated on Collateral, including, but not limited to, the right to: (a) notify and/or require Debtor to notify any or all Account Debtors and other parties obligated on Collateral to make payments directly to Secured Party or in the care of a post office lock box under the sole control of Secured Party established at the Debtor's expense subject to Secured Party's customary arrangements and charges therefor, and to take any or all action with respect to Collateral as Secured Party shall determine in its sole discretion, including, without limitation, the right to demand, collect, sue for and receive any money or property at any time due, payable or receivable on account thereof, compromise and settle with any person liable thereon, and extend the time of payment of otherwise change the terms thereof, without incurring liability or responsibility to Debtor; (b) require Debtor to segregate and hold in trust for Secured Party and, on the day of Debtor's receipt thereof, transmit to Secured Party in the exact form received by Debtor (except for such assignments and endorsements as may be required by Secured Party), all cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral; and/or (c) establish and maintain at Secured Party a "Repayment Account," which shall be under the exclusive control and subject to the sole order of Secured Party and which shall be subject to the imposition of such customary charges as are imposed by Secured Party from time to time upon such accounts, for the deposit of cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral from which Secured Party may, in its sole

22

Initials

discretion, at any time and from time to time, withdraw all or any part. Secured Party's collection and enforcement of Collateral against Account Debtors and other persons obligated thereon shall be deemed to be commercially reasonable if Secured Party exercises due care and follows the procedures that Secured Party generally applies to the collection of obligations owed to Secured Party. All cash and non-cash proceeds of the Collateral may be applied by Secured Party upon Secured Party's actual receipt of cash proceeds against such of the Obligations, matured or unmatured, as Secured Party shall determine in its sole discretion. Secured Party may defer the application of non-cash proceeds of Collateral, including, but not limited to, non-cash proceeds collected from Account Debtors and other persons obligated on Collateral, to the Obligations until cash proceeds are actually received by Secured Party.

e.  **Care of Collateral.** Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after an Event of Default, to collect or enforce any of its rights against the Collateral, to collect any income accruing on the Collateral, or to preserve rights against Account Debtors or other parties with prior interest in the Collateral. If Secured Party actually receives any notices requiring action with respect to Collateral in Secured Party's possession, Secured Party shall take reasonable steps to forward such notices to Debtor. Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral. Secured Party's sole responsibility is to take such action as is reasonably required by Debtor in writing, provided, however, Secured Party is not required to take any action that, in Secured Party's sole judgment, would adversely affect the value of the Collateral as security for the Obligations. While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.

5.  **POWER OF ATTORNEY.** Upon the occurrence or existence of any Event of Default, the Debtor irrevocably and unconditionally appoints the Secured Party as the attorney-in-fact of the Debtor, with full power of substitution and revocation, to take, in the name and on behalf of the Debtor or otherwise, each action relating to any of the Collateral that the Debtor could take (subject to the limitations contained in Section 12(j) of this Agreement), provided such appointment and power does not violate any code of professional conduct and the ethical rules thereunder applicable to the legal profession. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of the Secured Party.

6.  **CERTAIN RIGHTS, REMEDIES AND DUTIES.**

a.  **Rights and Remedies Pursuant to Applicable Law.** With respect to the Collateral, the Secured Party shall have each applicable right and remedy pursuant to applicable law (including, but not limited to, the Uniform Commercial Code) or this Agreement.

b.  **Additional Rights Without Event of Default.** The Secured Party shall have the right to (i) file in any public office each financing statement or amendment of any financing statement relating to any of the Collateral that the Secured Party desires to file and (ii) verify any of the Collateral in any manner or through any medium, whether directly with any Person (including, but not limited to, any Account Debtor) obligated with respect thereto or otherwise or in the name of the Debtor or otherwise.

c.  **Additional Rights Upon or After Event of Default.** Upon or at any time after any occurrence or existence of any Event of Default, the Secured Party shall have the right to, for the purpose of preserving or enhancing the value of any of the Collateral or exercising any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement, (i) perform each obligation of the Debtor pursuant to this Agreement and (ii) take control of all Proceeds and other proceeds thereof.

23

Initials

d.    **Application of Proceeds.** The Secured Party shall apply all proceeds received by the Secured Party from any collection, sale or other disposition of or other recovery upon or otherwise on account of any of the Collateral (including, but not limited to, as money payable pursuant to any insurance on any of the Collateral) first to liabilities, costs and expenses described in Section 7 of this Agreement and then to the remainder of the Obligations, whether due or not due, in any order determined by the Secured Party.

e.    **Notice of Disposition.** It is mutually agreed that commercial reasonableness and good faith require Lender to give Guarantors no more than ten days' prior written notice of the time and place of any public disposition of Collateral or of the time after which any private disposition or other intended disposition is to be made. It is mutually agreed that it is commercially reasonable for Lender to disclaim all warranties which arise with respect to the disposition of the Collateral.

7.    **EXPENSES; INDEMNIFICATION.**

a.    **Expenses.** The Debtor shall pay to the Secured Party on demand each cost and expense (including, but not limited to, if the Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter incurred by the Secured Party in (i) searching for, filing or recording or obtaining any information relating to any financing statement, amendment of any financing statement or other Record relating to any of the Collateral or otherwise obtaining any information relating to the Debtor or any of the Collateral or (ii) endeavoring to (A) enforce any obligation of the Debtor pursuant to this Agreement or preserve or exercise any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or (B) preserve or exercise any right or remedy relating to or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral. After such demand for the payment of any cost or expense incurred by the Secured Party in performing any obligation of the Debtor pursuant to this Agreement, the Debtor shall pay interest at an annual rate equal to the lesser of 25% or the highest rate permitted by applicable law on the portion of such cost or expense remaining unpaid.

b.    **Indemnification.** The Debtor shall indemnify and defend the Secured Party and each officer, employee, accountant, attorney, banker, lender and other agent of the Secured Party on demand, without any limitation as to amount, against each liability, cost and expense (including, but not limited to, if the Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against the Secured Party or such officer, employee, accountant, attorney or other agent as a result of any claim (including, but not limited to, any claim involving any allegation of any violation of applicable law (including, but not limited to, any criminal statute)), however asserted and whether now existing or hereafter arising or accruing, arising out of any collection, sale or other disposition of any of the Collateral or any breach by the Debtor of any representation or warranty or any covenant or other agreement contained in, or any other fact or circumstance relating to, this Agreement, except to the extent any such liability, cost or expense is caused by the gross negligence, bad faith or willful misconduct of the Secured Party or such officer, employee, accountant, attorney or other agent.

8.    **TERMINATION.** This Agreement shall remain in full force and effect until and shall terminate only upon (a) the actual receipt by an officer of the Secured Party at the chief executive office of the Secured Party of a written notice of the termination of this Agreement by any one of the Debtor, (b) the expiration of a reasonable period of time for the Secured Party to act upon such written notice and (c) the final and indefeasible payment in full of (i) each portion of the Obligations (A) arising or accrued before such receipt of such written notice and the expiration of such period of time, (B) thereafter arising or accruing as a result of any credit or other financial accommodation theretofore committed or otherwise agreed to by the Secured Party or (C) thereafter arising or accruing as a result of any of the Obligations described in clause (c)(i)(A) or (B) of this sentence (including, but not limited to, (I) all interest, fees, charges, costs and expenses thereafter arising or accruing with respect to any of the

24

Initials

Obligations described in such clause (c)(i)(A) or (B) and (II) all of the Obligations thereafter arising or accruing as a result of any direct or indirect extension, renewal, refinancing or other modification or replacement of any of the Obligations described in such clause (c)(i)(A) or (B)) and (ii) each liability, cost and expense that the Debtor is obligated to pay pursuant to Section 7 of this Agreement, whether theretofore or thereafter arising or accruing.

9.    **REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS.** The Debtor represents, warrants and covenants with and to the Secured Party as follows:

a.    **Authority.** The execution, delivery to the Secured Party and performance of this Agreement and the grant or other creation of each Security Interest by the Debtor (i) do not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which the Debtor is bound or, if the Debtor is not an individual, any certificate or articles of incorporation or organization, by-laws, operating or partnership agreement or other charter, organizational or other governing document of the Debtor or any resolution or other action of record of any shareholders, members, partners, directors or managers of the Debtor, (ii) do not and will not violate or constitute any default under any agreement, instrument or other Record by which the Debtor is bound or to which the Debtor's property is subject, (iii) if the Debtor is not an individual, are and will be in furtherance of the purposes and within the power and authority of the Debtor and (iv) do not and will not require any authorization of, notice to or other act by or relating to any Person (including, but not limited to, any Account Debtor or, if the Debtor is not an individual, any shareholder, member, partner, director or manager of the Debtor) that has not been duly obtained, given or done and is not in full force and effect.

b.    **Enforceability.** This Agreement is enforceable in accordance with its terms against the Debtor. All of Debtor's accounts, chattel paper, deposit accounts, documents, general intangibles, instruments, investment property, letter of credit rights and other liens, contracts, leases and agreements constituting the Collateral are and shall be valid, genuine and legally enforceable obligations and rights belonging to Debtor and not subject to any claim, defense, set-off, or counterclaim of any kind.

c.    **Ownership.** Debtor is and shall remain owner of the Collateral.

d.    **Questionnaire.** Each answer contained in any questionnaire submitted by or on behalf of the Debtor to the Secured Party in connection with this Agreement (including, but not limited to, the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement) is complete and accurate.

e.    **Rights and Obligations with Respect to Collateral.** Except as heretofore disclosed by the Debtor to the Secured Party in writing, there exists (i) no security interest in or other lien on any of the Collateral other than Permitted Liens, (ii) no presently effective financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than the Secured Party as a secured party other than those relating solely to Permitted Liens, (iii) no contractual or other restriction on the grant or other creation of any security interest in or assignment, pledge or hypothecation of any of the Collateral, and (iv) no demand, claim, counterclaim, setoff or defense, no action or other legal proceeding, and no outstanding judgment or order of any court, agency or other governmental body, relating to any of the Collateral. Debtor (i) shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (ii) shall cooperate with Secured Party in obtaining and maintaining control with respect to all deposit accounts, investment property, letter of credit rights and electronic chattel paper consituting the Collateral; (iii) shall not become a party to any restructuring of its form of business or participate in any consolidation, merger, liquidation or dissolution without Secured Party's prior written consent; (iv) shall not change its state of organization without first notifying Secured Party in writing; (v) shall immediately advise Lender in writing of any change in address of Debtor or the Collateral; and (vi) shall provide Secured Party with possession, as appropriate, of all chattel paper, documents, instruments and investment property constituting the Collateral.

25

Initials

f.    **Actions with Respect to Collateral.** Except as heretofore disclosed by the Debtor to the Secured Party in writing, the Debtor has not (i) sold or otherwise disposed of any of the Collateral or any interest or right in any of the Collateral or (ii) extended, renewed, refinanced or otherwise modified or replaced, compromised, canceled, discharged, subordinated, accelerated, waived, forborne from exercising any right or remedy relating to or adversely affected any obligation of any Person (including, but not limited to, any Account Debtor) relating to any of the Collateral.

g.    **Accounts and General Intangibles.** Each Account and General Intangible included in the Collateral is or, if not now existing, will be genuine, in all respects what it purports to be and enforceable in accordance with its terms against each Person (including, but not limited to, any Account Debtor) obligated with respect thereto, subject to no demand, claim, counterclaim, setoff or defense.

h.    **Incorrect or Misleading Information.** The Debtor has not provided to the Secured Party or permitted to be provided to the Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect.

i.    **Taxes.** The Debtor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and there are no outstanding tax liens against the assets of any Debtor.

10.    **CERTAIN CONSENTS AND WAIVERS.**

a.    **Consents.** Except to the extent expressly provided in this Agreement, this Agreement shall not be modified or terminated, no Security Interest, no obligation of the Debtor pursuant to this Agreement and no right or remedy of the Secured Party pursuant to this Agreement arising or accruing as a result of this Agreement shall be impaired or otherwise adversely affected, and no such right or remedy shall be waived, by any act, omission or other thing, whether heretofore occurred or hereafter occurring. The Debtor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, to each act, omission and other thing, whether heretofore occurred or hereafter occurring, that would or might, but for such consent, modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest or any such obligation, right or remedy or operate as a waiver of any such right or remedy.

b.    **Waivers.** The Debtor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, each act and other thing upon which, but for such waiver, any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement would or might be conditioned.

11.    **NOTICES AND OTHER COMMUNICATIONS.** Each notice and other communication relating to this Agreement (i) shall be given in writing, (ii) if given by facsimile, shall be directed to the Secured Party at (716) 568-0266 and to the Debtor at his, her or its facsimile number set forth on the signature page of this Agreement, (iii) if given otherwise in writing, shall be directed to the Secured Party or the Debtor at their respective addresses indicated at the beginning of the Agreement or on the Signature Page to this Agreement and (iv) if sent by mail or overnight courier service, shall be deemed to have been given when deposited in the mail, first-class or certified postage prepaid, or accepted by any post office or overnight courier service for delivery, and to have been received by the Secured Party or the Debtor upon such Person's actual receipt thereof. Address and facsimile information may be updated by any notice sent in accordance with the preceding sentence. Each requirement under applicable law of reasonable notice of any event by the Secured Party to the Debtor shall be deemed to have been met if a notice of such event is given by the Secured Party to the Debtor at least 10 days before the date on or after which

Initials

such event is to occur.

## 12.   MISCELLANEOUS.

**a.    Reliance by Other Persons.** Each Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral may accept without any question any exercise by the Secured Party of any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**b.    Limitation on Security Interest.** The payment of the Obligations shall not be secured by any Security Interest to the extent of any amount in excess of the maximum amount the payment of which can be so secured without rendering such Security Interest unenforceable under applicable law as a fraudulent conveyance or transfer.

**c.    Obligations Relating to Collateral.** The grant or other creation of any Security Interest shall not constitute an assignment by the Debtor to the Secured Party of any obligation of the Debtor relating to any of the Collateral. The Debtor shall remain obligated to perform each such obligation, and the Secured Party shall not be obligated to perform any such obligation, whether or not the Secured Party exercises any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement. The only obligations of the Secured Party relating to the Collateral shall be, to the extent required by applicable law, to act in a commercially reasonable manner in exercising with respect to any of the Collateral any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement.

**d.    Liability.** If more than one Person executes this Agreement, (i) each of them shall be jointly and severally liable pursuant to this Agreement, and (ii) this Agreement shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to the Secured Party a separate agreement identical to this Agreement.

**e.    Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by the Secured Party, the Secured Party shall have the right to assign or otherwise transfer or grant any participation in this Agreement, any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**f.    Binding Effect.** This Agreement shall be binding upon the Debtor and each direct or indirect legal representative, successor and assignee of the Debtor and shall inure to the benefit of and be enforceable by the Secured Party and each direct or indirect successor and assignee of the Secured Party.

**g.    Entire Agreement, Modifications and Waivers.** This Agreement contains the entire agreement between the Secured Party and the Debtor with respect to the subject matter of this Agreement and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of the Secured Party with respect thereto. No action heretofore or hereafter taken or not taken, no course of conduct heretofore or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation heretofore made, and no agreement or representation hereafter made other than in writing, by or on behalf of the Secured Party shall modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or operate as a waiver of any such right or remedy. No modification of this Agreement or waiver of any such right or remedy shall be effective unless made in a writing duly executed by the Secured Party and specifically referring to such modification or waiver.

27

Initials

**043**
000022

h.    Rights and Remedies Cumulative. All rights and remedies of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be cumulative, and no such right or remedy shall be exclusive of any other such right or remedy.

i.    Extent of Consents and Waivers. Each consent and waiver of the Debtor contained in this Agreement shall be deemed to have been given to the extent permitted by applicable law.

j.    Exercise of Rights; Requests. Except as expressly provided in this Agreement, each right and remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement may be exercised (i) at any time and from time to time, (ii) in the sole discretion of the Secured Party, (iii) without any notice or demand of any kind and (iv) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed, but the Secured Party shall not be obligated to exercise any such right or remedy. Each such right and remedy may be exercised only to the extent that the exercise thereof does not (i) violate applicable law or (ii) if requiring the Debtor to take any action, require the Debtor to violate any ethical or disciplinary rule, regulation or law governing non-disclosure of confidential information by an attorney or prohibiting the unauthorized practice of law. Each request by the Secured Party pursuant to this Agreement may be made (i) at any time and from time to time, (ii) in the sole discretion of the Secured Party and (iii) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed.

k.    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

l.    Governing Law. This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York without regard to principles of conflicts of laws.

m.    Headings. In this Agreement, headings of sections are for convenience of reference only and have no substantive effect.

13.   CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.

a.    JURISDICTIONAL CONSENTS AND WAIVERS. THE DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY CONSENTS AND AGREES THAT ANY ACTION OR OTHER LEGAL PROCEEDING COMMENCED BY THE SECURED PARTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF SUCH ACTION; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN POSSESSION OR FORECLOSURE UPON ANY COLLATERAL, TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY SECURED PARTY AGAINST DEBTOR OR WITH RESPECT TO ANY COLLATERAL, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS AGREEMENT OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY SECURED PARTY. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND DEBTOR HEREBY WAIVES ANY OBJECTIONS WHICH DEBTOR MAY HAVE BASED UPON LACK

28

Initials

OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT.

b.    WAIVER OF TRIAL BY JURY. THE DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT THE DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE OBLIGATIONS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL.

c.    SERVICE OF PROCESS. PROCESS ON DEBTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY <u>ONE</u> OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, POSTAGE PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO THE DEBTOR AT THE APPLICABLE ADDRESS SET FORTH IN THIS AGREEMENT. Such service shall be deemed in every respect effective service of process upon and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon the Debtor. Nothing in this Section shall affect the Secured Party's right to serve process in any other manner permitted by law. Debtor may add additional addresses or change the address for purposes of service of process by giving 10 days' prior written notice of such change to the Secured Party.

Dated: July 2, 2011

Girardi Keese

By: _____
Thomas V. Girardi, Partner
Facsimile No. 213 481 1554

29

Initials

**045**
000024

## EXHIBIT A

### QUESTIONNAIRE

1.  What is the Borrower's legal name?

    Girardi Keese

2.  What is the Borrower's jurisdiction of organization and business structure?

    General partnership under the laws of California

3.  What is the Borrower's Federal Employer Identification Number or Social Security Number?

    SSN  548 50 5134  (EIN# 95−2988995)

4.  What is the address (including state, county and zip code) of a business office of the Borrower?

    1126 Wilshire Blvd., Los Angeles, CA 90017

5.  What is the address (including state, county and zip code) of each location at which any Record included in the Collateral is or will be kept other than the locations the addresses of which are indicated in the answers to question 4?

    1126 Wilshire Blvd., Los Angeles, CA 90017

6.  In the case of any security interest or other lien covering any of the Collateral and existing on the date of this Agreement in favor of any Person other than the Secured Party, what are the complete name and address of each such Person in whose favor such security interest or other lien exists, and what is the nature of such security interest or other lien?

### Permitted Liens

| Name of Person | Address | Nature of Security Interest/Lien |
|---|---|---|
| Comerica Bank | 75 East Trimble Road San Jose, CA 95131 | blanket lien, as well as various specific security interests in certain accounts, contracts and deposits |
| Dell Financial Services L.P. | 12234 N. IH-35, Bldg. B Austin, TX 78753 | specific computer equipment |
| Key Equipment Finance Inc. | 1000 So. McCaslin Blvd. Superior, CO 80027 | specific leased equipment |
| Ikon Financial Svcs. | 1738 Bass Rd. Macon, GA 31210 | specific leased equipment |

30

Initials

Comerica Bank-California    333 W. Santa Clara St.    as to Thomas V. Girardi, certain specified shares
                           San Jose, CA 95113          of stock in Coast Resorts, Inc.

7.    What is the legal name and principal residence address of each Debtor other than the Borrower?

      None

31

Initials

**047**
000026

## ACKNOWLEDGMENT (SECURITY AGREEMENT)

STATE OF CALIFORNIA

COUNTY OF *Los Angeles*

On the _5¹ᵗ_ day of July in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as Partner of Girardi Keese, and that by his signature on the instrument, the entity upon behalf of which the individual acted, executed the instrument.

_Shirleen H. Fujimoto_
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1833089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2013

32

Initials

**048**
000027

## BORROWER'S CERTIFICATE

With respect to certain credit facilities to be extended by California Attorney Lending II, Inc., a New York corporation (the "Lender"), the undersigned certifies and verifies to Lender, its successors and assignees as follows:

1.    I am [check applicable box:]
      [  the duly elected and qualified President or Secretary
      [  the duly appointed Manager or other authorized Member
      ☑  a duly authorized Partner        of Girardi Keese, organized under the laws of California

2.    If the Borrower is a corporation or limited liability company, attached to this Borrowing Certificate as Schedule I is a correct and complete copy of, as applicable, the Certificate of Incorporation or Articles of Organization of the Borrower. If the Borrower is a partnership, attached to this Borrowing Certificate as Schedule I is a correct and complete copy of the publicly filed organizational document of the Borrower.

3.    If the Borrower is a corporation or limited liability company, attached to this Borrowing Certificate as Schedule II is a correct and complete copy of, as applicable, the By-Laws or Operating Agreement of the Borrower.

4.    If the Borrower is a general or limited liability partnership, attached to this Borrower's Certificate as Schedule II is a correct and complete copy of the Partnership Agreement of the Borrower.

5.    The resolutions attached to this Borrowing Certificate as Schedule III (collectively the "Resolutions") were duly adopted either (a) at a meeting of the board of directors, members or partners of the Borrower duly called and held on [specify date:]

      **July ___, 2011**
      which meeting a quorum was present and participated, or (b) by unanimous written consent of the directors, members or partners of the Borrower.

6.    None of the Resolutions has been rescinded, revoked or modified in any way.

7.    All of the Resolutions are in full force and effect.

8.    Neither any of the Resolutions nor any action taken or to be taken pursuant to any of the Resolutions (a) violates or will violate applicable law, any judgment or order of any court, agency or other governmental body by which the Borrower is bound, the Certificate of Incorporation, Articles of Organization, Certificate of Registration, By-Laws, Operating Agreement, Partnership Agreement or other governing document of the Borrower or any resolution or other action of record of the shareholders, directors or partners of the Borrower, (b) violates, will violate or constitutes or will constitute any default under any agreement, or instrument or other document by which the Borrower is bound or to which any of the Borrower's property is subject or (c) requires or will require any authorization of, notice to or other act by or relating to any individual, any court, agency or other governmental body or any other entity, body, organization or group (including, but not limited to, any shareholder, director, member, manager or partner of the Borrower) that has not been duly obtained, given or done and is not in full force and effect.

9.    Each of the following persons (individually a "Signer") (a) if the Borrower is a corporation or a limited liability company, has been duly elected to and qualified for and holds the office of the Borrower set opposite his or her name thereon, or (b) if the Borrower is a partnership, together constitute all of the partners of such partnership or (c) has been designated by Borrower as a person authorized to transact financial transactions on behalf of Borrower. Each Signer is duly authorized to execute the loan documents between Lender and the Borrower and is also authorized to make a Loan Request on behalf of the Borrower as that term is defined in the Note executed by Borrower to Lender:

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|

33

Initials

Thomas V. Girardi          Partner

10.    The signature set opposite each Signer's name on the list above is a true specimen of such Signer's signature.

11.    With respect to the borrowing of $3,500,000 by Girardi Keese from California Attorney Lending II, Inc., (i) the terms of the borrowing were negotiated in the State of New York, (ii) the drafting of the loan documents and the funding of the loan was in the State of New York (iii) the laws of the State of New York are intended by the parties to apply with respect to the construction, interpretation and choice of law governing all documents executed by the Borrower; and (iv) California Attorney Lending II, Inc. and its legal counsel are located within the State of New York. The loan was intended by the Lender and Borrower as a New York loan to be construed under New York law regardless of any other location of the Borrower or any guarantor.

12.    The Borrower has not granted or incurred any liens against its assets since the date of its loan application to Lender.

13.    The undersigned certifies that the Borrower and each Guarantor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and that there are no outstanding tax liens against the assets of any of them.

IN WITNESS WHEREOF, I have executed this Borrowing Certificate as of July __, 2011 and verify that all of the information contained herein is true and correct to the best of my knowledge being fully aware that Lender will rely on the accuracy of this Borrowing Certificate in extending credit facilities to Borrower.

Thomas V. Girardi

STATE OF CALIFORNIA
COUNTY OF Los Angeles.

On the 5th day of July in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

34

Initials

**050**
000029

## SCHEDULE I

## CERTIFICATE OF PARTNERSHIP

Initials

**051**
000030

# SCHEDULE II

## PARTNERSHIP AGREEMENT

36

Initials

**052**
000031

## SCHEDULE III

### Resolutions

### Girardi Keese (the "Borrower")
Organized under the laws of California

RESOLVED, that any officer, manager, member or partner of the Borrower (individually an "Authorized Person") be, and he or she hereby is, authorized, directed and empowered, acting alone, in the name or on behalf of the Borrower or otherwise, to transact with and through California Attorney Lending II, Inc. (the "Lender") all such business as he or she shall deem necessary or appropriate upon such terms as he or she shall deem necessary or appropriate (including, but not limited to, obtaining loans and other extensions of credit, guaranteeing or otherwise becoming contingently liable for obligations of others, applying for loans and other forms of credit and pledging, hypothecating, assigning, encumbering, granting security interests in and otherwise creating liens upon all assets including real and personal property, whether tangible or intangible, contingent or accrued, now owned or hereafter acquired ("Property") as security for loans and other extensions of credit and guaranties and other contingent liabilities) and, in connection with any such transaction of business, to do all such acts and other things as he or she shall deem necessary or appropriate (including, but not limited to, signing, drawing, endorsing, executing and delivering notes, guaranties, assignments, pledges, hypothecations, security agreements, mortgages, powers of attorney, confessions of judgment, indemnifications, receipts, waivers, releases and other agreements, instruments and other documents, making and receiving delivery of any Property, accepting, receiving, withdrawing and waiving demands and notices and incurring and paying liabilities, costs and expenses); and be it further

RESOLVED, that, without limiting the generality of the foregoing resolution, any Authorized Person be, and he or she hereby is, authorized, directed and empowered, acting alone, in the name or on behalf of the Borrower or otherwise, to obtain from the Lender revolving loans the total of the outstanding principal amounts of which does not at any time exceed $3,500,000 and to pledge, hypothecate, assign, encumber, grant security interests in and otherwise create liens on Property as security for such loans; and be it further

RESOLVED, that all loans and other extensions of credit heretofore obtained by the Borrower from the Lender, all actions heretofore taken by the Lender with respect to any Property of the Borrower and all transactions and agreements occurring or entered into between the Borrower and the Lender are ratified, approved and confirmed in all respects; and be it further

RESOLVED, that notwithstanding the dissolution or termination of existence of the Borrower or any change in the identity of or any modification or termination of any authority of any Authorized Person, the Lender may rely upon and act in accordance with the foregoing resolutions until it shall receive and have a reasonable time to act on a written notice to the contrary from an Authorized Person.

37

Initials

**053**
000032

## Key Loan Term Summary with Lender Forms

The following summary sets forth certain key terms in the Loan Documents between California Attorney Lending II, Inc. ("CAL") and Borrower and provides copies of forms required to be used by the Lender. THIS IS NOT A LEGAL DOCUMENT, it is not a complete listing of all rights and obligations of the parties under the Loan Documents, and is intended solely for the purpose of assisting Borrower in its administration of its Loan with CAL. In all events, the Loan Documents are controlling with respect to the parties' rights and remedies with respect to the Loan.

1.  Draw Requests: All Loan Requests are subject to the review and approval of CAL and must be submitted by e-mail or facsimile on the Draw Request form (attached).

2.  Purpose: The LOC will be used solely by Borrower to (i) refinance the Borrower's existing credit facilities (if any), (ii) pay the operating expenses of Borrower's legal practice, or (iii) fund interest payments on the LOC.

3.  Payment Terms: Months 1-24: Monthly interest only, except as described in "Mandatory Pre-Payments" below. Months 25-48: Monthly interest, plus 1/24 of the outstanding principal balance each month.

4.  Mandatory Pre-Payments: To the extent of outstanding interest and principal, 100% of all fees and reimbursed expenses from the following: (i) Award from the Vioxx Common Benefit Fund; (ii) Avandia litigation; (iii) Fogel v. Farmers Group, Inc. Line availability to be reevaluated upon the resolution and receipt of fees from these cases with adjustments made based upon remaining collateral.

5.  Interest: 18% per annum, payable on the 10th day of every month. Invoices are issued on the 1st day of every month. One month's interest in advance is payable to CAL at the closing and held on account, to be applied in the event timely payment is not made. We will require the Borrower to initiate preauthorized electronic funds transfers from a specified bank account to pay the interest on the 10th of every month.

6.  Fees and Charges: Borrower will be charged a closing fee equal to 3% of the LOC amount.

38

Initials

# *California Attorney Lending II, Inc.*

*Specialized Lending Exclusively For the Legal Community*

## AUTHORIZATION FOR LOAN PAYMENT
## AUTOMATIC WITHDRAWAL FORM

**Borrower's Information**

**Full Name:** GIRARDI KEESE

**SS# or EIN#:** EIN# 95-2988995 (Soc Sec #548 50 5134)

**Email Address:** tgirardi@girardikeese.com

**Borrower's Bank Information**

**Bank Name:** COMERICA BANK

**Bank ABA (Routing) No.** 121137522

**Bank Telephone No.** 562 463 6565

**Bank Address:** 13200 Crossroads Parkway North, Ste. 200, City of Industry, CA 91746

**Borrower's Bank Account No.** 1890686098

The undersigned on behalf of Borrower authorizes California Attorney Lending II, Inc. to initiate preauthorized electronic funds transfers from the bank account indicated above, and the undersigned authorizes the bank named above to debit the transfers to that account. This authorization shall not be revoked, modified, or in any other way altered without the express written consent of both the undersigned and California Attorney Lending II, Inc.

**Borrower:** GIRARDI KEESE

**Authorized Signature:** _____   **Date:** 7/15/11

**Name and Title of Signer:** Thomas V. Girardi, Partner

Return this Form and a Voided Check to California Attorney Lending II, Inc.

39

Initials

**055**
000034

# EXHIBIT 2

# UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Timothy C Cashmore
716-858-3883

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Damon Morey LLP
The Avant Building - Suite 1200
200 Delaware Avenue
Buffalo, NY 14202
USA

**DOCUMENT NUMBER:** 29534010002
**FILING NUMBER:** 11-7275806299
**FILING DATE:** 07/06/2011 09:08
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Girardi Keese | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1126 Wilshire Blvd. | Los Angeles | CA | 90017 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION general partnership | 1f. JURISDICTION OF ORGANIZATION CA | 1g. ORGANIZATIONAL ID#, if any ☒NONE |
|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any ☐NONE |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)**

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| California Attorney Lending II, Inc. | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6400 Main Street, Suite 120 | Williamsville | NY | 14221 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**
All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in
connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; and (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; all of Debtor's books related to the foregoing;

**5. ALT DESIGNATION:** ☐LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING

| ☐6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
Girardi Keese

**FILING OFFICE COPY**

000036

Page 2

# UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| 9a. ORGANIZATION'S NAME<br>Girardi Keese | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

| 10. MISCELLANEOUS: |
|---|
| |

DOCUMENT NUMBER: 29534010002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | 11a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 11c. MAILING ADDRESS | | CITY | | STATE | POSTAL CODE | COUNTRY |
| 11d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any | ☐NONE |

**12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| | 12a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 12c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

| 13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing. | 16. Additional collateral description: |
|---|---|
| 14. Description of real estate: | and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon. |
| 15. Name and address of RECORD OWNER of above-described real estate<br>(if Debtor does not have a record interest): | 17. Check only if applicable and check only one box.<br>Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate<br>18. Check only if applicable and check only one box.<br>☐ Debtor is a TRANSMITTING UTILITY<br>☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years<br>☐ Filed in connection with a Public-Finance Transaction - effective 30 years |

FILING OFFICE COPY

# EXHIBIT 3

000038

# UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Timothy C. Cashmore
716-858-3883

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Damon Morey LLP
The Avant Building - Suite 1200
200 Delaware Avenue
Buffalo, NY 14202
USA

DOCUMENT NUMBER: 30040950002
FILING NUMBER: 11-72814762
FILING DATE: 08/18/2011 08:35
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
11-7275806299

**1b. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.**

**2. ☐ TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

**3. ☐ CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4. ☐ ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any ☐ NONE |
|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; and (iii) all matters with respect to which the

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this amendment.

| a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Girardi Keese | | | |
| OR b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA**
Girardi Keese

FILING OFFICE COPY

000039

Page 2

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

| 11. INITIAL FINANCING STATEMENT FILE # (same as item 1a on Amendment form) |
| --- |
| 11-7275806299 |

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT**(same as item 9 on Amendment form)

| | 12a. ORGANIZATION'S NAME | | |
| --- | --- | --- | --- |
| | Girardi Keese | | |
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

DOCUMENT NUMBER: 30040950002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**13. Use this space for additional information**

Borrower is representing one or more individuals or estates against Southern California Regional Rail Authority d/b/a Metrolink, Connex Railroad, LLC and other defendants in the so-called "Chatsworth Metrolink Collision Cases" related to the Lead Case captioned and styled Magdaleno v. Southern California Regional Rail Authority dba Metrolink, Los Angeles County Superior Court, Case No. PC043703;

all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

**FILING OFFICE COPY**

# EXHIBIT 4

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
716-853-5100

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT LIEN SOLUTIONS      NMG
555 CAPITOL MALL
SUITE 1000
SACRAMENTO CA 95814
ACCT #10010537

**1373755925**

**08/28/2013 14:41**

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

39205220005  UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is |
|---|---|
| 117275806299 | to be filed [for record] (or recorded) in the ☐ REAL ESTATE RECORDS. |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor **or** ☐ Secured Party of record. Check only **one** of these two boxes.
Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME |
|---|
| **Girardi Keese** |

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME |
|---|
| |

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only **one** box.
Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

**See Attached Schedule A**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME |
|---|
| **California Attorney Lending II, Inc.** |

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA
CASOS #4384.78 Girardi Keese    39587536

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

International Association of Commercial Administrators (IACA)

000042

# SCHEDULE A

All of Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note) and Borrower's present and future right, title and interest in and to any and all legal fees and reimbursed expenses in connection with and/or derived from: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation and (iii) all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

# EXHIBIT 5

# LAW FIRM LEGAL FUNDING, CONSENSUAL EQUITABLE LIEN, ASSIGNMENT AND SECURITY AGREEMENT AND PERSONAL GUARANTEE

This Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement (the "Agreement") is made and effective as of the date accepted by TRANSFEREE defined as the date Agreement is signed by the Authorized Representative of Stillwell Madison, LLC (the "Effective Date") by and between Stillwell Madison, LLC, an Arizona limited liability company hereafter named TRANSFEREE, engaged in the business of making Legal Fundings, and Girardi & Keese, a California General Partnership dba Girardi/Keese, 1126 Wilshire Blvd, Los Angeles, CA 90017-1904 thereafter referred to as TRANSFEROR. TRANSFEROR and TRANSFEREE jointly referred to as the "Parties". With respect to the Agreement, DGMGT AZ, LLC, an Arizona limited liability company agrees to act as the relationship administrator between the Parties (the "ADMINISTRATOR").

BY THIS AGREEMENT, TRANSFEREE IS MAKING A LEGAL FUNDING TO TRANSFEROR TO BE USED FOR BUSINESS PURPOSES WHICH REPAYMENT IS BASED UPON THE SUCCESSFUL FUTURE OUTCOME OF THE CLIENT PORTFOLIO. TRANSFEROR HAS GRANTED A SECURITY INTEREST IN THE POTENTIAL FUTURE PROCEEDS FROM THE CLIENT PORTFOLIO TO TRANSFEREE BUT TRANSFEREE HAS ABSOLUTELY NO RIGHT TO AND WILL NOT MAKE ANY DECISIONS WITH RESPECT TO THE CONDUCT OF THE CLIENT PORTFOLIO OR ANY SETTLEMENT OR RESOLUTION THEREOF. THE RIGHT TO MAKE THOSE DECISIONS REMAINS SOLELY WITH TRANSFEROR AND/OR ITS LAW FIRM.

THIS AGREEMENT DEFINES ALL TERMS AND CONDITIONS OF THE LEGAL FUNDING BETWEEN TRANSFEROR AND TRANSFEREE.

**DEFINITIONS:** The following terms used throughout the Agreement and shall have the following meanings:

**"Account"**, means a right to payment of a monetary obligation, whether or not earned by performance.

**"Assignment"** means the TRANSFEROR immediately, totally, unconditionally, exclusively and irrevocably assigns, transfers, and conveys to TRANSFEREE all of TRANSFEROR'S control, right, title and interest in and to any and all claims of ownership including Proceeds and Payment Intangibles that are or may become due and payable to TRANSFEROR from the Client Portfolio or Proceedings. Such Assignment is effective as of the Assignment date.

**"Assignment Date"** means the date the event occurs where Proceeds from a Client Portfolio Case no longer are subject to a valid perfected security interest by the creditors listed in Schedule B, Exhibit B-2 Liens or Other Encumbrances On Payments Due To Transferor From Cases. Upon and simultaneously with the occurrence of such event, totally, unconditionally, exclusively, irrevocably and without the notice, TRANSFEROR grants TRANSFEREE the Assignment of Proceeds from such Client Portfolio Case. The Assignment Date is the same date as the Effective Date when, as of the Effective Date, a Client Portfolio Case is not secured by the creditors listed in Schedule B, Exhibit B-1.

**"Authorized Representative"** means a Person with binding authority to act on behalf of a Party; including but limited to the acceptance and execution of the Agreement, its Schedules, Exhibits, Modifications, Amendments, and such other supporting documents that may be required in accordance with the Agreement from time to time.

**"Bankrupt"** means a Person which has become the subject of an Order for Relief under the United States Bankruptcy Code, or has initiated, either in an original proceeding or by way of answer in any state insolvency or receivership proceeding, an action for liquidation arrangement, composition, readjustment, dissolution, or similar relief.

**"Case"** means Proceedings and Things in Action with respect to Clients, including all claims arising from the injury/incident/event including but not limited to a counter-claim, cross-claim, third party claim, whether

0000SM5000001

individual or combined with any other claim, whether resolved by mediation, arbitration, or any other alternative dispute resolution method, whether resolved by jury trial, settlement, or any other formal or informal resolution method, and including all forms of compensation including punitive damages, compensatory damages, loss of consortium and/or companionship, economic and non-economic damages, future and present damages whether reduced to present day value or not.

**"Case Resolution"** means an absolute end to the lawsuit, litigation or settlement of a Client claim resulting in a Payment Intangible which generates proceeds.

**"Client"** means the Persons provided by TRANSFEROR with Cases which fees and expenses are or may become due payable to the TRANSFEROR as listed or from time to time may be added to the Client Portfolio as specified by Schedule B in accordance with the Agreement.

**"Client Portfolio" or "Portfolio"** means the Clients and their Cases consider incorporated into Schedule B in accordance with and subject to the terms and conditions of the Agreement.

**"Contingent"** means repayment by TRANSFEROR is based solely on the successful and possible future outcome of the Client Portfolio where no current asset exists.

**"Controlled Account"** means a checking or interest bearing account subject to instruction agreed to by the Parties in accordance with the Agreement and set-up to receive Proceeds in the TRANSFEROR's name. TRANSFEROR agrees not to use this account for any other purpose other than to receive, hold cash from Proceeds, and to disburse such cash subject to the terms and restrictions of the Agreement, including but not limited to Schedule A Exhibit A-4 Disbursement of Funds.

**"Default"** means the following:

I.  Failure to pay in accordance with the provisions of this Agreement, including but not limited to avoiding or attempting to circumvent payment to TRANSFEREE as Proceeds become available to TRANSFEROR;

II.  Abandonment of any Client by TRANSFEROR that results in no similar replacement Client approved by TRANSFEREE, unless such Client is specifically exempted in Schedule B from such requirement;

III.  TRANSFEROR ceases to or is restricted from operating as a law firm, the practice of law or disallowed from receiving or sharing Legal Fees;

IV.  TRANSFEROR or any Owner withdraws monies or otherwise transfer to or pledges to another Person any monies in the Controlled Account without the written authorization of the TRANSFEREE;

V.  Intentional non-disclosure or concealment of (a) information that could have a material adverse effect on the value of a Client's Case, such information shall include but is not limited to, liability issues, damages, causation or pre-existing conditions and/or medical conditions/treatments or any court rulings that could have an adverse effect on the value of the Case;(b) Legal fundings to TRANSFEROR that remain unpaid that were provided by other Legal Funding companies or an individual other than TRANSFEREE which provide money either before (non-disclosed fraud) or after this agreement (breach);

VI.  Loss of TRANSFEREE'S priority position, for any reason, to receive payments from the Client Portfolio or any portion thereof;

VII.  TRANSFEROR not timely notifying or failing to notify TRANSFEREE as required by the Agreement, including but not limited to Sections 3, 8 and 11 notification requirements;

VIII.  Fraudulent activities by the TRANSFEROR or named signatories to the Agreement;

IX.  TRANSFEROR fails to notice TRANSFEREE of any settlement of Client Portfolio or to provide the proper notice to any appropriate Person, including but not limited to court, settlement masters, defendants and their counsel, insurance companies or other Persons to establish and maintain any third party administrator services or other arrangement to providing

0000SMR000002

Payments of Proceeds to TRANSFEREE as required by the Agreement, such that the TRANSFEREE's interests and payments are administrated for the benefit of the TRANSFEREE in accordance with the Agreement;

X.    Failure of TRANSFEROR to provide and direct co-counsel and other third parties or their Successor Persons who may receive Proceeds to irrevocably execute Instructions in accordance with Agreement;

XI.    The commencement of any Bankruptcy or insolvency proceeding by the TRANSFEROR or TRANSFEROR is found by court order to be insolvent or Bankrupt, whether through an involuntary or voluntary proceeding;

XII.    The commencement of any Bankruptcy or insolvency proceeding by any Owner where any Owner is found by court order to be insolvent or Bankrupt, whether through an involuntary or voluntary proceeding, which prevents the Transferor from bringing the Client Portfolio to final resolution and TRANSFEREE receiving TRANSFEREE Payments in accordance with the Agreement from such resolution;

XIII.    The appointment of a receiver to manage the assets of TRANSFEROR;

XIV.    Judgments against any Owner in excess of $100,000;

XV.    TRANSFEROR or any Owner who is an attorney is suspended or disbarred from the practice of law or otherwise suffers the loss of license or ability or right to practice law;

XVI.    The indictment, conviction or arrest of any owner for a serious crime, including but not limited to violent, property and financial crimes or commission of an act constituting common law fraud or any crime which could reasonably be expected to have an adverse impact on the TRANSFEROR, its business or assets;

XVII.    The death of any Owner that results in successor Person unacceptable to TRANSFEREE or cannot be accepted by all Parties;

XVIII.    TRANSFEROR approves changes to the creditor agreements listed in Schedule B, Exhibit B-2; or does not pay its obligations under and as required by such agreements.

XIX.    Any breach of the covenants representations, or warranties contained in this Agreement.

**"Effective Date"** the date the TRANSFEREE's authorized representative accepts and executes the Agreement as signed and accepted by TRANSFEROR's authorized representatives.

**"Equitable Lien"** arises from an express contract where the Parties indicate intent to charge particular property as security for an obligation. An equitable lien has (i) a debt or obligation owing by one person to another; (ii) a "res" or specific property to which the debt or obligation attaches; (iii) an intent, express or implied, that the property serve a security for the payment of the debt or obligation; and (iv) a lack of an adequate or complete remedy by an action at law. As a matter of contract law, an Equitable Lien becomes mature and legally enforceable with prior Notice to TRANSFEROR of the Legal Funding.

**"General Intangible"** means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, oil, gas, or other minerals before extraction. The term includes Payment Intangibles and software.

**"Instructions"** means TRANSFEROR's irrevocable written directions, in accordance with the Agreement, given to third parties.

**"Lawsuit"** means a claim for damages that you possess against the defendant and the action that you have filed to collect damages from the Case Defendant(s).

**"Legal Funding"** means money pre-paid by TRANSFEREE to the TRANSFEROR in anticipation of TRANSFEROR'S receipt payment from certain future and pending Proceeds which may arise from settlement, judgment or other conclusion resulting from the Proceedings.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

0000SM000003

**"Legal Fee"** means the portion of the Payments due to TRANSFEROR from Clients or co-counsels, including but not limited to any contingent, quantum meruit, or hourly rate fees, collected by TRANSFEROR or co-counsel from Proceeds, after deducting payments made to referring attorneys and associated outside counsel pursuant to a fee sharing agreement or arrangement (whether or not in writing) disclosed to the TRANSFEREE, which disclosure is incorporated into the Agreement prior to the Agreement Effective Date or approved in writing by TRANSFEREE after the Agreement effective date. For avoidance of doubt, if TRANSFEROR does not disclose such fee sharing agreement or arrangement as stated in this definition, then such payments that would have been made by TRANSFEROR from payments collected by TRANSFEROR from Proceeds made to referring attorneys and associated outside counsel pursuant to a fee sharing agreement or arrangement shall not be so paid and become a Payment due to TRANSFEREE in accordance with the Agreement.

**"Loan"** means a debt or obligation for which there is an absolute entitlement to repayment.

**"Owner"** means a Person which has ownership interest in the TRANSFEROR, such ownership interest may include, but not limited to a sole proprietor, partnership, membership or shareholder interest.

**"Monetary Obligation"** means an obligation to pay or receive money.

**"Payment"** means money or anything of value paid to satisfy obligations.

**"Payment Intangible"** means a general intangible under which the account debtor's principal obligation is a monetary obligation and the contractual right to payment is sufficiently liquidated.

**"Person"** means any natural person (if married, husband and wife), company, proprietorship, limited partnership, general partnership, limited liability partnership, limited liability corporation, corporation, joint venture, association, or other organization irrespective of whether it is a legal entity.

**"Proceeds"** means money, Payment Intangibles or anything of value that TRANSFEROR is due from Proceedings from any source, whether paid by single or multiple payors, including but not limited to payments from (i) the Client; (ii) co-counsel, any other third parties or their successor Persons; (iii) defendants and their law firms; (iv) claims processors; (v) insurers; (vi) trustees; and (vii) court stipulations.

**"Proceedings"** means any legal or civil claim for damages or any other compensation that Clients possess against the Case defendants or from Related Proceedings.

**"Related Proceedings"** means any claim or causes of action with the same or substantially the same operative facts or allegations arising out of the Proceedings including but not limited to filing in a different jurisdiction, adding additional Persons, and/or asserting a claim for legal malpractice, fraud, or breach arising from the handling or mishandling of the underlying Case.

**"Schedule"** means the attachments to the Agreement labeled "Schedule". Each Schedule may include the Schedule's associated Exhibit(s), e.g. Schedule A Includes Exhibits beginning with A-1; Schedule B includes Exhibits beginning with Exhibit B-1, and so on. A reference to a Schedule also is a reference to the Exhibits associated with such Schedule, unless such reference also specifies a Schedule's Exhibit, then such reference is to such Exhibit. All Schedules are incorporated within and part of the Agreement.

**"Thing in Action"** means any claim, debt or obligation upon which a future recovery may be made in Proceedings.

**"TRANSFEREE"** means the Person named as TRANSFEREE in the first paragraph of the Agreement.

**"TRANSFEROR"** means the Person referred to as the TRANSFEROR in the first paragraph of the Agreement.

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 4 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

**"TRANSFEREE Payment"** means in the event TRANSFEROR receives Legal Fee Payments and expense reimbursement Payments from Proceeds, TRANSFEREE shall in accordance with the Agreement **receive 100% of such Payments**, including but not limited to the terms and conditions as set forth in Schedule A, until such time that TRANSFEROR has fully satisfied its Agreement obligations to TRANSFEREE; except if TRANSFEROR is in default of the Agreement, then TRANSFEROR shall pay all of such Payments to TRANSFEREE from the Proceeds from the Client Portfolio until TRANSFEROR has fully satisfied its Agreement obligations, including but not limited to satisfaction of remedies, penalties and all other payments that may become due to TRANSFEREE as a result of such TRANSFEREE Agreement Default. For the avoidance of doubt, the Monthly Maintenance Fee as stated in Schedule A Exhibit A-3 Monthly Maintenance Fees are paid from the TRANSFEREE's operating account are not TRANSFEREE Payments and do not reduced the amount owed by TRANSFEROR with respect to repayment of the Legal Funding and its accrued Premium as stated in Schedule A Exhibit A-1 Premium Accrual and Legal Funding Payment Obligation.

### RECITALS:

Whereas, TRANSFEROR has been retained as legal counsel in the Client Portfolio and has signed agreements with Clients and has or may in the future enter into co-counsel or other fee sharing agreements with other law firms or lawyers;

Whereas, TRANSFEROR is desirous of obtaining Legal Funding from TRANSFEREE to pay for it business purposes only including but not limited to Client costs and other associated expenses attendant to operating a law practice;

Whereas, TRANSFEROR is aware of the fees associated with Legal Funding and has considered all other alternative avenues of commercial funding including loans from banks and other Persons that lend money;

Whereas, TRANSFEROR desires to obtain this Legal Funding from TRANSFEREE pursuant to this Agreement in order to enable TRANSFEROR to acquire new Clients, better service TRANSFEROR'S Clients and pay for operating expenses during the pendency of the Client Portfolio and TRANSFEROR has no assets against which they can or desire to borrow;

Whereas, the Parties acknowledge that the ADMINISTRATOR has brought the Parties together solely for the business purposes contemplated by the Agreement; that the Parties recognized the ADMINISTRATOR and its affiliates have a unique and confidential business relationship with TRANSFEROR such that TRANSFEREE shall not conduct any further business with TRANSFEROR not specifically allowed by the Agreement or circumvent the Agreement to do so; the Parties desire the relationship between the Parties be administered by the ADMINISTRATOR such that all communications between the Parties shall be made through the ADMINISTRATOR and not directly between the parties unless otherwise stated in the Agreement;

Whereas, in order to afford TRANSFEROR sufficient funds to acquire new Clients, adequately service the Clients, to prosecute the Client Portfolio and carry on its operations, TRANSFEREE has agreed to provide Legal Funding for business purposes to TRANSFEROR in consideration for an equitable lien on, and Assignment of, the Proceeds which may arise from the Proceedings and any Payment Intangible arising from the Client Portfolio. TRANSFEREE acknowledges that the outcome of the Proceedings is uncertain, unpredictable, and involves risks beyond the Parties' control which could result in no payment or recovery of Proceeds by the TRANSFEROR against the Defendant(s) or others arising out of Proceedings; and

Whereas, TRANSFEROR and its duly authorized representative has authority to enter into this Agreement.

### COVENANTS:

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 5 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

Now, THEREFORE, in consideration of the sum as stated in Schedule A and other good and valuable consideration, the receipt and acceptability of which is hereby acknowledged, TRANSFEREE and TRANSFEROR do hereby agree as follows:

1.      TRANSFEROR and TRANSFEREE hereby incorporate the Recitals and Definitions into the terms and conditions of this Agreement by this reference. TRANSFEROR acknowledges and agrees that the foregoing Recitals and Definitions are true and correct and, in particular, that TRANSFEROR has been informed by TRANSFEREE and is aware that alternative methods of financial assistance including, among others, credit card advances, bank loans, or personal loans from family or friends, may be available to TRANSFEROR and provide TRANSFEROR with more favorable rates, fees, repayment schedules, or other terms. Notwithstanding such alternative methods of financial assistance, TRANSFEROR acknowledges and agrees that obtaining Legal Funding from TRANSFEREE is voluntary, is in the best interest of TRANSFEROR, and will greatly assist TRANSFEROR to better service TRANSFEROR'S clients and pay expenses during the pendency of this Client Portfolio.

2.      TRANSFEROR agrees to the Assignment. TRANSFEROR warrants, represents, and covenants to TRANSFEREE that, as of the Effective Date TRANSFEROR shall not assign any right, title and interest in the future Proceeds or Payment Intangible from the Client Portfolio or any related proceedings to any other Person unless TRANSFEREE has approved and TRANSFEREE has approved in writing to such action by TRANSFEROR. TRANSFEROR also agrees to cause all Assigned Proceeds or Payment Intangible from the Client Portfolio or Proceedings to be paid to TRANSFEREE to the extent of the maximum amount referenced in Schedule A. TRANSFEROR has a valid (i) client retainer, (ii) co-counsel, or (iii) other fee sharing agreement on all Proceeds pledged in Schedule B and all such payment obligations to TRANSFEROR are fully disclosed, valid and enforceable.

3.      TRANSFEROR hereby also grants to TRANSFEREE a security interest in all General Intangibles, including any Thing in Action or Payment Intangible, associated with or arising from the Client Portfolio, Proceedings, or TRANSFEROR'S rights therein subject to an Assignment, to the extent of the maximum amount referenced in Schedule A to secure the conveyance and payments described in this Agreement. TRANSFEROR hereby authorizes and agrees to cooperate with TRANSFEREE to file a UCC1 Financing Statement, Consent Judgment if included in Agreement as a Schedule, and other documents as well as notifying any, co-counsels, appropriate courts, defendants, their counsels, insurance companies, settlement masters and other interested Persons as may be desired by TRANSFEREE to perfect or protect its security interest in all such General Intangibles. TRANSFEREE acknowledges and agrees that this Agreement creates a contractual right for TRANSFEREE to receive TRANSFEREE Payment in accordance with the Agreement from future Proceeds and Payment Intangible from the Client Portfolio or Proceedings whenever any such Case or Proceeding settles or is reduced to a judgment and, as such, at that time, automatically and immediately becomes a perfected security interest in a Payment Intangible or an Account regardless of whether any UCC-1 Financing Statement is filed. TRANSFEROR acknowledges and agrees that at the time the TRANSFEROR'S Payment Intangible or becomes a perfected security interest, it then becomes Proceeds from which TRANSFEREE shall receive TRANSFEREE PAYMENT.

4.      TRANSFEROR understands the above-mentioned Legal Funding provided by the TRANSFEREE to be a pre-payment of TRANSFEROR's possible recovery of Proceeds or Payment Intangible and such Legal Funding shall be used exclusively for TRANSFEROR's business purposes. TRANSFEREE shall not provide funding until such time that all itemized TRANSFEREE's expenses have been reimbursed and all documents requested by TRANSFEREE are executed to the TRANSFEREE's satisfaction. TRANSFEREE acknowledges it is providing Legal Funding for the certain future Proceeds or Payment Intangible which may arise from the Proceedings.

When all amounts required to be paid to TRANSFEREE pursuant to the Agreement, have been paid in full, TRANSFEROR shall owe no additional payment to TRANSFEREE. TRANSFEROR understands and agrees that, in the event TRANSFEROR is paid settlement Proceeds from one of potential multiples sources or at multiple times (whether there are multiple defendants, claims or lawsuits, co-counsels or insurers), TRANSFEREE

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 6 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

shall receive the TRANSFEREE Payment in accordance with the Agreement until TRANSFEREE is paid in full. In the event that such amounts paid to the TRANSFEREE are not sufficient to satisfy the amounts owed to TRANSFEREE and Client Cases remain unresolved, TRANSFEREE shall be entitled to continue to receive TRANSFEREE Payment which, upon receipt, such amount paid to the TRANSFEREE will be first applied to reduce the Premium until reduced to zero then the balance of such amount paid to the TRANSFEREE, if any, will be applied to reduce the Legal Funding until reduced to zero. TRANSFEROR may request in writing, after each such Payment, that TRANSFEREE prepare a revised Schedule A showing the remaining total balance owed by TRANSFEROR to TRANSFEREE.

If, at their sole discretion, both TRANSFEREE and the ADMINISTRATOR approve future Legal Fundings to TRANSFEROR and TRANSFEROR accepts such additional Legal Fundings, then, in addition to the TRANSFEREE Payment process defined in this section, Schedule A, Exhibit A-5 will determine the allocation of TRANSFEREE Payments among existing and such future additional TRANSFEROR Legal Fundings agreements. Such future fundings, if any, shall be agreed to by the Parties and may be incorporated into the Agreement as an amendment or by completion of a separate funding agreement. For the avoidance of doubt, TRANSFEREE Payments may be applied at the sole discretion of the TRANSFEREE to one, several or all TRANSFEROR Legal Fundings agreements with TRANSFEREE in accordance with such Legal Fundings agreements.

TRANSFEROR understands, acknowledges, and agrees that TRANSFEREE shall be entitled to receive TRANSFEREE Payments from any Proceeds or Payment Intangible in accordance with the Agreement until TRANSFEREE is paid in full for all amounts owed to TRANSFEREE under this Agreement. TRANSFEROR also understands acknowledges, and agrees that TRANSFEROR shall not dispose of, encumber, or pledge as security all or any portion of the Proceeds, Payment Intangible, or any other interest in the Client Portfolio or claims from Proceedings unless (i) TRANSFEREE has approved and TRANSFEREE has agreed to such subordination or disposal in Schedule B. or (ii) until TRANSFEREE is first paid in full for all amounts owed to TRANSFEREE under this Agreement.

5.     The Parties acknowledge and agree that this Agreement is expressly intended to transfer, convey and relinquish control over only a specified portion of the Proceeds which may result from the Client Portfolio or Proceedings. Prior to the resolution of any Case in the Client Portfolio, TRANSFEREE AND ADMINISTRATOR agree that they shall have no right to and will not make any decisions with respect to the conduct of the underlying civil actions or claims or any settlements or resolution thereof and that the right to make those decisions remains solely with TRANSFEROR.

6.     TRANSFEROR acknowledges that this lien in addition to an Assignment also becomes a mature, equitable lien enforceable under basic contract law and that any Court, a Settlement Master of a QSF, Third Party Administrator, co-counsel, the defendant's and/or their counsel or insurance company may be notified of this lien and could be requested to protect the interests of Transferee and/or disburse the Proceeds in accordance with the Agreement.

7.     TRANSFEROR acknowledges and agrees that the Legal Funding provided herein shall be used by TRANSFEROR only for business purposes which generally include expenses related to Cases and Proceedings, acquiring additional Cases, expenses associated with operating a law practice during the pendency of the Cases and payments as stated in the Agreement.

8.     TRANSFEROR understands and agrees to the following (i) timeframes to notice ADMINISTRATOR of specified events; and (ii) other specified conditions and actions:

(a) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within five (5) business days if TRANSFEROR is (i) discharged, (ii) acquires co-counsel or other fee sharing arrangement, or (iii) otherwise relieved of its responsibilities to any Client(s) in any of the Cases or Proceedings and that TRANSFEROR'S obligations under this Agreement shall remain in full force and effect.

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 7 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

(b) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within five (5) business days if the creditor agreements listed in Schedule B, Exhibit B-2 (i) have been changed or modified; (ii) the TRANSFEROR requests or is made aware of a request to change or modify such agreements; (iii) TRANSFEROR does not pay amount due under and as required by such agreements; or commits an act that is a default of any such agreement.

(c) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within five (5) business days in the event any attorney who is a partner, shareholder, member, employee or associate counsel of TRANSFEROR leaves the TRANSFEROR, whether voluntarily or by resignation, dismissal, retirement or otherwise; and that any Proceeds which may result from the Client Portfolio or Proceedings that may be claimed by such attorney shall remain the property of the TRANSFEROR unless such requirement contradicts an agreement between such attorney and the TRANSFEROR, or in absence of such an agreement, such requirement is determined to be professionally unethical by the Parties. For the avoidance of doubt, regardless of the foregoing, TRANSFEROR agrees that no portion of said Proceeds shall be released, paid, or distributed to said attorney until all Legal Fees from said Client have been paid in full to TRANSFEREE in accordance with the Agreement. TRANSFEREE'S security interest in the Proceeds and Payment Intangible shall also continue unaffected by TRANSFEROR'S discharge of such attorney.

(d) TRANSFEROR understands and agrees (i) TRANSFEROR shall be responsible to keep ADMINISTRATOR apprised of the status of all Clients and their Cases; (ii) that TRANSFEROR shall provide written notice to ADMINISTRATOR within five (5) business days in the event that a Client is no longer is represented by the TRANSFEROR or TRANSFEROR's co-counsel for any reason other than the Client's Case is settled or resolved, and TRANSFEROR shall immediately replace the Client's (unless such Client is specifically exempted in Schedule B from such requirement) with Client's with Cases of like kind and value acceptable to the TRANSFEREE such that TRANSFEREE will be placed in the same or similar position as TRANSFEREE prior to loss of such Client; (iii) TRANSFEREE shall have the right in accordance with this Agreement to protect its interest in such Clients and their Cases though all legal remedies including, but not limited to, notifying any attorneys or Persons involved in the continuation of the Client's Case ensuring that TRANSFEREE receives all amounts due to TRANSFEREE in accordance with the Agreement; and (iv) TRANSFEROR shall also take any action and sign any document reasonably requested by TRANSFEREE to enable TRANSFEREE to protect and enforce TRANSFEREE's rights under this Agreement with respect to any new attorney or creditor of such Client.

(e) TRANSFEROR understands and irrevocably agrees that it shall (i) provide written notice to ADMINISTRATOR within 48 hours in the event TRANSFEROR is unable to practice law for any reason (ii) upon such event, all Client Portfolio Clients will be referred by TRANSFEROR or by TRANSFEROR's successor controlling Person or Persons in accordance with the Succession Agreement Schedule or, if unable to perform such Succession Agreement to the TRANSFEREE's sole satisfaction, then to other counsel acceptable to TRANSFEREE, which shall become the counsel for TRANSFEROR's Clients upon Clients' acceptance of such counsel, however such referral shall not become effective and operative if there is a successor Person to the TRANSFEROR which is acceptable to the TRANSFEREE, provided such Person agrees to be bound by, empowered to and able to fully comply with the Agreement. The TRANSFEREE shall not refuse a reasonable successor Person, who in the opinion of the TRANSFEREE is qualified to fully execute the terms and conditions of the Agreement.

(f) TRANSFEROR agrees to release to ADMINISTRATOR, within 48 hours after request by ADMINISTRATOR unless ADMINISTRATOR agrees to a written extension, any/all information, files, records and documents for the duration of this Agreement regarding the subject matter and status of any Client and their Case, except TRANSFEROR shall not be required to release those portions of a Client's file which are subject to a confidentiality agreement that prohibits TRANSFEROR from forwarding copies of such Case files or disclosing the same to the ADMINISTRATOR unless ADMINISTRATOR complies with the confidentiality requirements to release such information to the

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 8 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

ADMINISTRATOR. To the extent ADMINISTRATOR or TRANSFEREE receives information deemed confidential by TRANSFEROR then ADMINISTRATOR or TRANSFEREE shall treat such information as confidential and shall receive and review these materials solely in the limited capacity necessary for the initial review and underwriting process as well as the ongoing execution and maintenance of this Agreement. In that regard, TRANSFEROR shall make available to ADMINISTRATOR the files for all of the Clients and their Cases upon reasonable notice so that ADMINISTRATOR can perform an onsite audit of each Case if ADMINISTRATOR elects to do so. The cost of such audit shall be reimbursed by TRANSFEROR. Furthermore, TRANSFEROR shall immediately notify ADMINISTRATOR by both fax at (480) 522-1199 or phone at (480) 515-3698 of any settlement, judgment, appeal or verdict or other conclusion of any of the Cases or other related proceedings in order for TRANSFEREE to take any action reasonably required by TRANSFEREE to protect and enforce TRANSFEREE'S rights under this Agreement. TRANSFEROR further agrees to provide TRANSFEROR's annual Financial statements (audited or unaudited) for each year the Legal Funding is outstanding to ADMINISTRATOR. Within fourteen days of request, TRANSFEROR will provide all related bank statements and trust account statements for each month that the Legal Funding is outstanding to ADMINISTRATOR. Nothing in this paragraph will require the TRANSFEROR to produce any confidential information, attorney-client information, work product information or any other Client information deemed to be prohibited by the applicable code of legal ethics.

(g) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within 5 business days after a Client has entered into a Master Settlement Agreement or otherwise has agreed to a settlement; and then TRANSFEROR shall insure all Proceeds including amounts due to TRANSFEREE are collected in accordance with the Agreement, including but not limited to Schedule A.

(h) TRANSFEROR understands and agrees that it shall provide reports to ADMINISTRATOR, upon ADMINISTRATOR's request, in a form acceptable the ADMINISTRATOR and within 5 days after such request unless such timeframe is extended by the ADMINISTRATOR. Unless otherwise agreed to by ADMINISTRATOR, the TRANSFEROR shall send a report to ADMINISTRATOR detailing all the Client Cases and their Proceedings showing the current status of each Case, whether any settlement discussions have taken place, whether any offers have been made, and when TRANSFEROR anticipates that each Case will resolve. If TRANSFEREE learns that the report has material errors or omissions, TRANSFEREE may proceed as if a Default has occurred.

(i) TRANSFEROR understands and agrees that ADMINISTRATOR may audit the client Case portfolio twice per year unless TRANSFEROR is default of the Agreement, then ADMINISTRATOR may audit the client Case portfolio more frequently as requested by TRANSFEREE until such time the default is cured. Such audits may require review of Case information at the TRANSFEROR's site and typical travel and related costs for such audits shall be paid by the TRANSFEROR as required by the ADMINISTRATOR.

(j) TRANSFEROR understands and agrees that the Legal Funding advanced by TRANSFEREE to TRANSFEROR has been provided for TRANSFEROR's business purposes and TRANSFEROR shall exclusively and only use such funding for business purposes.

(k) TRANSFEROR acknowledges and agrees each and all Schedules, Exhibits, addendums or other attachments attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference. TRANSFEROR also agrees to execute each for the foregoing Schedules where indicated and required and that they are doing so voluntarily, freely, and without duress. TRANSFEROR agrees that by executing the Agreement, TRANSFEROR does so with prior knowledge of the Agreement and its Schedules, Exhibits, addendums or other attachments. TRANSFEROR understands and agrees that the executed Agreement with each of the executed Schedules needs to be provided to ADMINISTRATOR for TRANFEREE's review and decision to accept or not accept the Agreement where such decision is at the sole discretion of the TRANSFEREE.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

9.      By signing this Agreement, TRANSFEROR warrants, represents, and covenants to TRANSFEREE that TRANSFEROR (i) has not filed a personal or business Bankruptcy within the previous two years; (ii) is not currently in the process of filing any form of Bankruptcy; and (iii) has not consulted with a counsel concerning personal or TRANSFEROR Bankruptcy within the previous 365 days, unless such consultation has been disclosed in writing to the TRANSFEREE. In the event that TRANSFEROR files any Bankruptcy proceeding subsequent to entering into this Agreement, TRANSFEROR shall promptly notify ADMINISTRATOR of that fact in writing. In addition, if the TRANSFEROR files Bankruptcy proceedings prior to the payoff of all amounts required to be paid to TRANSFEREE pursuant to this Agreement, TRANSFEROR agrees to notify the Bankruptcy court that the TRANSFEROR previously assigned the Client Portfolio Proceeds to the extent of the maximum amount stated in Schedule A pursuant to this Agreement, that TRANSFEROR no longer owns those Proceeds and that those Client Portfolio Proceeds to the extent of the maximum amount referenced in Schedule A are not available as part of any Bankruptcy estate, and that TRANSFEREE is a secured creditor and has a priority position to the Client Portfolio Proceeds superior to any other creditor as a result of this Agreement unless TRANSFEREE has approved and TRANSFEREE has agreed to such subordination in Schedule B. TRANSFEROR acknowledges and agrees that TRANSFEREE has provided Legal Funding(s) to TRANSFEROR in return for TRANSFEROR'S Assignment of the Client Portfolio Proceeds and that TRANSFEROR's obligations to TRANSFEREE pursuant to this Agreement shall not be discharged, voided, or reduced in any way as a result of any Bankruptcy proceeding.

10.     TRANSFEROR acknowledges TRANSFEREE and ADMINISTRATOR initially authored the Agreement. TRANSFEROR acknowledges it is a law firm with resources and legal knowledge to review and interpret the Agreement or to seek qualified counsel to do so. Moreover, all terms of the Agreement were subject to negotiation between the Parties, with the final terms representing a meeting of the minds. Thus TRANSFEREE and ADMINISTRATOR are not the draftsmen of the Agreement and the rule of construction that ambiguities be resolved against the draftsmen do not apply to TRANSFEREE, TRANSFEROR or ADMINISTRATOR. TRANSFEREE, TRANSFEROR and ADMINISTRATOR shall keep the Agreement confidential except (i) between the Parties, their advisers who may be involved with the transactions contemplated by the Agreement provided such advisors are not in the business of providing legal funding or related services; (ii) under a confidentiality agreement in support of due diligence requests with respect to the TRANSFEREE's business activity; (iii) as required by law, regulatory requests; or to the extent any such information has become available in public domain. Any unauthorized use, reproduction, or transmittal of the Agreement whatsoever shall constitute copyright infringement and shall render the infringer liable to prosecution under the law. Attorneys, their firms and all employees of the firm are issued a 'Limited Use Permit' to use the Agreement to complete the process of the Legal Funding from the initial gathering of client information to the final execution of this Assignment and Consensual Equity Lien and Security Agreement. All file documents created by TRANSFEREE and ADMINISTRATOR shall be considered Amalfi Management, LLC and Neoconomy, LLC Proprietary Intellectual Property and confidential by all Parties and ADMINISTRATOR involved in this Agreement including the processes leading to approving the TRANSFEROR for a Legal Funding. Further, if the Legal Funding contemplated by this Agreement is made subsequent to a prior Legal Funding, the date of this Legal Funding shall relate back to the date of the first Legal Funding for purposes of establishing priority of payment. In addition, the Parties agree that any prior agreements shall be controlled by any subsequent change in the language of this Agreement to the extent the prior agreement(s) conflicts.

11.     This Agreement constitutes the entire agreement between the Parties. There are no representations, warranties, covenants, or obligation except as set forth herein. This Agreement supersedes all prior agreements, understandings, negotiations and discussions, written or oral, of the Parties, relating to any transaction contemplated by this Agreement. This Agreement shall be binding on and inure to the benefit of the Parties, their heirs, trustees, executors or any other successor-in-interest including another co-counsel who may obtain or assert control over the TRANSFEROR's assets for any reason including but not limited to disability (physical or mental), a decline in health or death. Also by executing the Agreement, TRANSFEROR, at the request of TRANSFEREE with approval from the ADMINISTRATOR, agrees to exercise a Power of Appointment with which TRANSFEROR and/or any representative of TRANSFEROR will be empowered to the extent necessary to complete the Transfer that is the subject of this agreement. In the

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

000054
SM000010

event one or more of the covenants, terms or conditions of this Agreement shall for any reason be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity, liability, or enforceability of any other covenant, term or condition in this Agreement.

12.     TRANSFEROR represents, warrants, and covenants unto TRANSFEREE that, as of the date of this Agreement,

(a) The Client Portfolio Cases and Proceedings to be meritorious and executed in good faith;

(b) TRANSFEROR Clients have complete right, title and interest in and to the claims set forth in Client Portfolio and Proceedings and TRANSFEROR has received no money, anything else of value, entered into an undisclosed agreement or taken any undisclosed action that would diminish the value of any the Client Cases;

(c) TRANSFEROR has not assigned or encumbered the Proceeds, Payment Intangible, or any other similar rights or assets from the Client Portfolio or other related proceedings, other than agreed to and so specified in the Agreement;

(d) TRANSFEROR stipulates that all amounts required to be paid to TRANSFEREE pursuant to this Agreement are not subordinated to any other liens or claims of any other Person other than agreed to and so specified in the Agreement;

(e) TRANSFEROR shall have the obligation to cure or remedy any unintentional breach of (a) through (d) of this section by replacing Cases, unless such Case is specifically exempted in Schedule B from such requirement, in the Client Portfolio with similar Cases of like kind and value acceptable to the TRANSFEREE within ten days of the TRANSFEROR's communication of such breach to ADMINISTRATOR. The cure will only be effective after TRANSFEREE, at its sole, discretion, accepts the replacement Cases in writing.

(f) All current liens, assignments, co-counsel agreements and fee sharing arrangements, encumbrances or security interest of any kind or nature in or relating to Proceeds, Payment Intangible, or any other similar rights or assets from the Client Portfolio or Proceedings are listed in Schedule B;

(g) All Agreement financial and other terms have been are accurately and clearly stated by TRANSFEREE to TRANSFEROR;

(h) TRANSFEROR, to the extent required by the Agreement to be completed at time of closing, shall in accordance with the Agreement instruct co-counsels, Defendants, their insurers and counsel, third party administrators, escrow agents and settlement administrators to honor the provisions regarding payment of Client Portfolio proceeds as set forth in the Agreement such that there are no other agreements verbal, electronic or otherwise that modify such payment terms;

(i) TRANSFEROR has paid all of its federal, state, and local taxes through the date of execution of this agreement or has made and disclosed provisions for the payment;

(j) TRANSFEROR has disclosed to TRANSFEREE all material information about the Clients and their Cases as requested by the TRANSFEREE;

(k) There are no Bankruptcy or insolvency actions in progress involving TRANSFEROR, any equity holder of TRANSFEROR or Persons with controlling interests of such equity holder;

(l) All financial disclosures made to TRANSFEREE are complete and fairly characterize the financial position of TRANSFEROR;

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 11 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

(m) TRANSFEROR and all of its lawyers representing TRANSFEROR's Clients are in compliance with Bar, state and federal regulations to practice law and have not been indicted on any matters related to the practice of law, or are not presently subject to any investigation for any material disciplinary action by any state or federal court or authority (including any attorney registration & disciplinary commission or independent bar association) with regulatory powers or duties over attorneys;

(n) TRANSFEROR has full power and authority to make, execute, and perform this Agreement;

13. TRANSFEROR hereby waives any defenses to payment of all amounts required to be paid to TRANSFEREE pursuant to this Agreement. TRANSFEROR understands the Agreement's Instructions regarding payments due TRANSFEREE and such Instructions under this Agreement are irrevocable without which TRANSFEREE would not have agreed to provide the Legal Funding. TRANSFEROR hereby agrees to make Payments in amounts that are in full and complete compliance with this Agreement and not to seek to avoid payment of any such amounts by interfering with payment of or encouraging, cooperating with, instructing, or authorizing any Person to delay payment or not to pay or distribute any Proceeds from the Client Portfolio or Proceedings as required by the Agreement. TRANSFEROR shall also further cooperate with TRANSFEREE in procuring payment of all amounts required to be paid to TRANSFEREE under this Agreement.

14. In the event that TRANSFEROR terminates, materially defaults or otherwise breaches the covenants, conditions or terms of this Agreement, and fails to cure such Default in accordance with the Agreement, TRANSFEREE shall at its discretion exercise any or all remedies available to enforce the Agreement and to collect all amounts due TRANSFEREE, including but not limited to recovering costs from TRANSFEROR of amounts for attorney fees and other expenses to make TRANSFEREE whole. TRANSFEROR expressly acknowledges that in the event of termination or Default which is not or cannot be cured in accordance with the Agreement, the anticipated loss to TRANSFEREE in such an event will be estimated to be the amount set forth as liquidated damages and such estimated value is reasonable and not imposed as a penalty. The Parties agree that liquidated damages to TRANSFEREE shall be in the amount of 20% of the Schedule A total amounts due to TRANSFEREE which shall be in addition to the total amount due TRANSFEREE as set forth in Schedule A.

15. Any and all claims, counterclaims, demands, causes of action, disputes, or controversies under this Agreement or the alleged breach of any provision hereof (all of which are referred to as "Disputed Claims"), whether such Disputed Claims arise at law or in equity, under US state or federal law, or the law of any other nation or state, for damages or any other relief, shall be resolved in the manner set forth below:

(a) The Parties to this Agreement agree that all Disputed Claims, which shall include any dispute, controversy or claim that may arise between or among them in connection with, arising out of, or otherwise relating to this Agreement or the application, implementation, validity or breach of this Agreement or any provision of this Agreement (including, without limitation, claims based on contract, tort or statute), shall be finally, conclusively and exclusively settled by binding arbitration in Phoenix, Arizona in accordance with the arbitration rules (the "Rules") of the National Arbitration Forum (NAF) or JAMS or any successor thereto then in effect. **THE PARTIES HEREBY EXPRESSLY WAIVE THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO TRIAL BY JURY, WITH RESPECT TO ANY MATTER SUBJECT TO ARBITRATION PURSUANT TO THIS AGREEMENT. THE PARTIES AGREE THAT THERE SHALL BE NO AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR PRIVATE ATTORNEY GENERAL BASIS. FURTHERMORE, ARBITRATION CAN ONLY DECIDE EACH PARTY'S CLAIMS AND MAY NOT CONSOLIDATE OR JOIN THE CLAIMS OF OTHER PERSONS THAT MAY HAVE SIMILAR CLAIMS.** Any Party may bring an action, including, without limitation, a summary or expedited proceeding in any court having jurisdiction, to compel arbitration of any dispute, controversy or claim to which the provisions hereof apply. The initiation and conduct of arbitration shall be as set forth in the Rules, which Rules are incorporated in this Agreement by reference with the same effect as if they were set forth in this Agreement.

(b) The arbitration shall be administered by the NAF or JAMS. If the NAF and JAMS is unable or legally precluded from administering the arbitration, then the Parties shall agree upon an alternative arbitration organization, provided that, if the Parties cannot agree, such organization shall be selected by a judge of the United States District Court for the District that includes Phoenix, Arizona.

(c) All arbitration hearings shall be commenced within thirty (30) days after arbitration is initiated pursuant to the Rules, unless, upon a showing of good cause by a Party to the arbitration, the arbitrator permits the extension of the commencement of such hearing; provided, however, that any such extension shall not be longer than thirty (30) days.

(d) All claims presented for arbitration shall be particularly identified and the Parties to the arbitration shall each prepare a statement of their position with recommended courses of action. These statements of position and recommended courses of action shall be submitted to the arbitrator. The arbitrator shall not be empowered to make decisions beyond the scope of the position papers.

(e) The arbitration proceeding will be governed by the substantive laws of the State of Arizona and will be conducted in accordance with such procedures as shall be fixed for such purpose by the arbitrator. The Parties shall preserve their right to assert and to avail himself of the attorney-client and attorney-work product privileges, and any other privileges to which they may be entitled pursuant to applicable law. No Party to the arbitration or any arbitrator may compel or require mediation and/or settlement conferences without the prior written consent of all such Parties and arbitrator.

(f) The arbitrator shall make an arbitration award as soon as possible after the later of the close of evidence or the submission of final briefs, and the award shall be made not later than thirty (30) days following submission of the matter. The finding and decision of the arbitrator shall be final and shall be binding upon the Parties. Judgment upon the arbitration award or decision may be entered in any court having jurisdiction thereof or application may be made to any such court for a judicial acceptance of the award and an order of enforcement, as the case may be. The arbitrator shall have the authority to assess liability for pre-award and post-award interest on the claims, attorneys' fees, expert witness fees and all other expenses of arbitration as such arbitrator shall deem appropriate based on the outcome of the claims arbitrated. Unless otherwise agreed by the Parties to the arbitration in writing, the arbitration award shall include findings of fact and conclusions of law.

(g) **EACH PARTY UNDERSTANDS AND AGREES THAT (i) THIS AGREEMENT CONTAINS THE REQUIREMENT TO ARBITRATE WITH RESPECT TO ANY DISPUTE OR NEED OF INTERPRETATION OF THIS AGREEMENT; (ii) EACH PARTY WILL NOT BE ABLE TO BRING A LAWSUIT AGAINST THE OTHER PARTY; (iii) THERE SHALL BE NO AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR PRIVATE ATTORNEY GENERAL BASIS; AND (iv) ARBITRATION CAN ONLY DECIDE THE PARTIES' CLAIMS AND MAY NOT CONSOLIDATE OR JOIN THE CLAIMS OF OTHER PERSONS THAT MAY HAVE SIMILAR CLAIMS.**

(h) TRANSFEROR understands that the "choice of laws", "forum", and "venue" clauses are critical in nature, and are essential to this Contract, and that they have not been placed in this Contract as mere "form" insertions and recitals.

(i) TRANSFEROR agrees to have all disputed amounts placed into an escrow account separate from the law firm's trust fund account until the dispute is resolved. The prevailing Party in the dispute shall be entitled to recover reasonable attorney fees, filing fees and costs associated with the efforts to collect.

16.     TRANSFEREE's rights and obligations under this agreement may be assigned, provided such assignment is approved in writing by the ADMINISTRATOR, without the consent of TRANSFEROR. TRANSFEROR's rights and obligations under this Agreement may not be assigned or transferred (whether

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

0000SM000013

voluntarily, by operation of law or otherwise) without the written consent of TRANSFEREE and ADMINISTRATOR, except for transfer by intestate due to TRANSFEROR'S death in which case TRANSFEROR's heirs, estate, executors and personal representatives will be bound by this Agreement. TRANSFEROR agrees that TRANSFEREE may share information that TRANSFEREE obtained about TRANSFEROR (whether from TRANSFEROR or any other Person) with potential assignees to whom TRANSFEREE may assign its rights and obligations under this Agreement, where such information is reasonably necessary to allow a potential assignee to make an informed decision whether to take assignment from TRANSFEREE, provided that TRANSFEREE enters into an appropriate confidentiality agreement with any such potential assignee.

17.    TRANSFEROR also understands and agrees that this agreement will be interpreted under Arizona law and that absent TRANSFEROR'S agreement to Arizona law, TRANSFEREE would not have entered into this Agreement.

18.    To the extent that TRANSFEROR engaged a consultant to assist in obtaining the legal funding, TRANSFEROR confirms and agrees that the consultant is an independent contractor and not an employee of TRANSFEREE, has no right or authority to bind TRANSFEREE, and TRANSFEREE and ADMINISTRATOR is not liable for any statements made by consultant. All commissions due consultant are owed by TRANSFEROR to consultant. If requested by TRANSFEROR, TRANSFEREE may, at TRANSFEREE's discretion, agree to pay TRANSFEROR's obligations owed consultant and, if so agreed by TRANSFEREE, TRANSFEROR consents to increasing the total amount to be funded to and owed by the TRANSFEROR by the amount TRANSFEREE agrees to pay consultant at TRANSFEROR's request.

19.    TRANSFEROR shall pay TRANSFEREE per the terms of this Agreement as presented in Schedule A. Any Payments made from the Legal Funding by TRANSFEREE on behalf of TRANSFEROR shall accrue Premium at the same Premium Rate as the balance of the Legal Funding. Premium shall accrue on the aggregate amount of the Legal Funding to TRANSFEROR. Payments made on behalf of TRANSFEROR from Legal Funding advanced to TRANSFEROR by TRANSFEREE shall be used only for business purposes and may include, but are not limited to payments due to TRANSFEREE, independent consultants referring TRANSFEROR to TRANSFEREE, banks, other funding Persons, lien holders and other business services or product providers which are specified by the Agreement to be paid. TRANSFEREE is not obligated to pay such expenses on behalf of TRANSFEROR but may agree to do so selecting any one or more of such expenses for any reason, and in doing so it may elect to consider only its own interests and will not be required to consider the effect of any such closure on TRANSFEROR under the Agreement.

20.    **Notices.** All notices authorized or required to be given pursuant to this Agreement shall be given in writing and either personally served on the Party to whom given with copy to ADMINISTRATOR, mailed postage prepaid, or sent by email or facsimile transmission (and also mailed within 24 hours thereafter), addressed to the Party's address, email address or facsimile number as it appears on the books of the Company. All notices shall be deemed given when personally delivered or, if mailed as provided in this section, on the second day after the date of mailing, or if sent by email or facsimile transmission, 24 hours after the time of dispatch.

Any Party and ADMINISTRATOR may change his address for the receipt of notices at any time by giving written notice thereof to Manager and the other Members in accordance with the terms of this section. The inability to deliver notice because of a changed address of which no notice was given, or the rejection or other refusal to accept any notice, shall be deemed to be the effective receipt of the Notice as of the date of such inability to deliver or the rejection or refusal to accept. Any notice to be given by any Party herein may be given by an agent for such Party.

Notification and other communication shall be sent to the Parties as follows:

Notification or other communication required in writing:
TRANSFEREE (send to ADMINISTRATOR): ALF Operations, Attn: DGMGT AZ LLC, 17700 North Pacesetter Way Scottsdale, AZ 85255

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 14 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

TRANSFEROR: Girardi/Keese, 1126 Wilshire Blvd, Los Angeles, CA 90017-1904
Other communications:
   ADMINISTRATOR:
      Phone: (480) 563-0087 Email: ahald@alfoperations.com Fax: (480) 522-1199
   TRANSFEROR:
      Phone: (213) 977-0211 Email: tgirardi@girardikeese.com Fax: 213-481-1554

21.   **Severability.** Every provision of this Agreement is intended to be severable. If any term or provision is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

22.   **Parties and Successors in Interest**. Nothing in this Agreement, whether expressed or implied, is intended to confer upon any Person other than the Parties hereto and their respective heirs, representatives, successors and permitted assigns any rights or remedies under or by reason of this Agreement. Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the respective heirs, representatives, successors and permitted assigns of any of the Parties to this Agreement.

23.   **Entire Agreement**. This Agreement constitutes the entire agreement among or between the Parties, and supersedes any prior understandings and agreements, whether written or oral, with respect to the subject matter hereof.

24.   **Representation.** Each Party has been advised to obtain independent representation in connection with this Agreement

25.   **Counterparts**. This Agreement may be executed in counterparts, all of which taken together shall be deemed one original.

**IF THE AGREEMENT CONTAINS ANY BLANK SPACES WHICH ARE NOT INDICATED TO BE COMPLETED BY THE PARTIES, THIRD PARTIES OR NOTARY, TRANSFEROR IS ENTITLED TO A COMPLETELY FILLED IN COPY BEFORE TRANSFEROR SIGNS THE AGREEMENT. TRANSFEROR SHOULD OBTAIN THE ADVICE OF AN ATTORNEY. DEPENDING ON THE CIRCUMSTANCES, TRANSFEROR MAY WANT TO CONSULT A TAX, PUBLIC OR PRIVATE BENEFIT PLANNING, OR FINANCIAL PROFESSIONAL. TRANSFEROR ACKNOWLEDGES THE TRANSFEREE AND ADMINISTRATOR HAAVE PROVIDED NO TAX, PUBLIC OR PRIVATE BENEFIT PLANNING, OR FINANCIAL ADVICE REGARDING THIS TRANSACTION. TRANSFEROR HAS REVIEWED THE AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING AND HEREBY ACKNOWLEDGES THAT TRANSFEROR UNDERSTANDS THE TERMS OF THE AGREEMENT INCLUDING THAT THEAGREEMENT CONTAINS ARBITRATION PROVISIONS WHICH MAY BE ENFORCED BY THE PARTIES.**

**[SIGNATURES ON FOLLOWING PAGE]**

000059
GIR0000015

**Agreed and accepted on behalf of TRANSFEROR**

_____ Date: 3 / 31 /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

**NOTARY**

STATE _California_          COUNTY _Los Angeles_

On this _31st_ day of _March_, 2016, before me personally came, the persons, Thomas V. Girardi who signed the foregoing LAW FIRM LEGAL FUNDING, CONSENSUAL EQUITABLE LIEN, ASSIGNMENT AND SECURITY AGREEMENT known to me personally to be such, and acknowledged that the above is her act and deed and that the facts stated herein are true.

_____Shirleen H. Fujimoto_____ My Commission Expires: _May 15, 2019_
Notary Public

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

**On behalf of TRANSFEREE**

_____ Date: 04 / 01 /2016

**Signature of Jay Holland, Member and Authorized Representative of Stillwell Madison, LLC**

**On behalf of ADMINISTRATOR**

_____ Date: 04 / 01 /2016

**Signature of Alan Hald, Authorized Representative of DGMGT AZ, LLC**

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 16 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## SCHEDULE A - FUNDING APPROVAL AND REPAYMENT SCHEDULE

TRANSFEREE has approved Legal Funding for TRANSFEROR in the estimated funding amount of **$5,110,440.38**, as stated in Schedule C Client Funding Disclosure. Prior to funding, with disclosure to TRANSFEREE, such funding amount and associated fees and payments may be adjusted or corrected by TRANSFEROR. TRANSFEROR agrees to accept such funding as disclosed in Exhibit A-1 and related conditions as discussed and disclosed in Exhibits A-2, A-3, A-4 and A-5 to Schedule A.

**TRANSFEROR agrees that any and all TRANSFEREE Payments shall be made to TRANSFEREE, in accordance with the Agreement including but not limited to**:

> a. Having all Proceeds received into a controlled bank account which shall be the TRANSFEROR's trust account separate from the attorney's own funds where such trust account is in conformance with the State Bar of California Rules of Professional Conduct Rule 4-100 Preserving Identity of Funds and Property of a Client.
>
> b. In accordance with the Agreement, TRANSFEROR shall make Payments to TRANSFEREE from the TRANSFEROR's trust account.
>
> c. With respect to each Legal Funding, unless TRANSFEREE Payments have satisfied the TRANSFEROR's obligations to TRANSFEREE, TRANSFEREE shall be entitled to receive TRANSFEREE Payment which, upon receipt, such amount paid to the TRANSFEREE will be first applied in accordance with the Agreement to reduce the Premium owed until reduced to zero then the balance of TRANSFEREE Payment, if any, will be applied in accordance with the Agreement to reduce the Legal Funding until reduced to zero. TRANSFEROR may request in writing, after each such Payment, that ADMINISTRATOR prepare a new Schedule A showing the remaining total balance owed by TRANSFEROR to TRANSFEREE.

For the avoidance of doubt, TRANSFEREE Payments shall include but not be limited to, (i) all Legal Fees and expense reimbursement due to TRANSFEROR in accordance with the Agreement (ii) all Payments due to TRANSFEROR from co-counsel and any other fee sharing arrangements, plus (iii) all other Payments due to TRANSFEROR where such payments are from co-counsel representing Clients or administrative Persons facilitating Payments to Clients which are disclosed in Schedule B-1 List of Clients but where such Payments are not allocated to specified Clients.

Provided TRANSFEROR is not in Default of the Agreement, TRANSFEROR, may deduct from TRANSFEREE Payments, (i) TRANSFEROR's third party payment obligations contracted by the TRANSFEROR in writing which have been disclosed in writing to the TRANSFEREE prior to TRANSFEREE's Agreement acceptance or by written consent of TRANSFEREE after such Agreement acceptance; however (ii) if TRANSFEROR is in Default of the Agreement, such that TRANSFEREE, at its sole discretion, does not provide a Default waiver or a remedy in writing (which remedy is satisfied by TRANSAFEROR), then such deductions from TRANSFEREE Payments are disallowed.

**Exhibit A-1** discloses the total payment due at the end of the monthly periods including the repayment of the Legal Funding and accrued investment charges in accordance with the Agreement.
**Exhibit A-2** discussed Additional Fundings
**Exhibit A-3** discloses the Monthly Maintenance Fee
**Exhibit A-4** discusses the Disbursement of Funds
**Exhibit A-5** discusses Assignment of Proceeds and Allocation of Payments Among Multiple TRANSFEROR Legal Fundings

**Valid Offers for Client Legal Funding:** Any and all verbal, written or other communications with TRANSFEROR or ADMINISTRATOR staff members are not valid Legal Funding offers; valid Legal Funding offers are only made at the time lien documents are delivered to the TRANSFEROR. Future and additional

Legal Funding offers are always subject to the internal review by TRANSFEREE and ADMINISTRATOR and are not valid until lien documents are delivered to the TRANSFEROR. A valid Legal Funding offer is not a commitment to pay funds until such time that the lien documents are completely and properly executed, returned to ADMINISTRATOR and accepted by TRANSFEREE. Such acceptance will be deemed to have occurred upon the releasing of money by TRANSFEREE to the TRANSFEROR.

**This offer will be a valid offer until 5:00 pm MST on 04-10-2016 and will be withdrawn thereafter. If this above offer meets with your approval, sign and date below and FedEx this and all other executed documents back to us.**

**Agreed and accepted on behalf of TRANSFEROR**

_____Date: 3 / 5 /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

000062
SM000018

## Exhibit A-1
## Premium Accrual and Legal Funding Payment Obligation

The per month accrued investment premium amount("Premium") is calculated as the Legal Funding amount times the monthly Premium Rate times the number of months in the calculation period. The monthly Premium Rate for the first six month periods after funding is 2.0% (24.0% annualized Premium Rate) and continues at such monthly Premium Rate until the TRANSFEROR's obligations under the Agreement are fully satisfied. The following table provides an estimate of the amount due including the Legal Funding repayment and cumulative investment charges at the end of each month period over the first 36 six months at the monthly Premium Rate. Investment charges will continue to accrue after 36 months and are not shown in the table. Actual amounts will vary from below table based on actual advance amount and total settlement days. The first month period begins as of the issue date on the Legal Funding check or wire transfer payable to the TRANSFEROR in accordance with the Agreement.

| Month Period [1] | 2.0% | Month Period | 2.0% |
|---|---|---|---|
| **1 to 6** | $5,723,693.22 | 22 | $7,359,034.14 |
| 7 | $5,825,902.03 | 23 | $7,461,242.95 |
| 8 | $5,928,110.84 | 24 | $7,563,451.76 |
| 9 | $6,030,319.64 | 25 | $7,665,660.56 |
| 10 | $6,132,528.45 | 26 | $7,767,869.37 |
| 11 | $6,234,737.26 | 27 | $7,870,078.18 |
| 12 | $6,336,946.07 | 28 | $7,972,286.99 |
| 13 | $6,439,154.87 | 29 | $8,074,495.79 |
| 14 | $6,541,363.68 | 30 | $8,176,704.60 |
| 15 | $6,643,572.49 | 31 | $8,278,913.41 |
| 16 | $6,745,781.30 | 32 | $8,381,122.22 |
| 17 | $6,847,990.10 | 33 | $8,483,331.02 |
| 18 | $6,950,198.91 | 34 | $8,585,539.83 |
| 19 | $7,052,407.72 | 35 | $8,687,748.64 |
| 20 | $7,154,616.53 | 36 | $8,789,957.45 |
| 21 | $7,256,825.33 | | |

**Agreed and accepted on behalf of TRANSFEROR**

_____Date: 3 / 31 /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

_____

[1] The term "month period" means from the start date to one day less than the start date of the following calendar month i.e. from 2-17-16 to 3-16-16, with the next period beginning 3-17-16. The usage of the term "month period" where X=the # of month periods and "date the Agreement" = 2-17-16, in a phrase, "six month period after the date the Agreement" means a period starting 2-17-16 and ending in the future sixth calendar month on 8-16-16, with the next period beginning 8-17-16.

If payment is made before the end of a month period, the amount due is calculated as the total payments due in all prior month periods plus the payment due for the entire payment period in which the payment is made multiplied by the following ratio calculated as the number of days from and including the start date of month period in which the payment is made and ending on and including the payment date, divided by the total number of days in the month period in which the payment is made. For example, if PAYMENT is made 11-9-16 and the month period start date is 10-17-16, the end date of the month period is 11-16-16 then the PAYMENT = total payments due in all prior month periods + payment due for the entire payment period in which the payment is made times (24 days divided by 31 days).

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 19 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## Exhibit A-2
## Additional Fundings

If TRANSFEROR requests an additional funding at a future date, consideration of such additional Legal Funding is at the sole discretion of the TRANSFEREE and ADMINISTRATOR. TRANSFEROR understands and agrees that this Agreement or any statements made by TRANSFEREE or ADMINISTRATOR shall not be interpreted as a commitment, promise or assurance to provide an additional Legal Funding. Such additional Legal Funding, if offered by TRANSFEREE and approved by ADMINISTRATOR may be offered as an amendment to the Agreement or as a separate consensual equitable lien, assignment, and security agreement with terms and conditions, including but not limited to Funding amount, Premium Rate and Monthly Maintenance Fee, different from the Agreement, which determinations are at the sole discretion of the TRANSFEREE and ADMINISTRATOR.

TRANSFEROR agrees that, with completing of the current fundings, sufficient funding has been provided by the TRANSFEREE to TRANSFEROR and that the Assignment and related security interests shall not be released by the TRANSFEREE until such time that all amounts required to be paid to TRANSFEREE pursuant to the Agreement, have been paid in full.

**Agreed and accepted on behalf of TRANSFEROR**

**Date:** 3 /3/ /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

SM000020

## Exhibit A-3
## Monthly Maintenance Fee

The TRANSFEREE shall pay no Monthly Maintenance Fee to TRANSFEROR with respect to this first funding.

**Agreed and accepted on behalf of TRANSFEROR**

Date: __3__ / __3__ /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 21 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## Exhibit A-4
## Disbursement of Funds

Provided the Agreement has been properly and completely executed by the TRANSFEROR, then TRANSFEREE shall consider, at its sole discretion, whether to accept the Agreement, and if so accepted and executed by TRANSFEREE the TRANSFEREE or ADMINISTRATOR shall issue checks or wire funds within 5 business days thereafter to pay fees and/or payments being made on TRANSFEROR's behalf at TRANSFEROR's request and to pay the TRANSFEROR for the net cash balance of the funding amount after issuing such payments and fees as stated in Schedule C Client Funding Disclosure. Such fees and payments can be adjusted or corrected by TRANSFEREE or ADMINISTRATOR with disclosure to TRANSFEROR prior to funding. However, as required by Schedule titled Irrevocable Letters Of Instructions, unless TRANSFEREE at its sole discretion elects in writing to waive such requirement in part or in its entirety, TRANSFEREE shall not release any funding payments to TRANSFEROR until such time TRANSFEREE has received Irrevocable Letters of Instructions from all Partnering Firms signed by the persons with authority to acknowledge and accept such Instructions on behalf of such Partnering Firms.

**Agreed and accepted on behalf of TRANSFEROR**

_____    Date: 3 / 3 /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

000066
SM000022

## EXHIBIT A-5
## MULTIPLE LEGAL FUNDINGS ASSIGNMENT OF PROCEEDS PORTFOLIO AND ALLOCATION OF TRANSFEREE PAYMENTS

TRANSFEROR understands and agrees that if TRANSFEROR requests and, at TRANSFEREE's and ADMINISTRATOR sole discretion, is approved for additional Legal Fundings, the Client Portfolios from each and all such Legal Fundings will be combined and collectively (without duplication of Clients, except where duplicate Clients have different Cases or have same Cases with separately filed claims) do not have the same Cases) be assigned, transferred, and conveyed to TRANSFEREE including all of TRANSFEROR'S control, right, title and interest in and to any and all obligations now existing or in the future including future Proceeds and Payment Intangibles of TRANSFEROR resulting from the Client Portfolio or Proceedings.

TRANSFEROR understands and agrees when the TRANSFEROR receives Proceeds from one or more Legal Fundings, which may be at multiple times from any of a number of sources, including but not limited to co-counsel, defendants, claims, lawsuits, or insurers, and then TRANSFEROR shall insure:

  a. TRANSFEREE receives TRANFEREE Payments from each and all Legal Fundings' Client Portfolios Proceeds until all TRANSFEREE Legal Fundings and associated Premium due in accordance with each and all such Legal Funding Agreements are paid in full and the TRANSFEREE's obligations for all Agreements are fully satisfied.

  b. All TRANSFEREE Payments from Proceeds received by TRANSFEREE will be first allocated to payment of the Legal Funding with the lowest Premium Rate, irrespective of the Legal Funding agreement effective date, until such Legal Funding is paid in full;

  c. Thereafter any remaining TRANSFEREE Payments shall then be allocated to each subsequent unpaid Legal Funding with the lowest Premium Rate, irrespective of the Legal Funding agreement effective date, until all Legal Funding are paid in full and the TRANSFEREE's obligations from all Agreements are fully satisfied, after which TRANSFEROR is released from any further payment obligations.

TRANSFEROR understands and agrees to pay when due multiple Monthly Maintenance Fees from multiple Legal Fundings. If requested by TRANSFEROR, TRANSFEREE will recalculate and make payment adjustments to allow all multiple Monthly Maintenance Fees to be combined into a single Monthly Maintenance Fee payment due on the same numerical dates in successive calendar months.


**Agreed and accepted on behalf of TRANSFEROR**

**Date:** 3 / 3/ /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 23 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## SCHEDULE B
## TRANSFEROR LIST OF CLIENTS AND ENCUMBRANCES

The Clients Cases collectively defined as the Client Portfolio are specified and incorporated into the Agreement as Exhibit B-1 List of Clients. The TRANSFEROR confirms that Exhibit B-2 Liens or Other Encumbrances on Payments Due to Transferor list all encumbrances on payments that are or may become due to TRANSFEROR under the Agreement.

TRANSFEROR agrees that any Clients which according to the Agreement should have been included in Exhibit B-1 List of Clients as of the Effective Date but omitted or otherwise not included from such List and are to be later added to such List, including but not limited to Clients replaced in accordance with the Agreement, are to be considered incorporated into the Exhibit B-1 List of Clients whether or not such Clients are in a current update of such List. From time-to-time, when requested by TRANSFEREE, the TRANSFEROR shall update Exhibit B-1 List of Clients with Clients not entered or otherwise modified from such prior List.

**Exhibit B-1 List of Clients, if not included within the Agreement, may be prepared as a separate document with the title: "Exhibit B-1 List of Clients" and is incorporated as part of the Agreement.**

The TRANSFEROR agrees that the broadest and most inclusive interpretation of the TRANSFEROR's provided Client designations shall apply to the extent there is a dispute over the interpretation of such designations, including, but not limited to, Client Identification Code ("ID Code") Client Last Names with different forenames, spellings or changed names; Clients having multiple Sub-Category designations whether they are MDL's or other unnamed litigation categories; incorrect retainer dates or multiple retainers agreements; and incorrect or multiple ID Codes. TRANSFEROR confirms that Client ID Codes have been applied consistently to all documentation made available by TRANSFEROR to ADMINISTRATOR such that each Client ID Code only refers to the same specific Client.

TRANSFEROR represents, in addition to other TRANSFEROR's representations:

   a. The TRANSFEROR has executed agreements to represent each of the Clients and their Cases, as referenced by a unique ID Code assigned by TRANSFEROR.

   b. Each Client listed in the Client Portfolio has contractually agreed to pay, upon resolution of such Client Case, the percentage contingency fees (% Fee) as stated in the Exhibit B-1 List of Clients plus reimbursed expenses.

   c. No Client has asked for or taken actions that could lead to TRANSFEROR's removal as the counsel for such Client or to the dismissal of the Client Case.

   d. There are no other co-counsel fees or fees from other arrangements due other than the co-counsel fees disclosed in Exhibit B-1 List of Clients.

   e. The TRANSFEROR shall pay TRANSFEREE Payments to TRANSFEREE, in accordance with the Agreement, from the Legal Fees due to TRANSFEROR from the Proceeds of resolved Exhibit B-1 List of Clients and;

   f. TRANSFEROR confirms information provided by TRANSFEROR in Exhibit B-1 List of Clients is correct, factual and consistent with the TRANSFEROR's records, that TRANSFEROR shall notify ADMINISTRATOR; provide ADMINISTRATOR a corrected version of or corrections to the current Exhibit B-1 List of Clients within five business days after TRANSFEROR has identified any such inconsistencies or errors; and such inconsistencies or errors if deemed not material by the TRANSFEREE shall not be consider an Agreement Default if corrected as stated.

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 24 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

g. With respect to encumbrances of Proceeds or other TRANSFEROR assets, TRANSFEROR has (i) verified all encumbrances listed in Exhibit B-2 and corrected errors; (ii) listed all other existing Liens and Loans, including cash advances or loans by another company and any other encumbrances; (iii) listed any other anticipated or future encumbrances, including but not limited to statutory and any other consensual written liens, assignments or other encumbrances to be perfected on or after the date of this Agreement.

**Agreed and accepted on behalf of TRANSFEROR**

_____Date: _3_ / _31_ /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# EXHIBIT B-1 LIST OF CLIENTS

The Cases and Clients collectively defined as the Portfolio of Clients are specified and incorporated into the Agreement as Exhibit B-1 Lists of Cases. Proceeds from Clients listed in Exhibit B-1 List of Clients are secured in accordance with the Agreement. Such Cases and Clients have been provided by TRANSFEROR and are included in the Portfolio of Clients as follows:

1. All Shell v Acosta mass tort action case clients $45,500,000 in estimated TRANSFEROR proceeds approximate 1,491 individual Plaintiffs. (Dole Food Co. Inc. et al. v. Superior Court of Los Angeles County, case number B262044, in the California Court of Appeals, Second Appellate District: and Adelino Acosta et al v. Shell Oil Company, et al L.A. Superior Ct. No.053643; and City of Carson v. Shell Oil Company et al, L.A. Super. Ct. No. BC499369 and related cases). Defendants include the Shell Oil, Equiline Enterprises LLC dba Shell Oil Products US and Barclay-Hollander-Curci, now a Dole subsidiary.
   a. As appended to Schedule B, Exhibit B-1, the Adelino Acosta, et al, vs Shell Oil Company, et al and related cases; the State of California, ex rel City of Carson v Shell Oil Company et al; and Shell Oil Company v Barclay Hollander Corporation Settlement Agreement (the "Shell Oil Cases") and TRANSFEROR's list of 1491 clients.
   b. As appended to this Schedule B, Exhibit B-1, a list of $9,562,560.78 Shell Oil Case expense reimbursements due TRANSFEROR from future Case settlement payments ($6,600,466.54 itemized by TRANSFEROR expense categories plus $2,962,094.24 Kurtzman Carson Consultants LLC invoice)
2. Barclay Hollander case clients estimated legal fees of $12,000,000 and cost reimbursements of $3,000,000; related to Shell Oil settlement.
3. All Avandia case clients - $17,514,518 in Cash proceeds. Named defendant is Smith Kline Beecham Corp., d.b.a. GlaxoSmithKline (GSK). Final SETTLEMENT payment stages with TRANSFEROR proceeds available in near future from cash placed in escrow by defendant.
4. All TXI Riverside Cement with estimated $12,000,000 in legal fees ($6,000,000 to TRANSFEROR) and TRANSFEROR cost reimbursements of $2,051,716; settled with defendants Riverside Cement Company, TXI Riverside, Inc., TXI California, Inc., Riverside Cement Holdings Company, Beazer West, Inc., Beazer West of California, Inc., Beazer West Cement Company, Hanson Aggregates West, Inc., Amcord, Inc. Gifford-Hill & Co., Inc. and Hanson Pipe & Precast, Inc.
5. All Byetta case clients estimated $6,000,000 in legal fees and $710,550 in cost reimbursements; Defendants include Merc, Brystal Myers Squib, Eli Lilly & Co., Amylin Pharmaceuticals, and Novo Norrdisk A/S with California case filed in Los Angeles in regard to the various lawsuits in California.
6. All Zometa case clients estimated $5,000,000 in legal fees and $5,387,512 in cost reimbursements. The named defendant is Novartis Pharmaceutical Corporation.
7. All Actos case clients estimated $5,000,000 in legal fees and costs. Defendants include Takeda Pharmaceuticals America Inc., Takeda Pharmaceuticals North America Inc., Takeda Pharmaceutical Company Limited and Eli Lilly and Company.

The TRANSFEROR shall provide, upon ADMINISTRATOR's request, the Case type, Client File No. (ID#), Client retainer fee %, co-counsel and co-counsel % fee sharing for the Portfolio of Cases to TRANSFEREE in an acceptable electronic format (preferably Microsoft Excel spreadsheet) to include to be organized by ADMINISTRATOR into Exhibit B-1 Lists of Clients.

**Agreed and accepted on behalf of TRANSFEROR**

Date: _3_ / _3_ /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 26 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

000GW000026

# EXHIBIT 6

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**16-7519369916**

**04/11/2016 17:00**

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

54459470002    UCC 1 FILING

A. NAME & PHONE OF CONTACT AT FILER (optional)
JAY HOLLAND    (480) 563-3256

B. E-MAIL CONTACT AT FILER (optional)
JAY@HOLLANDPARTNERS.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

STILLWELL MADISON, LLC
PO BOX 832
CAREFREE, AZ 85377

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GIRARDI  KEESE | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1126 WILSHIRE BOULEVARD | BEVERLY HILLS | CA | 90017 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| STILLWELL MADISON, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 832 | CAREFREE | AZ | 85377 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

ALL ACCOUNTS, ACCOUNTS RECEIVABLE, CONTROLLED ACCOUNTS, THINGS IN ACTION, PROCEEDS, (WHETHER ARISING THROUGH JUDGMENT OR SETTLEMENT), AND GENERAL OR PAYMENT INTANGIBLES ARISING FROM ALL CLAIMS OF DEBTOR TO RECEIVE ATTORNEY'S FEES AND COSTS FROM CLIENTS AND/OR CO-COUNSEL(S) IN ALL CASES NOW OR LATER SET FORTH IN EXHIBIT B-1 OF SECURED PARTY'S AGREEMENT NAMED "LAW FIRM LEGAL FUNDING, CONSENSUAL EQUITABLE LIEN, ASSIGNMENT AND SECURITY AGREEMENT AND PERSONAL GUARANTEE" WITH DEBTOR, WHICH IS HEREBY INCORPORATED BY THIS REFERENCE, AND ALL OTHER COLLATERAL CONVEYED BY DEBTOR TO SECURED PARTY BY SAID AGREEMENT.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:    6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility    ☐ Agricultural Lien    ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):    ☐ Lessee/Lessor    ☐ Consignee/Consignor    ☐ Seller/Buyer    ☐ Bailee/Bailor    ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

000072

# EXHIBIT 7

000073

# UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS**

**1675306737**

**06/10/2016 12:45**

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

55659130007  UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jillian E. Deck, Esq.  716-853-5100

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**
CT Fulfillment
555 Capitol Ave. Suite 1000
Sacramento, CA 95814
54349303
Account 60574850

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
11-7275806299

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, **and** address of Assignee in item 7c **and** name of Assignor in item 9
For partial assignment, complete items 7 and 9 **and** also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:

This Change affects ☐ Debtor **or** ☐ Secured Party of record

**AND** Check **one** of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; **and** item 7a or 7b **and** item 7c
☐ ADD name: Complete item 7a or 7b, **and** item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only **one** name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Girardi Keese | | | |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check **one** of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| California Attorney Lending II, Inc. | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
CASOS #4384.78                                                                JK-54349303-1

# EXHIBIT 8

000075

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jillian E. Deck, Esq.  716-853-5100

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

CT Fulfillment
555 Capitol Mall, Suite 1000
Sacramento, CA 95814
59857865-1
Account 60574850

1775969950

07/19/2017 14:47

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

62796840002    UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 11-7275806299 | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:    **AND** Check one of these three boxes to:

This Change affects ☑ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☑ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | Girardi | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | Thomas | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| | V. | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 100 Los Altos Drive | Pasadena | CA | 91105 | USA |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | California Attorney Lending II, Inc. | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10. OPTIONAL FILER REFERENCE DATA: | | |
|---|---|---|
| CASOS | #4384.78 | JK-59857865-1 |

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# EXHIBIT 9

| 04:20:58 p.m. 10-31-2017 | 5 | 3056661028 |

Oct 31 17 04:34p

305          R&B

3056661028                              p. 5

04:06:04 p.m.    10-31-2017        5/15

PROMISSORY NOTE

U.S. $10,675,000.00                                          November 1, 2017

FOR VALUE RECEIVED, the undersigned, Girardi & Keese, a law firm organized under the laws of the State of California ("*Girardi*"),

and collectively, with Girardi and GPW, the "*Borrower*"), hereby promises to pay to Virage SPV I LLC (the "*Lender*") or its registered assigns at the principal office of the Lender in Houston, Texas (or such other location as the Lender may designate to the Borrower), in immediately available funds, the principal sum of Ten Million Six Hundred Seventy-Five Thousand Dollars and 00/100 ($10,675,000.00), together with any accrued interest added to the principal balance in accordance with Section 2.2 of the Amended and Restated Loan Agreement, or, if less, the aggregate unpaid principal amount of the Loan made or maintained by the Lender to the Borrower pursuant to the Amended and Restated Loan Agreement, in the manner and subject to the terms of Section 2 of the Amended and Restated Loan Agreement (including, but not limited to, any terms limiting recourse to GPW or Russomanno), together with interest on the principal amount of such Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Amended and Restated Loan Agreement.

This Note is the Note referred to in the Amended and Restated Loan Agreement dated as of November 1, 2017 among the Borrower, the Guarantors party thereto, and the Lender (as extended, renewed, amended or restated from time to time, the "*Loan Agreement*"), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Amended and Restated Loan Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Amended and Restated Loan Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Texas.

This Note is issued in substitution and replacement for (and not as a novation of) and continues to evidence the indebtedness previously evidenced by, that certain Promissory Note due July 31, 2021 in an original amount of $10,500,000.00.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Amended and Restated Loan Agreement.

The Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

Initials on Behalf of Each Borrower: _____

000078

04:20:56 p.m. 10-31-2017 | 6 | 3056661028

Oct 31 17 04:35p

305        R&B

3056661028        p.6

04;06;46 p.m.    10-31-2017        6 /15

Girardi & Keese

By: _____
    Name: Thomas V. Girardi
    Title:  Managing Partner / Owner



Initials on Behalf of Each Borrower: _HJR_

000079

# EXHIBIT 10

## SECURITY AGREEMENT

This Security Agreement (the *"Agreement"*) is dated as of November 1, 2017, between Girardi & Keese, a California partnership (the *"Debtor"*), with a mailing address of 1126 Wilshire Boulevard, Los Angeles, CA 90017 and Virage SPV 1 LLC (the *"Secured Party"*), with its mailing address of 1700 Post Oak Boulevard, 2 BLVD Place, Suite 300, Houston, Texas 77056.

### PRELIMINARY STATEMENT

A.    The Debtor and the Secured Party have entered into an Amended and Restated Loan Agreement dated as of November 1, 2017 (the Amended and Restated Loan Agreement and any agreements or notes issued in substitution and replacement thereof, all as may be amended or modified from time to time, including amendments and restatements thereof in its entirety, being referred to herein as the *"Loan Agreement"*), which evidences a loan or loans made by the Secured Party to the Debtor.

B.    As a condition to extending credit, continuing to extend credit or otherwise making financial accommodations available to or for the account of the Debtor under the Loan Agreement, the Secured Party requires, among other things, that the Debtor grant the Secured Party a security interest in the Debtor's personal property described herein subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the benefits accruing to the Debtor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

*Section 1.    Grant of Security Interest.* The Debtor hereby grants to the Secured Party a lien on and security interest in, and acknowledges and agrees that the Secured Party has and shall continue to have a continuing lien on and security interest in, all right, title, and interest of the Debtor, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the following:

(a)    Accounts and General Intangibles (including Payment Intangibles) arising out of any Eligible Case or any Eligible Collateral Case (as defined in the Loan Agreement) and any other property constituting Case Proceeds (as defined in the Loan Agreement);

(b)    Any Assigned Accounts into which any of the Collateral described in clause (a) above is deposited; and

(c)    Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof;

all of the foregoing being herein sometimes referred to as the *"Collateral"*. All terms which are used in this Security Agreement which are defined in the Uniform Commercial Code of the State

Reference: Loan Number: VL1082-B                                    Borrower Initials _____

000081

of Texas as in effect from time to time (*"UCC"*) shall have the same meanings herein as such terms are defined in the UCC, unless this Security Agreement shall otherwise specifically provide.

    *Section 2.    Obligations Hereby Secured.* The lien and security interest herein granted and provided for is made and given to secure, and shall secure, the payment and performance of (a) any and all indebtedness, obligations and liabilities of whatsoever kind and nature of the Debtor to the Secured Party (whether arising before or after the filing of a petition in bankruptcy) evidenced by the Loan Agreement, whether direct or indirect, absolute or contingent, due or to become due, and whether now existing or hereafter arising and howsoever held, evidenced or acquired, and whether several, joint or joint and several and (b) any and all expenses and charges, legal or otherwise, suffered or incurred by the Secured Party in collecting or enforcing any of such indebtedness, obligations or liabilities or in realizing on or protecting or preserving any security therefor, including, without limitation, the lien and security interest granted hereby (all of the foregoing being hereinafter referred to as the *"Obligations"*).

    *Section 3.    Covenants, Agreements, Representations and Warranties.* The Debtor hereby covenants and agrees with, and represents and warrants to, the Secured Party that:

    (a)    The Debtor is duly organized and validly existing in good standing under the laws of the jurisdiction of its organization. The Debtor shall not change its jurisdiction of organization without the Secured Party's prior written consent. The Debtor is the sole and lawful owner of the Collateral, and has full right, power and authority to enter into this Security Agreement and to perform each and all of the matters and things herein provided for. The execution and delivery of this Security Agreement, and the observance and performance of each of the matters and things herein set forth, will not (i) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon the Debtor or any provision of the Debtor's organizational documents (*e.g.*, charter, articles or certificate of incorporation and by-laws, articles or certificate of formation and limited liability company operating agreement, partnership agreement, or similar organizational documents) or any covenant, indenture or agreement of or affecting the Debtor or any of its property or (ii) result in the creation or imposition of any lien or encumbrance on any property of the Debtor except for the lien and security interest granted to the Secured Party hereunder. Schedule A is true and accurate in all material respects.

    (b)    The Debtor shall not move its chief executive office or maintain a place of business other than those specified on Schedule A without first providing the Secured Party thirty (30) days' prior written notice of the Debtor's intent to do so, provided that the Debtor shall at all times maintain its chief executive office in the United States of America and, with respect to any such new location, the Debtor shall have taken all action requested by the Secured Party to maintain the lien and security interest of the Secured Party in the Collateral at all times fully perfected and in full force and effect.

    (c)    The Debtor's legal name and jurisdiction of organization is correctly set forth on Schedule A. The Debtor has not transacted business at any time during the immediately preceding five-year period, and does not currently transact business, under any other legal names or trade names other than the prior legal names and trade names (if any) set forth on Schedule A attached

Borrower Initials _____

hereto. The Debtor shall not change its legal name or transact business under any other trade name without first giving thirty (30) days' prior written notice of its intent to do so to the Secured Party.

(d)    The Collateral and every part thereof is and shall be free and clear of all security interests, liens, attachments, levies, and encumbrances of every kind, nature and description, whether voluntary or involuntary, except for the lien and security interest of the Secured Party therein and the rights of the depository bank with respect to any Deposit Account. The Debtor shall warrant and defend the Collateral against any claims and demands of all persons at any time claiming the same or any interest in the Collateral adverse to the Secured Party.

(e)    The Debtor shall use commercially reasonable efforts to maintain the security interest of Secured Party hereunder in all Collateral as a valid, perfected lien, subject only to the right of the depository bank with respect to any Deposit Account; *provided,* it is the responsibility of the Secured Party to file UCC-1 Financing and Continuation Statements.

(f)    The Debtor shall not, without the Secured Party's prior written consent, sell, assign, mortgage, lease or otherwise dispose of the Collateral or any interest therein.

(g)    The Debtor shall at all times allow the Secured Party and its representatives free access to and right of inspection of the Collateral.

(h)    The Debtor agrees to execute and deliver to the Secured Party such further agreements, assignments, instruments, and documents and to do all such other things as the Secured Party may deem necessary or appropriate to assure the Secured Party its lien and security interest hereunder, including, without limitation, (i) such financing statements, and amendments thereof or supplements thereto, and such other instruments and documents as the Secured Party may from time to time require in order to comply with the UCC and any other applicable law, and (ii) such control agreements with respect to Deposit Accounts and to cause the relevant depository institution to execute and deliver such control agreements, as the Secured Party may from time to time require. The Debtor hereby authorizes the Secured Party to file any and all financing statements covering the Collateral or any part thereof as the Secured Party may require. The Secured Party may order lien searches from time to time against the Debtor and the Collateral, and the Debtor shall promptly reimburse the Secured Party for all reasonable costs and expenses incurred in connection with such lien searches. In the event for any reason the law of any jurisdiction other than Texas becomes or is applicable to the Collateral or any part thereof, or to any of the Obligations, the Debtor agrees to execute and deliver all such instruments and documents and to do all such other things as the Secured Party in its sole discretion deems necessary or appropriate to preserve, protect, and enforce the lien and security interest of the Secured Party under the law of such other jurisdiction. The Debtor agrees to mark its books and records to reflect the lien and security interest of the Secured Party in the Collateral.

(i)    On failure of the Debtor to perform any of the covenants and agreements herein contained, the Secured Party may, at its option, perform the same and in so doing may expend such sums as the Secured Party may deem advisable in the performance thereof, including, without limitation, the payment of any taxes, liens and encumbrances, expenditures made in defending against any adverse claims, and all other expenditures which the Secured Party may be compelled

Reference: Loan Number: VL1082-B                                    Borrower Initials _____

000083

to make by operation of law or which the Secured Party may make by agreement or otherwise for the protection of the security hereof. The Secured Party, in making any payment hereby authorized, may do so according to any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien or title or claim. The Secured Party, in performing any act hereunder, shall be the sole judge of whether the Debtor is required to perform same under the terms of this Security Agreement.

Section 4.   *Certain Perfection Requirements.*   (a) The Debtor shall use commercially reasonable efforts to receive any funds paid as Case Proceeds and upon such receipt shall promptly pay to Secured Party any amounts owed to Secured Party in accordance with the Loan Agreement.

(b)   Although it is the intention of the parties that the Debtor shall receive the funds referred to in clause (a) of this Section, if, in any particular instance, the Secured Party reasonably determines that such intention may not be realized, or in any other instance in which the Secured Party determines that the establishment of a Deposit Account is required or advisable for the perfection or further perfection of the Secured Party's security interest, the Secured Party may require the Debtor to establish a Deposit Account with any commercial bank having an office in the City of Houston, and to execute a control agreement, in form and substance reasonably satisfactory to the Secured Party, pursuant to which such depository bank agrees to comply with the Secured Party's delivery instructions with respect to any funds held in such account without further consent by the Debtor.

Section 5.   *Power of Attorney.*   In addition to any other powers of attorney contained herein, the Debtor hereby appoints the Secured Party, its nominee, and any other person whom the Secured Party may designate, as the Debtor's attorney-in-fact, with full power and authority upon the occurrence and during the continuation of any Event of Default (a) after receipt of any Case Proceeds (as defined in the Loan Agreement) has occurred, to ask for, demand, collect, sue for, recover, receive and give acquittance and receipts for moneys due and to become due in respect of any of the Collateral; and (b) to the extent necessary or desirable to effectuate the power set forth in clause (a), to endorse the Debtor's name on any checks, notes, acceptances, money orders, drafts and any other forms of payment or security that may come into the Secured Party's possession. The Debtor hereby ratifies and approves all acts of any such attorney and agrees that neither the Secured Party nor any such attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct. The Secured Party may file one or more financing statements disclosing its security interest in any or all of the Collateral without the Debtor's signature appearing thereon. The Debtor also hereby grants the Secured Party a power of attorney to execute any such financing statements, or amendments and supplements to financing statements, on behalf of the Debtor without notice thereof to the Debtor. The foregoing powers of attorney, being coupled with an interest, are irrevocable until the Obligations have been fully paid and satisfied.

Section 6.   *Defaults and Remedies.*   (a) An "Event of Default" on the Loan Agreement shall constitute an *"Event of Default"* hereunder.

Reference: Loan Number: VL1082-B

Borrower Initials

000084

(b)    Upon the occurrence and during the continuation of any Event of Default, the Secured Party shall have, in addition to all other rights provided herein or by law, the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights or remedies are asserted and regardless of whether the UCC applies to the affected Collateral), and further the Secured Party may, without demand and without advertisement, notice, hearing or process of law, all of which the Debtor hereby waives, at any time or times, sell and deliver all or any part of the Collateral held by or for it at public or private sale, for cash, upon credit or otherwise, at such prices and upon such terms as the Secured Party deems advisable, in its sole discretion and further may notify the account debtor or other person obligated on the Collateral to make payment or otherwise render performance to or for the benefit of Secured Party. In addition to all other sums due the Secured Party hereunder, the Debtor shall pay the Secured Party all costs and expenses incurred by the Secured Party, including reasonable attorneys' fees and court costs, in obtaining, liquidating or enforcing payment of Collateral or the Obligations or in the prosecution or defense of any action or proceeding by or against the Secured Party or the Debtor concerning any matter arising out of or connected with this Security Agreement or the Collateral or the Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code (or any successor statute). Any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Debtor in accordance with Section 11(b) hereof at least ten (10) days before the time of sale or other event giving rise to the requirement of such notice; *provided however,* no notification need be given to the Debtor if the Debtor has signed, after an Event of Default has occurred, a statement renouncing any right to notification of sale or other intended disposition. The Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. The Secured Party may be the purchaser at any such sale. The Debtor hereby waives all of its rights of redemption from any such sale. The Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, be made at the time and place to which the sale was postponed or the Secured Party may further postpone such sale by announcement made at such time and place. The Secured Party may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral or any part thereof, including disclaimers of any warranties of title or the like, and the Debtor acknowledges and agrees that the absence of such warranties shall not render the disposition commercially unreasonable.

(c)    Without in any way limiting the foregoing, upon the occurrence and during the continuation of any Event of Default, the Secured Party shall have the right to exercise any and all rights with respect to all Deposit Accounts of the Debtor, including, without limitation, the right to direct the disposition of the funds in each Deposit Account to collect, withdraw and receive all amounts due or to become due or payable under each such Deposit Account.

(d)    The powers conferred upon the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose on it any duty to exercise such powers. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equivalent to that which the Secured Party accords its own property, consisting of similar type assets. This Security Agreement constitutes an assignment of rights only and not an assignment

of any duties or obligations of the Debtor in any way related to the Collateral, and Secured Party shall have no duty or obligation to discharge any such duty or obligation. The Secured Party shall have no responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral. Neither the Secured Party nor any party acting as attorney for the Secured Party shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct.

(e)    Failure by the Secured Party to exercise any right, remedy or option under this Security Agreement or any other agreement between the Debtor and the Secured Party or provided by law, or delay by the Secured Party in exercising the same, shall not operate as a waiver; and no waiver by the Secured Party shall be effective unless it is in writing and then only to the extent specifically stated. The rights and remedies of the Secured Party under this Security Agreement shall be cumulative and not exclusive of any other right or remedy which the Secured Party may have.

Section 7.    *Application of Proceeds.* The proceeds and avails of the Collateral at any time received by the Secured Party after the occurrence and during the continuation of any Event of Default shall, when received by the Secured Party in cash or its equivalent, be applied by the Secured Party as follows:

(i)    first, to the payment and satisfaction of all sums paid and costs and expenses incurred by the Secured Party hereunder or otherwise in connection herewith, including such monies paid or incurred in connection with protecting, preserving or realizing upon the Collateral or enforcing any of the terms hereof, including reasonable attorneys' fees and court costs, together with any interest thereon (but without preference or priority of principal over interest or of interest over principal), to the extent the Secured Party is not reimbursed therefor by the Debtor; and

(ii)    second, to the payment and satisfaction of the remaining Obligations, whether or not then due (in whatever order the Secured Party elects), both for interest and principal.

The Debtor shall remain liable to the Secured Party for any deficiency. Any surplus remaining after the full payment and satisfaction of the foregoing shall be returned to the Debtor or to whomsoever the Secured Party reasonably determines is lawfully entitled thereto.

Section 8.    *Continuing Agreement.* This Security Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until all of the Obligations, both for principal and interest, have been fully paid and satisfied and all agreements of the Secured Party to extend credit to or for the account of the Debtor have expired or otherwise have been terminated. Upon such termination of this Security Agreement, the Secured Party shall, upon the request and at the expense of the Debtor, forthwith release its security interest hereunder.

Section 9.    *Miscellaneous.*    (a) This Security Agreement cannot be changed or terminated orally. All of the rights, privileges, remedies and options given to the Secured Party hereunder shall inure to the benefit of its successors and assigns, and all the terms, conditions,

covenants, agreements, representations and warranties of and in this Security Agreement shall bind the Debtor and its legal representatives, successors and assigns, provided that the Debtor may not assign its rights or delegate its duties hereunder without the Secured Party's prior written consent.

(b)   All notices hereunder shall be given in accordance with the terms of the Loan Agreement.

(c)   In the event and to the extent that any provision hereof shall be deemed to be invalid or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Security Agreement shall to such extent be construed as not containing such provision, but only as to such locations where such law or interpretation is operative, and the invalidity or unenforceability of such provision shall not affect the validity of any remaining provisions hereof, and any and all other provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

(d)   This Security Agreement shall be deemed to have been made in the State of Texas and shall be governed by, and construed in accordance with, the laws of the State of Texas. The headings in this Security Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any provision hereof.

(e)   This Security Agreement may be executed in any number of counterparts and by different parties hereto on separate counterpart signature pages, each constituting an original, but all together one and the same instrument. The Debtor acknowledges that this Security Agreement is and shall be effective upon its execution and delivery by the Debtor to the Secured Party, and it shall not be necessary for the Secured Party to execute this Security Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

(f)   The Debtor hereby submits to the non-exclusive jurisdiction of the United States Federal or State court sitting in Harris County, Texas for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. The Debtor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient form. THE DEBTOR AND THE SECURED PARTY EACH HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Debtor has caused this Security Agreement to be duly executed and delivered, as of the date and year first above written.

GIRARDI & KEESE

By: _____
    Name:  Thomas V. Girardi
    Title:    Managing Partner / Owner

Accepted and agreed to as of the date and year first above written.

VIRAGE SPV 1 LLC

By: Virage Capital Management LP, its
    manager

By: Virage LLC, its general partner

By: _____
    Name:  Edward Ondarza
    Title:    Manager

# EXHIBIT 11

000089

AMENDED AND RESTATED LOAN AGREEMENT

DATED AS OF NOVEMBER 1, 2017,

AMONG

GIRARDI & KEESE,

THE GUARANTORS FROM TIME TO TIME PARTY HERETO,

AND

VIRAGE SPV 1 LLC

Lender Reference:  Loan Number VL 1082-B

000090

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| SECTION 1. | DEFINITIONS; INTERPRETATION | 1 |
| Section 1.1. | Definitions | 1 |
| Section 1.2. | Interpretation | 6 |
| SECTION 2. | THE LOAN | 6 |
| Section 2.1. | The Loan | 6 |
| Section 2.2. | Calculation of Interest | 7 |
| Section 2.3. | Maturity of Loan | 7 |
| Section 2.4. | Prepayments | 7 |
| Section 2.5. | Recourse | 8 |
| Section 2.6. | Default Rate | 8 |
| Section 2.7. | Evidence of Indebtedness | 8 |
| Section 2.8. | Agreements Regarding Loan | 9 |
| Section 2.9. | Joint and Several Obligations | 9 |
| SECTION 3. | FEES | 10 |
| Section 3.1. | Fees | 10 |
| SECTION 4. | PLACE AND APPLICATION OF PAYMENTS | 10 |
| Section 4.1. | Place and Application of Payments | 10 |
| Section 4.2. | Non-Business Days | 11 |
| Section 4.3. | Payments Set Aside | 11 |
| SECTION 5. | REPRESENTATIONS AND WARRANTIES | 11 |
| Section 5.1. | Organization and Qualification | 11 |
| Section 5.2. | Authority and Validity of Obligations | 11 |
| Section 5.3. | Use of Proceeds | 12 |
| Section 5.4. | Financial Reports | 12 |
| Section 5.5. | No Material Adverse Change | 12 |
| Section 5.6. | Full Disclosure | 12 |
| Section 5.7. | Governmental Authority and Licensing | 13 |
| Section 5.8. | Legal Interest | 13 |
| Section 5.9. | Litigation and Other Controversies | 13 |
| Section 5.10. | Taxes | 13 |
| Section 5.11. | Approvals | 13 |
| Section 5.12. | Compliance with Laws and Ethics | 13 |
| Section 5.13. | Other Agreements | 13 |
| Section 5.14. | Solvency | 13 |
| Section 5.15. | No Default | 13 |

| SECTION 6. | CONDITIONS PRECEDENT | 14 |
|---|---|---|
| SECTION 7. | COVENANTS | 15 |
| Section 7.1. | Maintenance of Business; Retention of Rights in Case Proceeds | 15 |
| Section 7.2. | Taxes and Assessments | 15 |
| Section 7.3. | Reports | 15 |
| Section 7.4. | Inspection | 16 |
| Section 7.5. | Borrowings and Guaranties | 16 |
| Section 7.6. | Liens | 17 |
| Section 7.7. | Mergers, Consolidations and Sales | 18 |
| Section 7.8. | Compliance with Laws | 18 |
| Section 7.9. | Use of Proceeds | 18 |
| Section 7.10. | Maintenance of Malpractice Insurance | 18 |
| SECTION 8. | EVENTS OF DEFAULT AND REMEDIES | 19 |
| Section 8.1. | Events of Default | 19 |
| Section 8.2. | Non-Bankruptcy Defaults | 21 |
| Section 8.3. | Bankruptcy Defaults | 21 |
| SECTION 9. | THE GUARANTEES | 21 |
| Section 9.1. | The Guarantees | 21 |
| Section 9.2. | Guarantee Unconditional | 22 |
| Section 9.3. | Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances | 22 |
| Section 9.4. | Subrogation | 23 |
| Section 9.5. | Subordination | 23 |
| Section 9.6. | Waivers | 23 |
| Section 9.7. | Stay of Acceleration | 23 |
| Section 9.8. | Benefit to Guarantors | 24 |
| SECTION 10. | COLLATERAL | 24 |
| Section 10.1. | Collateral | 24 |
| Section 10.2. | Direction of Proceeds; Depository Banks | 24 |
| Section 10.3. | Further Assurances | 24 |
| SECTION 11. | MISCELLANEOUS | 25 |
| Section 11.1. | Notices | 25 |
| Section 11.2. | Amendments, Etc | 25 |
| Section 11.3 | Costs and Expenses; Indemnification | 25 |
| Section 11.4. | No Waiver, Cumulative Remedies | 26 |
| Section 11.5. | Survival of Representations | 26 |
| Section 11.6. | Survival of Indemnities | 27 |
| Section 11.7. | Counterparts, Integration; Effectiveness | 27 |
| Section 11.8. | Headings | 27 |

000092

| Section 11.9. | Severability of Provisions | 27 |
| Section 11.10. | Construction | 27 |
| Section 11.11. | Excess Interest | 28 |
| Section 11.12. | No Advisory or Fiduciary Responsibility | 28 |
| Section 11.13. | Binding Nature; Governing Law; Jurisdiction; Consent to Service of Process | 29 |
| Section 11.14. | Waiver of Jury Trial | 30 |
| Section 11.15 | Future Financing | 30 |
| Section 11.16. | USA Patriot Act | 30 |
| Section 11.17. | Confidentiality | 30 |
| Section 11.18. | Amendment and Restatement | 30 |

Signature Page ................................................................................................................ S-1

| EXHIBIT A | — | TERM NOTE |
| EXHIBIT B | — | ADDITIONAL GUARANTOR SUPPLEMENT |
| EXHIBIT C | — | LETTER OF DIRECTION |
| EXHIBIT D | — | DIRECTION OF PROCEEDS |
| EXHIBIT D-1 | — | LOAN PROCEEDS DISTRIBUTION |
| EXHIBIT E | — | PAYMENT AND STATUS UPDATE REPORT |

| SCHEDULE 1.1 | — | ELIGIBLE CASES |
| SCHEDULE 1.2 | — | ELIGIBLE COLLATERAL CASES |
| SCHEDULE 5.3 | — | EXPENSES |

000093

## AMENDED AND RESTATED LOAN AGREEMENT

This Amended and Restated Loan Agreement is entered into as of November 1, 2017, by and among Girardi & Keese, a California partnership, with offices at 1126 Wilshire Blvd, Los Angeles, CA 90017 ("Girardi"), ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████, the "Borrower"), the equity partners party to this Agreement, as Guarantors, and Virage SPV 1 LLC (the "Lender"), as the lender as provided herein with an address of 1700 Post Oak Boulevard, 2 BLVD Place, Suite 300, Houston, Texas 77056.

### PRELIMINARY STATEMENT

The Borrower and Virage SPV 1 LLC are currently party to that certain Loan Agreement dated as of July 31, 2017 (as amended, the "Existing Loan Agreement" or "Existing Loan"). The Borrower hereby requests that the Loan be increased under terms acceptable to Lender, including the payment in full of amounts due and owing under the Existing Loan Agreement, and that certain other amendments be made to the Existing Loan Agreement and, for the sake of clarity and convenience, that the Existing Loan Agreement be restated as so amended.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.    DEFINITIONS; INTERPRETATION.

Section 1.1.    Definitions.  The following terms when used herein shall have the following meanings:

"Adverse Case Resolution" means, with respect to any Eligible Case, a Case Resolution that results in no Case Proceeds.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided that, in any event for purposes of this definition, any Person that owns, directly or indirectly, 5% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 5% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"Agreement" means this Amended and Restated Loan Agreement, as the same may be amended, modified, restated or supplemented from time to time pursuant to the terms hereof.

"Borrower" is defined in the introductory paragraph of this Agreement.

Initials on Behalf of Each Borrower: _____   _____   _____

"Business Day" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Houston, Texas.

"Case Proceeds" means, with respect to any Eligible Case or Eligible Collateral Case, all funds and other property or value received directly or indirectly by or on behalf of the Borrower or an Affiliate for its own account in the form of (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) the client on account or as a result or by virtue (directly or indirectly) of an Eligible Case or Eligible Collateral Case, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement, or otherwise, and includes all of the Borrower's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; (ii) any consequential, recessionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, and attorneys' and other fees and costs awarded or recovered on account thereof; and (iii) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of the Eligible Case or Eligible Collateral Case. For the avoidance of doubt, "Case Proceeds" includes (without limitation) any and all of the foregoing in the form of cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds, and any other rights to payment of cash and/or transfer(s) of things of value or other property (including property substituted therefor), expense reimbursement, common benefit fees, or any other remuneration in which Borrowers or Guarantors have an interest, whether delivered or to be delivered in a lump sum or in installments, in relation to any Eligible Case or Eligible Collateral Case, or negotiation with any Person in relation to the Eligible Case or Eligible Collateral Case, in all events only to the extent such value is actually received by the Borrower or such Affiliate. For further clarity, "Case Proceeds" does not include the client's share of the settlement, nor previously disclosed referral fees owed to third-party law firms.

"Case Resolution" means, with respect to any Eligible Case or any Eligible Collateral Case, either full and final settlement of the Eligible Case or Eligible Collateral Case, or the entry of a final, non-appealable and enforceable judgment, in either case, resolving with prejudice all aspects and elements of such Eligible Case or Eligible Collateral Case.

"Change of Control" means any Guarantor ceases to be an equity partner in the Borrower for any reason, including death, incapacity or termination.

"Closing Date" means the date of this Agreement or such later Business Day upon which each condition described in Section 6 shall be satisfied or waived in a manner acceptable to the Lender in its discretion.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Initials on Behalf of Each Borrower: _____  _____  _____

-2-

"Collateral" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to the Lender by the Collateral Documents.

"Collateral Documents" means the Security Agreement and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements, control agreements, and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition which constitutes an Event of Default or any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default. "Designated Disbursement Account" means the operating account of the Borrower designated in writing to the Lender as the Borrower's Designated Disbursement Account (or such other account as the Borrower and the Lender may otherwise agree).

"Designated Disbursement Account" means the operating account of the Borrower designated in writing to the Lender as the Borrower's Designated Disbursement Account (or such other account as the Borrower and the Lender may otherwise agree).

"Effective Date" shall mean the date first set forth above.

"Eligible Case" means any and all filed or unfiled claims or cases, as well as litigation or arbitration for each case or claim listed on Schedule 1.1 and "Eligible Cases" means all of such cases and claims.

"Eligible Collateral Case" means any and all filed or unfiled claims or cases, as well as litigation or arbitration for each case or claim listed on Schedule 1.2 and "Eligible Collateral Cases" means all of such cases and claims.

"Event of Default" means any event or condition identified as such in Section 8.1.

"Expenses" means costs and expenses of litigation, including court filing fees, deposition costs, expert fees and expenses, investigation costs, long-distance telephone charges, messenger service fees, photocopying expenses, process server fees, case development costs, and medical expenses, and, in addition, marketing and case acquisition costs. Expenses shall not include

Initials on Behalf of Each Borrower: _____  _____  _____

-3-

attorney fees of the Loan Parties, salaries or other overhead of the Loan Parties.  The Borrower agrees not to pass through any expenses to its client that are not permitted in the written contract between the Borrower and its client.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranty Agreements" means and includes the Guarantee of the Guarantors provided for in Section 9, and any other guaranty agreement executed and delivered in order to guarantee the Obligations or any part thereof in form and substance acceptable to the Lender.

"Guarantors" means and includes each Person that signs a Guaranty Agreement.

"Indebtedness" means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business), (c) all indebtedness secured by any Lien upon property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all capitalized lease obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (g) all Guarantees of such Person in respect of any of the foregoing.

Initials on Behalf of Each Borrower: _____  _____  _____

-4-

"Interest Rate" means 20% per annum; unless prohibited under the laws of the State of the Borrower's principal place of business (i.e, the address set forth in the introductory paragraph above), in which case the Maximum Rate will apply.

"IRS" means the United States Internal Revenue Service.

"Legal Requirement" means any treaty, convention, statute, law, common law, rule, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any governmental authority, whether federal, state, or local.

"Lender" means VIRAGE SPV 1 LLC, in its capacity as the lender hereunder, and any successor in such capacity.

"Lien" means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any property, including the interests of a vendor or lessor under any conditional sale, capital lease or other title retention arrangement.

"Loan" is defined in Section 2.1.

"Loan Documents" means this Agreement, the Note, the Collateral Documents, the Guaranty Agreements, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith.

"Loan Party" means the Borrower and each of the Guarantors.

"Material Adverse Effect" means (a) a material adverse change in, or material adverse effect upon, the operations, business, property, condition (financial or otherwise) or prospects of the Borrower, (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document or the rights and remedies of the Lender thereunder or (ii) the perfection or priority of any Lien granted under any Collateral Document.

"Maturity Date" means (i) July 31, 2021, (ii) the date thirty (30) days after a Case Resolution has been achieved with respect to at least 90% of the Eligible Cases, or (iii) the date upon which the Loan is accelerated in accordance with Sections 8.2 or 8.3 hereof; provided that if the date in clause (i) is left blank, such date shall be four (4) years from the date of this Agreement.

"Note" is defined in Section 2.7.

"Obligations" means all obligations of the Borrower to pay principal and interest on the Loan, all fees and charges payable hereunder, and all other payment obligations of the Borrower or any other Loan Party arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

Initials on Behalf of Each Borrower: _____ _____ _____

-5-

"Person" means any natural Person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Responsible Officer" of any Person means any executive officer of such Person and any other officer, equity partner or managing member or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"Security Agreement" means that certain Security Agreement dated the date of this Agreement between the Borrower and the Lender, as the same may be amended, modified, supplemented or restated from time to time.

"U.S. Dollars" and "$" each means the lawful currency of the United States of America.

Section 1.2.   Interpretation.  The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  All references to time of day herein are references to Houston, Texas, time unless otherwise specifically provided.

SECTION 2.   THE LOAN.

Section 2.1.   The Loan.  The Lender and its affiliates have previously extended a loan to the Borrower pursuant to the Existing Loan Agreement. The principal balance of the Existing Loan Agreement is $10,500,000.00 and $542,500.00 of unpaid interest has accrued thereon, and the Borrower acknowledges that such amounts are due and owing without defense, offset or counterclaim (the total principal due under the Existing Loan Agreement is the "Existing Balance"). Subject to the terms and conditions hereof, the Lender agrees to make a new advance (the "New Advance") in U.S. Dollars to the Borrower in the amount of $175,000.00, such that the outstanding principal balance of the Loan as of the Closing Date is $10,675,000.00 (the "Loan") and unpaid interest accrued thereon in the amount of $542,500.00, and Borrower agrees that such amounts remain due and owing without defense, offset or counterclaim.  No amount repaid or

Initials on Behalf of Each Borrower:  _____  _____  _____

-6-

prepaid on the Loan (the Existing Balance plus the New Advance) may be borrowed again. The proceeds of the Loan will be sent via wire or other electronic funds transfer to the Designated Disbursement Account following Lender's receipt of Borrower's written direction and funds transfer information and satisfaction of the conditions precedent in this Agreement. The principal will be decreased by the amount of any prepayments and increased by the amount of any unpaid interest that accrues on the Loan amount and is added to the principal balance as set forth in Section 2.2. Each Loan Party acknowledges and agrees that the payoff of the Existing Loan Agreement shall be a cashless transaction without payment of any funds to Borrower.

Section 2.2.    Calculation of Interest. The Loan shall bear interest at a rate per annum equal to the Interest Rate from the date of the Amended and Restated Loan Agreement until the entire unpaid balance of the principal including unpaid accrued interest has been paid in full. Interest will begin accruing on the Business Day following the date of this Agreement. Interest shall be computed based on a 360-day year and the actual number of days elapsed. Unpaid accrued interest will be added to the unpaid principal balance on an annual basis on the anniversary date of the Amended and Restated Loan Agreement.   Unpaid accrued interest will increase the unpaid principal balance and will compound on an annual basis.

Section 2.3.    Maturity of Loan. The Borrower shall make a payment of all principal and interest not sooner paid on the Loan due and payable on the Maturity Date, subject to the provisions of Section 2.5.

Section 2.4.    Prepayments.

(a)    Optional. The Borrower may prepay in whole or in part (without penalty or premium) upon notice delivered by the Borrower to the Lender no later than 12:00 Noon (Houston time) on the date of prepayment.

(b)    Mandatory. If the Borrower shall at any time or from time to time receive any Case Proceeds, the Borrower shall, within five (5) days of receipt of any Case Proceeds, repay the Obligations in an aggregate amount equal to at least 90% of the amount of all such Case Proceeds (the "Mandatory Prepayments").    Additionally, the Borrower agrees that the Mandatory Prepayments may be adjusted by Lender, in Lender's sole discretion, as set forth below:

(i)    Borrower agrees to pay One-hundred percent (100%) of any Case Proceeds as the Mandatory Prepayments in the event that the amount of interest due on the Loan is equal to or greater than fifty percent (50%) of the current Principal balance of the Loan;

(ii)    Borrower agrees to pay One-hundred percent (100%) of any Case Proceeds as the Mandatory Prepayments in the event that the amount of the Obligations due is equal to or greater than one-hundred fifty percent (150%) of the original Principal balance of the Loan; or

(iii)    Borrower agrees to pay One-hundred percent (100%) of any Case Proceeds as the Mandatory Prepayments in the event that the Borrower fails to provide the information required

Initials on Behalf of Each Borrower: _____  _____  _____

-7-

by Section 7.3 of this Agreement or, in the good faith judgment of Lender, the information provided by Borrower is inaccurate;

Notwithstanding the forgoing, Borrower agrees that in the Event of Default, and in addition to any other rights of Lender under the terms of this Amended and Restated Loan Agreement, Borrower agrees that 100% of all such Case Proceeds shall be used to repay the Obligations.

Upon a reduction in the amount of the Obligations or additional Collateral being provided by Borrower (and made subject to the terms of this Agreement and the security interest of Lender), Lender may, in its sole good faith discretion, reduce the Mandatory Prepayments. Lender shall provide written notice (including via electronic communication as permitted herein) to Borrower and any Guarantor of a change in the Mandatory Prepayments. Upon receipt of such written notice, Borrower shall immediately update the instructions required by Section 10.2 of this Agreement to reflect the adjustment in the Mandatory Prepayments. Each of the Loan Parties expressly agrees that GPW shall have sole and independent authority to provide instructions to Lender and the administrator of the QSF with respect to the direction of amounts received from Case Proceeds that are due to Borrower, if any, without any further written consent from any Loan Party and notwithstanding any conflicting instructions from any Loan Party.

Section 2.5.    Recourse. The Loan Parties agree that the Lender has full recourse for the Obligations under this Agreement against Borrower; provided, however, the Lender's recourse to GPW and Russomanno in connection with the principal and interest portion of the Obligations shall be limited to the sum of (i) the portion of the Loan which was not used to fund Expenses (as reflected in Schedule 5.3), plus (ii) 100% of Case Proceeds of the Eligible Cases and Eligible Collateral Cases. Notwithstanding the foregoing, the Loan Parties shall at all times and in all cases be responsible for 100% of the Obligations consisting of penalty fees, if any, and other charges payable hereunder and all other payment obligations of any Loan Party arising under or in relation to any Loan Document.

Section 2.6.    Default Rate. Notwithstanding anything to the contrary contained herein, while any Event of Default exists or after acceleration, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of the Loan and other amounts at a rate per annum equal to the sum of 5.0% plus the Interest Rate; provided, however, that in the absence of acceleration pursuant to Sections 8.2 or 8.3, any adjustments pursuant to this Section shall be made at the election of the Lender, with written notice to the Borrower (which election may be retroactively effective to the date of such Event of Default). While any Event of Default exists or after acceleration, interest shall be paid on demand of the Lender.

Section 2.7.    Evidence of Indebtedness. (a) The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower resulting from the Loan made by the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

Initials on Behalf of Each Borrower: \_\_\_\_\_  \_\_\_\_\_  \_\_\_\_\_

-8-

(b)    The Lender shall also maintain accounts in which it will record (i) the amount of the Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder from the Borrower.

(c)    The entries maintained in the accounts maintained pursuant to subsections (a) and (b) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; provided, however, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Obligations in accordance with their terms.

(d)    The Borrower shall prepare, execute and deliver to the Lender a promissory note or notes payable to the Lender or its registered assigns in the forms of Exhibit A (the "Note").

Section 2.8.    Agreements Regarding Loan. (a) The Borrower and the Lender hereby agree that this Agreement and all the Loan Documents evidence a loan and financing agreement wherein the Lender is providing financing to the Borrower, and the Borrower represents to the Lender that the contemplated transactions do not constitute in any manner a fee sharing agreement between the Lender and the Borrower, and it is the intent of the Borrower to strictly comply with all Legal Requirements and all ethical obligations of the Borrower.

(b)    The Borrower and the Lender acknowledge and agree that the Lender does not have a contingent or other interest in the outcome of any Eligible Cases or Eligible Collateral Cases. The Lender shall have no direct contact with the Borrower's clients, and the Lender shall have no influence or control over the litigation strategy with respect to any Eligible Cases or Eligible Collateral Cases.  The Borrower shall not, without the consent of the relevant client, disclose to the Lender any attorney-client privileged or confidential information of its clients relating to the Eligible Cases, Eligible Collateral Cases, or otherwise.  The Lender shall not interfere, and the Borrower shall not allow any interference by the Lender, with the attorney-client relationship in connection with any Eligible Cases, Eligible Collateral Cases, or otherwise.

Section 2.9.    Joint and Several Obligations.  Each party constituting the Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Lender for the payment and performance of the Obligations.  Each party constituting Borrower acknowledges and agrees that its joint and several liability on the Obligations owed by any party or parties constituting Borrower under this Agreement is absolute and unconditional and shall not in any manner be affected or impaired by any of acts or omissions whatsoever by the Lender, and without limiting the generality of the foregoing, each party constituting Borrower's joint and several liability on the Obligations shall not be impaired by any acceptance by the Lender of any other security for or guarantors upon the Obligations or by any failure, neglect or omission on the Lender's part to resort to any one or all of the parties constituting Borrower for payment of the Obligations or to realize upon or protect any collateral security therefor.  Each party constituting Borrower's joint and several liability on the Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the Loans or for what purposes such credits and financial accommodations are used, and each party constituting Borrower waives notice of

Initials on Behalf of Each Borrower: _____  _____  _____

-9-

borrowing requests issued by, and Loans made to, the other parties constituting Borrower. Such joint and several liability of each party constituting Borrower shall also not be impaired or affected by (and the Lender, without notice to anyone, is hereby authorized to make from time to time) any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or disposition of any collateral security for the Obligations or of any guaranty thereof. In order to enforce payment of the Obligations, foreclose or otherwise realize on any Collateral, or exercise any other rights granted hereunder or under any other Loan Document or under applicable law (all in accordance with the terms of the Loan Documents), the Lender shall be under no obligation at any time to first resort to any Collateral, Property, Liens, or any other rights or remedies whatsoever, and the Lender shall have the right to enforce the Obligations irrespective of whether or not other proceedings or steps are pending seeking resort to or realization upon or from any of the foregoing. Each party constituting Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse, or subrogation available to such Borrower against any party liable for payment of any Obligations, or as to any security therefor, unless and until the Obligations have been paid and satisfied in full. By its acceptance below, each party constituting Borrower hereby expressly waives and surrenders any defense to its joint and several liability on the Obligations based upon any of the foregoing. In furtherance thereof, each party constituting Borrower agrees that wherever in this Agreement it is provided that the Borrower is liable for a payment or performance of an obligation, such obligation is the joint and several obligation of each party constituting Borrower. Notwithstanding anything herein to the contrary, the right of recovery against each party constituting Borrower under this Agreement shall not exceed $1.00 less than the lowest amount which would render such party constituting Borrower's obligation under this Agreement void or voidable under applicable law, including, without limitation, fraudulent conveyance law. Lender and each of the Loan Parties acknowledge that the foregoing terms in this Section are subject to the terms of Section 2.5 above.

SECTION 3.    FEES.

Section 3.1.    Fees.

(a)    Closing Fee. The Borrower shall pay to the Lender on the Closing Date a non-refundable closing fee in an amount equal to 1.50% of the original principal amount of the Loan. The Lender is hereby authorized to deduct such amount from the disbursement of the Loan.

(b)    Late Fees. In addition to any other amounts due hereunder, if any payment due hereunder is not received by the Lender on or before 1:00 p.m. (Houston time) of the third (3rd) Business Day after such payment is due, the Borrower shall pay to the Lender on demand a late fee equal to the greater of (i) five percent (5%) of the amount due or (ii) $15.00.

SECTION 4.    PLACE AND APPLICATION OF PAYMENTS.

Section 4.1.    Place and Application of Payments. All payments of principal of and interest on the Loan, and all other Obligations payable by the Borrower under this Agreement and the other Loan Documents, shall be made by the Borrower to the Lender prior to 5:00 p.m. (Houston time)

Initials on Behalf of Each Borrower: _____ _____ _____

-10-

on the due date thereof at the place designated for payment by the Lender in Houston, Texas. Any payments received after such time shall be deemed to have been received by the Lender on the next Business Day. All such payments shall be made in U.S. Dollars, in immediately available funds at the place of payment, in each case without set-off or counterclaim. All payments shall first be applied to indemnities and expenses payable to Lender or any other indemnified Person under this Agreement and to the Loan Documents, then to all accrued but unpaid interest on the Loan and then to the outstanding principal balance of the Loan.

Section 4.2.    Non-Business Days. If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable. In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

Section 4.3.    Payments Set Aside. To the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to the Lender is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

SECTION 5.    REPRESENTATIONS AND WARRANTIES.

The Borrower represents and warrants to the Lender as follows:

Section 5.1.    Organization and Qualification. The Borrower is duly organized, validly existing, and in good standing as a limited liability company, limited partnership or corporation, as applicable, under the laws of the jurisdiction in which it is organized, has full and adequate power to conduct its business as now conducted, and is duly licensed or qualified in its jurisdiction or organization. No Loan Party is the subject of any order of relief under any Debtor Relief Law.

Section 5.2.    Authority and Validity of Obligations. Each Loan Party has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for (in the case of the Borrower), to guarantee the Obligations (in the case of each Guarantor), to grant to the Lender the Liens described in the Collateral Documents executed by the Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it. The Loan Documents delivered by the Loan Parties have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of such Loan Parties enforceable against each of them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement

Initials on Behalf of Each Borrower: _____ _____ _____

-11-

and the other Loan Documents do not, nor does the performance or observance by any Loan Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon any Loan Party or any provision of the organizational documents (e.g., charter, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of any Loan Party, (b) contravene or constitute a default under any covenant, indenture or agreement of or affecting any Loan Party or any of their respective property, or (c) result in the creation or imposition of any Lien on any property of any Loan Party other than the Liens granted in favor of the Lender pursuant to the Collateral Documents.

Section 5.3.   Use of Proceeds.   The Borrower shall use the proceeds of the Loan to fund the Expenses set forth on Schedule 5.3, including the full payment and satisfaction of any loan on the Collateral or other loan, and pay any fees due to the Lender on the Closing Date under this Agreement, and not for any other purpose (including for personal, household or family purposes). For further clarity, the proceeds of the Loan will be used for a commercial purpose and only for law firm purposes. Furthermore, up to 20% of the proceeds of the Loan may be used to reimburse the partners of the Borrower for Expenses set forth on Schedule 5.3 previously advanced to the Borrower by such partners.

Section 5.4.   Financial Reports.   All financial statements of the Loan Parties heretofore submitted to the Lender are true and correct in all material respects, have been prepared in accordance with appropriate accounting principles consistently applied, and truly and accurately reflect in all material respects the financial condition of the relevant Loan Party and, with respect to the Borrower, the results of the operations and cash flows for the Borrower as of the dates thereof and for the periods covered thereby. The Borrower has no contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 7.3(e).

Section 5.5.   No Material Adverse Change.   Since May 1, 2017, (a) there has been no change in the condition (financial or otherwise) or business prospects of any Loan Party, none of which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect nor (b) has there been a material adverse change in the value of the Collateral or the Borrower's interest in the same taken as a whole.

Section 5.6.   Full Disclosure.   The statements and information furnished to the Lender in connection with the negotiation of this Agreement and the other Loan Documents as required to obtain the commitment by the Lender to provide all or part of the financing contemplated hereby or subsequently provided to Lender as required under the terms of this Agreement (including, but not limited to, the information provided by Borrower with respect to the Eligible Cases and Eligible Collateral Cases from time to time as required by Section 7.3) do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading, the Lender acknowledging that as to any projections furnished to the Lender, the Loan Parties only represent that the same were prepared on the basis of information and estimates the Loan Parties believed to be reasonable.

Initials on Behalf of Each Borrower: _____ _____ _____

000105

Section 5.7.    Governmental Authority and Licensing.   The Borrower has received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct their businesses.   No investigation or proceeding which, if adversely determined, could reasonably be expected to result in revocation or denial of any material license, permit or approval is pending or, to the knowledge of the Borrower, threatened.

Section 5.8.    Legal Interest.   The Borrower has good and defensible legal interest in the Eligible Cases as set forth on Schedule 1.1 and the Eligible Collateral Cases as set forth on Schedule 1.2, subject to no Liens other than such thereof as are permitted by Section 7.6.

Section 5.9.    Litigation and Other Controversies.   There is no litigation or governmental or arbitration proceeding pending, nor to the knowledge of any Loan Party threatened, against any Loan Party.

Section 5.10.    Taxes.  All federal and state tax returns required to be filed by any Loan Party in any jurisdiction have, in fact, been filed, and all taxes upon any Loan Party or upon any of their respective property, income or franchises, which are shown to be due and payable in such returns, have been paid, except such Taxes, if any, as are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in accordance with GAAP have been provided.

Section 5.11.    Approvals.  No authorization, consent, license or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by any Loan Party of any Loan Document, except for (i) such approvals which have been obtained prior to the date of this Agreement and remain in full force and effect and (ii) filings which are necessary to perfect the security interests under the Collateral Documents.

Section 5.12.    Compliance with Laws and Ethics.  The Borrower is in compliance with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing.

Section 5.13.    Other Agreements.  No Loan Party is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

Section 5.14.    Solvency.  The Borrower is solvent, able to pay its debts as they become due, and has sufficient capital to carry on its business.

Section 5.15.    No Default.  No Default has occurred and is continuing.

Initials on Behalf of Each Borrower: _____  _____  _____

-13-

SECTION 6.     CONDITIONS PRECEDENT.

This Agreement shall not be binding on Lender until this Agreement has been executed and delivered by the Borrower, the Guarantors and the Lender, and prior to making the Loan the following conditions precedent shall have been satisfied:

(a)     each of the representations and warranties set forth herein and in the other Loan Documents shall be true and correct as of said time, except to the extent the same expressly relate to an earlier date, in which case they shall be true and correct as of such earlier date;

(b)     no Default shall have occurred and be continuing or would occur as a result of the Loan;

(c)     the Lender shall have received the duly executed Note of the Borrower dated the date hereof and otherwise in compliance with the provisions of Section 2.7;

(d)     the Lender shall have received the Security Agreement duly executed by the Borrower and deposit account control agreements to the extent requested by the Lender;

(e)     the Lender shall have received copies of the Borrower's certificate of limited partnership and partnership agreement (or comparable organizational documents) and any amendments thereto;

(f)     the Lender shall have received the initial fees called for by Section 3.1;

(g)     the capital and organizational structure of the Borrower shall be satisfactory to the Lender;

(h)     the Lender shall have received financing statement, tax, and judgment lien search results against the Collateral evidencing the absence of Liens thereon except as permitted by Section 7.6;

(i)     the Lender shall have received pay-off and lien release letters from secured creditors of the Borrower (other than secured parties intended to remain outstanding after the Closing Date with Indebtedness and Liens permitted by Sections 7.5 and 7.6) setting forth, among other things, the total amount of indebtedness outstanding and owing to them and containing an undertaking to cause to be delivered to the Lender UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of the Borrower, which pay-off and lien release letters shall be in form and substance acceptable to the Lender;

(j)     the Lender shall have received a fully executed Internal Revenue Service Form W-9 (or its equivalent) for the Borrower and each Guarantor;

Initials on Behalf of Each Borrower: _____ _____ _____

(k)     the Borrower shall have entered into an agreement with The Settlement Alliance, LLC to establish a Qualified Settlement Fund ("QSF") for the receipt of all Case Proceeds. Borrower agrees to continue the agreement with The Settlement Alliance (or, should The Settlement Alliance cease doing business, another QSF provider of Virage's choosing), and not revoke or terminate same, until all Obligations have been satisfied; and

(l)     the Lender shall have received such other agreements, instruments, documents, certificates, and opinions as the Lender may reasonably request.

SECTION 7.     COVENANTS.

The Borrower agrees that, so long as any credit is available to or in use by the Borrower hereunder, except to the extent compliance in any case or cases is waived in writing by the Lender:

Section 7.1.     Maintenance of Business; Retention of Rights in Case Proceeds.   The Borrower shall preserve and maintain its existence.  The Borrower shall preserve and keep in force and effect all licenses, permits, and approvals necessary to the proper conduct of its business.  The Borrower shall not assign or reassign any of Borrower's rights to the Case Proceeds in any of the Eligible Cases or Eligible Collateral Cases unless and until Borrower has satisfied all of the Obligations under the terms of this Agreement and Lender has released its security interest, if any, in the Eligible Cases and Eligible Collateral Cases.  The Borrower shall handle the Eligible Cases and the Eligible Collateral Cases with best efforts in order to receive compensation for each of Borrower's clients, all within the applicable rules of professional responsibility, until Borrower has satisfied its Obligations under this Agreement.

Section 7.2.     Taxes and Assessments.  The Borrower shall duly pay and discharge all federal, state, and local taxes, rates, assessments, fees, and governmental charges upon or against it, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

Section 7.3.     Reports.  The Borrower shall furnish to the Lender:

(a)     as soon as available, and in any event no later than 105 days after the last status report of all Eligible Cases and Eligible Collateral Cases was received by Lender, a status report of all Eligible Cases and Eligible Collateral Cases in the form and format provided in Exhibit E to this Agreement, prepared by the Borrower and certified to by a partner of the Borrower which status report shall describe the current status of the Eligible Cases and Eligible Collateral Cases, the expected date of receipt of Case Proceeds and any material developments since the last quarterly status report;

(b)     promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of any Loan Party or of notice of any material noncompliance with any applicable law, regulation or guideline relating to any Loan Party;

Initials on Behalf of Each Borrower:  _____  _____  _____

-15-

(c)     notice of any Change of Control;

(d)     promptly after knowledge thereof shall have come to the attention of any Responsible Officer of the Borrower or any Loan Party, written notice of (i) any threatened or pending litigation or governmental or arbitration proceeding or labor controversy against any Loan Party or any of their property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, (ii) the occurrence of any Material Adverse Effect, (iii) the occurrence of any Default or (iv) any material deterioration in the value of the Collateral or the Borrower's interest therein;

(e)     within five (5) Business Days after receipt of an award letter from the NFL or receipt of the gross settlement funds (whichever first occurs), Borrower will send Lender a settlement statement confirming the percentage of the funds due to the client, the percentage due to referring lawyers, if any, (and whether Settlement Administrator or Borrower will be paying such referral fees), and the amount paid to Lender; and

(f)     promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Loan Party, or compliance with the terms of any Loan Document, as the Lender may reasonably request, subject to the terms of Section 2.8.

Section 7.4.     Inspection.   The Borrower shall permit the Lender and each of its duly authorized representatives and agents to visit and inspect any of its property, corporate books, and financial records (including documentation necessary to support the character and quality of the Collateral), to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision the Borrower hereby authorizes such accountants to discuss with the Lender the finances and affairs of the Borrower) at such reasonable times and intervals as the Lender may designate and, so long as no Default exists, with reasonable prior notice to the Borrower, subject at all times to all Legal Requirements and Section 2.8.

Section 7.5.     Borrowings and Guaranties.   The Borrower shall not issue, incur, assume, create or have outstanding any Indebtedness, or be or become liable as endorser, guarantor, surety or otherwise for any Indebtedness or undertaking of any Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any Person; provided, however, that the foregoing shall not restrict nor operate to prevent:

(a)     the Obligations of the Borrower owing to the Lender and any other indebtedness, liabilities and obligations of the Borrower owing to the Lender;

Initials on Behalf of Each Borrower: _____ _____ _____

-16-

000109

(b)    purchase money indebtedness and capitalized lease obligations of the Borrower in an amount not to exceed $250,000.00 in the aggregate at any one time outstanding;

(c)    secured indebtedness, other than the secured indebtedness referenced in Section 7.5 (d) and (e), in an amount not to exceed $250,000.00 in the aggregate at any one time outstanding;

(d)    indebtedness by Girardi in favor of Law Finance Group, LLC in an aggregate principal amount not to exceed $10,500,000.00 at any one time outstanding so long as interest on such principal balance is paid current;

(e)    indebtedness by Girardi in favor of California Attorney Lending in an aggregate principal amount not to exceed $5,000,000.00 at any one time outstanding so long as such principal balance is paid current;

(f)    indebtedness by Girardi in favor of Stillwell Madison, LLC in an aggregate amount not to exceed $1,000,000.00 at any one time outstanding so long as such principal balance is paid current;

(g)    indebtedness by Girardi in favor of Comerica in an aggregate principal amount not to exceed $27,000,000.00 at any one time outstanding so long as interest on such principal balance is paid current; and

(h)    unsecured indebtedness of the Borrower not otherwise permitted by this Section in an amount not to exceed $250,000.00 in the aggregate at any one time outstanding.

Section 7.6.    Liens.

(a) Girardi Liens.  Girardi shall not create, incur or permit to exist any Lien of any kind on any of its property (including the Collateral); provided, however, that the foregoing shall not apply to nor operate to prevent:

(i)    Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(ii)    Liens on equipment of the Borrower created solely for the purpose of securing indebtedness permitted by Section 7.5(b), representing or incurred to finance the purchase price of such property, provided that no such Lien shall extend to or cover other property of the Borrower other than the respective property so acquired, and the principal

Initials on Behalf of Each Borrower: _____  _____  _____

-17-

amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such property, as reduced by repayments of principal thereon;

     (iii)    any interest or title of a lessor under any operating lease, including the filing of Uniform Commercial Code financing statements solely as a precautionary measure in connection with operating leases entered into by the Borrower in the ordinary course of its business;

     (iv)    other encumbrances not materially affecting the conduct of the Borrower's business and not securing Indebtedness;

     (v)    Liens on cases and claims which do not constitute Collateral to secure indebtedness permitted by Sections 7.5(c), 7.5(d), and 7.5(e); and

     (vi)    Liens granted in favor of the Lender pursuant to the Collateral Documents.

(b) GPW and Russomanno Liens. GPW and Russomanno shall not create, incur or permit to exist any Lien of any kind on the Collateral; provided, however, that the foregoing shall not apply to nor operate to prevent:

     (i)    Liens on cases and claims which do not constitute Collateral to secure indebtedness permitted by Sections 7.5(a), 7.5(b), and 7.5(c); and

     (ii)    Liens granted in favor of the Lender pursuant to the Collateral Documents.

Section 7.7.    Mergers, Consolidations and Sales. The Borrower shall not be a party to any merger or consolidation or amalgamation, or sell, transfer, lease or otherwise dispose of all or substantially all of its assets. The Borrower shall not sell, transfer, refer, encumber or otherwise dispose of its legal interest in any Eligible Cases and any Eligible Collateral Cases or enter into any agreement for the same or similar purpose without the written consent of the Lender; provided that the foregoing restrictions shall not apply to any Case Resolution in the ordinary course of business.

Section 7.8.    Compliance with Laws. The Borrower shall comply in all respects with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing.

Section 7.9.    Use of Proceeds. The Borrower shall use the proceeds of the Loan solely for the purposes set forth in, or otherwise permitted by, Section 5.3.

*Section 7.10.    Maintenance of Malpractice Insurance.* During the term of this Agreement, the Borrower shall maintain, at its sole cost and expense, legal malpractice insurance policies issued by an insurance carrier with an A.M. Best rating of "A" or better. The Borrower represents and warrants that the Malpractice Insurance Policies are in full force and effect and the Firm is not in default under any of them and no claim for coverage thereunder has been denied under any such

Initials on Behalf of Each Borrower: _____ _____ _____

-18-

current Malpractice Insurance Policies with respect to any matter. At the request of the Lender, the Borrower shall furnish the Lender with a copy of the certificate of insurance evidencing the coverage under such Malpractice Insurance Policies and the Firm agrees that no such Malpractice Insurance Policies may be cancelled or the amount of coverage under such Malpractice Insurance Policies reduced without thirty (30) days prior written notice to the Lender.

SECTION 8.      EVENTS OF DEFAULT AND REMEDIES.

Section 8.1.      Events of Default.  Any one or more of the following shall constitute an "Event of Default" hereunder:

(a)      default in the payment when due of all or any part of the principal of or interest on the Loan (whether at the stated maturity thereof or at any other time provided for in this Agreement) or of any fee or other Obligation payable hereunder or under any other Loan Document or any default has occurred under any other agreement with the Lender;

(b)      default in the observance or performance of any covenant set forth in Sections 7.1, 7.2, 7.4, 7.5, 7.6, 7.7, 7.8, 7.9 or 10.2 of this Agreement;

(c)      default in the observance or performance of any other provision hereof (including, but not limited to the obligation to provide information under Section 7.3) or of any other Loan Document which is not remedied within thirty (30) days after the earlier of (i) the date on which such failure shall first become known to any Responsible Officer of the Borrower or (ii) written notice thereof is given to the Borrower by the Lender;

(d)      any representation or warranty made herein or in any other Loan Document or in any certificate furnished to the Lender pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby is determined in the sole discretion of the Lender to be untrue in any material respect as of the date of the issuance or making or deemed making thereof;

(e)      (i) any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or (ii) any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or (iii) any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the Lender in any Collateral purported to be covered thereby except as expressly permitted by the terms hereof, or (iv) any Loan Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder;

(f)      default shall occur under any Indebtedness issued, assumed or guaranteed by any Loan Party in an amount in excess of $25,000.00, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue

Initials on Behalf of Each Borrower:  _____  _____  _____

for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness (whether or not such maturity is in fact accelerated), or any such Indebtedness shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

(g)     (i) any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against any Loan Party, or against any of their respective property, in an aggregate amount for all such Persons in excess of $25,000.00 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days, or any action shall be legally taken by a judgment creditor to attach or levy upon any property of any Loan Party to enforce any such judgment, or (ii) any Loan Party shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(h)     any Change of Control shall occur; or the death or legal incompetence of any Guarantor shall occur;

(i)     any Loan Party shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate or similar action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 8.1(j);

(j)     a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for any Loan Party, or any substantial part of any of its property, or a proceeding described in Section 8.1(i)(v) shall be instituted against any Loan Party, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of thirty (30) days; or

(k)     the Borrower's engagement with the client is terminated for any reason (whether initiated by the Borrower, the client or legal process other than Adverse Case Resolution) with respect to more than 5% of Eligible Cases (a "Client Termination"); provided, however, that in the event of such Client Termination, the Borrower shall be

Initials on Behalf of Each Borrower: _____  _____  _____

-20-

permitted to present replacement cases to Lender in an effort to cure such breach; provided further, that such cases must be presented to Lender within fifteen (15) days of the Client Termination and such cases will not be deemed Eligible Cases unless and until Lender provides written notice of acceptance of same by Lender to Borrower which shall be given in Lender's sole discretion. Borrower agrees to notify Lender within seven (7) days of its representation being terminated by any client or of a dual representation claim being asserted as to any client.

Section 8.2.   Non-Bankruptcy Defaults.   When any Event of Default (other than those described in subsections (j) or (k) of Section 8.1 with respect to the Borrower) has occurred and is continuing, the Lender may, by written notice to the Borrower, declare the principal of and the accrued interest on the Loan to be forthwith due and payable and thereupon the Loan, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under the Loan Documents without further demand, presentment, protest or notice of any kind. In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable law or equity when any such Event of Default has occurred and is continuing. Without limiting the foregoing, the Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of the Collateral and to enforce any of the Lender's remedies, without prior notice or hearing as to such appointment.

Section 8.3.   Bankruptcy Defaults.   When any Event of Default described in subsections (i) or (j) of Section 8.1 with respect to the Borrower has occurred and is continuing, then the Loan shall immediately become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or notice of any kind. In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable law or equity when any such Event of Default has occurred and is continuing.

SECTION 9.   THE GUARANTEES.

Section 9.1.   The Guarantees.   To induce the Lender to provide the Loan described herein and in consideration of benefits expected to accrue to the Borrower by reason of the Loan and for other good and valuable consideration, receipt of which is hereby acknowledged, the equity partner of Girardi (including any equity partner executing an Additional Guarantor Supplement in the form attached hereto as Exhibit B or such other form acceptable to the Lender) hereby unconditionally and irrevocably guarantees jointly and severally to the Lender, the due and punctual payment of all present and future Obligations, including, but not limited to, the due and punctual payment of principal of and interest on the Loan, and Borrower guarantees the due and punctual payment of all Obligations now or hereafter owed by the Borrower under the Loan Documents, subject to Section 2.5, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges after the entry of an order for relief against the Borrower or such other obligor in a case under the United States Bankruptcy Code or any similar proceeding, whether or not such interest, costs, fees and charges would be an allowed claim against the Borrower or any such obligor in any such proceeding).

Initials on Behalf of Each Borrower: _____ _____ _____

-21-

Section 9.2.   Guarantee Unconditional.   The obligations of each Guarantor under this Section 9 shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(a)   any full or limited extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of any Loan Party or other obligor or of any other guarantor under this Agreement or any other Loan Document or by operation of law or otherwise;

(b)   any modification or amendment of or supplement to this Agreement or any other Loan Document;

(c)   any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, any Loan Party or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of any Loan Party or other obligor or of any other guarantor contained in any Loan Document;

(d)   the existence of any claim, set-off, or other rights which any Loan Party or other obligor or any other guarantor may have at any time against the Lender or any other Person, whether or not arising in connection herewith;

(e)   any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against any Loan Party or other obligor, any other guarantor, or any other Person or property;

(f)   any application of any sums by whomsoever paid or howsoever realized to any obligation of any Loan Party or other obligor, regardless of what obligations of any Loan Party or other obligor remain unpaid;

(g)   any invalidity or unenforceability relating to or against any Loan Party or other obligor or any other guarantor for any reason of this Agreement or of any other Loan Document or any provision of applicable law or regulation purporting to prohibit the payment by any Loan Party or other obligor or any other guarantor of the principal of or interest on any Loan or any other amount payable under the Loan Documents; or

(h)   any other act or omission to act or delay of any kind by the Lender or any other Person or any other circumstance whatsoever that might, but for the provisions of this subsection, constitute a legal or equitable discharge of the obligations of any Guarantor under this Section 9.

Section 9.3.   Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances.   Each Guarantor's obligations under this Section 10 shall remain in full force and effect until the principal of and interest on the Loan and all other amounts payable by the Borrower and the other Loan Parties under this Agreement and all other Loan Documents shall have been

Initials on Behalf of Each Borrower: _____  _____  _____

-22-

paid in full. If at any time any payment of the principal of or interest on any Loan or any other amount payable by any Loan Party or other obligor or any guarantor under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of such Loan Party or other obligor or of any guarantor, or otherwise, each Guarantor's obligations under this Section 9 with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

Section 9.4.   Subrogation. Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations shall have been paid in full. If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the payment in full of the Obligations and all other amounts payable by the Loan Parties hereunder and the other Loan Documents, such amount shall be held in trust for the benefit of the Lender (and its Affiliates) and shall forthwith be paid to the Lender or be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

Section 9.5.   Subordination. Each Guarantor (each referred to herein as a "Subordinated Creditor") hereby subordinates the payment of all indebtedness, obligations, and liabilities of the Borrower or other Loan Party owing to such Subordinated Creditor, whether now existing or hereafter arising, to the indefeasible payment in full in cash of all Obligations. During the existence of any Event of Default, subject to Section 9.4, any such indebtedness, obligation, or liability of the Borrower or other Loan Party owing to such Subordinated Creditor shall be enforced and performance received by such Subordinated Creditor as trustee for the benefit of the holders of the Obligations and the proceeds thereof shall be paid over to the Lender for application to the Obligations (whether or not then due), but without reducing or affecting in any manner the liability of such Guarantor under this Section 9.

Section 9.6.   Waivers.   Each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Lender or any other Person against the Borrower or any other Loan Party or other obligor, another guarantor, or any other Person. Furthermore, each Guarantor irrevocably waives the benefit of any right of discharge under Chapter 43 of the Texas Civil Practice and Remedies Code and all other rights of sureties and guarantors under such Chapter; and waives all rights or defenses arising under Rule 31 of the Texas Rules of Civil Procedure, Section 17.001 of the Texas Civil Practice and Remedies Code, or any other statute or law, common law, in equity, under contract or otherwise, or under any amendments, recodifications, supplements or any successor statute or law of or to any such statute or law.

Section 9.7.   Stay of Acceleration. If acceleration of the time for payment of any amount payable by the Borrower or other Loan Party or other obligor under this Agreement or any other Loan Document is stayed upon the insolvency, bankruptcy or reorganization of the Borrower or such other Loan Party or obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement or the other Loan Documents shall nonetheless be payable by the Guarantors hereunder forthwith on demand by the Lender.

Initials on Behalf of Each Borrower: _____  _____  _____

-23-

Section 9.8.    Benefit to Guarantors.    Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder, and each Guarantor acknowledges that this guarantee is necessary or convenient to the conduct, promotion and attainment of its business.

SECTION 10.    COLLATERAL.

Section 10.1.    Collateral.    The Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of the Borrower in all of the Case Proceeds of all Eligible Cases and Eligible Collateral Cases, whether now owned or hereafter acquired. The Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to the Lender and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Lender.

Section 10.2.    Direction of Proceeds; Depository Banks.    Upon request by the Lender, the Borrower shall make such arrangements as may be reasonably requested by the Lender to assure that all Case Proceeds are deposited (in the same form as received) in the QSF for further disbursement to Lender. As part of Borrower's foregoing obligation, if applicable, Borrower shall send a written direction ("Letter of Direction") to the administrator of the litigation or qualified settlement fund to direct any Case Proceeds due to Borrower to the QSF until further notice for further disbursement to Lender. A form of this Letter of Direction is attached hereto as Exhibit C. If necessary, the Borrower agrees to provide a Letter of Direction to the administrator of the QSF to direct any Case Proceeds received in the QSF to Lender. Borrower shall provide a copy of the Letter of Direction to Lender that has been accepted and countersigned by Borrower. Borrower shall not revoke the Letter of Direction until the Loan has been paid in full or by prior written agreement with Lender. Any Case Proceeds received by the Borrower shall be promptly deposited into the QSF and, until so deposited, shall held by it in trust for the Lender.

At the Lender's sole option, Lender may require that the Borrower make such arrangements as reasonably requested to assure that all Case Proceeds are deposited (in the same form received) in a deposit account maintained with a commercial bank reasonably acceptable to the Lender subject to a deposit account control agreement in favor of the Lender on terms reasonably satisfactory to the Lender or otherwise held in the name of the Lender as agent for the Borrower (such deposit account being hereinafter referred to as the "Assigned Account"). The Borrower acknowledges and agrees that the Lender has (and is hereby granted to the extent it does not already have) a Lien on the Assigned Account and all funds contained therein to secure the Obligations. The Lender may apply the funds on deposit in the Assigned Account to the Obligations (whether or not then due) and distribute the excess to the Borrower.

The QSF or Assigned Account, as applicable, shall remain in place until Borrower has satisfied all Obligations under this Agreement and after such time the QSF or Assigned Account may be terminated and closed.

Section 10.3.    Further Assurances.    The Borrower agrees that it shall, from time to time at the request of the Lender, execute and deliver such documents and do such acts and things as the Lender may reasonably request in order to provide for or perfect or protect such Liens on the

Initials on Behalf of Each Borrower: _____  _____  _____

-24-

Collateral or otherwise carry out the terms of this Agreement. Upon the Borrower making a new equity partner, the Borrower shall promptly thereafter cause such new equity partner to execute a Guaranty Agreement, and the Loan Parties shall also deliver to the Lender, or cause such equity partner to deliver to the Lender, at the Borrower's cost and expense, such other instruments, documents, certificates, and opinions reasonably required by the Lender in connection therewith.

SECTION 11.    MISCELLANEOUS.

Section 11.1.    Notices.

(a)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail to the addresses listed in the introductory paragraph of this Agreement. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through electronic communications, to the extent provided in subsection (b) below, shall be effective as provided in said subsection (b).

(b)    Electronic Communications. The Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    Change of Address, Etc. Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

Section 11.2.    Amendments, Etc. No amendment, modification, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 11.3.    Costs and Expenses; Indemnification. (a) The costs and expenses of the Lender in connection with the negotiation, preparation, execution and delivery of this Agreement,

Initials on Behalf of Each Borrower: _____ _____ _____

-25-

000118

the other Loan Documents are covered by the closing fee. The Borrower agrees to pay on demand the costs and expenses of the Lender in connection with any subsequent consents hereunder or waivers or amendments hereto or thereto, including the reasonable fees and expenses of counsel for the Lender with respect to all of the foregoing (whether or not the transactions contemplated by any such waiver or amendment are consummated). The Borrower further agrees to pay to the Lender or any other holder of the Obligations all costs and expenses (including court costs and reasonable attorneys' fees), if any, incurred or paid by the Lender or any other holder of the Obligations in connection with any Default or Event of Default or in connection with the enforcement of this Agreement or any of the other Loan Documents or any other instrument or document delivered hereunder or thereunder (including, without limitation, all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving the Borrower or any guarantor). The Borrower further agrees to indemnify the Lender, and any security trustee, and their respective directors, officers and employees, against all losses, claims, damages, penalties, judgments, liabilities and expenses (including, without limitation, all expenses of litigation or preparation therefor, whether or not the indemnified Person is a party thereto) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any extension of credit made available hereunder, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification. The Borrower, upon demand by the Lender at any time, shall reimburse the Lender for any legal or other expenses incurred in connection with investigating or defending against any of the foregoing except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified. The obligations of the Borrower under this Section shall survive the termination of this Agreement.

(b)  All amounts due under this Section shall be payable within five (5) Business Days after demand therefor.

(c)  Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

Section 11.4.  No Waiver, Cumulative Remedies.  No delay or failure on the part of the Lender or on the part of the holder or holders of any of the Obligations in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The rights and remedies hereunder of the Lender and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

Section 11.5.  Survival of Representations.  All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

Initials on Behalf of Each Borrower:  _____  _____  _____

-26-

Section 11.6.    Survival of Indemnities. All indemnities and other provisions relative to reimbursement to the Lender of amounts sufficient to protect the yield of the Lender with respect to the Loan, including, but not limited to, Section 11.3, shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligations.

Section 11.7.    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Lender, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 6, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.8.    Headings. Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 11.9.    Severability of Provisions. Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

Section 11.10.    Construction. The parties acknowledge and agree that the Loan Documents shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of the Loan Documents. Each Loan Party acknowledges that it has had access to counsel of its own choice in negotiations leading up to execution of this Agreement. Each Loan Party acknowledges that (a) it has conducted such investigation and inquiry that it, in its sole discretion, deems necessary and in executing this Agreement, (b) no Loan Party is relying or acting upon any advice or representation of the Lender and (c) no Loan Party has been influenced to any extent in entering in this Agreement by any statements made by any other party. Each Loan Party has read this Agreement and has had it fully explained to them by its counsel or has waived its right to do so. Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

Initials on Behalf of Each Borrower: _____  _____  _____

-27-

Section 11.11.    Excess Interest.    Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable law (after giving effect to any separate usury waiver that the Borrower may have delivered to the Lender) to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loan or other obligations outstanding under this Agreement or any other Loan Document ("Excess Interest"). If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither the Borrower nor any guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that the Lender may have received hereunder shall, at the option of the Lender, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable law), (ii) refunded to the Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the "Maximum Rate"), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither the Borrower nor any guarantor or endorser shall have any action against the Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any of Borrower's Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Borrower's Obligations shall remain at the Maximum Rate until the Lender has received the amount of interest which the Lender would have received during such period on the Borrower's Obligations had the rate of interest not been limited to the Maximum Rate during such period.

Section 11.12.    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) no fiduciary, advisory or agency relationship between any Loan Party and the Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Lender has advised or is advising any Loan Party on other matters, (ii) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between such Loan Parties and their Affiliates, on the one hand, and the Lender, on the other hand, (iii) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate and (iv) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents and is sophisticated in the practice of law and in borrowing funds to finance litigation expenses; and (b) (i) the Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates, or any other Person; (ii) the Lender has no obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly

Initials on Behalf of Each Borrower:  _____   _____   _____

-28-

set forth herein and in the other Loan Documents; and (iii) the Lender and its respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of any Loan Party and its Affiliates, and the Lender has no obligation to disclose any of such interests to any Loan Party or its Affiliates and (iv) the Lender has not solicited any clients for the Borrower and has not recommended any clients to the Borrower. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.13.    Binding Nature; Governing Law; Jurisdiction; Consent to Service of Process. (a) This Agreement shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Lender and the benefit of its successors and assigns, including any subsequent holder of the Obligations. The Borrower may not assign its rights hereunder without the written consent of the Lender. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

(b)    THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS (EXCEPT AS OTHERWISE SPECIFIED THEREIN), AND THE RIGHTS AND DUTIES OF THE PARTIES HERETO, SHALL BE CONSTRUED AND DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION; PROVIDED, HOWEVER, FOR PURPOSES OF CLARIFICATION AND NOT AS A LIMITATION, THE TERMS OF THE AGREEMENT AND THE NOTES RELATED TO THE INTEREST RATE WILL BE CONSTRUED BY AND DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF THE BORROWER'S PRINCIPAL PLACE OF BUSINESS.

(c)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the United States District Court for the Southern District of Texas and of any Texas State court sitting in the City of Houston, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each party hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Texas State court or, to the extent permitted by applicable Legal Requirements, in such federal court. Each party hereto hereby agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirements. Nothing in this Agreement or any other Loan Document or otherwise shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any Guarantor or its respective properties in the courts of any jurisdiction.

(d)    Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Legal Requirements, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or

Initials on Behalf of Each Borrower:  _____  _____  _____

-29-

000122

any other Loan Document in any court referred to in Section 11.13(c). Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable Legal Requirements, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)   Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than e-mail) in Section 11.1. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable Legal Requirements.

Section 11.14.   Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 11.15.   Future Financing. It is the intent of the Borrower and Lender to have an ongoing borrowing and lending relationship and, therefore, Borrower agrees that if it intends to obtain financing in the future that is similar in nature to the Loan contemplated by this Agreement, then Lender shall have the right to provide such future financing on equal or better terms than those Borrower has obtained in good faith. In the event that Borrower obtains from a third party (or multiple third parties) in good faith a term sheet, commitment letter or other document reflecting transaction terms that Borrower desires to accept, Borrower shall first provide such document to Lender and Lender shall evaluate the collateral for such proposed financing and the terms thereof and, within fourteen (14) Business Days of receipt thereof, advise Borrower if Lender is amenable to granting a loan upon substantially the same or better terms. In the event Lender agrees to provide such new financing in writing, Borrower and Lender shall enter into such financing on substantially the same terms and conditions. Nothing in this Section 11.15 shall obligate Lender to make additional loans or provide any additional financing to Borrower.

Section 11.16.   USA Patriot Act. The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify, and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.

Section 11.17.   Confidentiality. The Loan Parties acknowledge that this Agreement and the other Loan Documents are for the Loan Parties' confidential use only and may not, without the written consent of the Lender, be disclosed by any Loan Party to any other Person other than Representatives of the Loan Parties having a need to know the same, except where such disclosure

Initials on Behalf of Each Borrower: _____ _____ _____

-30-

is required by law or legal process (in which case the Loan Parties agree to notify the Lender promptly thereof). As used above, "Representatives" of a Loan Party means such Loan Party or its employees, directors, officers attorneys and agents (but not commercial lenders).

Section 11.18. Amendment and Restatement. This Agreement shall become effective on the Closing Date and shall then supersede all provisions of the Existing Loan Agreement as of such date. From and after such date, all references made to the Existing Loan Agreement in any Loan Document or in any other instrument or document shall, without further action, be deemed to refer to this Agreement. This Agreement amends and restates the Existing Loan Agreement and is not intended to be or operate as a novation or an accord and satisfaction of the Existing Loan Agreement or the indebtedness, obligations and liabilities of the Borrower evidenced or provided for thereunder. Without limiting the generality of the foregoing, the Borrower agrees that notwithstanding the execution and delivery of this Agreement, the Liens previously granted to the Lender pursuant to the Collateral Documents shall be and remain in full force and effect and that any rights and remedies of the Lender thereunder and obligations of the Borrower thereunder shall be and remain in full force and effect, shall not be affected, impaired or discharged thereby and shall secure all of the Borrower's indebtedness, obligations and liabilities to the Lender under the Existing Loan Agreement as Second Amended and Restated hereby and Security Agreement shall encumber the Eligible Cases and Eligible Collateral Cases as defined in this Agreement. Without limiting the foregoing, the parties to this Agreement hereby acknowledge and agree that the "Note" referred to in the Collateral Documents shall from and after the date hereof be deemed references to this Agreement and the Note issued hereunder.

[SIGNATURE PAGES TO FOLLOW]

Initials on Behalf of Each Borrower: _____ _____ _____

-31-

000124

This Amended and Restated Loan Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

"BORROWER"

**Girardi & Keese**

By _____
    Name:  Thomas V. Girardi
    Title:    Managing Partner / Owner

█████████████████████

By _____
█████████████████
███ ████████████████ ──
███████████████████

By _____
████████████████████
    Title:   President

"GUARANTORS"

EACH GUARANTOR ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS AMENDED AND RESTATED LOAN AGREEMENT (WHICH INCLUDES THE GUARANTEE) AS OF THE TIME OF EXECUTION.

_____
THOMAS V. GIRARDI, individually

Initials on Behalf of Each Borrower: _____ _____ _____

"LENDER"

**VIRAGE SPV 1 LLC**

By: **Virage Capital Management LP**, its
    manager

By: **Virage LLC**, its general partner

By _____
    Name:  Edward Ondarza
    Title:   Manager

Initials on Behalf of Each Borrower: _____  _____  _____

# EXHIBIT 12

This document was auto-generated from data received from the California Department of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Corporation Service Company    1-800-858-5294 | **Initial Filing #:** 177614819640<br>**Initial Book #:**<br>**Initial Page #:**<br>**Initial Filing Date:** 11/6/2017 |
| **B. E-MAIL CONTACT AT FILER (optional)**<br>SPRFiling@cscinfo.com | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address)<br>⌐1383 83500<br>Corporation Service Company<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703<br>Filed In: California<br>(S.O.S.) | |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME Girardi & Keese | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1126 Wilshire Blvd | CITY Los Angeles | STATE CA / POSTAL CODE 90017 | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS P.O. BOX 2576<br>uccsprep@cscinfo.com | CITY SPRINGFIELD | STATE IL / POSTAL CODE 62708 | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All right, title, and interest of the Debtor, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the following:
(a) Accounts and General Intangibles (including Payment Intangibles) arising out of any Eligible Case (as defined in the Loan Agreement) and any other property constituting Case Proceeds (as defined in the Loan Agreement);
(b) Any Assigned Accounts into which any of the Collateral described in clause (a) above is deposited; and
(c) Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof.
"Loan Agreement" means that certain Loan Agreement dated as of 11/01/2017 between the Debtor and lender for whom the Secured Party is acting as the agent, as the same may be amended, modified or restated from time to time. For more information regarding this security interest, please contact the Secured Party at the address above.

| | |
|---|---|
| **5. Check only if applicable and check only one box:** Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
| **6a. Check only if applicable and check only one box:**<br>☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | **6b. Check only if applicable and check only one box:**<br>☐ Agricultural Lien ☐ Non-UCC Filing |
| **7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |
| **8. OPTIONAL FILER REFERENCE DATA:** | 1383 83500 |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
This document was auto-generated from data received from the California Department of State

Corporation Service Company
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

# EXHIBIT 13

## PROMISSORY NOTE

U.S. $4,070,000.00                                                      FEBRUARY 26, 2018

     FOR VALUE RECEIVED, the undersigned, Girardi & Keese, a law firm organized under the laws of the State of California (the *"Borrower"*), hereby promises to pay to Virage SPV 1 LLC (the *"Lender"*) or its registered assigns at the principal office of the Lender in Houston, Texas (or such other location as the Lender may designate to the Borrower), in immediately available funds, the principal sum of Four Million Seventy Thousand Dollars and No Cents ($4,070,000.00), together with any accrued interest added to the principal balance in accordance with Section 2.2 of the Loan Agreement, or, if less, the aggregate unpaid principal amount of the Loan made or maintained by the Lender to the Borrower pursuant to the Loan Agreement, in the manner and subject to the terms of Section 2 of the Loan Agreement, together with interest on the principal amount of such Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Loan Agreement.

     This Note is the Note referred to in the Loan Agreement dated as of February 26, 2018, among the Borrower, the Guarantors party thereto, and the Lender (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Loan Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Loan Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Texas.

     Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Loan Agreement.

     The Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

GIRARDI & KEESE

By: _____
     Name: Thomas V. Girardi
     Title:  Managing Partner / Owner

Lender Reference: VI.1100                                    Borrower Initials_____

000130

# EXHIBIT 14

000131

LOAN AGREEMENT

DATED AS OF FEBRUARY 26, 2018

AMONG

**GIRARDI & KEESE,**

THE GUARANTORS FROM TIME TO TIME PARTY HERETO,

AND

**VIRAGE SPV 1 LLC**

Lender Reference: VL1100

000132

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---------|---------|------|
| SECTION 1. | DEFINITIONS; INTERPRETATION .................................................... | 1 |
| Section 1.1. | Definitions .......................................................................... | 1 |
| Section 1.2. | Interpretation ...................................................................... | 6 |
| SECTION 2. | THE LOAN ............................................................................. | 6 |
| Section 2.1. | The Loan ............................................................................. | 6 |
| Section 2.2. | Calculation of Interest ......................................................... | 7 |
| Section 2.3. | Maturity of Loan ................................................................. | 7 |
| Section 2.4. | Prepayments ....................................................................... | 7 |
| Section 2.5. | Recourse ............................................................................. | 8 |
| Section 2.6. | Default Rate ....................................................................... | 8 |
| Section 2.7. | Evidence of Indebtedness .................................................... | 8 |
| Section 2.8. | Agreements Regarding Loan ................................................ | 9 |
| SECTION 3. | FEES ................................................................................... | 9 |
| Section 3.1. | Fees ................................................................................... | 9 |
| SECTION 4. | PLACE AND APPLICATION OF PAYMENTS ..................................... | 10 |
| Section 4.1. | Place and Application of Payments ....................................... | 10 |
| Section 4.2. | Non-Business Days ............................................................. | 10 |
| Section 4.3. | Payments Set Aside ............................................................ | 10 |
| SECTION 5. | REPRESENTATIONS AND WARRANTIES ........................................... | 11 |
| Section 5.1. | Organization and Qualification ............................................ | 11 |
| Section 5.2. | Authority and Validity of Obligations .................................. | 11 |
| Section 5.3. | Use of Proceeds .................................................................. | 11 |
| Section 5.4. | Financial Reports ................................................................ | 11 |
| Section 5.5. | No Material Adverse Change ................................................ | 12 |
| Section 5.6. | Full Disclosure ................................................................... | 12 |
| Section 5.7. | Governmental Authority and Licensing ................................. | 12 |
| Section 5.8. | Legal Interest; Liens ........................................................... | 12 |
| Section 5.9. | Litigation and Other Controversies ...................................... | 12 |
| Section 5.10. | Taxes ................................................................................. | 12 |
| Section 5.11. | Approvals ........................................................................... | 13 |
| Section 5.12. | Compliance with Laws and Ethics ........................................ | 13 |
| Section 5.13. | Other Agreements .............................................................. | 13 |
| Section 5.14. | Solvency ............................................................................ | 13 |
| Section 5.15. | No Default .......................................................................... | 13 |
| SECTION 6. | CONDITIONS PRECEDENT ......................................................... | 13 |

-i-

SECTION 7.    COVENANTS ....................................................................................14

    Section 7.1.    Maintenance of Business; Retention of Rights in Case
        Proceeds ....................................................................14
    Section 7.2.    Taxes and Assessments ................................................14
    Section 7.3.    Reports ..........................................................................15
    Section 7.4.    Inspection ......................................................................15
    Section 7.5.    Borrowings and Guaranties .........................................15
    Section 7.6.    Liens ..............................................................................16
    Section 7.7.    Mergers, Consolidations and Sales ..............................17
    Section 7.8.    Compliance with Laws .................................................17
    Section 7.9.    Use of Proceeds ............................................................17
    Section 7.10.    Maintenance of Malpractice Insurance ......................17

SECTION 8.    EVENTS OF DEFAULT AND REMEDIES ..............................18

    Section 8.1.    Events of Default ..........................................................18
    Section 8.2.    Non-Bankruptcy Defaults ............................................20
    Section 8.3.    Bankruptcy Defaults ....................................................20

SECTION 9.    THE GUARANTEES ...........................................................20

    Section 9.1.    The Guarantees .............................................................20
    Section 9.2.    Guarantee Unconditional .............................................20
    Section 9.3.    Discharge Only upon Payment in Full; Reinstatement in
        Certain Circumstances .................................................21
    Section 9.4.    Subrogation ..................................................................21
    Section 9.5.    Subordination ...............................................................22
    Section 9.6.    Waivers .........................................................................22
    Section 9.7.    Stay of Acceleration .....................................................22
    Section 9.8.    Benefit to Guarantors ...................................................22
    Section 9.9.    Representations and Covenants ....................................22

SECTION 10.    COLLATERAL .................................................................23

    Section 10.1.    Collateral ......................................................................23
    Section 10.2.    Direction of Proceeds; Depository Banks ...................23
    Section 10.3.    Further Assurances .......................................................24

SECTION 11.    MISCELLANEOUS ..........................................................24

    Section 11.1.    Notices ..........................................................................24
    Section 11.2.    Amendments, Etc ..........................................................25
    Section 11.3    Costs and Expenses; Indemnification ..........................25
    Section 11.4.    No Waiver, Cumulative Remedies ...............................26
    Section 11.5.    Survival of Representations ..........................................26
    Section 11.6.    Survival of Indemnities ................................................26
    Section 11.7.    Counterparts, Integration; Effectiveness ....................26
    Section 11.8.    Headings ........................................................................27

-ii-

| Section 11.9. | Severability of Provisions | 27 |
| Section 11.10. | Construction | 27 |
| Section 11.11. | Excess Interest | 27 |
| Section 11.12. | No Advisory or Fiduciary Responsibility | 28 |
| Section 11.13. | Binding Nature; Governing Law; Jurisdiction; Consent to Service of Process | 28 |
| Section 11.14. | Waiver of Jury Trial | 29 |
| Section 11.15. | Future Financing | 30 |
| Section 11.16. | USA Patriot Act | 30 |
| Section 11.17. | Confidentiality | 30 |

Signature Page ................................................................................................ S-1

| EXHIBIT A | — | TERM NOTE |
| EXHIBIT B | — | ADDITIONAL GUARANTOR SUPPLEMENT |
| EXHIBIT C | — | LETTER OF DIRECTION |
| EXHIBIT D | — | DIRECTION OF PROCEEDS |
| EXHIBIT D-1 | — | LOAN PROCEEDS DISTRIBUTION |
| EXHIBIT E | — | PAYMENT AND STATUS UPDATE REPORT |
| EXHIBIT F | — | LETTER OF AUTHORIZATION |

| SCHEDULE 1.1 | — | ELIGIBLE CASES |
| SCHEDULE 1.2 | — | ELIGIBLE COLLATERAL CASES |
| SCHEDULE 1.2A | — | TALCUM POWDER AND RISPERDAL ELIGIBLE COLLATERAL CASES |
| SCHEDULE 5.3 | — | EXPENSES |

000135

## LOAN AGREEMENT

This Loan Agreement is entered into as of February 26, 2018, by and among Girardi & Keese, a California Partnership organized under the laws of the State of California having an address of 1126 Wilshire Boulevard, Los Angeles, California 90017 (the *"Borrower"*), the equity partners party to this Agreement, as Guarantors, and Virage SPV 1 LLC (the *"Lender"*), as the lender as provided herein with an address of 1700 Post Oak Boulevard, 2 BLVD Place, Suite 300, Houston, Texas 77056.

### PRELIMINARY STATEMENT

The Borrower has requested, and the Lender has agreed to extend, a loan on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.    DEFINITIONS; INTERPRETATION.

*Section 1.1.    Definitions.* The following terms when used herein shall have the following meanings:

*"Adverse Case Resolution"* means, with respect to any Eligible Case, a Case Resolution that results in no Case Proceeds. However, Adverse Case Resolution does not include: (i) a voluntary dismissal; entry of judgment or dismissal resulting from a motion to dismiss, summary judgment or otherwise, wherein the court allows for an amended or refiled pleading to correct an alleged failure to adhere to procedural or substantive prerequisites to maintaining such legal matter; (ii) entry of judgment or dismissal resulting from a motion to dismiss, summary judgment or otherwise, wherein the court disallows an amended or refiled pleading to cure an alleged failure to adhere to procedural or substantive prerequisites to maintaining such legal matter, other than a dismissal or entry of judgment on the merits; or (iii) dismissal or entry of judgment based upon actions and/or omissions of Borrower, any Guarantor, handling attorney/firm or co-counsel that make the basis of a legal malpractice claim or allegation.

*"Affiliate"* means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided that*, in any event for purposes of this definition, any Person that owns, directly or indirectly, 5% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 5% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

*"Agreement"* means this Loan Agreement, as the same may be amended, modified, restated or supplemented from time to time pursuant to the terms hereof.

-1-                                                                Borrower Initials ___

*"Borrower"* is defined in the introductory paragraph of this Agreement.

*"Business Day"* means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Houston, Texas.

*"Case Proceeds"* means, with respect to any Eligible Case or Eligible Collateral Case, all funds and other property or value received directly or indirectly by or on behalf of the Borrower or an Affiliate (and not the client's share) on account of (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) the client on account or as a result or by virtue (directly or indirectly) of an Eligible Case or Eligible Collateral Case, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement or otherwise, and includes all of the Borrower's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; (ii) any consequential, recessionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, and attorneys' fees (including, without limitation, common benefit fees) and other fees and costs awarded or recovered on account thereof; (iii) any expense reimbursement; and (iv) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of the Eligible Case or Eligible Collateral Case and amounts received on account of fees and expenses in connection with any of the forgoing. "Case Proceeds" includes (without limitation) any and all of the foregoing in the form of cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds and any other rights to payment of cash and/or transfer(s) of things of value or other property (including property substituted therefor), whether delivered or to be delivered in a lump sum or in installments, in relation to any Eligible Case or Eligible Collateral Case or negotiation with any Person in relation to the Eligible Case or Eligible Collateral Case, in all events only to the extent such value is actually received by the Borrower or such Affiliate.

The amount received by Borrower shall be determined net of (a) the amount of the recovery actually due and payable to the client, and (b) any amounts actually due and payable to a referral or handling law firm or attorney that is not employed by or on retainer with Borrower, an Affiliate of Borrower or otherwise related (including by marriage) to Borrower, any Guarantor or any current or former employee of Borrower or Guarantor (the *"Referral Amount"*). For any amounts described in clause (b) above to be excluded from the calculation **or deducted from the amount** of Case Proceeds such amount or percentage must have been disclosed in writing to Lender no less than five (5) days prior to the date of this Agreement.

*"Case Resolution"* means, with respect to any Eligible Case or Eligible Collateral Case, either full and final settlement of the Eligible Case or Eligible Collateral Case or the entry of a final, non-appealable and enforceable judgment, in either case, resolving with prejudice all aspects and elements of such Eligible Case or Eligible Collateral Case.

*"Change of Control"* means any Guarantor ceases to be an equity partner in the Borrower for any reason, including death, incapacity or termination.

-2-

Borrower Initials _____

"*Closing Date*" means the date of this Agreement or such later Business Day upon which each condition described in Section 6 shall be satisfied or waived in a manner acceptable to the Lender in its discretion.

"*Code*" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"*Collateral*" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to the Lender by the Collateral Documents.

"*Collateral Documents*" means the Security Agreement and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements, control agreements, and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"*Default*" means any event or condition which constitutes an Event of Default or any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"*Designated Disbursement Account*" means the operating account of the Borrower designated in writing to the Lender as the Borrower's Designated Disbursement Account (or such other account as the Borrower and the Lender may otherwise agree).

"*Effective Date*" shall mean the date first set forth above.

"*Eligible Case*" means all legal matters (whether filed or unfiled) in which Borrower and/or Guarantor currently has or hereafter acquires a legal interest in or which relates to the Porter Ranch legal matters. The list of claimants and/or claims listed on Schedule 1.1 represents those Porter Ranch legal matters in which the Borrower and/or Guarantor has a current legal interest. "*Eligible Cases*" means all of such cases and claims.

"*Eligible Collateral Case*" means each case or claim listed on Schedule 1.2 and/or Schedule 1.2A. "*Eligible Collateral Cases*" means all of such cases and claims.

-3-

Borrower Initials _____

"*Event of Default*" means any event or condition identified as such in Section 8.1. of this Agreement.

"*Expense*" or "*Expenses*" means costs and expenses of litigation, including court filing fees, deposition costs, expert fees and expenses, investigation costs, long-distance telephone charges, messenger service fees, photocopying expenses, process server fees, case development costs, and medical expenses, and, in addition, marketing and case acquisition costs. Expenses shall not include attorney fees of the Loan Parties, salaries or other overhead of the Loan Parties. The Borrower agrees not to pass through any expenses to its client which are not permitted in the written contract between the Borrower and its client.

"*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Guarantee*" of or by any Person (the "*guarantor*") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; *provided,* that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"*Guaranty Agreements*" means and includes the Guarantee of the Guarantors provided for in Section 9, and any other guaranty agreement executed and delivered in order to guarantee the Obligations or any part thereof in form and substance acceptable to the Lender.

"*Guarantor*" or "*Guarantors*" means and includes each Person that signs a Guaranty Agreement.

"*Indebtedness*" means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business), (c) all indebtedness secured by any Lien upon property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all capitalized lease obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for

-4-                                                                 Borrower Initials _____

borrowed money, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (g) all Guarantees of such Person in respect of any of the foregoing.

*"Interest Rate"* means 20.00% per annum; unless prohibited under the laws of the State of the Borrower's principal place of business (i.e., the address set forth in the introductory paragraph above), in which case the Maximum Rate will apply.

*"IRS"* means the United States Internal Revenue Service.

*"Legal Requirement"* means any treaty, convention, statute, law, common law, rule, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any governmental authority, whether federal, state, or local.

*"Lender"* means VIRAGE SPV 1 LLC, in its capacity as the lender hereunder, and any successor in such capacity.

*"Lien"* means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any property, including the interests of a vendor or lessor under any conditional sale, capital lease or other title retention arrangement.

*"Loan"* is defined in Section 2.1. of this Agreement

*"Loan Documents"* means this Agreement, the Note, the Collateral Documents, the Guaranty Agreements, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith.

*"Loan Party"* means the Borrower and each of the Guarantors.

*"Material Adverse Effect"* means (a) a material adverse change in, or material adverse effect upon, the operations, business, property, condition (financial or otherwise) or prospects of the Borrower, (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document or the rights and remedies of the Lender thereunder or (ii) the perfection or priority of any Lien granted under any Collateral Document.

*"Maturity Date"* means the earliest of (i) February 26, 2020, (ii) the date thirty (30) days after a Case Resolution has been achieved with respect to at least 90% of the Eligible Cases or Eligible Collateral Cases listed on Schedules 1.1 or 1.2, respectively, or (iii) the date upon which the Loan is accelerated in accordance with Sections 8.2 or 8.3 hereof; provided that if the date in clause (i) is left blank, such date shall be two (2) years from the date of this Agreement.

*"Note"* is defined in Section 2.7. of this Agreement.

-5-                                                                    Borrower Initials _____

000140

"*Obligations*" means all obligations of the Borrower to pay principal and interest on the Loan, all fees and charges payable hereunder, and all other payment obligations of the Borrower or any other Loan Party arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

"*Person*" means any natural Person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Responsible Officer*" of any Person means any executive officer of such Person and any other officer, equity partner or managing member or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"*Security Agreement*" means that certain Security Agreement dated the date of this Agreement between the Borrower and the Lender, as the same may be amended, modified, supplemented or restated from time to time.

"*U.S. Dollars*" and "*$*" each means the lawful currency of the United States of America.

*Section 1.2.    Interpretation.* The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references to time of day herein are references to Houston, Texas, time unless otherwise specifically provided.

SECTION 2.    THE LOAN.

*Section 2.1.    The Loan.* Subject to the terms and conditions hereof, the Lender agrees to make a loan in U.S. Dollars to the Borrower in the amount of $4,070,000.00 (the "*Loan*"). The Loan shall be advanced in a single borrowing on the Closing Date. No amount repaid or prepaid on the Loan may be borrowed again. The proceeds of the Loan will be sent via wire or other electronic funds transfer to the Designated Disbursement Account following Lender's receipt of

-6-                                                      Borrower Initials _____

Borrower's written direction and funds transfer information and satisfaction of the conditions precedent in this Agreement. The principal will be decreased by the amount of any prepayments and increased by the amount of any unpaid interest that accrues on the Loan amount and is added to the principal balance as set forth in Section 2.2.

Section 2.2.    *Calculation of Interest.*  The Loan shall bear interest at a rate per annum equal to the Interest Rate from the Closing Date until the entire unpaid balance of the principal including unpaid accrued interest has been paid in full. Interest shall be computed based on a 360-day year and the actual number of days elapsed. Unpaid accrued interest will be added to the unpaid principal balance on an annual basis on the anniversary date of the Loan Agreement. Unpaid accrued interest will increase the unpaid principal balance and will compound on an annual basis.

Section 2.3.    *Maturity of Loan.*  The Borrower shall make a payment of all principal and interest not sooner paid on the Loan due and payable on the Maturity Date, subject to the provisions of Section 2.5.

Section 2.4.    *Prepayments.*

(a)    *Optional.*  The Borrower may prepay in whole or in part (without penalty or premium) upon notice delivered by the Borrower to the Lender no later than 12:00 p.m. Noon (Houston time) on the date of prepayment.

(b)    *Mandatory.*  If the Borrower shall at any time or from time to time receive any Case Proceeds from any Eligible Cases, the Borrower shall, within five (5) days of receipt of such Case Proceeds from the Eligible Case, repay the Obligations in an aggregate amount equal to one hundred percent (100%) of the amount of all such Case Proceeds, directing such Case Proceeds as set forth in Section 10 below. In the event that the Obligations have not been repaid by at least fifty percent (50%) by the end of the eighteenth (18th) month from the Effective Date, the Borrower shall also repay the Obligations in an aggregate amount equal to at least sixty percent (60%) of the amount of any Case Proceeds from any Eligible Collateral Cases within five (5) days of receipt of such Case Proceeds from any Eligible Collateral Case, directing such Case Proceeds as set forth in Section 10 below. Additionally, Borrower shall make the following lump sum payments to Lender, which will be applied to the Obligations, as follows: (i) $1,000,000.00 at the end of the sixth (6th) month from the Effective Date; (ii) $1,00,000.00 at the end of the twelfth (12th) month from the Effective Date; and (iii) an amount equal to any Obligations still outstanding at the end of the twenty-fourth (24th) month from the Effective Date (collectively, the *"Mandatory Prepayments"*). Additionally, the Borrower agrees that the Mandatory Prepayments may be adjusted by Lender, in Lender's sole discretion, as set forth below:

(i)    Borrower agrees to pay one-hundred percent (100%) of any Case Proceeds as the Mandatory Prepayments in the event that the amount of interest due on the Loan is equal to or greater than fifty percent (50%) of the current principal balance of the Loan;

(ii)    Borrower agrees to pay one-hundred percent (100%) of any Case Proceeds as the Mandatory Prepayments in the event that the amount of the Obligations due is equal to or greater than one-hundred fifty percent (150%) of the original principal balance of the Loan; or

-7-                                                                                        Borrower Initials _____

(iii)    Borrower agrees to pay one-hundred percent (100%) of any Case Proceeds as the Mandatory Prepayments in the event that the Borrower fails to provide the information required by Section 7.3 of this Agreement or, in the good faith judgment of Lender, the information provided by Borrower is inaccurate;

*Notwithstanding the forgoing,* Borrower agrees that in the Event of Default, and in addition to any other rights of Lender under the terms of this Loan Agreement, Borrower agrees that 100% of all such Case Proceeds shall be used to repay the Obligations.

(c)    Upon making any payments under Sections 2.4(a) or 2.4(b) above, Borrower agrees to provide information to Lender to identify the specific source of funds for such payment.

Borrower acknowledges, understands and agrees that any optional prepayments or other amount repaid in addition to the Mandatory Prepayments required above (whether intentional or inadvertent, made by Borrower or a third party on Borrower's behalf) does not reduce the amount or percentage of any subsequent mandatory prepayment required under the terms of this Agreement. Borrower agrees that Lender is not required to credit or apply any optional prepaid amounts to the next Mandatory Prepayment amount, and any Mandatory Prepayments must be made in the full amount as set forth in this Section 2.4 above, without deduction or offset by Borrower or otherwise. Upon a reduction in the amount of the Obligations or additional Collateral being provided by Borrower (and made subject to the terms of this Agreement and the security interest of Lender), Lender may, in its sole good faith discretion, reduce the Mandatory Prepayments. Lender shall provide written notice (including via electronic communication as permitted herein) to Borrower and any Guarantor of a change in the Mandatory Prepayments. Upon receipt of such written notice, Borrower shall immediately update the instructions required by Section 10.2 of this Agreement to reflect the adjustment in the Mandatory Prepayments.

Section 2.5.    *Recourse.* The Loan Parties agree that the Lender has full recourse for the Obligations under this Agreement against Borrower and any Guarantor pursuant to the terms of this Agreement.

Section 2.6.    *Default Rate.* Notwithstanding anything to the contrary contained herein, while any Event of Default exists or after acceleration, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of the Loan and other amounts at a rate per annum equal to the sum of 5.0% *plus* the Interest Rate; *provided, however,* that in the absence of acceleration pursuant to Sections 8.2 or 8.3, any adjustments pursuant to this Section shall be made at the election of the Lender, with written notice to the Borrower (which election may be retroactively effective to the date of such Event of Default). While any Event of Default exists or after acceleration, interest shall be paid on demand of the Lender.

Section 2.7.    *Evidence of Indebtedness.* (a) The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower resulting from the Loan made by the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

-8-

Borrower Initials _____

(b)    The Lender shall also maintain accounts in which it will record (i) the amount of the Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder from the Borrower.

(c)    The entries maintained in the accounts maintained pursuant to subsections (a) and (b) above shall be *prima facie* evidence of the existence and amounts of the Obligations therein recorded; *provided, however,* that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Obligations in accordance with their terms.

(d)    The Borrower shall prepare, execute and deliver to the Lender a promissory note or notes payable to the Lender or its registered assigns in the forms of Exhibit A (the *"Note"*).

Section 2.8.    *Agreements Regarding Loan.* (a) The Borrower and the Lender hereby agree that this Agreement and all the Loan Documents evidence a loan and financing agreement wherein at the Borrower's request the Lender is providing financing to the Borrower, and the Borrower represents to the Lender that the contemplated transactions do not constitute in any manner a fee sharing agreement between the Lender and the Borrower, and it is the intent of the Borrower to strictly comply with all Legal Requirements and all ethical obligations of the Borrower. Neither the Borrower nor any Guarantor shall assign or reassign any of Borrower's or Guarantor's rights and/or ownership interest in any of the Eligible Cases or Eligible Collateral Cases unless and until: (1) Borrower has satisfied all of the Obligations under the terms of this Agreement and Lender has released its security interest, if any, in the Eligible Cases and Eligible Collateral Cases or (2) the Borrower obtains written consent from the Lender.

(b)    The Borrower and the Lender acknowledge and agree that the Lender does not have a contingent or other interest in the outcome of any Eligible Case or Eligible Collateral Case. The Lender shall have no direct contact with the Borrower's clients, and the Lender shall have no influence or control over the litigation strategy with respect to any Eligible Cases or Eligible Collateral Cases. The Borrower shall not, without the consent of the relevant client, disclose to the Lender any attorney-client privileged or confidential information of its clients relating to the Eligible Cases, or Eligible Collateral Cases, or otherwise. The Lender shall not interfere, and the Borrower shall not allow any interference by the Lender, with the attorney-client relationship or disclosure of client confidences in connection with any Eligible Cases, or Eligible Collateral Cases, or otherwise.

SECTION 3.    FEES.

Section 3.1.    *Fees.*

(a)    *Closing Fee.* The Borrower shall pay to the Lender on the Closing Date a non-refundable closing fee in an amount equal to 1.50% of the principal amount of the Loan. The Lender is hereby authorized to deduct such amount from the disbursement of the Loan.

-9-

Borrower Initials _____

(b)    *Late Fees.*    In addition to any other amounts due hereunder, if any payment due hereunder is not received by the Lender on or before 1:00 p.m. (Houston time) of the third (3rd) Business Day after such payment is due, the Borrower shall pay to the Lender on demand a late fee equal to the greater of (i) five percent (5%) of the amount due or (ii) $15.00.

(c)    *Set-up Fees.*    The Borrower shall pay on the Closing Date, as directed by Lender, a non-refundable fee to establish the Assigned Account (defined below) or otherwise permit access to the Borrower's Accounts as required by this Agreement. The initial amount to be paid shall be as set forth on Schedule D-1 of this Agreement, and Borrower agrees Lender is authorized to deduct such amount from the disbursement of the Loan. Lender is further authorized to pay, or permit the deduction in the amount of, any such ongoing fees required to maintain the Borrower's Accounts.

SECTION 4.    PLACE AND APPLICATION OF PAYMENTS.

*Section 4.1.    Place and Application of Payments.* All payments of principal of and interest on the Loan, and all other Obligations payable by the Borrower under this Agreement and the other Loan Documents, shall be made by the Borrower to the Lender prior to 5:00 p.m. (Houston time) on the due date thereof at the place designated for payment by the Lender in Houston, Texas. Any payments received after such time shall be deemed to have been received by the Lender on the next Business Day. All such payments shall be made in U.S. Dollars, in immediately available funds (i.e., either by wire or automated clearinghouse transfer) at the place of payment as directed by Lender, in each case without set-off or counterclaim. Borrower agrees that payments shall not be made by check or cash and that Lender has no obligation to accept such payments. All payments shall first be applied to indemnities and expenses payable to Lender or any other indemnified Person under this Agreement and to the Loan Documents, then to all accrued but unpaid interest on the Loan and then to the outstanding principal balance of the Loan.

*Section 4.2.    Non-Business Days.* If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable. In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

*Section 4.3.    Payments Set Aside.* To the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to the Lender and is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

-10-

Borrower Initials _____

SECTION 5.    REPRESENTATIONS AND WARRANTIES.

The Borrower represents and warrants to the Lender as follows:

*Section 5.1.    Organization and Qualification.* The Borrower is duly organized, validly existing, and in good standing as a limited liability company, limited partnership or corporation, as applicable, under the laws of the jurisdiction in which it is organized, has full and adequate power to conduct its business as now conducted, and is duly licensed or qualified in its jurisdiction or organization. No Loan Party is the subject of any order of relief under any Debtor Relief Law.

*Section 5.2.    Authority and Validity of Obligations.* Each Loan Party has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for (in the case of the Borrower), to guarantee the Obligations (in the case of each Guarantor), to grant to the Lender the Liens described in the Collateral Documents executed by the Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it. The Loan Documents delivered by the Loan Parties have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of such Loan Parties enforceable against each of them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by any Loan Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon any Loan Party or any provision of the organizational documents (*e.g.*, charter, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of any Loan Party, (b) contravene or constitute a default under any covenant, indenture or agreement of or affecting any Loan Party or any of their respective property, or (c) result in the creation or imposition of any Lien on any property of any Loan Party other than the Liens granted in favor of the Lender pursuant to the Collateral Documents.

*Section 5.3.    Use of Proceeds.* The Borrower shall use the proceeds of the Loan to fund the Expenses set forth on Schedule 5.3, including the full payment and satisfaction of any loan on the Collateral or other loan, and pay any fees due to the Lender on the Closing Date under this Agreement, and not for any other purpose (including for personal, household or family purposes). For further clarity, the proceeds of the Loan will be used for a commercial purpose and only for law firm purposes. Furthermore, up to 20% of the proceeds of the Loan may be used to reimburse the partners of the Borrower for Expenses set forth on Schedule 5.3 previously advanced to the Borrower by such partners.

*Section 5.4.    Financial Reports.* All financial statements of the Loan Parties heretofore submitted to the Lender are true and correct in all material respects, have been prepared in accordance with appropriate accounting principles consistently applied, and truly and accurately reflect in all material respects the financial condition of the relevant Loan Party and, with respect to the Borrower, the results of the operations and cash flows for the Borrower as of the dates thereof and for the periods covered thereby. The Borrower has no contingent liabilities which are

-11-

Borrower Initials

material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 7.3(e).

**Section 5.5.    *No Material Adverse Change.*** Since November 9, 2017, (a) there has been no change in the condition (financial or otherwise) or business prospects of any Loan Party, none of which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect nor (b) has there been a material adverse change in the value of the Collateral or the Borrower's interest in the same taken as a whole.

**Section 5.6.    *Full Disclosure.*** The statements and information furnished to the Lender (including, but not limited to, the information provided regarding the Collateral) in connection with the negotiation of this Agreement and the other Loan Documents as required to obtain the commitment by the Lender to provide all or part of the financing contemplated hereby or subsequently provided to Lender as required under the terms of this Agreement (including, but not limited to, the information provided by Borrower with respect to the Eligible Cases and Eligible Collateral Cases from time to time as required by Section 7.3) do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading, the Lender acknowledging that as to any projections furnished to the Lender, the Loan Parties only represent that the same were prepared on the basis of information and estimates the Loan Parties believed to be reasonable.

**Section 5.7.    *Governmental Authority and Licensing.*** The Borrower has received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct their businesses. No investigation or proceeding which, if adversely determined, could reasonably be expected to result in revocation or denial of any material license, permit or approval is pending or, to the knowledge of the Borrower, threatened.

**Section 5.8.    *Legal Interest; Liens.*** The Borrower has good and defensible legal interest in the Eligible Cases and Eligible Collateral Cases as set forth on Schedule 1.1 and Schedule 1.2, respectively, subject to no Liens other than such thereof as are permitted by Section 7.6. Further, with regard to the Eligible Cases, Borrower has a co-counsel agreement with the Frantz Law Group to split the attorneys' fees fifty percent (50%) to Borrower and fifty percent (50%) to the Frantz Law Group on certain identified Eligible Cases. The Borrower shall take all necessary steps to resolve and verify the resolution of any claims or potential claims against the Eligible Cases, Eligible Collateral Cases or any Case Proceeds.

**Section 5.9.    *Litigation and Other Controversies.*** There is no litigation or governmental or arbitration proceeding pending, nor to the knowledge of any Loan Party threatened, against any Loan Party.

**Section 5.10.    *Taxes.*** All federal and state tax returns required to be filed by any Loan Party in any jurisdiction have, in fact, been filed (or extensions granted), and all taxes upon any Loan Party or upon any of their respective property, income or franchises, which are shown to be due and payable in such returns, have been paid, except such Taxes, if any, as are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in accordance with GAAP have been provided.

-12-

Borrower Initials _____

*Section 5.11.    Approvals.* No authorization, consent, license or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by any Loan Party of any Loan Document, except for (i) such approvals which have been obtained prior to the date of this Agreement and remain in full force and effect and (ii) filings which are necessary to perfect the security interests under the Collateral Documents.

*Section 5.12.    Compliance with Laws and Ethics.* The Borrower is in compliance with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing.

*Section 5.13.    Other Agreements.* No Loan Party is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

*Section 5.14.    Solvency.* The Borrower is solvent, able to pay its debts as they become due, and has sufficient capital to carry on its business.

*Section 5.15.    No Default.* No Default has occurred and is continuing.

SECTION 6.    CONDITIONS PRECEDENT.

This Agreement shall not be binding on Lender until this Agreement has been executed and delivered by the Borrower, the Guarantors and the Lender, and prior to making the Loan the following conditions precedent shall have been satisfied:

(a)    each of the representations and warranties set forth herein and in the other Loan Documents shall be true and correct as of said time, including, but not limited to the quality, quantity and value of the Eligible Cases and Eligible Collateral Cases, except to the extent the same expressly relate to an earlier date, in which case they shall be true and correct as of such earlier date;

(b)    no Default shall have occurred and be continuing or would occur as a result of the Loan;

(c)    the Lender shall have received the duly executed Note of the Borrower dated the date hereof and otherwise in compliance with the provisions of Section 2.7;

(d)    the Lender shall have received the Security Agreement duly executed by the Borrower and deposit account control agreements to the extent requested by the Lender;

(e)    the Lender shall have received copies of the Borrower's certificate of limited partnership and partnership agreement (or comparable organizational documents) and any amendments thereto;

(f)    the Lender shall have received the initial fees called for by Section 3.1;

-13-

Borrower Initials _____

(g)    the capital and organizational structure of the Borrower shall be satisfactory to the Lender;

(h)    the Lender shall have received financing statement, tax, and judgment lien search results against the Collateral evidencing the absence of Liens thereon except as permitted by Section 7.6;

(i)    the Lender shall have received pay-off and lien release letters from secured creditors of the Borrower (other than secured parties intended to remain outstanding after the Closing Date with Indebtedness and Liens permitted by Sections 7.5 and 7.6) setting forth, among other things, the total amount of indebtedness outstanding and owing to them and containing an undertaking to cause to be delivered to the Lender UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of the Borrower, which pay-off and lien release letters shall be in form and substance acceptable to the Lender;

(j)    the Lender shall have received a fully executed Internal Revenue Service Form W-9 (or its equivalent) for the Borrower and each Guarantor;

(k)    the Lender shall have received the personal financial statements for the Guarantor as of January 2017; and

(l)    the Lender shall have received such other agreements, instruments, documents, certificates, and opinions as the Lender may reasonably request.

SECTION 7.    COVENANTS.

The Borrower agrees to the following, so long as any credit is available to or in use by the Borrower hereunder, except to the extent compliance in any case or cases is waived in writing by the Lender:

*Section 7.1.    Maintenance of Business; Retention of Rights in Case Proceeds.* The Borrower shall preserve and maintain its existence. The Borrower shall preserve and keep in force and effect all licenses, permits, and approvals necessary to the proper conduct of its business. Neither the Borrower nor any Guarantor shall assign or reassign any of Borrower's or Guarantor's rights to the Case Proceeds in any of the Eligible Cases or Eligible Collateral Cases unless and until Borrower has satisfied all of the Obligations under the terms of this Agreement and Lender has released its security interest, if any, in the Eligible Cases or Eligible Collateral Cases. The Borrower shall handle the Eligible Cases and Eligible Collateral Cases with best efforts in order to receive compensation for each of Borrower's clients, all within the applicable rules of professional responsibility, until Borrower has satisfied its Obligations under this Agreement.

*Section 7.2.    Taxes and Assessments.* The Borrower shall duly pay and discharge all federal, state, and local taxes, rates, assessments, fees, and governmental charges upon or against it, in each case before the same become delinquent and before penalties accrue thereon, unless and

-14-                                                    Borrower Initials _____

to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

    *Section 7.3.*   *Reports.* The Borrower shall furnish to the Lender:

        (a)   as soon as available, and in any event no later than 105 days after the last status report of all Eligible Cases and Eligible Collateral Cases was received by Lender, a status report of all Eligible Cases and Eligible Collateral Cases in the form and format provided in Exhibit E to this Agreement, prepared by the Borrower and certified to by a partner of the Borrower which status report shall describe the current status of the Eligible Cases and Eligible Collateral Cases, the expected date of receipt of Case Proceeds and any material developments since the last quarterly status report;

        (b)   promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of any Loan Party or of notice of any material noncompliance with any applicable law, regulation or guideline relating to any Loan Party;

        (c)   notice of any Change of Control;

        (d)   promptly after knowledge thereof shall have come to the attention of any Responsible Officer of the Borrower or any Loan Party, written notice of (i) any threatened or pending litigation or governmental or arbitration proceeding or labor controversy against any Loan Party or any of their property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, (ii) the occurrence of any Material Adverse Effect, (iii) the occurrence of any Default or (iv) any material deterioration in the value of the Collateral or the Borrower's interest therein; and

        (e)   promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Loan Party, or compliance with the terms of any Loan Document, as the Lender may reasonably request, subject to the terms of Section 2.8.

    *Section 7.4.*   *Inspection.* The Borrower shall permit the Lender and each of its duly authorized representatives and agents to visit and inspect any of its property, corporate books, and financial records (including documentation necessary to support the character and quality of the Collateral), to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision the Borrower hereby authorizes such accountants to discuss with the Lender the finances and affairs of the Borrower) at such reasonable times and intervals as the Lender may designate and, so long as no Default exists, with reasonable prior notice to the Borrower, subject at all times to all Legal Requirements and Section 2.8.

    *Section 7.5.*   *Borrowings and Guaranties.* The Borrower shall not issue, incur, assume, create or have outstanding any Indebtedness, or be or become liable as endorser, guarantor, surety or otherwise for any Indebtedness or undertaking of any Person, or otherwise agree to provide

-15-

Borrower Initials _____

funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any Person; *provided, however,* that the foregoing shall not restrict nor operate to prevent:

        (a)    the Obligations of the Borrower owing to the Lender and any other indebtedness, liabilities and obligations of the Borrower owing to the Lender;

        (b)    purchase money indebtedness and capitalized lease obligations of the Borrower in an amount not to exceed $250,000.00 in the aggregate at any one time outstanding;

        (c)    secured indebtedness other than the secured indebtedness referenced in Section 7.5(d), (e) and (f), in an amount not to exceed $250,000.00 in the aggregate at any one time outstanding;

        (d)    indebtedness by Girardi in favor of Law Finance Group, LLC in an aggregate principal amount not to exceed $10,500,000.00 at any one time outstanding so long as interest on such principal balance is paid current;

        (e)    indebtedness by Girardi in favor of California Attorney Lending in an aggregate principal amount not to exceed $5,000,000.00 at any one time outstanding so long as such principal balance is paid current;

        (f)    indebtedness by Girardi in favor of Comerica in an aggregate principal amount not to exceed $27,000,000.00 at any one time outstanding so long as interest on such principal balance is paid current; and

        (g)    unsecured indebtedness of the Borrower not otherwise permitted by this Section in an amount not to exceed $250,000.00 in the aggregate at any one time outstanding.

**Section 7.6.    *Liens.***

The Borrower shall not create, incur or permit to exist any Lien of any kind on any of its property (including the Collateral); *provided, however,* that the foregoing shall not apply to nor operate to prevent:

        (a)    Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

-16-

Borrower Initials _____

(b)    Liens on equipment of the Borrower created solely for the purpose of securing indebtedness permitted by Section 7.5(b), representing or incurred to finance the purchase price of such property, provided that no such Lien shall extend to or cover other property of the Borrower other than the respective property so acquired, and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such property, as reduced by repayments of principal thereon;

(c)    any interest or title of a lessor under any operating lease, including the filing of Uniform Commercial Code financing statements solely as a precautionary measure in connection with operating leases entered into by the Borrower in the ordinary course of its business;

(d)    other encumbrances not materially affecting the conduct of the Borrower's business and not securing Indebtedness;

(e)    Liens on cases and claims which do not constitute Collateral to secure indebtedness permitted by Section 7.5(c); and

(f)    Liens granted in favor of the Lender pursuant to the Collateral Documents.

*Section 7.7.    Mergers, Consolidations and Sales.*  The Borrower shall not be a party to any merger or consolidation or amalgamation, or sell, transfer, lease or otherwise dispose of all or substantially all of its assets. The Borrower shall not sell, transfer, refer, encumber or otherwise dispose of its legal interest in any Eligible Case or any Eligible Collateral Case or enter into any agreement for the same or similar purpose without the written consent of the Lender; provided that the foregoing restrictions shall not apply to any Case Resolution in the ordinary course of business.

*Section 7.8.    Compliance with Laws.*  The Borrower shall comply in all respects with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing.

*Section 7.9.    Use of Proceeds.*  The Borrower shall use the proceeds of the Loan solely for the purposes set forth in, or otherwise permitted by, Section 5.3.

*Section 7.10.    Maintenance of Malpractice Insurance.*  During the term of this Agreement, the Borrower shall maintain, at its sole cost and expense, legal malpractice insurance policies issued by an insurance carrier with an A.M. Best rating of "A" or better. The Borrower represents and warrants that the Malpractice Insurance Policies are in full force and effect and the Borrower is not in default under any of them and no claim for coverage thereunder has been denied under any such current Malpractice Insurance Policies with respect to any matter. At the request of the Lender, the Borrower shall furnish the Lender with a copy of the certificate of insurance evidencing the coverage under such Malpractice Insurance Policies and the Borrower agrees that no such Malpractice Insurance Policies may be cancelled or the amount of coverage under such Malpractice Insurance Policies reduced without thirty (30) days prior written notice to the Lender.

-17-                                                                Borrower Initials _____

SECTION 8.    EVENTS OF DEFAULT AND REMEDIES.

    *Section 8.1.    Events of Default.* Any one or more of the following shall constitute an *"Event of Default"* hereunder:

        (a)    default in the payment when due of all or any part of the principal of or interest on the Loan (whether at the stated maturity thereof or at any other time provided for in this Agreement) or of any fee or other Obligation payable hereunder or under any other Loan Document or any default has occurred under any other agreement with the Lender;

        (b)    default in the observance or performance of any covenant set forth in Sections 7.1, 7.2, 7.4, 7.5, 7.6, 7.7, 7.8, 7.9, 9.9 or 10.2 of this Agreement;

        (c)    default in the observance or performance of any other provision hereof (including, but not limited to the obligation to provide information under Section 7.3) or of any other Loan Document which is not remedied within thirty (30) days after the earlier of (i) the date on which such failure shall first become known to any Responsible Officer of the Borrower or (ii) written notice thereof is given to the Borrower by the Lender;

        (d)    any representation or warranty made herein, including, but not limited to those outlined in Section 5 and Section 9, or in any other Loan Document or in any certificate furnished to the Lender pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby is determined in the sole discretion of the Lender to be noncompliant with or untrue in any material respect as of the date of the issuance or making or deemed making thereof;

        (e)    (i) any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or (ii) any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or (iii) any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the Lender in any Collateral purported to be covered thereby except as expressly permitted by the terms hereof, or (iv) any Loan Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder;

        (f)    default shall occur under any Indebtedness issued, assumed or guaranteed by any Loan Party in an amount in excess of $25,000.00, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness (whether or not such maturity is in fact accelerated), or any such Indebtedness shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

        (g)    (i) any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against any Loan

-18-

Borrower Initials _____

Party, or against any of their respective property, in an aggregate amount for all such Persons in excess of $25,000.00 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days, or any action shall be legally taken by a judgment creditor to attach or levy upon any property of any Loan Party to enforce any such judgment, or (ii) any Loan Party shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(h)   any Change of Control shall occur; or the death or legal incompetence of any Guarantor shall occur;

(i)   any Loan Party shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate or similar action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 8.1(j);

(j)   a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for any Loan Party, or any substantial part of any of its property, or a proceeding described in Section 8.1(i)(v) shall be instituted against any Loan Party, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of thirty (30) days; or

(k)   the Borrower's engagement with the client is terminated for any reason (whether initiated by the Borrower, the client or legal process other than Adverse Case Resolution) with respect to more than five percent (5%) of Eligible Cases or Eligible Collateral Cases (a *"Client Termination"*); *provided, however,* that in the event of such Client Termination, the Borrower shall be permitted to present replacement cases to Lender in an effort to cure such breach; *provided further,* that such cases must be presented to Lender within fifteen (15) days of the Client Termination and such cases will not be deemed Eligible Cases unless and until Lender provides written notice of acceptance of same by Lender to Borrower which shall be given in Lender's sole discretion. Borrower agrees to notify Lender within seven (7) days of its representation being terminated by any client or of a dual representation claim being asserted as to any client.

-19-

Borrower Initials:_____

*Section 8.2.    Non-Bankruptcy Defaults.*  When any Event of Default (other than those described in subsections (j) or (k) of Section 8.1 with respect to the Borrower) has occurred and is continuing, the Lender may, by written notice to the Borrower, declare the principal of and the accrued interest on the Loan to be forthwith due and payable and thereupon the Loan, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under the Loan Documents without further demand, presentment, protest or notice of any kind.  In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable law or equity when any such Event of Default has occurred and is continuing.  Without limiting the foregoing, the Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of the Collateral and to enforce any of the Lender's remedies, without prior notice or hearing as to such appointment.

*Section 8.3.    Bankruptcy Defaults.*  When any Event of Default described in subsections (i) or (j) of Section 8.1 with respect to the Borrower has occurred and is continuing, then the Loan shall immediately become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or notice of any kind.  In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable law or equity when any such Event of Default has occurred and is continuing.

SECTION 9.    THE GUARANTEES.

*Section 9.1.    The Guarantees.*  To induce the Lender to provide the Loan described herein and in consideration of benefits expected to accrue to the Borrower by reason of the Loan and for other good and valuable consideration, receipt of which is hereby acknowledged, each equity partner of the Borrower party hereto (including any equity partner executing an Additional Guarantor Supplement in the form attached hereto as Exhibit B or such other form acceptable to the Lender) hereby unconditionally and irrevocably guarantees jointly and severally to the Lender, the due and punctual payment of all present and future Obligations, including, but not limited to, the due and punctual payment of principal of and interest on the Loan, and the due and punctual payment of all other Obligations now or hereafter owed by the Borrower under the Loan Documents, subject to Section 2.5, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges after the entry of an order for relief against the Borrower or such other obligor in a case under the United States Bankruptcy Code or any similar proceeding, whether or not such interest, costs, fees and charges would be an allowed claim against the Borrower or any such obligor in any such proceeding).

*Section 9.2.    Guarantee Unconditional.*  The obligations of each Guarantor under this Section 9 shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(a)    any full or limited extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of any Loan Party or other obligor or of any other guarantor under this Agreement or any other Loan Document or by operation of law or otherwise;

-20-

Borrower Initials _____

(b)    any modification or amendment of or supplement to this Agreement or any other Loan Document;

(c)    any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, any Loan Party or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of any Loan Party or other obligor or of any other guarantor contained in any Loan Document;

(d)    the existence of any claim, set-off, or other rights which any Loan Party or other obligor or any other guarantor may have at any time against the Lender or any other Person, whether or not arising in connection herewith;

(e)    any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against any Loan Party or other obligor, any other guarantor, or any other Person or property;

(f)    any application of any sums by whomsoever paid or howsoever realized to any obligation of any Loan Party or other obligor, regardless of what obligations of any Loan Party or other obligor remain unpaid;

(g)    any invalidity or unenforceability relating to or against any Loan Party or other obligor or any other guarantor for any reason of this Agreement or of any other Loan Document or any provision of applicable law or regulation purporting to prohibit the payment by any Loan Party or other obligor or any other guarantor of the principal of or interest on any Loan or any other amount payable under the Loan Documents; or

(h)    any other act or omission to act or delay of any kind by the Lender or any other Person or any other circumstance whatsoever that might, but for the provisions of this subsection, constitute a legal or equitable discharge of the obligations of any Guarantor under this Section 9.

*Section 9.3.    Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances.* Each Guarantor's obligations under this Section 10 shall remain in full force and effect until the principal of and interest on the Loan and all other amounts payable by the Borrower and the other Loan Parties under this Agreement and all other Loan Documents shall have been paid in full. If at any time any payment of the principal of or interest on any Loan or any other amount payable by any Loan Party or other obligor or any guarantor under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of such Loan Party or other obligor or of any guarantor, or otherwise, each Guarantor's obligations under this Section 9 with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

*Section 9.4.    Subrogation.* Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations shall have been paid in full. If any amount shall be paid to a Guarantor on account of

-21-                                                            Borrower Initials _____

such subrogation rights at any time prior to the payment in full of the Obligations and all other amounts payable by the Loan Parties hereunder and the other Loan Documents, such amount shall be held in trust for the benefit of the Lender (and its Affiliates) and shall forthwith be paid to the Lender or be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

**Section 9.5.    *Subordination.*** Each Guarantor (each referred to herein as a *"Subordinated Creditor"*) hereby subordinates the payment of all indebtedness, obligations, and liabilities of the Borrower or other Loan Party owing to such Subordinated Creditor, whether now existing or hereafter arising, to the indefeasible payment in full in cash of all Obligations. During the existence of any Event of Default, subject to Section 9.4, any such indebtedness, obligation, or liability of the Borrower or other Loan Party owing to such Subordinated Creditor shall be enforced and performance received by such Subordinated Creditor as trustee for the benefit of the holders of the Obligations and the proceeds thereof shall be paid over to the Lender for application to the Obligations (whether or not then due), but without reducing or affecting in any manner the liability of such Guarantor under this Section 9.

**Section 9.6.    *Waivers.*** Each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Lender or any other Person against the Borrower or any other Loan Party or other obligor, another guarantor, or any other Person. Furthermore, each Guarantor irrevocably waives the benefit of any right of discharge under Chapter 43 of the Texas Civil Practice and Remedies Code and all other rights of sureties and guarantors under such Chapter; and waives all rights or defenses arising under Rule 31 of the Texas Rules of Civil Procedure, Section 17.001 of the Texas Civil Practice and Remedies Code, or any other statute or law, common law, in equity, under contract or otherwise, or under any amendments, recodifications, supplements or any successor statute or law of or to any such statute or law.

**Section 9.7.    *Stay of Acceleration.*** If acceleration of the time for payment of any amount payable by the Borrower or other Loan Party or other obligor under this Agreement or any other Loan Document is stayed upon the insolvency, bankruptcy or reorganization of the Borrower or such other Loan Party or obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement or the other Loan Documents shall nonetheless be payable by the Guarantors hereunder forthwith on demand by the Lender.

**Section 9.8.    *Benefit to Guarantors.*** Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder, and each Guarantor acknowledges that this guarantee is necessary or convenient to the conduct, promotion and attainment of its business. Guarantor represents, warrants and covenants that the Borrower listed in this Agreement is of the law firms or legal related businesses owned and operated by Guarantor, and further that Guarantor will not establish another law firm or other legal business that will manage, administer or have any rights or obligations in the Eligible Cases or Eligible Collateral Cases, both now owned or hereafter acquired.

**Section 9.9.    *Representations and Covenants.*** The Guarantor represents and warrants that the personal financial statements of the Guarantor heretofore submitted to the Lender are true and

-22-

Borrower Initials _____

correct in all material respects and truly and accurately reflect in all material respects the financial condition of the Guarantor as of the dates thereof and for the periods covered thereby.

SECTION 10.    COLLATERAL.

*Section 10.1.    Collateral.*  The Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of the Borrower in all of the Case Proceeds of all Eligible Cases and Eligible Collateral Cases listed on Schedule 1.2A, whether now owned or hereafter acquired. The Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to the Lender and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Lender.

*Section 10.2.    Direction of Proceeds; Depository Banks.*  (a) *Assigned Account.*  Within ten (10) days of request from the Lender, the Borrower, at Borrower's sole expense, shall make such arrangements as may be reasonably requested by the Lender to assure that all Case Proceeds are deposited (in the same form as received) in a Qualified Settlement Fund or like account (*"QSF"*) or deposit account maintained with a commercial bank reasonably acceptable to the Lender subject to a deposit account control agreement in favor of the Lender on terms reasonably satisfactory to the Lender or otherwise held in the name of the Lender as agent for the Borrower (such deposit account being hereinafter referred to as the *"Assigned Account"*). As part of Borrower's foregoing obligation, Borrower shall send a written direction (*"Letter of Direction"*) to any administrator of the litigation or qualified settlement fund to direct any Case Proceeds due to Borrower directly to the QSF or Assigned Account until further notice. A form of this Letter of Direction is attached hereto as Exhibit C. Borrower shall provide a copy of the Letter of Direction to Lender that has been accepted and countersigned by Borrower. Borrower shall not revoke the Letter of Direction until the Loan has been paid in full or by prior written agreement with Lender. Any Case Proceeds received by the Borrower shall be promptly deposited into the QSF or Assigned Account and, until so deposited, shall held by it in trust for the Lender. The Borrower acknowledges and agrees that the Lender has (and is hereby granted to the extent it does not already have) a Lien on the QSF or Assigned Account and all funds contained therein to secure the Obligations. The Lender may apply the funds on deposit in the QSF or Assigned Account to the Obligations (whether or not then due) and distribute the excess to the Borrower.

The QSF or Assigned Account, as applicable, shall remain in place until Borrower has satisfied all Obligations under this Agreement and after such time the QSF or Assigned Account may be terminated and closed.

(b)    *Borrower Accounts.*  Within two (2) Business Days of the Closing Date and at Borrower's sole expense, Borrower shall direct the bank or other financial institution where Borrower maintains its Interest on Lawyer Trust Account, Interest on Lawyer Account, lawyer trust account or like account (collectively, the *"IOLTA Account"*) to permit Lender to make electronic viewing access to the IOLTA Account by using the financial institution's treasury management or other online banking system. Until such time as Borrower shall satisfy all Obligations under this Agreement, Borrower shall notify Lender within twenty-four (24) hours of

-23-

Borrower Initials _____

establishing any additional or different IOLTA Accounts, at which time Lender may at its discretion require Borrower to comply with the terms of this Section 10.2(b).

Additionally, within two (2) Business Days of request from the Lender and at Borrower's sole expense, Borrower shall direct the bank or other financial institution where Borrower maintains the IOLTA Account to establish a secondary commercial account in which all Case Proceeds from Collateral will be deposited (*"Secondary Account"*) and Borrower will further direct such financial institution as follows: (i) to permit Lender to have electronic viewing access to the Secondary Account by using the financial institution's online banking system and (ii) to add Lender as an authorized signer on the Secondary Account, with full authority to authorize electronic funds transfers from the Secondary Account in amounts adequate to permit Lender to direct payments as required by this Agreement, including payment of Case Proceeds to satisfy the Mandatory Prepayments due to Lender. Borrower agrees to undertake all necessary actions as may be required and provide all necessary authorizations in order to allow and permit Lender to have such access and authority over the Borrower's IOLTA and Secondary Accounts. As part of Borrower's foregoing obligation, Borrower shall send a written authorization(s) (*"Letter of Authorization"*) to the appropriate financial institution to permit such access and authorization until further notice. A form of this Letter of Authorization is attached hereto as Exhibit F. Borrower shall not revoke any Letter of Authorization until the Loan has been paid in full or by prior written agreement with Lender. Borrower agrees to undertake any additional actions as required by the holder of the Borrower's IOLTA and/or Secondary Accounts to permit such access and authorization, including entering into additional agreements with such financial institution.

    *Section 10.3.    Further Assurances.* The Borrower agrees that it shall, from time to time at the request of the Lender, execute and deliver such documents and do such acts and things as the Lender may reasonably request in order to provide for or perfect or protect such Liens on the Collateral or otherwise carry out the terms of this Agreement. Upon the Borrower making a new equity partner, the Borrower shall promptly thereafter cause such new equity partner to execute a Guaranty Agreement, and the Loan Parties shall also deliver to the Lender, or cause such equity partner to deliver to the Lender, at the Borrower's cost and expense, such other instruments, documents, certificates, and opinions reasonably required by the Lender in connection therewith.

SECTION 11.    MISCELLANEOUS.

    *Section 11.1.    Notices.*

    (a)    *Notices Generally.* Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail to the addresses listed in the introductory paragraph of this Agreement. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through electronic communications, to the extent provided in subsection (b) below, shall be effective as provided in said subsection (b).

-24-

Borrower Initials

(b)    *Electronic Communications.* The Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    *Change of Address, Etc.* Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

*Section 11.2.    Amendments, Etc.* No amendment, modification, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

*Section 11.3.    Costs and Expenses; Indemnification.* (a) The costs and expenses of the Lender in connection with the negotiation, preparation, execution and delivery of this Agreement and other Loan Documents are covered by the closing fee. The Borrower agrees to pay on demand the costs and expenses of the Lender in connection with (a) establishing and maintaining the QSF or Assigned Account and access to the Borrower's IOLTA Account and Secondary Account (including, but not limited to, set-up, documentation, or other bank charges, or attorneys' fees and expenses), and (b) any subsequent consents hereunder or waivers or amendments hereto or thereto, including the reasonable fees and expenses of counsel for the Lender with respect to all of the foregoing (whether or not the transactions contemplated by any such waiver or amendment are consummated). The Borrower further agrees to pay to the Lender or any other holder of the Obligations all costs and expenses (including court costs and reasonable attorneys' fees), if any, incurred or paid by the Lender or any other holder of the Obligations in connection with any Default or Event of Default or in connection with the enforcement of this Agreement or any of the other Loan Documents or any other instrument or document delivered hereunder or thereunder (including, without limitation, all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving the Borrower or any guarantor). The Borrower further agrees to indemnify the Lender, and any security trustee, and their respective directors, officers and employees, against all losses, claims, damages, penalties, judgments, liabilities and expenses (including, without limitation, all expenses of litigation or preparation therefor, whether or not the indemnified Person is a party thereto) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any

-25-                                                                          Borrower Initials _____

extension of credit made available hereunder, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification. The Borrower, upon demand by the Lender at any time, shall reimburse the Lender for any legal or other expenses incurred in connection with investigating or defending against any of the foregoing except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified. The obligations of the Borrower under this Section shall survive the termination of this Agreement.

(b)    All amounts due under this Section shall be payable within five (5) Business Days after demand therefor.

(c)    Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

*Section 11.4.    No Waiver, Cumulative Remedies.*    No delay or failure on the part of the Lender or on the part of the holder or holders of any of the Obligations in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The rights and remedies hereunder of the Lender and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 11.5.    Survival of Representations.*    All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

*Section 11.6.    Survival of Indemnities.*    All indemnities and other provisions relative to reimbursement to the Lender of amounts sufficient to protect the yield of the Lender with respect to the Loan, including, but not limited to, Section 11.3, shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligations.

*Section 11.7.    Counterparts; Integration; Effectiveness.*    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Lender, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 6, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

-26-

Borrower Initials _____

*Section 11.8.    Headings.* Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

*Section 11.9.    Severability of Provisions.* Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

*Section 11.10.    Construction.* The parties acknowledge and agree that the Loan Documents shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of the Loan Documents. Each Loan Party acknowledges that it has had access to counsel of its own choice in negotiations leading up to execution of this Agreement. Each Loan Party acknowledges that (a) it has conducted such investigation and inquiry that it, in its sole discretion, deems necessary and in executing this Agreement, (b) no Loan Party is relying or acting upon any advice or representation of the Lender and (c) no Loan Party has been influenced to any extent in entering in this Agreement by any statements made by any other party. Each Loan Party has read this Agreement and has had it fully explained to them by its counsel or has waived its right to do so. Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

*Section 11.11.    Excess Interest.* Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable law (after giving effect to any separate usury waiver that the Borrower may have delivered to the Lender) to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loan or other obligations outstanding under this Agreement or any other Loan Document (*"Excess Interest"*). If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither the Borrower nor any guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that the Lender may have received hereunder shall, at the option of the Lender, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable law), (ii) refunded to the Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the *"Maximum Rate"*), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither the Borrower nor any guarantor or endorser

-27-                                                                Borrower Initials _____

shall have any action against the Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any of Borrower's Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Borrower's Obligations shall remain at the Maximum Rate until the Lender has received the amount of interest which the Lender would have received during such period on the Borrower's Obligations had the rate of interest not been limited to the Maximum Rate during such period.

Section 11.12.    *No Advisory or Fiduciary Responsibility.*  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) no fiduciary, advisory or agency relationship between any Loan Party and the Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Lender has advised or is advising any Loan Party on other matters, (ii) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between such Loan Parties and their Affiliates, on the one hand, and the Lender, on the other hand, (iii) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate and (iv) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents and is sophisticated in the practice of law and in borrowing funds to finance litigation expenses; and (b) (i) the Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates, or any other Person; (ii) the Lender has no obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Lender and its respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of any Loan Party and its Affiliates, and the Lender has no obligation to disclose any of such interests to any Loan Party or its Affiliates and (iv) the Lender has not solicited any clients for the Borrower and has not recommended any clients to the Borrower. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.13.    *Binding Nature; Governing Law; Jurisdiction; Consent to Service of Process.*  (a) This Agreement shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Lender and the benefit of its successors and assigns, including any subsequent holder of the Obligations. The Borrower may not assign its rights hereunder without the written consent of the Lender. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

-28-

Borrower Initials _____

(b)    THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS (EXCEPT AS OTHERWISE SPECIFIED THEREIN), AND THE RIGHTS AND DUTIES OF THE PARTIES HERETO, SHALL BE CONSTRUED AND DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION; PROVIDED, HOWEVER, FOR PURPOSES OF CLARIFICATION AND NOT AS A LIMITATION, THE TERMS OF THE AGREEMENT AND THE NOTES RELATED TO THE INTEREST RATE WILL BE CONSTRUED BY AND DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF THE BORROWER'S PRINCIPAL PLACE OF BUSINESS.

(c)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the United States District Court for the Southern District of Texas and of any Texas State court sitting in the City of Houston, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each party hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Texas State court or, to the extent permitted by applicable Legal Requirements, in such federal court. Each party hereto hereby agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirements. Nothing in this Agreement or any other Loan Document or otherwise shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any Guarantor or its respective properties in the courts of any jurisdiction.

(d)    Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Legal Requirements, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 11.13(c). Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable Legal Requirements, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)    Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than e-mail) in Section 11.1. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable Legal Requirements.

*Section 11.14.    Waiver of Jury Trial.* EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE

-29-

Borrower Initials _____

BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 11.15.    *Future Financing.*** It is the intent of the Borrower and Lender to have an ongoing borrowing and lending relationship and, therefore, Borrower agrees that if it intends to obtain financing in the future that is similar in nature to the Loan contemplated by this Agreement, then Lender shall have the right to provide such future financing on equal or better terms than those Borrower has obtained in good faith. In the event that Borrower obtains from a third party (or multiple third parties) in good faith a term sheet, commitment letter or other document reflecting transaction terms that Borrower desires to accept, Borrower shall first provide such document to Lender and Lender shall evaluate the collateral for such proposed financing and the terms thereof and, within fourteen (14) Business Days of receipt thereof, advise Borrower if Lender is amenable to granting a loan upon substantially the same or better terms. In the event Lender agrees to provide such new financing in writing, Borrower and Lender shall enter into such financing on substantially the same terms and conditions. Nothing in this Section 11.15 shall obligate Lender to make additional loans or provide any additional financing to Borrower.

**Section 11.16.    *USA Patriot Act.*** The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the *"Act"*), it is required to obtain, verify, and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.

**Section 11.17.    *Confidentiality.*** The Loan Parties acknowledge that this Agreement and the other Loan Documents are for the Loan Parties' confidential use only and may not, without the written consent of the Lender, be disclosed by any Loan Party to any other Person other than Representatives of the Loan Parties having a need to know the same, except where such disclosure is required by law or legal process (in which case the Loan Parties agree to notify the Lender promptly thereof). As used above, "Representatives" of a Loan Party means such Loan Party or its employees, directors, officers attorneys and agents (but not commercial lenders).

[SIGNATURE PAGES TO FOLLOW]

-30-

Borrower Initials _____

This Loan Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

"*BORROWER*"

GIRARDI & KEESE

By: _____
    Name:  Thomas V. Girardi
    Title:   Managing Partner / Owner

"*GUARANTORS*"

EACH GUARANTOR ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS LOAN AGREEMENT (WHICH INCLUDES THE GUARANTEE) AS OF THE TIME OF EXECUTION.

_____
    THOMAS V. GIRARDI, individually

[Signature Page to Loan Agreement]

*"LENDER"*

**VIRAGE SPV 1 LLC**

By: **Virage Capital Management LP,** its
manager

By: **Virage LLC,** its general partner

By: _____
   Name:  Edward Ondarza
   Title:   Manager

[Signature Page to Loan Agreement]

# EXHIBIT 15

000168

### SECURITY AGREEMENT

This Security Agreement (the *"Agreement"*) is dated as of February 26, 2018, between Girardi & Keese, a California Partnership (the *"Debtor"*), with a mailing address of 1126 Wilshire Boulevard, Los Angeles, California 90017 and Virage SPV 1 LLC (the *"Secured Party"*), with its mailing address of 1700 Post Oak Boulevard, 2 BLVD Place, Suite 300, Houston, Texas 77056.

### PRELIMINARY STATEMENT

A.    The Debtor and the Secured Party have entered into a Loan Agreement dated as of February 26, 2018 (the Loan Agreement and any agreements or notes issued in substitution and replacement thereof, all as may be amended or modified from time to time, including amendments and restatements thereof in its entirety, being referred to herein as the *"Loan Agreement"*), which evidences a loan or loans made by the Secured Party to the Debtor.

B.    As a condition to extending credit, continuing to extend credit or otherwise making financial accommodations available to or for the account of the Debtor under the Loan Agreement, the Secured Party requires, among other things, that the Debtor grant the Secured Party a security interest in the Debtor's personal property described herein subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the benefits accruing to the Debtor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

*Section 1.    Grant of Security Interest.* The Debtor hereby grants to the Secured Party a lien on and security interest in, and acknowledges and agrees that the Secured Party has and shall continue to have a continuing lien on and security interest in, all right, title, and interest of the Debtor, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the following:

(a)    Accounts and General Intangibles (including Payment Intangibles) arising out of any Eligible Case or any Eligible Collateral Case listed on Schedule 1.2A (as defined in the Loan Agreement) and any other property constituting Case Proceeds (as defined in the Loan Agreement);

(b)    Any Assigned Accounts into which any of the Collateral described in clause (a) above is deposited; and

(c)    Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof;

all of the foregoing being herein sometimes referred to as the *"Collateral"*. All terms which are used in this Security Agreement which are defined in the Uniform Commercial Code of the State

-1-                                                                    Borrower Initials ____

of Texas as in effect from time to time (*"UCC"*) shall have the same meanings herein as such terms are defined in the UCC, unless this Security Agreement shall otherwise specifically provide.

*Section 2.    Obligations Hereby Secured.*  The lien and security interest herein granted and provided for is made and given to secure, and shall secure, the payment and performance of (a) any and all indebtedness, obligations and liabilities of whatsoever kind and nature of the Debtor to the Secured Party (whether arising before or after the filing of a petition in bankruptcy) evidenced by the Loan Agreement, whether direct or indirect, absolute or contingent, due or to become due, and whether now existing or hereafter arising and howsoever held, evidenced or acquired, and whether several, joint or joint and several and (b) any and all expenses and charges, legal or otherwise, suffered or incurred by the Secured Party in collecting or enforcing any of such indebtedness, obligations or liabilities or in realizing on or protecting or preserving any security therefor, including, without limitation, the lien and security interest granted hereby (all of the foregoing being hereinafter referred to as the *"Obligations"*).

*Section 3.    Covenants, Agreements, Representations and Warranties.*  The Debtor hereby covenants and agrees with, and represents and warrants to, the Secured Party that:

(a)    The Debtor is duly organized and validly existing in good standing under the laws of the jurisdiction of its organization. The Debtor shall not change its jurisdiction of organization without the Secured Party's prior written consent. The Debtor is the sole and lawful owner of the Collateral, and has full right, power and authority to enter into this Security Agreement and to perform each and all of the matters and things herein provided for. The execution and delivery of this Security Agreement, and the observance and performance of each of the matters and things herein set forth, will not (i) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon the Debtor or any provision of the Debtor's organizational documents (*e.g.*, charter, articles or certificate of incorporation and by-laws, articles or certificate of formation and limited liability company operating agreement, partnership agreement, or similar organizational documents) or any covenant, indenture or agreement of or affecting the Debtor or any of its property or (ii) result in the creation or imposition of any lien or encumbrance on any property of the Debtor except for the lien and security interest granted to the Secured Party hereunder. Schedule A is true and accurate in all material respects.

(b)    The Debtor shall not move its chief executive office or maintain a place of business other than those specified on Schedule A without first providing the Secured Party thirty (30) days' prior written notice of the Debtor's intent to do so, provided that the Debtor shall at all times maintain its chief executive office in the United States of America and, with respect to any such new location, the Debtor shall have taken all action requested by the Secured Party to maintain the lien and security interest of the Secured Party in the Collateral at all times fully perfected and in full force and effect.

(c)    The Debtor's legal name and jurisdiction of organization is correctly set forth on Schedule A. The Debtor has not transacted business at any time during the immediately preceding five-year period, and does not currently transact business, under any other legal names or trade names other than the prior legal names and trade names (if any) set forth on Schedule A attached

-2-                                                          Borrower Initials

hereto. The Debtor shall not change its legal name or transact business under any other trade name without first giving thirty (30) days' prior written notice of its intent to do so to the Secured Party.

(d)    The Collateral and every part thereof is and shall be free and clear of all security interests, liens, attachments, levies, and encumbrances of every kind, nature and description, whether voluntary or involuntary, except for the lien and security interest of the Secured Party therein and the rights of the depository bank with respect to any Deposit Account. The Debtor shall warrant and defend the Collateral against any claims and demands of all persons at any time claiming the same or any interest in the Collateral adverse to the Secured Party.

(e)    The Debtor shall use commercially reasonable efforts to maintain the security interest of Secured Party hereunder in all Collateral as a valid, perfected lien, subject only to the right of the depository bank with respect to any Deposit Account; *provided*, it is the responsibility of the Secured Party to file UCC-1 Financing and Continuation Statements.

(f)    The Debtor shall not, without the Secured Party's prior written consent, sell, assign, mortgage, lease or otherwise dispose of the Collateral or any interest therein.

(g)    The Debtor shall at all times allow the Secured Party and its representatives free access to and right of inspection of the Collateral.

(h)    The Debtor agrees to execute and deliver to the Secured Party such further agreements, assignments, instruments, and documents and to do all such other things as the Secured Party may deem necessary or appropriate to assure the Secured Party its lien and security interest hereunder, including, without limitation, (i) such financing statements, and amendments thereof or supplements thereto, and such other instruments and documents as the Secured Party may from time to time require in order to comply with the UCC and any other applicable law, and (ii) such control agreements with respect to Deposit Accounts and to cause the relevant depository institution to execute and deliver such control agreements, as the Secured Party may from time to time require. The Debtor hereby authorizes the Secured Party to file any and all financing statements covering the Collateral or any part thereof as the Secured Party may require. The Secured Party may order lien searches from time to time against the Debtor and the Collateral, and the Debtor shall promptly reimburse the Secured Party for all reasonable costs and expenses incurred in connection with such lien searches. In the event for any reason the law of any jurisdiction other than Texas becomes or is applicable to the Collateral or any part thereof, or to any of the Obligations, the Debtor agrees to execute and deliver all such instruments and documents and to do all such other things as the Secured Party in its sole discretion deems necessary or appropriate to preserve, protect, and enforce the lien and security interest of the Secured Party under the law of such other jurisdiction. The Debtor agrees to mark its books and records to reflect the lien and security interest of the Secured Party in the Collateral.

(i)    On failure of the Debtor to perform any of the covenants and agreements herein contained, the Secured Party may, at its option, perform the same and in so doing may expend such sums as the Secured Party may deem advisable in the performance thereof, including, without limitation, the payment of any taxes, liens and encumbrances, expenditures made in defending against any adverse claims, and all other expenditures which the Secured Party may be compelled

-3-

Borrower Initials

to make by operation of law or which the Secured Party may make by agreement or otherwise for the protection of the security hereof. The Secured Party, in making any payment hereby authorized, may do so according to any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien or title or claim. The Secured Party, in performing any act hereunder, shall be the sole judge of whether the Debtor is required to perform same under the terms of this Security Agreement.

Section 4. *Certain Perfection Requirements.* (a) The Debtor shall use commercially reasonable efforts to receive any funds paid as Case Proceeds and upon such receipt shall promptly pay to Secured Party any amounts owed to Secured Party in accordance with the Loan Agreement.

(b) Although it is the intention of the parties that the Debtor shall receive the funds referred to in clause (a) of this Section, if, in any particular instance, the Secured Party reasonably determines that such intention may not be realized, or in any other instance in which the Secured Party determines that the establishment of a Deposit Account is required or advisable for the perfection or further perfection of the Secured Party's security interest, the Secured Party may require the Debtor to establish a Deposit Account with any commercial bank having an office in the City of Houston, and to execute a control agreement, in form and substance reasonably satisfactory to the Secured Party, pursuant to which such depository bank agrees to comply with the Secured Party's delivery instructions with respect to any funds held in such account without further consent by the Debtor.

Section 5. *Power of Attorney.* In addition to any other powers of attorney contained herein, the Debtor hereby appoints the Secured Party, its nominee, and any other person whom the Secured Party may designate, as the Debtor's attorney-in-fact, with full power and authority upon the occurrence and during the continuation of any Event of Default (a) after receipt of any Case Proceeds (as defined in the Loan Agreement) has occurred, to ask for, demand, collect, sue for, recover, receive and give acquittance and receipts for moneys due and to become due in respect of any of the Collateral; and (b) to the extent necessary or desirable to effectuate the power set forth in clause (a), to endorse the Debtor's name on any checks, notes, acceptances, money orders, drafts and any other forms of payment or security that may come into the Secured Party's possession. The Debtor hereby ratifies and approves all acts of any such attorney and agrees that neither the Secured Party nor any such attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct. The Secured Party may file one or more financing statements disclosing its security interest in any or all of the Collateral without the Debtor's signature appearing thereon. The Debtor also hereby grants the Secured Party a power of attorney to execute any such financing statements, or amendments and supplements to financing statements, on behalf of the Debtor without notice thereof to the Debtor. The foregoing powers of attorney, being coupled with an interest, are irrevocable until the Obligations have been fully paid and satisfied.

Section 6. *Defaults and Remedies.* (a) An "Event of Default" on the Loan Agreement shall constitute an *"Event of Default"* hereunder.

-4-

Borrower Initials _____

000172

(b)    Upon the occurrence and during the continuation of any Event of Default, the Secured Party shall have, in addition to all other rights provided herein or by law, the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights or remedies are asserted and regardless of whether the UCC applies to the affected Collateral), and further the Secured Party may, without demand and without advertisement, notice, hearing or process of law, all of which the Debtor hereby waives, at any time or times, sell and deliver all or any part of the Collateral held by or for it at public or private sale, for cash, upon credit or otherwise, at such prices and upon such terms as the Secured Party deems advisable, in its sole discretion and further may notify the account debtor or other person obligated on the Collateral to make payment or otherwise render performance to or for the benefit of Secured Party. In addition to all other sums due the Secured Party hereunder, the Debtor shall pay the Secured Party all costs and expenses incurred by the Secured Party, including reasonable attorneys' fees and court costs, in obtaining, liquidating or enforcing payment of Collateral or the Obligations or in the prosecution or defense of any action or proceeding by or against the Secured Party or the Debtor concerning any matter arising out of or connected with this Security Agreement or the Collateral or the Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code (or any successor statute). Any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Debtor in accordance with Section 11(b) hereof at least ten (10) days before the time of sale or other event giving rise to the requirement of such notice; *provided however*, no notification need be given to the Debtor if the Debtor has signed, after an Event of Default has occurred, a statement renouncing any right to notification of sale or other intended disposition. The Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. The Secured Party may be the purchaser at any such sale. The Debtor hereby waives all of its rights of redemption from any such sale. The Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, be made at the time and place to which the sale was postponed or the Secured Party may further postpone such sale by announcement made at such time and place. The Secured Party may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral or any part thereof, including disclaimers of any warranties of title or the like, and the Debtor acknowledges and agrees that the absence of such warranties shall not render the disposition commercially unreasonable.

(c)    Without in any way limiting the foregoing, upon the occurrence and during the continuation of any Event of Default, the Secured Party shall have the right to exercise any and all rights with respect to all Deposit Accounts of the Debtor, including, without limitation, the right to direct the disposition of the funds in each Deposit Account to collect, withdraw and receive all amounts due or to become due or payable under each such Deposit Account.

(d)    The powers conferred upon the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose on it any duty to exercise such powers. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equivalent to that which the Secured Party accords its own property, consisting of similar type assets. This Security Agreement constitutes an assignment of rights only and not an assignment

-5-

Borrower Initials _____

of any duties or obligations of the Debtor in any way related to the Collateral, and Secured Party shall have no duty or obligation to discharge any such duty or obligation. The Secured Party shall have no responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral. Neither the Secured Party nor any party acting as attorney for the Secured Party shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct.

(e)    Failure by the Secured Party to exercise any right, remedy or option under this Security Agreement or any other agreement between the Debtor and the Secured Party or provided by law, or delay by the Secured Party in exercising the same, shall not operate as a waiver; and no waiver by the Secured Party shall be effective unless it is in writing and then only to the extent specifically stated. The rights and remedies of the Secured Party under this Security Agreement shall be cumulative and not exclusive of any other right or remedy which the Secured Party may have.

Section 7.    Application of Proceeds.    The proceeds and avails of the Collateral at any time received by the Secured Party after the occurrence and during the continuation of any Event of Default shall, when received by the Secured Party in cash or its equivalent, be applied by the Secured Party as follows:

(i)    first, to the payment and satisfaction of all sums paid and costs and expenses incurred by the Secured Party hereunder or otherwise in connection herewith, including such monies paid or incurred in connection with protecting, preserving or realizing upon the Collateral or enforcing any of the terms hereof, including reasonable attorneys' fees and court costs, together with any interest thereon (but without preference or priority of principal over interest or of interest over principal), to the extent the Secured Party is not reimbursed therefor by the Debtor; and

(ii)    second, to the payment and satisfaction of the remaining Obligations, whether or not then due (in whatever order the Secured Party elects), both for interest and principal.

The Debtor shall remain liable to the Secured Party for any deficiency. Any surplus remaining after the full payment and satisfaction of the foregoing shall be returned to the Debtor or to whomsoever the Secured Party reasonably determines is lawfully entitled thereto.

Section 8.    Continuing Agreement.    This Security Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until all of the Obligations, both for principal and interest, have been fully paid and satisfied and all agreements of the Secured Party to extend credit to or for the account of the Debtor have expired or otherwise have been terminated. Upon such termination of this Security Agreement, the Secured Party shall, upon the request and at the expense of the Debtor, forthwith release its security interest hereunder.

Section 9.    Miscellaneous.    (a) This Security Agreement cannot be changed or terminated orally. All of the rights, privileges, remedies and options given to the Secured Party hereunder shall inure to the benefit of its successors and assigns, and all the terms, conditions,

-6-                                                            Borrower Initials

covenants, agreements, representations and warranties of and in this Security Agreement shall bind the Debtor and its legal representatives, successors and assigns, provided that the Debtor may not assign its rights or delegate its duties hereunder without the Secured Party's prior written consent.

(b)    All notices hereunder shall be given in accordance with the terms of the Loan Agreement.

(c)    In the event and to the extent that any provision hereof shall be deemed to be invalid or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Security Agreement shall to such extent be construed as not containing such provision, but only as to such locations where such law or interpretation is operative, and the invalidity or unenforceability of such provision shall not affect the validity of any remaining provisions hereof, and any and all other provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

(d)    This Security Agreement shall be deemed to have been made in the State of Texas and shall be governed by, and construed in accordance with, the laws of the State of Texas. The headings in this Security Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any provision hereof.

(e)    This Security Agreement may be executed in any number of counterparts and by different parties hereto on separate counterpart signature pages, each constituting an original, but all together one and the same instrument. The Debtor acknowledges that this Security Agreement is and shall be effective upon its execution and delivery by the Debtor to the Secured Party, and it shall not be necessary for the Secured Party to execute this Security Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

(f)    The Debtor hereby submits to the non-exclusive jurisdiction of the United States Federal or State court sitting in Harris County, Texas for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. The Debtor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient form. THE DEBTOR AND THE SECURED PARTY EACH HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGE TO FOLLOW]

-7-

Borrower Initials _____

IN WITNESS WHEREOF, the Debtor has caused this Security Agreement to be duly executed and delivered, as of the date and year first above written.

**GIRARDI & KEESE**

By:_____

    Name:  Thomas V. Girardi
    Title:   Managing Partner / Owner

Accepted and agreed to as of the date and year first above written.

**VIRAGE SPV 1 LLC**

By: **Virage Capital Management LP,** its
    manager

By: **Virage LLC,** its general partner

By_____

    Name:  Edward Ondarza
    Title:   Manager

-8-

Borrower Initials _____

000176

# EXHIBIT 16

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>CSC    1-800-858-5294 | Initial Filing #: 187635620856<br>Initial Book #:<br>Initial Page #:<br>Initial Filing Date: 3/1/2018 |
| B. E-MAIL CONTACT AT FILER (optional)<br>SPRFiling@cscglobal.com | |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address)<br><br>1433 69741<br>CSC<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703<br><br>Filed In: California<br>(S.O.S.) | |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME Girardi & Keese | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1126 Wilshire Blvd | CITY Los Angeles | STATE CA   POSTAL CODE 90017 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE   POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS P.O. BOX 2576<br>uccsprep@cscinfo.com | CITY SPRINGFIELD | STATE IL   POSTAL CODE 62708 | COUNTRY USA |

4. COLLATERAL:  This financing statement covers the following collateral:
All right, title, and interest of the Debtor, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the following:
(a) Accounts and General Intangibles (including Payment Intangibles) arising out of any Eligible Case (as defined in the Loan Agreement) and any other property constituting Case Proceeds (as defined in the Loan Agreement);
(b) Any Assigned Accounts into which any of the Collateral described in clause (a) above is deposited; and
(c) Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof.
"Loan Agreement" means that certain Loan Agreement dated as of February 26, 2018 between the Debtor and lender for whom the Secured Party is acting as the agent, as the same may be amended, modified or restated from time to time.  For more information regarding this security interest, please contact the Secured Party at the address above.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
|---|---|---|---|---|---|

| 8. OPTIONAL FILER REFERENCE DATA: | |
|---|---|
| | 1433 69741 |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
This document was auto-generated from data received from the California Department of State

000178

# EXHIBIT 17

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,250,000.00 | 08-20-2018 | 08-19-2019 | 7000233400 | 0020-4 / 55 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:** Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

---

**THIS BUSINESS LOAN AGREEMENT** dated August 20, 2018, is made and executed between Girardi & Keese ("Borrower") and Nano Banc ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of August 20, 2018, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Thomas V. Girardi, individually.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) subordinations; (7) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any indebtedness exists:

**Organization.** Borrower is a partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1126 Wilshire Boulevard, Los Angeles, CA 90017. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 7000233400                                                                          Page 2

all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. ·All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.**

**Company's Annual Statements.** As soon as available, but in no event later than one hundred fifty (150) days after each calendar year end, or upon request, balance sheet and income statement for the year ended,in form and content acceptable to Lender.

**Business Tax Returns.** As soon as available, but in no event later than October 31st, or 15 days after filing, whichever occurs first, annual tax returns. Tax returns are understood to be federal and other governmental tax returns with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities.

**Guarantor:**

**Personal Financial Statements and Real Estate Schedule.** As soon as available, but in no event later than one hundred twenty (120) days after each calendar year end, or upon request, personal financial statement and Real Estate Schedule("REO"), in form and content acceptable to Lender. REO to include all properties owned either directly or as an investor in partnerships, including total debt, debt service and Guarantor's share of debt for each property.

**Bank and/or Brokerage House Statements.** In aggregate, if Guarantor does not maintain account balances with Lender in amounts sufficient to verify the $10,000,000 Net Liquid Assets covenant, then as soon as available, but in no event later than sixty (60) days after each June 30th and December 31st, Guarantor shall provide to Lender bank and/or brokerage house statements to document Guarantor's Net Liquid Assets.

**Tax Returns.** As soon as available, but in no event later than October 31st, or fifteen (15) days after filing, whichever occurs first, annual tax returns. Tax returns are understood to be federal personal returns (form 1040, 1041 or 1065) with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities (form 1065 and K-1's for partnerships and LLC's, and form 1120S for Sub S Corporations).

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**

000181

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 7000233400                                                                    Page 3

---

**Tangible Net Worth.** Borrower shall maintain a minimum Net Worth of not less than $25,000,000. For purposes of this calculation, the Banc will consider the Note Payable-Partner as equity. The Banc will use the book net worth of the Borrower plus the Note Payable-Partner less receivables from related companies to equal the tangible net worth of the company.

**Net Liquid Assets.** In aggregate, Borrower shall maintain a minimum of $4,000,000 in unencumbered Net Liquid Assets at all times. Net Liquid Assets are defined as cash and margin-free marketable NYSE, AMEX or NASDAQ listed securities in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity. Guarantor shall maintain a minimum of $10,000,000 in unencumbered Net Liquid Assets at all times. Net Liquid Assets are defined as cash and margin-free marketable NYSE, AMEX or NASDAQ listed securities in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity.

**Tangible Net Worth.** In aggregate, Guarantor to maintain a minimum Tangible Net Worth of not less than $75,000,000.

**Profitability.** Borrower to maintain EBITDA on an annual basis of at least $4,000,000, verified by Line 22 of the Borrower tax return. Lender shall add back Interest (Line 15) and Depreciation (Line 16) for the purposes of this calculation.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| **Thomas V. Girardi** | 50.000% of all Indebtedness or $2,125,000.00, whichever is less |
| **1126 Wilshire Partnership** | Unlimited |

**Subordination.** Prior to disbursement of any Loan proceeds, deliver to Lender a subordination agreement on Lender's forms, executed by Borrower's creditor named below, subordinating all of Borrower's indebtedness to such creditor, on such lesser amount as may be agreed to by Lender in writing, and any security interests in collateral securing that indebtedness to the Loans and security interests of Lender.

| Name of Creditor | Total Amount of Debt |
|---|---|
| **Thomas V. Girardi** | **$51,230,000.00** |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 7000233400                                                                                    Page 4

provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Additional Financial Restrictions.**

**Unsecured Debt.** Borrower shall agree not to apply for and/or accept any additional unsecured debt of $500,000 in aggregate, without prior written approval from Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 7000233400                                                              Page 5

---

forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT RELATIONSHIP.** Borrower to maintain all operating accounts with Lender and establish automatic withdrawal of monthly interest and principal payments from one of said accounts.

**INDEMNITY.** Borrower shall indemnify, pay and hold harmless the Lender against any loss, liability, cost or expenses incurred in respect to the financing contemplated hereby, the use or the proposed used of the proceeds hereof or any loss incurred as a result of environmental issues.

**EXPENSES.** Borrower agrees to reimburse Lender for expenses incurred in connection with any due diligence and out of pocket expenses. These expenses include without limitation appraisal and appraisal review costs, environmental and review costs, credit reports, lien searches, title insurance and documentation costs.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 7000233400    Page 6

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Girardi & Keese and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Nano Banc, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated August 20, 2018 and executed by Girardi & Keese in the principal amount of $4,250,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 7000233400                                                                 Page 7

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure Indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED AUGUST 20, 2018.

**BORROWER:**

**GIRARDI & KEESE**

By: _____
    Thomas V. Girardi, General Partner of Girardi &
    Keese

**LENDER:**

**NANO BANC**

By: _____
    Brian Buchanan, Vice President

LaserPro, Ver. 18.1.10.007 Copr. Finastra USA Corporation 1997, 2018  All Rights Reserved  - CA  Z:\HARLAND\CFR\PL\C40.FC  TR-1115  PR-30

# EXHIBIT 18

000187

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,250,000.00 | 08-20-2018 | 08-19-2019 | 7000233400 | 0020-47 55 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:** Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

---

**Principal Amount: $4,250,000.00** **Date of Note: August 20, 2018**

**PROMISE TO PAY. Girardi & Keese ("Borrower") promises to pay to Nano Banc ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Million Two Hundred Fifty Thousand & 00/100 Dollars ($4,250,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on August 19, 2019. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning September 10, 2018, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**EXTENSION OPTION.** Assuming the Borrower has handled all credit obligations as agreed with no late payments, Lender shall provide one 364-day extension.

**TERM-OUT OPTION.** A five (5) year term-out option will be available subject to the satisfaction of the following conditions:
> Lender receives at least ninety (90) days written notice from the Borrower of its intention to strike the term-out option.
> No continuing or existing events of default at the time of the notice of the term-out, and at the term-out.
> No material adverse change in the financial capacity of the Borrower and Guarantor.
> The Debt Coverage Ratio (the "DCR") shall be 1.25x, using the term-out rate and five-year amortization.
> At the time of the term-out, the rate shall be a fixed rate of Wall Street Journal Prime minus 1.00%, with a 6.00% rate floor and a five-year amortization period.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 5.000% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point under the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.000%. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.**

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Nano Banc, Irvine Office, 7700 Irvine Center Dr., Suite 700, Irvine, CA 92618.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of

**PROMISSORY NOTE**
**(Continued)**

Loan No: 7000233400                                                                                                      Page 2

creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: inventory, chattel paper, accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas described in a Commercial Security Agreement dated August 20, 2016.

**LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Thomas V. Girardi, individually. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Nano Banc 25220 Hancock Avenue Suite 140 Murrieta, CA 92562.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

GIRARDI & KEESE

By: _____
Thomas V. Girardi, General Partner of Girardi & Keese

# EXHIBIT 19

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $4,250,000.00 | 08-20-2018 | 08-19-2019 | 7000233400 | 0020/4155 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:**  Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:**  Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

**THIS COMMERCIAL SECURITY AGREEMENT** dated August 20, 2018, is made and executed between Girardi & Keese ("Grantor") and Nano Banc ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the partners of the partnership, including the addition of new partners or the departure of current partners from the partnership (Grantor); (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name, state or organization, or principal office address will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its partnership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

## COMMERCIAL SECURITY AGREEMENT
Loan No: 7000233400                      **(Continued)**                      Page 2

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the indebtedness, and shall pay the balance to

**Loan No: 7000233400**

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Page 3

Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business or the death of any partner, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 7000233400                                                                                                                        Page 4

adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 7000233400                                                                                      Page 5

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Girardi & Keese and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Girardi & Keese.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

000195

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

**Loan No: 7000233400**

Page 6

Lender. The word "Lender" means Nano Banc, its successors and assigns.

Note. The word "Note" means the Note dated August 20, 2018 and executed by Girardi & Keese in the principal amount of $4,250,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

Property. The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AUGUST 20, 2018.

GRANTOR:

GIRARDI & KEESE

By: _____
Thomas V. Girardi, General Partner of Girardi & Keese

LaserPro, Ver. 18.1.10.007  Copr. Finastra USA Corporation 1997, 2018   All Rights Reserved.   - CA  Z:\HARLAND\CFI\LPL\E49.FC  TR-1115  PR-29

000196

# EXHIBIT 20

000197

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,250,000.00 | 08-20-2018 | 08-19-2019 | 7000233400 | 0020-4 / 55 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:** Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

**Guarantor:** 1126 Wilshire Partnership
1126 Wilshire Boulevard
Los Angeles, CA 90017

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. Guarantor's obligations under this Guaranty shall be in addition to any of Guarantor's obligations, or any of them, under any other guaranties of the Indebtedness or any other person heretofore or hereafter given to Lender unless such other guaranties are modified or revoked in writing; and this Guarantor shall not, unless provided in this Guaranty, affect, invalidate, or supersede any such other guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 7000233400                                                                                                 Page 2

payments and credits shall be made on the Indebtedness;  (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine;  (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and  (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.**  Guarantor represents and warrants to Lender that  (A)  no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty;  (B) this Guaranty is executed at Borrower's request and not at the request of Lender;  (C)  Guarantor has full power, right and authority to enter into this Guaranty;  (D)  the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;  (E)  Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;  (F)  upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;  (G)  no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition;  (H)  no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;  (I)  Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and  (J)  Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition.  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.**  Except as prohibited by applicable law, Guarantor waives any right to require Lender to  (A)  make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness;  (B)  proceed against any person, including Borrower, before proceeding against Guarantor;  (C)  proceed against any collateral for the Indebtedness, including Borrower's collateral, before proceeding against Guarantor;  (D)  apply any payments or proceeds received against the Indebtedness in any order;  (E)  give notice of the terms, time, and place of any sale of the collateral pursuant to the Uniform Commercial Code or any other law governing such sale;  (F)  disclose any information about the Indebtedness, the Borrower, the collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or  (G)  pursue any remedy or course of action in Lender's power whatsoever.

Guarantor also waives any and all rights or defenses arising by reason of  (H)  any disability or other defense of Borrower, any other guarantor or surety or any other person;  (I)  the cessation from any cause whatsoever, other than payment in full, of the Indebtedness;  (J)  the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Guarantor and Lender;  (K)  any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise;  (L)  any statute of limitations in any action under this Guaranty or on the Indebtedness; or  (M)  any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate, and including any such modification or change in terms after revocation of this Guaranty on the Indebtedness incurred prior to such revocation.

Guarantor waives all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive.

Guarantor waives all rights and any defenses arising out of an election of remedies by Lender even though that the election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.

Guarantor waives all rights and defenses that Guarantor may have because Borrower's obligation is secured by real property.  This means among other things:  (N)  Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.  (O)  If Lender forecloses on any real property collateral pledged by Borrower:  (1)  the amount of Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.  (2) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.  This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's obligation is secured by real property.  These rights and defenses include, but are not limited to, any rights and defenses based upon Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.

Guarantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Guarantor might otherwise be entitled under state and federal law.  The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code.  Guarantor acknowledges that Guarantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender.  Guarantor further understands and agrees that this Guaranty is a separate and independent contract between Guarantor and Lender, given for full and ample consideration, and is enforceable on its own terms.  Until all of the Indebtedness is paid in full, Guarantor waives any right to enforce any remedy Guarantor may have against the Borrower or any other guarantor, surety, or other person, and further, Guarantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**Guarantor's Understanding With Respect To Waivers.**  Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law.  If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**Collateral.**  This Guaranty is secured by 1126 Wilshire Blvd., Los Angeles, CA 90017.

**Subordination of Borrower's Debts to Guarantor.**  Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower.  In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness.  Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of

Loan No: 7000233400

# COMMERCIAL GUARANTY
## (Continued)

Page 3

the indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**Miscellaneous Provisions.** The following miscellaneous provisions are a part of this Guaranty:

**AMENDMENTS.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**ATTORNEYS' FEES; EXPENSES.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**CAPTION HEADINGS.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**GOVERNING LAW.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.

**INTEGRATION.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**INTERPRETATION.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**NOTICES.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**NO WAIVER BY LENDER.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**ADDITIONAL REQUIREMENTS. Personal Financial Statements and Real Estate Schedule.** As soon as available, but in no event later than one hundred twenty (120) days after each calendar year end, or upon request, personal financial statement and Real Estate Schedule("REO"), in form and content acceptable to Lender. REO to include all properties owned either directly or as an investor in partnerships, including total debt, debt service and Guarantor's share of debt for each property.

**Bank and/or Brokerage House Statements.** In aggregate, if Guarantor does not maintain account balances with Lender in amounts sufficient to verify the $10,000,000 Net Liquid Assets covenant, then as soon as available, but in no event later than sixty (60) days after each June 30th and December 31st, Guarantor shall provide to Lender bank and/or brokerage house statements to document Guarantor's Net Liquid Assets.

**Tax Returns.** As soon as available, but in no event later than October 31st, or fifteen (15) days after filing, whichever occurs first, annual tax returns. Tax returns are understood to be federal personal returns (form 1040, 1041 or 1065) with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities (form 1065 and K-1's for partnerships and LLC's, and form 1120S for Sub S Corporations).

**Net Liquid Assets.** Guarantor shall maintain a minimum of $10,000,000 in unencumbered Net Liquid Assets at all times. Net Liquid Assets are defined as cash and margin-free marketable NYSE, AMEX or NASDAQ listed securities in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity.

**Tangible Net Worth.** In aggregate, Guarantor to maintain a minimum Tangible Net Worth of not less than $75,000,000.

**Definitions.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in

**COMMERCIAL GUARANTY**

Loan No: 7000233400                                   **(Continued)**                                    Page 4

the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**BORROWER.** The word "Borrower" means Girardi & Keese and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GUARANTOR.** The word "Guarantor" means everyone signing this Guaranty, including without limitation 1126 Wilshire Partnership, and in each case, any signer's successors and assigns.

**GUARANTY.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**INDEBTEDNESS.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**LENDER.** The word "Lender" means Nano Banc, its successors and assigns.

**NOTE.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED AUGUST 20, 2018.**

**GUARANTOR:**

**1126 WILSHIRE PARTNERSHIP**

By: _____
Thomas V. Girardi, General Partner of 1126 Wilshire
Partnership

LaserPro, Ver. 18.1.10.007  Copr. Finastra USA Corporation 1997, 2018   All Rights Reserved   - CA  Z:\HARLAN\CFILPLN230.FC  TR-1115  PR-30

# EXHIBIT 21

**This page is part of your document - DO NOT DISCARD**



## 20181231538



Pages:
0011

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**12/06/18 AT 08:00AM**

| | |
|---|---|
| FEES: | 94.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 319.00 |



**LEADSHEET**



201812060210006

**00016034690**



009501895

**SEQ:**
**11**

**DAR - Title Company (Hard Copy)**



**THIS FORM IS NOT TO BE DUPLICATED**

R38

**CONSUMER'S TITLE COMPANY**

18 — 104426-02

**RECORDATION REQUESTED BY:**

Synrgo

12/06/2018

*20181231538*

**WHEN RECORDED MAIL TO:**
Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA  92618

**SEND TAX NOTICES TO:**
1126 Wilshire Partnership
1126 Wilshire Boulevard
Los Angeles, CA  90017

FOR RECORDER'S USE ONLY

This Deed of Trust is 2nd and subordinate
to a Deed of Trust recording concurrently herewith.

## DEED OF TRUST

**THIS DEED OF TRUST** is dated August 20, 2018, among 1126 Wilshire Partnership, a California General Partnership, whose address is 1126 Wilshire Boulevard, Los Angeles, CA 90017 ("Trustor"); Nano Banc, whose address is Irvine Office, 7700 Irvine Center Dr., Suite 700, Irvine, CA  92618 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and Nano Banc, whose address is 25220 Hancock Avenue, Suite 140, Murrieta, CA  92562 (referred to below as "Trustee").

CONVEYANCE AND GRANT.  For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Los Angeles County, State of California:

LOTS 48 AND 49 OF THE SUBDIVISION OF THAT PART OF LOT 1 IN BLOCK 37 OF HANCOCK'S SURVEY, LYING SOUTH OF ORANGE STREET AND WESTERLY FROM WILLIAM STREET, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGE 95 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBONS, BELOW A DEPTH OF 500 FEET, WITHOUT THE RIGHT OF SURFACE ENTRY, AS RESERVED IN INSTRUMENTS OF RECORD.

The Real Property or its address is commonly known as  1126 Wilshire Boulevard, Los Angeles, CA  90017. The Assessor's Parcel Number for the Real Property is 5143-022-012.

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938.  In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PERFORMANCE OF A GUARANTY FROM TRUSTOR TO LENDER, AND DOES NOT DIRECTLY SECURE THE OBLIGATIONS DUE LENDER UNDER THE NOTE, (B)  PAYMENT OF THE INDEBTEDNESS AND  (C)  PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

TRUSTOR'S REPRESENTATIONS AND WARRANTIES.  Trustor warrants that.  (a) this Deed of Trust is executed at Borrower's request and not at the request of Lender;  (b) Trustor has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property;  (c) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Trustor and do not result in a violation of any law, regulation, court decree or order applicable to Trustor;  (d) Trustor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition, and  (e) Lender has made no representation to Trustor about Borrower (including without limitation the creditworthiness of Borrower).

TRUSTOR'S WAIVERS.  Except as prohibited by applicable law, Trustor waives any right to require Lender to  (a) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness,  (b) proceed against any person, including Borrower, before proceeding against Trustor,  (c) proceed against any collateral for the Indebtedness, including Borrower's collateral, before proceeding against Trustor;  (d) apply any payments or proceeds received against the Indebtedness in any order;  (e) give notice of the terms, time, and place of any sale of any collateral pursuant to the Uniform Commercial Code or any other law governing such sale;  (f) disclose any information about the Indebtedness, Borrower, any collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or  (g) pursue any

000204 

# DEED OF TRUST
**Loan No: 7000233400**                    **(Continued)**                    **Page 2**

remedy or course of action in Lender's power whatsoever.

Trustor also waives any and all rights or defenses arising by reason of (h) any disability or other defense of Borrower, any other guarantor or surety or any other person; (i) the cessation from any cause whatsoever, other than payment in full, of the Indebtedness, (j) the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Trustor and Lender, (k) any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (l) any statute of limitations in any action under this Deed of Trust or on the Indebtedness; or (m) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate

Trustor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Trustor's rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure, or otherwise

Trustor waives all rights and defenses that Trustor may have because Borrower's obligation is secured by real property. This means among other things: (1) Lender may collect from Trustor without first foreclosing on any real or personal property collateral pledged by Borrower. (2) If Lender forecloses on any real property collateral pledged by Borrower: (A) The amount of Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price. (B) Lender may collect from Trustor even if Lender, by foreclosing on the real property collateral, has destroyed any right Trustor may have to collect from Borrower  This is an unconditional and irrevocable waiver of any rights and defenses Trustor may have because Borrower's obligation is secured by real property  These rights and defenses include, but are not limited to, any rights and defenses based upon Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.

Trustor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Trustor might otherwise be entitled under state and federal law. The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code. Trustor acknowledges that Trustor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender. Trustor further understands and agrees that this Deed of Trust is a separate and independent contract between Trustor and Lender, given for full and ample consideration, and is enforceable on its own terms. Until all Indebtedness is paid in full, Trustor waives any right to enforce any remedy Trustor may have against Borrower's or any other guarantor, surety, or other person, and further, Trustor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Deed of Trust, Trustor shall strictly perform all of Trustor's obligations under the Guaranty and under this Deed of Trust.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Lender and Trustor agree that Borrower's and Trustor's possession and use of the Property shall be governed by the following provisions:

    **Possession and Use.** Until the occurrence of an Event of Default, Trustor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property, and (3) collect the Rents from the Property.

    **Duty to Maintain.** Trustor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value

    **Compliance With Environmental Laws.** Trustor represents and warrants to Lender that: (1) During the period of Trustor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Trustor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Trustor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property, and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Trustor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Trustor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Trustor or to any other person. The representations and warranties contained herein are based on Trustor's due diligence in investigating the Property for Hazardous Substances. Trustor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Trustor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Trustor's ownership or interest in the Property, whether or not the same was or should have been known to Trustor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

    **Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

    **Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory

**DEED OF TRUST**
**(Continued)**

Loan No: 7000233400                                                                                  Page 3

to Lender to replace such improvements with improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act  Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized.  Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property.  Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property.  Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized.  If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien.  In any contest, Trustor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property.  Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Trustor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies  Additionally, Trustor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender.  Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty.  If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property.  If the proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance

5

## DEED OF TRUST
**(Continued)**

Loan No: 7000233400

Page 4

with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**Trustor's Report on Insurance.** Upon request of Lender, however not more than once a year, Trustor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Trustor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Trustor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Trustor's failure to comply with any obligation to maintain Existing Indebtedness in good standing as required below, or to discharge or pay when due any amounts Trustor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Trustor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Trustor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand, (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy, or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Trustor warrants that: (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense. Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Trustor warrants that the Property and Trustor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Trustor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

**Existing Lien.** The lien of this Deed of Trust securing the Indebtedness may be secondary and inferior to an existing lien. Trustor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Trustor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Trustor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to pursue or defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed



of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

Taxes. The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

Subsequent Taxes. If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

Security Agreement. This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

Security Interest. Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

Addresses. The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust.

Further Assurances. At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Trustor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust on the Property, whether now owned or hereafter acquired by Trustor. Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

Attorney-In-Fact. If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense. For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor shall strictly perform all of Trustor's obligations under the Guaranty and Trustor otherwise performs all the obligations imposed upon Trustor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

Payment Default. Borrower fails to make any payment when due under the Note Indebtedness or Trustor fails to make any payment when due under the Indebtedness.

Other Defaults. Borrower or Trustor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Trustor.

Default Under the Guaranty. Failure by Trustor to comply with any term, obligation, covenant or condition contained in the Guaranty.

Compliance Default. Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

Default on Other Payments. Failure of Trustor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

Default in Favor of Third Parties. Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Deed of Trust or any of the Related Documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or Trustor or on Borrower's or Trustor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

7

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Trustor's existence as a going business or the death of any partner, the insolvency of Borrower or Trustor, the appointment of a receiver for any part of Borrower's or Trustor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Trustor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Trustor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Trustor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Trustor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Trustor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Trustor under the terms of any other agreement between Borrower or Trustor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any Indebtedness or other obligation of Borrower or Trustor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness

**Adverse Change.** A material adverse change occurs in Borrower's or Trustor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired  ·

**Insecurity.** Lender in good faith believes itself insecure.

**Existing Indebtedness.** The payment of any installment of principal or any interest on the Existing Indebtedness is not made within the time required by the promissory note evidencing such indebtedness, or a default occurs under the instrument securing such indebtedness and is not cured during any applicable grace period in such instrument, or any suit or other action is commenced to foreclose any existing lien on the Property.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Trustor under this Deed of Trust, after Trustor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Note, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement in accordance with applicable law. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of· all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a

000209

**DEED OF TRUST**
**(Continued)**

Loan No: 7000233400                                                                        Page 7

---

receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust.

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of Los Angeles County, State of California  The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Acceptance by Trustee.** Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.** Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address. Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors.

**STATEMENT OF OBLIGATION FEE.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

## DEED OF TRUST
### (Continued)

Loan No: 7000233400                                                                                    Page 8

---

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust  No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Trustor's residence, Trustor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Trustor's previous fiscal year in such form and detail as Lender shall require.  "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law.** This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of California.

**Joint and Several Liability.** All obligations of Borrower and Trustor under this Deed of Trust shall be joint and several, and all references to Trustor shall mean each and every Trustor, and all references to Borrower shall mean each and every Borrower. This means that each Trustor signing below is responsible for all obligations in this Deed of Trust  Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust.  No prior waiver by Lender, nor any course of dealing between Lender and Trustor, shall constitute a waiver of any of Lender's rights or of any of Trustor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns.  If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code.

**Beneficiary.** The word "Beneficiary" means Nano Banc, and its successors and assigns.

**Borrower.** The word "Borrower" means Girardi & Keese and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7 7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Deed of Trust

10

**DEED OF TRUST
(Continued)**

Loan No: 7000233400                                                    Page 9

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Trustor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all obligations of Trustor under the Guaranty and any amounts expended, extensions of, modifications of, consolidations of and substitutions for the obligations under the Guaranty and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means Nano Banc, its successors and assigns.

**Note.** The word "Note" means the promissory note dated August 20, 2018, **in the original principal amount of $4,250,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. NOTICE TO TRUSTOR:  THE NOTE CONTAINS A VARIABLE INTEREST RATE.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness; except that the words do not mean any guaranty or environmental agreement, whether now or hereafter existing, executed in connection with the Indebtedness

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means Nano Banc, whose address is 25220 Hancock Avenue, Suite 140, Murrieta, CA 92562 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means 1126 Wilshire Partnership.

**TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND TRUSTOR AGREES TO ITS TERMS, INCLUDING THE VARIABLE RATE PROVISIONS OF THE NOTE SECURED BY THIS DEED OF TRUST.**

**TRUSTOR:**

1126 WILSHIRE PARTNERSHIP

By: _____
   Thomas V. Girardi, General Partner of 1126 Wilshire Partnership

000212

Loan No: 7000233400

**DEED OF TRUST
(Continued)**

Page 10

## CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF _California_                    )
                                          ) SS
COUNTY OF _Los Angeles_                   )

On _August 23_ , 20_18_ before me, _Shirleen H. Fujimoto, Notary Public_
(here insert name and title of the officer)

personally appeared Thomas V. Girardi, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Shirleen H. Fujimoto_

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

(Seal)

---

**(DO NOT RECORD)**
## REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To _____ , Trustee

The undersigned is the legal owner and holder of all indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

Date: _____          Beneficiary: _____
                                              By: _____
                                              Its: _____

LaserPro, Ver 18 1 10 007  Copr Finastra USA Corporation 1997, 2018.  All Rights Reserved.  - CA  Z:\HARLAND\CFI\LPL\G01.FC
TR-1115 PR-20

# EXHIBIT 22

000214

This ACKNOWLEDGEMENT reflects the information received from the California Department Of State.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| CSC    1-800-858-5294 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| SPRFiling@cscglobal.com |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

```
1515 59436
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703
```
Filed In: California
(S.O.S.)

Initial Filing #: 187666662169
Initial Book #:
Initial Page #:
Initial Filing Date: 8/31/2018

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME Girardi & Keese | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1126 Wilshire Boulevard | CITY Los Angeles | STATE CA | POSTAL CODE 90017 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME Nano Banc | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 25220 Hancock Avenue, Ste. 140 | CITY Murrieta | STATE CA | POSTAL CODE 92562 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien    ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):    ☐ Lessee/Lessor    ☐ Consignee/Consignor    ☐ Seller/Buyer    ☐ Bailee/Bailor    ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
1515 59436

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
This document was auto-generated from data received from the California Department of State

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**

Girardi & Keese

OR

**9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)**          **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME**

OR

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)**          **SUFFIX**

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
payments) of or relating to the foregoing property.

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# EXHIBIT 23

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $4,250,000.00 | 08-19-2019 | 11-19-2019 | 7000233400 | 0020 47 56 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:**  Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

---

**Principal Amount: $4,250,000.00**  **Date of Agreement: August 19, 2019**

DESCRIPTION OF EXISTING INDEBTEDNESS.

A Revolving Line of Credit evidenced by a Promissory Note dated August 20, 2019, in the original principal amount of $4,250,000.00 and referencing Loan No. 7000233400 (Note) and all renewals, modifications/extensions thereof.

DESCRIPTION OF COLLATERAL.

Borrower acknowledges this Note is secured by a UCC 1 Broadform filing on the following collateral listed herein: Inventory, chattel paper, accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas, as further described in a Commercial Security Agreement dated August 20, 2019.

DESCRIPTION OF CHANGE IN TERMS.

The Promissory Note has been amended as follows:

The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is hereby extended from August 19, 2019 to November 19, 2019.

All other terms and conditions remain the same.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on November 19, 2019. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning September 10, 2019, with all subsequent interest payments to be due on the same day of each month after that.

VARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The index currently is 5.250% per annum. Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point under the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.000%. NOTICE: Under no circumstances will the interest rate on this loan be less than 6.000% per annum or more than the maximum rate allowed by applicable law.

INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

GIRARDI & KEESE

By: _____
Thomas V. Girardi, General Partner of Girardi &
Keese

||||||||||||||||||||||||||
*HLP0590*

# CHANGE IN TERMS AGREEMENT

| Principal $4,250,000.00 | Loan Date 11-19-2019 | Maturity 01-19-2020 | Loan No 7000233400 | Call Coll 0020-4/755 | Account | Officer BRI | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:**  Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

---

**Principal Amount: $4,250,000.00**                 **Date of Agreement: November 19, 2019**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

A Line of Credit evidenced by a Promissory Note dated August 20, 2019, in the original principal amount of $4,250,000.00 and referencing Loan No. 7000233400 (Note) and all renewals, modifications/extensions thereof.

**DESCRIPTION OF COLLATERAL.**

Borrower acknowledges this Note is secured by a UCC 1 Broadform filing on the following collateral listed herein: inventory, chattel paper, accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas, as further described in a Commercial Security Agreement dated August 20, 2019.

**DESCRIPTION OF CHANGE IN TERMS.**

The Promissory Note has been amended as follows:

The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is hereby extended from November 19, 2019 to January 19, 2020.

All other terms and conditions remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**GIRARDI & KEESE**

By: _____
Thomas V. Girardi, General Partner of Girardi &
Keese

LaserPro, Ver. 19.3.0.033  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - CA  Z:\LaserPro\CFI\LPL\D20C.FC  TR-1207  PR-30

000219



*HLP0590*

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,250,000.00 | 01-19-2020 | 04-19-2020 | 7000233400 | 0020-4 / 55 | | BB1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA  90017

**Lender:**  Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA  92618
(844) 626-0262

**Principal Amount: $4,250,000.00**                     **Date of Agreement:  January 19, 2020**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

A Line of Credit evidenced by a Promissory Note dated August 20, 2019, in the original principal amount of $4,250,000.00 and referencing
Loan No. 7000233400 (Note) and all renewals, modifications/extensions thereof.

**DESCRIPTION OF COLLATERAL.**

Borrower acknowledges this Note is secured by a UCC 1 Broadform filing on the following collateral listed herein: inventory, chattel paper,
accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas, as further described in a Commercial Security
Agreement dated August 20, 2019.

**DESCRIPTION OF CHANGE IN TERMS.**

**The Promissory Note has been amended as follows:**

The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is
hereby extended from January 19, 2020 to April 19, 2020.

All other terms and conditions remain the same.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all
agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does
not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing
in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and
endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or
endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation
does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the
representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released
by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER
AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**GIRARDI & KEESE**

By: _____
Thomas V. Girardi, General Partner of Girardi &
Keese

LaserPro, Ver. 19.3.0.039 Copr. Finastra USA Corporation 1997, 2020.  All Rights Reserved.  - CA  Z:\LaserPro\CFI\LPL\D30C.FC  TR-1307  PR-20



*HLP0590*

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,250,000.00 | 04-19-2020 | 04-18-2021 | 7000233400 | 0020-4 / 55 | | BB1 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:**  Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

---

**Principal Amount: $4,250,000.00**                    **Date of Agreement: April 19, 2020**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

A Line of Credit evidenced by a Promissory Note dated August 20, 2019, in the original principal amount of $4,250,000.00 and referencing Loan No. 7000233400 (Note) and all renewals, modifications/extensions thereof.

**DESCRIPTION OF COLLATERAL.**

Borrower acknowledges this Note is secured by a UCC 1 Broadform filing on the following collateral listed herein: inventory, chattel paper, accounts, equipment, general intangibles, fixtures, standing timber and mineral, oil and gas, as further described in a Commercial Security Agreement dated August 20, 2019.

**DESCRIPTION OF CHANGE IN TERMS.**

**The Promissory Note has been amended as follows:**

The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) ("Maturity Date") is hereby extended from April 19, 2020 to April 18, 2021.

All other terms and conditions remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**GIRARDI & KEESE**

By: _____
Thomas V. Girardi, General Partner of Girardi & Keese

---

# EXHIBIT 24

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,250,000.00 | 08-20-2018 | 08-19-2019 | 7000233400 | 0020-4 / 55 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017

**Lender:** Nano Banc
Irvine Office
7700 Irvine Center Dr., Suite 700
Irvine, CA 92618
(844) 626-0262

**Guarantor:**
Thomas V. Girardi
1126 Wilshire Boulevard
Los Angeles, CA 90017

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of Guarantor's Share of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.
If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**GUARANTOR'S SHARE OF THE INDEBTEDNESS.** Thomas V. Girardi's share of the Indebtedness shall be an amount not to exceed 50% of the principal amount of the Indebtedness or $2,125,000, plus all accrued unpaid interest on the Indebtedness and all collection costs, expenses and attorneys' fees whether or not there is a lawsuit, and if there is a lawsuit, any fees and costs for trial and appeals paid or incurred by Lender for the collection of the Indebtedness, the realization on any collateral securing the Indebtedness or any guaranty of the Indebtedness (including this guaranty), or the enforcement of this guaranty.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE GUARANTOR'S SHARE OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON A CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Guarantor's Share of the Indebtedness remains unpaid and even though the Guarantor's Share of the Indebtedness may from time to time be zero dollars ($0.00).**

**OBLIGATIONS OF MARRIED PERSONS.** Any married person who signs this Guaranty hereby expressly agrees that recourse under this Guaranty may be had against both his or her separate property and community property.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 7000233400                                                                Page 2

information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender to (A) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness; (B) proceed against any person, including Borrower, before proceeding against Guarantor; (C) proceed against any collateral for the Indebtedness, including Borrower's collateral, before proceeding against Guarantor; (D) apply any payments or proceeds received against the Indebtedness in any order; (E) give notice of the terms, time, and place of any sale of the collateral pursuant to the Uniform Commercial Code or any other law governing such sale; (F) disclose any information about the Indebtedness, the Borrower, the collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or (G) pursue any remedy or course of action in Lender's power whatsoever.
Guarantor also waives any and all rights or defenses arising by reason of (H) any disability or other defense of Borrower, any other guarantor or surety or any other person; (I) the cessation from any cause whatsoever, other than payment in full, of the Indebtedness; (J) the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Guarantor and Lender; (K) any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (L) any statute of limitations in any action under this Guaranty or on the Indebtedness; or (M) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate, and including any such modification or change in terms after revocation of this Guaranty on the Indebtedness incurred prior to such revocation.
Guarantor waives all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive.
Guarantor waives all rights and defenses arising out of an election of remedies by Lender even though that the election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.
Guarantor waives all rights and defenses that Guarantor may have because Borrower's obligation is secured by real property. This means among other things: (N) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower. (O) If Lender forecloses on any real property collateral pledged by Borrower: (1) the amount of Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price. (2) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's obligation is secured by real property. These rights and defenses include, but are not limited to, any rights and defenses based upon Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.
Guarantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Guarantor might otherwise be entitled under state and federal law. The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code. Guarantor acknowledges that Guarantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender. Guarantor further understands and agrees that this Guaranty is a separate and independent contract between Guarantor and Lender, given for full and ample consideration, and is enforceable on its own terms. Until all of the Indebtedness is paid in full, Guarantor waives any right to enforce any remedy Guarantor may have against the Borrower or any other guarantor, surety, or other person, and further, Guarantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**Guarantor's Understanding With Respect To Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**Subordination of Borrower's Debts to Guarantor.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**Miscellaneous Provisions.** The following miscellaneous provisions are a part of this Guaranty.

**AMENDMENTS.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**ATTORNEYS' FEES; EXPENSES.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**CAPTION HEADINGS.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**GOVERNING LAW. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.**

**INTEGRATION.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**INTERPRETATION.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 7000233400                                                                          Page 3

**NOTICES.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**NO WAIVER BY LENDER.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**ADDITIONAL REQUIREMENTS.** Personal Financial Statements and Real Estate Schedule. As soon as available, but in no event later than one hundred twenty (120) days after each calendar year end, or upon request, personal financial statement and Real Estate Schedule("REO"), in form and content acceptable to Lender. REO to include all properties owned either directly or as an investor in partnerships, including total debt, debt service and Guarantor's share of debt for each property.

Bank and/or Brokerage House Statements. In aggregate, if Guarantor does not maintain account balances with Lender in amounts sufficient to verify the $10,000,000 Net Liquid Assets covenant, then as soon as available, but in no event later than sixty (60) days after each June 30th and December 31st, Guarantor shall provide to Lender bank and/or brokerage house statements to document Guarantor's Net Liquid Assets.

Tax Returns. As soon as available, but in no event later than October 31st, or fifteen (15) days after filing, whichever occurs first, annual tax returns. Tax returns are understood to be federal personal returns (form 1040, 1041 or 1065) with all schedules, and federal tax returns for any and all entities reported on the tax returns or for related entities (form 1065 and K-1's for partnerships and LLC's, and form 1120S for Sub S Corporations).

Net Liquid Assets. Guarantor shall maintain a minimum of $10,000,000 in unencumbered Net Liquid Assets at all times. Net Liquid Assets are defined as cash and margin-free marketable NYSE, AMEX or NASDAQ listed securities in non-retirement accounts (funds in retirement accounts such as IRA's shall not be counted). Cash value of life insurance policy to be acceptable in terms of liquidity.

Tangible Net Worth. In aggregate, Guarantor to maintain a minimum Tangible Net Worth of not less than $75,000,000.

**Definitions.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**BORROWER.** The word "Borrower" means Girardi & Keese and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GUARANTOR.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Thomas V. Girardi, and in each case, any signer's successors and assigns.

**GUARANTOR'S SHARE OF THE INDEBTEDNESS.** The words "Guarantor's Share of the Indebtedness" mean Guarantor's indebtedness to Lender as more particularly described in this Guaranty.

**GUARANTY.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**INDEBTEDNESS.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**LENDER.** The word "Lender" means Nano Banc, its successors and assigns.

**NOTE.** The word "Note" means the promissory note dated August 20, 2018, in the original principal amount of $4,250,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED AUGUST 20, 2018..

**GUARANTOR:**

X _____
Thomas V. Girardi, Individually

**1126 WILSHIRE PARTNERSHIP**

By: _____
Thomas V. Girardi, General Partner of 1126 Wilshire
Partnership

# EXHIBIT 25

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Lien Solutions
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071
USA

DOCUMENT NUMBER: 83664410002
FILING NUMBER: 19-7746713843
FILING DATE: 11/14/2019 07:57

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | Girardi & Keese | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1126 Wilshire Blvd | Los Angeles | CA | 90017 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | C T Corporation System, as representative | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Each Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| **6a.** Check only if applicable and check only one box: | **6b.** Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
CA-0-72544054-58088571

FILING OFFICE COPY

000227

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| OR | 9a. ORGANIZATION'S NAME<br>Girardi & Keese |
| | 9b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX |

DOCUMENT NUMBER: 83664410002

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | | |
|---|---|---|---|---|---|
| OR | 10a. ORGANIZATION'S NAME | | | | |
| | 10b. INDIVIDUAL'S SURNAME | | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| OR | 11a. ORGANIZATION'S NAME | | | |
| | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | | CITY | STATE    POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (collateral):
right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note).

| | |
|---|---|
| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:<br>☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing. |
| 15. Name and address of RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |
| 17. MISCELLANEOUS: | |

FILING OFFICE COPY

# EXHIBIT 26

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | RESERVED FOR CLERK'S FILE STAMP |
|---|---|
| **COURTHOUSE:**<br>Stanley Mosk | |
| **PLAINTIFF(S):**<br>Joseph Ruigomez, Kathleen Ruigomez, Jamie Ruigomez | **FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>APR 20 2020<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By _____ Deputy<br>A. Barton |
| **CROSS-DEFENDANT(S):** | |
| **DEFENDANT(S):**<br>Thomas V. Girardi; Girardi \| Keese | |
| **CROSS-COMPLAINANT(S):** | |

| STIPULATION FOR CIVIL JUDGMENT | CASE NUMBER:<br>19STCV22296 | DEPT.:<br>56 |
|---|---|---|

THE PARTIES STIPULATE (AGREE ) AS FOLLOWS:

1. Judgment shall be entered in favor of:

    ☑ Plaintiff(s)  Joseph Ruigomez, Kathleen Ruigomez, and Jamie Ruigomez _____

    ☐ Cross-Defendant(s) _____

    ☐ Defendant(s) _____

    ☐ Cross-Complainant(s) _____

    and against   Thomas V. Girardi and Girardi | Keese _____ *per Consent*
    *TJSC*  *(name(s))*  *at ex parte*  , as follows:
    *at 4/20/20*

    Principal            $ ~~12,000,000~~  11,000,000      ☐ Other Additional Relief: _____

    Prejudgment Interest  $ _____      _____

    Attorney's Fees       $ _____      _____

    Costs                 $ _____      _____

    TOTAL                 $ _____      _____

    Any other terms and conditions (for example terms of a stay on execution of judgment):
    Payment is due within sixty (60) days. _____

    _____

    _____

3. If execution of the judgment is stayed, it is agreed that upon default by the party to perform, the stay will be lifted and a writ of execution or other relief may issue upon ex parte application by the party entitled to performance (check 3a, 3b, or 3c), as follows:

    a.    ☐    Without further notice or hearing

    b.    ☐    On 24-hour telephonic notice to the defaulting party

    c.    ☐    Other _____

4. **Acknowledgment and Waiver:** I acknowledge and agree that I have the right to be represented by counsel at my own expense and that I have had the opportunity to raise any questions I have with the judge and/or counsel before signing this Stipulation.

Joseph Ruigomez

(TYPE OR PRINT NAME)                        (SIGNATURE OF PLAINTIFF)

(TYPE OR PRINT NAME)                        (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

(TYPE OR PRINT NAME)                        (SIGNATURE OF DEFENDANT)

(TYPE OR PRINT NAME)                        (SIGNATURE OF ATTORNEY FOR DEFENDANT)

(TYPE OR PRINT NAME)                        (SIGNATURE OF _Defendant Girardi Kees_

(TYPE OR PRINT NAME)                        (SIGNATURE OF ATTORNEY FOR _____ )

(TYPE OR PRINT NAME)                        (SIGNATURE OF _____ )

(TYPE OR PRINT NAME)                        (SIGNATURE OF ATTORNEY FOR _____ )

☐ Judgment is entered this date in accord with the above.

☐ The Court's case file will be destroyed on or after _____ without further order of the court.
                                                 (INSERT DATE)

_____                        _____
DATE                                       JUDICIAL OFFICER

000231

3.  If execution of the judgment is stayed, it is agreed that upon default by the party to perform, the stay will be lifted and a writ of execution or other relief may issue upon ex parte application by the party entitled to performance (check 3a, 3b, or 3c), as follows:

    a.    ☐    Without further notice or hearing

    b.    ☐    On 24-hour telephonic notice to the defaulting party

    c.    ☐    Other _____

4.  **Acknowledgment and Waiver:** I acknowledge and agree that I have the right to be represented by counsel at my own expense and that I have had the opportunity to raise any questions I have with the judge and/or counsel before signing this Stipulation.

Kathleen Ruigomez

..................................................................        *Kathlee Ruigom* _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF PLAINTIFF)


..................................................................        _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF ATTORNEY FOR PLAINTIFF)


..................................................................        _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF DEFENDANT)


..................................................................        _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF ATTORNEY FOR DEFENDANT)


..................................................................        _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF _____ )


..................................................................        _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF ATTORNEY FOR _____ )


..................................................................        _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF _____ )


..................................................................        _____

(TYPE OR PRINT NAME)                                                (SIGNATURE OF ATTORNEY FOR _____ )


Judgment is entered this date in accord with the above.

The Court's case file will be destroyed on or after _____ without further order of the court.
                                              (INSERT DATE)


_____                    _____

DATE                                        JUDICIAL OFFICER

3.  If execution of the judgment is stayed, it is agreed that upon default by the party to perform, the stay will be lifted and a writ of execution or other relief may issue upon ex parte application by the party entitled to performance (check 3a, 3b, or 3c), as follows:

    a.    ☐    Without further notice or hearing

    b.    ☐    On 24-hour telephonic notice to the defaulting party

    c.    ☐    Other _____

4.  **Acknowledgment and Waiver:** I acknowledge and agree that I have the right to be represented by counsel at my own expense and that I have had the opportunity to raise any questions I have with the judge and/or counsel before signing this Stipulation.

Jamie Ruigomez

(TYPE OR PRINT NAME)                                    (SIGNATURE OF PLAINTIFF)

(TYPE OR PRINT NAME)                                    (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

(TYPE OR PRINT NAME)                                    (SIGNATURE OF DEFENDANT)

(TYPE OR PRINT NAME)                                    (SIGNATURE OF ATTORNEY FOR DEFENDANT)

(TYPE OR PRINT NAME)                                    (SIGNATURE OF _____ )

(TYPE OR PRINT NAME)                                    (SIGNATURE OF ATTORNEY FOR _____ )

(TYPE OR PRINT NAME)                                    (SIGNATURE OF _____ )

(TYPE OR PRINT NAME)                                    (SIGNATURE OF ATTORNEY FOR _____ )

Judgment is entered this date in accord with the above.

The Court's case file will be destroyed on or after _____ without further order of the court.
                                                (INSERT DATE)

APR 2 0 2020

DATE                                                    JUDICIAL OFFICER

                                                                David J. Cowan
                                                                 Judge

LASC LACIV 220 (Rev. 08/18)        **STIPULATION FOR CIVIL JUDGMENT**        Page 2 of 2
For Optional Use

000233

I certify that this is a true and correct copy of the
original on file in this office consisting of ___ pages

SHERRI R. CARTER, Executive Officer / Clerk of the
Superior Court of California, County of Los Angeles

Date: JUN 1 9 2020    By: _____ Deputy
                          KARLA BLUMENBERG

# EXHIBIT 27

Electronically FILED by Superior Court of California, County of Los Angeles on 05/07/2020 09:01 AM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Ortega, Deputy Clerk

AT-138, EJ-125

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Boris Treyzon, Esq. (SBN 188893)<br>ABIR COHEN TREYZON SALO, LLP<br>16001 Ventura Blvd., Suite 200<br>Encino, California 91436<br>TELEPHONE NO.: (424) 288-4367   FAX NO.: (424) 288-4368<br>ATTORNEY FOR *(Name):* Plaintiffs | |

| NAME OF COURT: Los Angeles Superior Court |
|---|
| STREET ADDRESS: 111 N. Hill Street |
| MAILING ADDRESS: 111 N. Hill Street |
| CITY AND ZIP CODE: Los Angeles, 90012 |
| BRANCH NAME: Stanley Mosk Courthouse, Central District |

PLAINTIFF: Joseph Ruigomez, et al.

DEFENDANT: Thomas V. Girardi, et al.

| APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION | CASE NUMBER: |
|---|---|
| [✓] ENFORCEMENT OF JUDGMENT  [ ] ATTACHMENT (Third Person)<br>[✓] Judgment Debtor  [ ] Third Person | 19STCV22296 |

**ORDER TO APPEAR FOR EXAMINATION**

1. TO *(name):* Thomas V. Girardi, as Person Most Knowledgeable for Girardi | Keese
2. YOU ARE ORDERED TO APPEAR personally before this court, or before a referee appointed by the court, to
   a. [✓] furnish information to aid in enforcement of a money judgment against you.
   b. [ ] answer concerning property of the judgment debtor in your possession or control or concerning a debt you owe the judgment debtor.
   c. [ ] answer concerning property of the defendant in your possession or control or concerning a debt you owe the defendant that is subject to attachment.

| Date: January 6, 2021   Time: 8:30 a.m.   Dept. or Div.: 44   Rm.: 418 |
|---|
| Address of court [✓] shown above [✓] is: Los Angeles Superior Court, Central<br>111 N. Hill Street, Los Angeles, CA 90012 |

3. This order may be served by a sheriff, marshal, registered process server, or the following specially appointed person *(name):*

Date: 05/07/2020 _____   Edward B. Moreton, Jr.
                                                                        JUDGE OR REFEREE

**This order must be served not less than 10 days before the date set for the examination.**

# IMPORTANT NOTICES ON REVERSE

## APPLICATION FOR ORDER TO APPEAR FOR EXAMINATION

4. [✓] Judgment creditor  [ ] Assignee of record  [ ] Plaintiff who has a right to attach order
   applies for an order requiring *(name):* Thomas V. Girardi, as Person Most Knowledgeable for Girardi | Keese  to appear and furnish information to aid in enforcement of the money judgment or to answer concerning property or debt.
5. The person to be examined is
   a. [✓] the judgment debtor.
   b. [ ] a third person (1) who has possession or control of property belonging to the judgment debtor or the defendant or (2) who owes the judgment debtor or the defendant more than $250. An affidavit supporting this application under Code of Civil Procedure section 491.110 or 708.120 is attached.
6. The person to be examined resides or has a place of business in this county or within 150 miles of the place of examination.
7. [ ] This court is not the court in which the money judgment is entered or *(attachment only)* the court that issued the writ of attachment. An affidavit supporting an application under Code of Civil Procedure section 491.150 or 708.160 is attached.
8. [ ] The judgment debtor has been examined within the past 120 days. An affidavit showing good cause for another examination is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: May 4, 2020

Boris Treyzon, Esq.
(TYPE OR PRINT NAME)                              ▶                      (SIGNATURE OF DECLARANT)

(Continued on reverse)

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>AT-138, EJ-125 [Rev. July 1, 2000] | **APPLICATION AND ORDER<br>FOR APPEARANCE AND EXAMINATION**<br>(Attachment—Enforcement of Judgment) | Code of Civil Procedure,<br>§§ 491.110, 708.110, 708.120 |
|---|---|---|

Exhibit D

Page 35
000236

*(left margin, vertical)* Electronically Received 05/07/2020 09:01 AM

## APPEARANCE OF JUDGMENT DEBTOR (ENFORCEMENT OF JUDGMENT)

**NOTICE TO JUDGMENT DEBTOR   If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the judgment creditor in this proceeding.**

## APPEARANCE OF A THIRD PERSON
## (ENFORCEMENT OF JUDGMENT)

**(1) NOTICE TO PERSON SERVED   If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the judgment creditor in this proceeding.**

**(2) NOTICE TO JUDGMENT DEBTOR   The person in whose favor the judgment was entered in this action claims that the person to be examined pursuant to this order has possession or control of property which is yours or owes you a debt. This property or debt is as follows *(Describe the property or debt using typewritten capital letters)*:**

**If you claim that all or any portion of this property or debt is exempt from enforcement of the money judgment, you must file your exemption claim in writing with the court and have a copy personally served on the judgment creditor not later than three days before the date set for the examination. You must appear at the time and place set for the examination to establish your claim of exemption or your exemption may be waived.**

## APPEARANCE OF A THIRD PERSON (ATTACHMENT)

**NOTICE TO PERSON SERVED   If you fail to appear at the time and place specified in this order, you may be subject to arrest and punishment for contempt of court, and the court may make an order requiring you to pay the reasonable attorney fees incurred by the plaintiff in this proceeding.**

## APPEARANCE OF A CORPORATION, PARTNERSHIP,
## ASSOCIATION, TRUST, OR OTHER ORGANIZATION

**It is your duty to designate one or more of the following to appear and be examined: officers, directors, managing agents, or other persons who are familiar with your property and debts.**

AT-138, EJ-125 [Rev. July 1, 2000]     **APPLICATION AND ORDER**     Page two
**FOR APPEARANCE AND EXAMINATION**
**(Attachment—Enforcement of Judgment)**

Exhibit D                                      Page 36
                                               000237

# EXHIBIT 28

**POS-020**

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Boris Treyzon, Esq. (SBN 188893)<br>ABIR COHEN TREYZON SALO, LLP<br>16001 Ventura Blvd.<br>Suite 200<br>Encino, California 91436<br>TELEPHONE NO.: (424) 288-4367    FAX NO. *(Optional):* (424) 288-4368<br>E-MAIL ADDRESS *(Optional):* btreyzon@actslaw.com<br>ATTORNEY FOR *(Name):* Plaintiffs | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse, Centrsl District

PETITIONER/PLAINTIFF: Joseph Ruigomez, et al.

RESPONDENT/DEFENDANT: Thomas V. Girardi, et al.

| PROOF OF PERSONAL SERVICE—CIVIL | CASE NUMBER:<br>19STCV22296 |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. I am over 18 years of age and **not a party to this action.**
2. I served the following **documents** *(specify):*

   1) Application and Order for Appearance and Examination - Thomas V. Girardi as the Person Most Knowledgeable for Girardi | Keese
   2) Civil Subpoena (Duces Tecum) for Personal Appearance and Production of Documents - Thomas V. Girardi as the Person Most Knowledgeable for Girardi | Keese

   ☐ The documents are listed in the *Attachment to Proof of Personal Service—Civil (Documents Served)* (form POS-020(D)).

3. I personally served the following **persons** at the address, date, and time stated:
   a. Name: Thomas V. Girardi as the Person Most Knowledgeable for Girardi | Keese
   b. Address: 100 Los Altos Dr., Pasadena, CA 91105
   c. Date: May 20, 2020
   d. Time: 6:30 p.m.

   ☐ The persons are listed in the *Attachment to Proof of Personal Service—Civil (Persons Served)* (form POS-020(P)).

4. I am
   a. ☐ not a registered California process server.
   b. ☑ a registered California process server.
   c. ☐ an employee or independent contractor of a registered California process server.
   d. ☐ exempt from registration under Business & Professions Code section 22350(b).

5. My name, address, telephone number, and, if applicable, county of registration and number are *(specify):*

   Raul Madrid
   P.O. Box 509, La Puente, CA 91747
   (626) 523-5826
   Los Angeles County Registration No. 3905

6. ☑ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
7. ☐ I am a California sheriff or marshal and certify that the foregoing is true and correct.

Date: July 8, 2020

Raul Madrid
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)

(SIGNATURE OF PERSON WHO SERVED THE PAPERS)

Form Approved for Optional Use
Judicial Council of California
POS-020 [New January 1, 2005]

**PROOF OF PERSONAL SERVICE—CIVIL**

Code of Civil Procedure, § 1011
www.courtinfo.ca.gov

American LegalNet, Inc.
www.USCourtForms.com

Exhibit E

000239

# EXHIBIT 29

000240

U200037891132

B0353-5098 12/17/2020 11:42 AM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State, Alex Padilla*
**NOTICE OF JUDGMENT LIEN (JL 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
|---|
| **-FILED-** |
| File #: U200037891132 |
| Date Filed: 12/17/2020 |

**Submitter Information:**

| | |
|---|---|
| Contact Name | Michael J. Quinn |
| Organization Name | Vedder Price (CA), LLP |
| Phone Number | (424) 204-7700 |
| Email Address | mquinn@vedderprice.com |
| Address | MICHAEL J. QUINN |
| | 1925 CENTURY PARK EAST |
| | SUITE 1900 |
| | LOS ANGELES, CA 90067 |

**Judgment Debtor Information:**

| Judgment Debtor Name | Mailing Address |
|---|---|
| Girardi Keese | 1126 Wilshire Boulevard<br>Los Angeles, CA 90017 |
| Thomas V. Girardi | 100 Los Altos Drive<br>Pasadena, CA 91105 |

**Judgment Creditor Information:**

| Judgment Creditor Name | Mailing Address |
|---|---|
| KCC Class Action Services, LLC | 222 N. Pacific Coast Highway<br>3rd Floor<br>El Segundo, CA 90245 |

**Judgment Information:**

| | |
|---|---|
| A. Name of Court Where Judgment Was Entered | Superior Court of California, Los Angeles County |
| B. Title of the Action | KCC Class Action Services, LLC v. Girardi Keese & Thomas V. Girardi |
| C. Case Number | 19STCV38587 |
| D. Date Judgment Was Entered | 12/15/2020 |

| E. Date(s) of Subsequent Renewal of Judgment (if any) |
|---|
| None Entered |

| | |
|---|---|
| F. Date of This Notice | 12/17/2020 |
| G. Amount Required to Satisfy Judgment at This Date of Notice | $7,504,109.59 |

All property subject to enforcement of a Money Judgment against the Judgment Debtor to which a Judgment Lien on personal property may attach under Section 697.530 of the Code of Civil Procedure is subject to this Judgment Lien.

**Declaration and Signature:**

Declaration:                                                    I am the Attorney of Record for the Judgment Creditor.

☒  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*Michael J. Quinn*                                              *12/17/2020*
Sign Here                                                      Date

B0353-5099 12/17/2020 11:42 AM Received by California Secretary of State

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Joseph Ruigomez, an individual; Kathleen Ruigomez,<br>an individual; Jamie Ruigomez, an individual | DEFENDANTS<br>Elissa D. Miller, Chapter 7 Trustee; California Attorney Lending<br>II, Inc.; Still Well Madison, LLC; Virage SPV 1, LLC; Nano<br>Bank; KCC Class Action Services, LLC |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Fredman Lieberman Pearl, LLP<br>1875 Century Park East, Suite 2230, Los Angeles, CA 90067<br>(310) 284-7350 | ATTORNEYS (If Known) |
| PARTY (Check One Box Only)<br>☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor    ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor    ☐ Other<br>☒ Trustee |

| CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br><br>Complaint for: (1) Declaratory Relief Regarding the Validity, Priority and Extent of Purported UCC-1 and Judgment Liens Against Property of the Bankruptcy Estate; (2) Equitable Subordination Claims |
|---|

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property – §542 turnover of property
☐ 12-Recovery of money/property – §547 preference
☐ 13-Recovery of money/property – §548 fraudulent transfer
☐ 14-Recovery of money/property – other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability – §523(a)(5), domestic support
☐ 68-Dischargeability – §523(a)(6), willful and malicious injury
☐ 63-Dischargeability – §523(a)(8), student loan
☐ 64-Dischargeability – §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☒ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $      See Complaint |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Girardi Keese | BANKRUPTCY CASE NO.<br>2:20-bk-21022-BR | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Barry Russell |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 30, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>ALAN W. FORSLEY, Attorney for Plaintiffs | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.