LARRY W. GABRIEL [SBN 68329]
JENKINS MULLIGAN & GABRIEL LLP
Email: lgabrielaw@outlook.com
585 Lorna Lane
Los Angeles, California 90049
Telephone: 818.943.8992

Special Litigation Counsel for Plaintiff,
Elissa D. Miller, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>GIRARDI KEESE,<br><br>Debtor.<br>――――――――――――――――――<br>ELISSA D. MILLER, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>COUNSEL FINANCIAL SERVICES, LLC, a Delaware limited liability company, CALIFORNIA ATTORNEY LENDING II, INC., a New York Corporation, JOSEPH D. DiNARDO, an individual,<br><br>Defendants. | Case No. 2:20-bk-21022-BR<br><br>Chapter 7<br><br>Adversary No:<br><br>COMPLAINT FOR:<br><br>1. DECLARATORY RELIEF (LEGAL RELATIONSHIP);<br>2. DISALLOWANCE OF PROOF OF CLAIM, EQUITABLE SUBORDINATION;<br>3. SURCHARGING DEFENDANTS;<br>4. DECLARATORY RELIEF (FEE SHARING AGREEMENTS);<br>5. CONSTRUCTIVE TRUST, BREACH OF FIDUCIARY DUTY;<br>6. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;<br>7. AVOIDANCE OF FRAUDULENT CONVEYANCE;<br>8. RECOVERY OF AVOIDED TRANSFER;<br>9. RECOVERY OF AVOIDANCE OF FRAUDULENT TRANSFER;<br>10. PRESERVATION OF AVOIDED TRANSFER;<br>11. CONVERSION; AND<br>12. MONEY HAD AND RECEIVED |

Plaintiff, Elissa D. Miller, in her capacity as the chapter 7 trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of the debtor Girardi Keese ("Girardi Keese"

or "Debtor" or "Firm") and as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account (the "Successor Trustee"), files her "Complaint for: 1. Declaratory Relief (Legal Relationship); 2. Disallowance of Proof of Claim, Equitable Subordination; 3. Surcharging Defendants; 4. Declaratory Relief (Fee Sharing Agreements); 5. Constructive Trust, Breach of Fiduciary Duty; 6. Aiding and Abetting Breach of Fiduciary Duty; 7. Avoidance of Fraudulent Conveyance; 8. Recovery of Avoided Transfer; 9. Recovery of Avoidance of Fraudulent Transfer; 10. Preservation of Avoided Transfer; 11. Conversion; and 12. Money Had and Received" (the "Complaint"), and alleges as follows:

## I.

## <u>INTRODUCTION</u>

1.　　On December 14, 2019, the Honorable Thomas M. Durkin, United States District Court of Illinois for the Northern District of Illinois, Eastern Division, caused a docket entry to be made in the case styled *Welly Chandra, et al. v. Boeing International Sales Corporation*, Case No.: 1:18-cv-07686, also referred to as *In re Lion Air Flight JT 610 Crash* (the "Lion Air Case"). The Lion Air Case was brought against Boeing by family members whose loved ones perished when a Lion Air Boeing 737 MAX crashed into the Indonesian sea off the coast of the island of Java.[1]　Girardi Keese and its general partner Thomas V. Girardi ("Thomas") represented 22 of the families in the Lion Air Case.　The docket entry was made after Judge Durkin held a hearing regarding a "motion for rule to show cause."　Judge Durkin's docket entry (the "Contempt Judgment") stated as follows:

> A civil contempt against the law firm Girardi Keese and against
> Tom Girardi, individually, for the reasons stated on the record.

---

[1] There were 189 people on board the Lion Air aircraft:  181 passengers (178 adults, 1 child, and 2 infants), as well as 6 cabin crew and 2 pilots.  Among the passengers were twenty Ministry of Finance employees, ten Audit Board of Indonesia employees, two auditors from the Finance and Development Inspection Agency, three Ministry of Energy and Mineral Resources employees, three public attorneys, three Indonesian National Police officers, six Bangka Belitung Regional People's Representative Council members, and three judges of Indonesia's High Court and National Court, for a total of thirty-eight civil servants, three police officers, and ten state officials. There were two confirmed foreigners among those on board:  the pilot from India and Andrea Manfredi, an Italian citizen and former professional cyclist.

1

2          Judgment is entered in the amount of $2,000,000.00 plus interest, as
           to Girardi Keese and Tom Girardi for the reasons also stated on the
3          record.

4          2.      The Contempt Judgment was entered after it was discovered that Girardi Keese

5    and/or Thomas had stolen $2,000,000 from the settlement money Boeing had paid to resolve the

6    claims filed by the families in the Lion Air Case and that Girardi Keese did not have the money to

7    pay the clients their share of the settlement.  In addition, Girardi Keese allegedly failed to pay its

8    co-counsel, Edelson P.C., $2,500,000, representing its percentage share of the contingency fee.

9    Four days later, on December 18, 2020 (the "Petition Date"), Thomas's former partner, Robert

10   Keese, among others, filed an involuntary bankruptcy petition against Girardi Keese in the United

11   States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Court"

12   or the "Bankruptcy Court"), styled *In re Girardi Keese,* bearing Case No. 2:20-bk-21022-BR.

13         3.      On January 5, 2021, the Court entered its "Order Granting 'Motion of Petitioning

14   Creditors for Appointment of Interim Trustee Pursuant to 11 U.S.C. 303(g).'"  On January 6,

15   2021, the Office of the United States Trustee filed its "(Corrected) Notice of Appointment of

16   Chapter 7 Trustee (11 U.S.C. §§ 303(g) and 701)" pursuant to which, among other things, Elissa

17   D. Miller was appointed interim chapter 7 trustee for the Girardi Keese Estate.

18         4.      On January 13, 2021, the Court entered its "Order Directing: (1) the Clerk of Court

19   to Immediately Enter an Order for Relief Under Chapter 7; (2) the United States Trustee to

20   Immediately Appoint a Chapter 7 Trustee; (3) the Debtor to File All Schedules and Related

21   Documentation for Chapter 7 Case Within Fourteen Days of the Entry of This Order; and (4)

22   Vacating February 16, 2021 Status Conference."  On January 13, 2021, the Clerk of Court entered

23   its "Order for Relief and Order to File Schedules, Statements and List(s)."  On January 13, 2021,

24   the Office of the United States Trustee filed its "Notice of Appointment of Trustee and Fixing of

25   Bond; Acceptance of Appointment As Interim Trustee" pursuant to which, among other things,

26   Elissa D. Miller was appointed and accepted her appointment as chapter 7 trustee for Girardi

27

28

1   Keese's Estate, and she continues to act in that capacity as well as the Successor-in-Interest

2   Trustee of the Girardi Keese Client Trust Account.[2]

3        5.        The disclosure of Thomas's theft and Judge Durkin's ruling sent shockwaves

4   across the legal community.  Thomas was long considered one of the premier trial attorneys in the

5   country and Girardi Keese was often appointed as lead or co-lead counsel in many of the most

6   significant "mass tort" cases filed over the last 40 years.  Lawyers and judges alike gave deference

7   to Thomas's positions in organizing lead counsel or committee roles for those cases where the

8   Firm had a representation.  Judge Durkin did not see it that way:

9            These poor folks in Indonesia expect integrity.  It's an
10           embarrassment to the whole legal community that people in
             Indonesia are being ripped off by someone who is acting like a
11           two-bit crook.  And that's how they're acting.  That's how Mr.
12           Girardi acted.  I'm not going to restrain myself on this.  That's
             exactly how he acted.  This is an embarrassment . . .
13
    See, **Exhibit 1**, Hearing Transcript, December 9, 2021, pp. 543:22-544:4.
14
         6.        Thomas is not a "two-bit" crook.  He is so much worse.  The $2,000,000 Thomas
15
    stole from the Lion Air Case plaintiffs, while shocking and unconscionable, is only the tip of the
16
    iceberg.  The Trustee's investigation of the Firm's financial records revealed that over the last ten
17
    years, Thomas and his cohorts stole at least $14,000,000 in settlement funds that should have gone
18
    to the Firm's clients.  Thomas also used the Firm's IOLTA trust account as his personal piggy
19
    bank depositing over $41,000,000 into the account to cover checks he had issued from the IOLTA
20
    account to support his lavish lifestyle.  The deposits were insufficient to cover his use of the funds.
21
    As of the filing of this Complaint, there have been 682 claims filed against the Estate totaling, to
22
    date, $495,912,891.48.  Of this amount, $91,279,514.31 is on behalf of alleged "secured claims,"
23
    with $79,705,458.83 filed on behalf of alleged "priority claims."
24
    / / /
25
    / / /
26

27  _____

28  [2] The petitioning creditors also filed an involuntary chapter 7 bankruptcy petition against Thomas
    V. Girardi, which is currently pending as Case No. 2:20-bk-21020-BR.

## II.

## NATURE OF THE ACTION

7.    This Complaint addresses the secured claim filed by certain litigation funding lenders, notably, California Attorney Lending II ("CAL II"), which filed a claim in the amount of $6,668,484.21 (Claim Nos. 71 and 71-1), and Counsel Financial Services, LLC ("CFS"), which filed a claim in the amount of $8,698,610.00 (Claim Nos. 72 and 72-1).[3]  Also named as a defendant is one of CFS's owners, Joseph DiNardo ("DiNardo," and collectively with CFS and CAL, the "CFS Defendants") as the same relates to their relationships with Thomas and Girardi Keese.[4]

8.    Based upon the Trustee's investigation, the Trustee is informed and believes, and based thereon alleges, that the CFS Defendants, Weitz & Luxenberg, Girardi Keese, and Thomas, have been doing business together dating back to 2005, if not before, when Girardi Keese and Weitz & Luxenberg were appointed as co-lead counsel in the national mass tort cases styled *In re Bextra & Celebrex Mktg. Sales Practice & Prod. Liab. Litig* and *In re Vioxx Prods. Liab. Litig.*[5] From there, and continuing to the date the involuntary petition commencing the instant case was filed, the two firms were appointed similar roles in at least five other national mass tort/class action cases.  As co-lead counsel, the two firms shared in the work and fees generated from the cases.  The Trustee is also informed and believes that since 2005, and continuing through the filing of the involuntary petition, the CFS Defendants, collectively and individually, would refer

---

[3] Generally, litigation funders provide loans to plaintiff's lawyers to cover the costs and expenses incurred in complex contingency fee cases.  The industry is essentially unregulated.  The financing is expensive with large fees and annual interest rates typically starting at 18%.  Default interest rates can range between 24% to 30% or more.

[4] Other owners of CFS and CAL II are Perry Weitz and Arthur Luxenberg, the founding partners of the New York based plaintiff's law firm Weitz & Luxenberg.

[5] *See, In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.* Case No. M:05-CV-01699-CRB; MDL No. 1699 (N.D. Cal. 2005).  *See also, In re Vioxx Prods. Liab. Litig.* MDL NO. 1657 (E.D. La. 2005).  The two firms were handsomely compensated for their efforts.  *See, e.g.*, *In re Vioxx Prods. Liab. Litig.,* 802 F. Supp. 2d 740 (2011) (Girardi Keese:  $18,200,000; Weitz & Luxenberg:  $17,836,121.78).

cases to Girardi Keese as a regular course of business for which they typically expected to receive 50% of the fees.

9.      In 2011, CAL II provided a $5,000,000 financing line of credit for Girardi Keese to cover the costs and expenses of various contingency fee cases.  The financing was put in place shortly after DiNardo had arranged a deal whereby Girardi Keese took over the representation of thousands of cases from the bankrupt law firm, Masry & Vititoe, whose largest secured creditor was CAL II.[6]  In exchange, the CFS Defendants were to get referral fees.  In fact, the CAL II financing was never paid off or paid down and was twice increased to a total of $8,000,000, notwithstanding that the terms of the loan were never adhered to, participating payments were not made, interest payments were missed, and Girardi Keese often failed to make a loan pay-down based upon the 50-50 fee split arrangement.  *See, e.g.*, **Exhibit 2**, September 2019, email re Accounting of Fees Due CFS Defendants; **Exhibit 3**, August 15, 2019, email re "addendum."[7]

10.      Cal II was not Girardi Keese's only litigation funder.  In fact, Girardi Keese borrowed funds from four litigation lenders.  And, after Girardi Keese's other "funders" threatened to, and then did, in fact, commence collection efforts on $28,000,000 in loans that were in default for the years 2018-2019, DiNardo insisted Girardi Keese retain Robert Cohan ("Cohan") of Simba Capital ("Simba"), as its chief restructuring officer.  In September 2019, DiNardo personally stepped in and took control of the negotiations regarding the other litigation lenders, which led to various work out arrangements.  In the case of one of the other three lenders, Law Financial Group ("LFG"), which extended a $15,000,000 loan to Girardi Keese, DiNardo arranged a full pay-off instead of protecting CAL II, which held a first priority lien ahead of LFG. Remarkably, CAL II provided Girardi Keese with an additional $2,000,000!

---

[6] *In re Masry & Vititoe,* filed in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, bearing Case No. 1:09-bk-20447-MT.  The largest unsecured creditor of this estate was Joseph DiNardo.

[7] Some statements from Exhibit 3:  "It is Masry & Vititoe.  Actually Masry is passed and only Vititoe filed BK.  We arranged and Tom agreed to handle all cases and then pay all of Vititoe's share into the BK."; "Joe personally is owed fees on the Balagot Case (min 350K) case settled Fees;" "Referral fees on 90 settled Avandia Cases."

11.     The foregoing is just a summary of certain of the financing transactions involving Girardi Keese and CFS but, based upon the foregoing and the detailed facts as set forth herein, among other claims alleged in this Complaint, the Trustee is alleging a claim for declaratory relief to determine the true nature of the relationship as between Girardi Keese and CFS.  The Trustee is informed and believes and based thereon alleges that the CFS Defendants are "implied in fact" partners of Girardi Keese, or, alternatively, that the CFS Defendants are "insiders" of Girardi Keese and that the CFS Defendants' claim(s) should be recharacterized as equity.  Assuming, *arguendo*, the CFS Defendants' claim(s) is not recharacterized as equity, the Trustee asserts the claim(s) should be equitably subordinated to the claims of Girardi Keese's general unsecured creditors, including Girardi Keese's former clients.  In addition, the Trustee asserts that the CFS Defendants' referral/fee sharing agreements violated California's Rules of Professional Conduct, Rule 2-200 (now Rule 5.4) and Rule 1-320, and, hence, are null and void as against public policy. Based thereon, the CFS Defendants should be ordered to disgorge all money received from Girardi Keese based upon the illegal and unenforceable fee sharing agreements.

12.     The Trustee also is alleging claims against the CFS Defendants for conversion in failing and refusing to return to the Trustee the $1,772,500 they obtained directly from Boeing (the Lion Air Case) based upon a fee sharing arrangement with Girardi Keese, notwithstanding that, at the time of the payment, Girardi Keese had improperly paid itself in full.  Thus, the payment should not have been made, and the CFS Defendants have no legal claim to that money.  The CFS Defendants have refused to turn over the $1,772,500, notwithstanding the CFS Defendants' knowledge that they are not entitled to keep the money and that keeping the money constitutes a crime under California law including, but not limited to, California Penal Code § 496.

13.     The Trustee also presents additional claims against the CFS Defendants for aiding and abetting Thomas in his looting of Girardi Keese's IOLTA accounts for the seven years prior to the bankruptcy, in an amount in excess of $23,000,000.  The Trustee is informed and based thereon alleges that, for years, the CFS Defendants had actual knowledge of (i) Girardi Keese and Thomas's failure to pay Girardi Keese's clients the settlement proceeds they were entitled to receive, and (ii) Girardi Keese and Thomas's failure to pay co-counsel or referral fees

1   notwithstanding that Girardi Keese received the contingency fee from the specific representations.

2   Yet, despite this actual knowledge, CFS continued to support Girardi Keese's business operations

3   knowing that they were doing business with a Firm and an individual who was not to be trusted

4   and who regularly failed to pay Girardi Keese's obligations to its clients in breach of Thomas's

5   fiduciary obligations to do so.  The Trustee is also alleging claims for fraudulent conveyances both

6   actual and constructive.

7          14.     Given the nature of the issues presented by the relationship of the parties, the

8   Trustee brings this action pursuant to 28 U.S.C. § 2201, and Rule 57, Federal Rules of Civil

9   Procedure, as applicable to bankruptcy proceedings, as the issues present an actual controversy,

10  are of a justiciable nature and are based upon actual not hypothetical facts.  The Trustee reserves

11  her rights and remedies to assert a surcharge claim against the CFS Defendants' claims should the

12  same be necessary depending upon the outcome of this litigation.

**III.**

**JURISDICTION AND VENUE**

15         15.     This adversary proceeding arises out of and is related to the bankruptcy case of

16  Girardi Keese, bearing Case No. 2:20-bk-21022-BR, pending before the Honorable Barry Russell,

17  United States Bankruptcy Judge presiding.

18         16.     The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to

19  28 U.S.C. § 1334(b) and (e), 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A), and 157(b)(2)(O), and/or 28

20  U.S.C. § 157(a) because all claims asserted hereunder are either:  (a) core claims, or (b) arise

21  under or are related to Girardi Keese's pending bankruptcy case, and the Trustee consents to the

22  entry of a final judgment in this matter by the Bankruptcy Court.  Defendants are hereby notified

23  that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether

24  consent is given to the entry of a final order and judgment by the Bankruptcy Court.

25         17.     This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A)(K)(H) and

26  (O).

27  / / /

28  / / /

18.     Venue properly lies in this judicial district because this proceeding arises in and relates to a case pending in this district under Title 11 of the United States Code as provided in 28 U.S.C. § 1400(a).

**IV.**

**PARTIES**

19.     Plaintiff is the duly appointed, qualified, and acting chapter 7 trustee of the Girardi Keese Estate and is acting herein in that capacity and in her capacity as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account.  To the extent Plaintiff asserts claims under 11 U.S.C. § 544(b), Plaintiff is informed and believes, and based thereon alleges, that there exists in this case one or more creditors holding unsecured claims allowable under 11 U.S.C. § 502, or that are allowable only under 11 U.S.C. § 502(e), who could have avoided the respective transfer or transfers alleged in this Complaint under California or other applicable law before the Petition Date.

20.     Plaintiff was appointed the chapter 7 trustee after the filing of the bankruptcy case. As a result, Plaintiff may not have personal knowledge of certain facts alleged in this Complaint that occurred prior to her appointment and, to the extent that is the case, Plaintiff alleges all such facts on information and belief.  To the extent Plaintiff may not have personal knowledge of any other facts alleged herein, whether relating to acts and events before or after her appointment, all such facts are alleged on information and belief.  Plaintiff reserves the right to amend this Complaint to allege additional claims against the defendants named herein to challenge, avoid, and/or recover transfers other than, and in addition to, those alleged in this Complaint, and to name additional defendants, and to otherwise amend this Complaint as necessary and appropriate in the interests of justice.

21.     Defendant CFS is a Delaware limited liability company, that is registered to do business in the State of New York.  CFS's business address is 6400 Main Street, Suite 120, Williamsville, New York 14221.  Upon information and belief, CFS provides financing and other resources and services to contingency fee plaintiff law firms.  CFS was founded by New York attorneys, DiNardo, Perry Weitz, and Arthur Luxenberg in or around 1998.  Upon further

1    information and belief, CFS is not authorized to do business in California and is not licensed to do

2    business in California as a Financial Lender.  Nonetheless, the Trustee is informed and believes,

3    and based thereon alleges that CFS has done and continues to do business in the State of

4    California by and through DiNardo.

5        22.    Defendant CAL II is a New York corporation, with its principal place of business

6    located at 6400 Main Street, Suite 120, Williamsville, New York 14221.  CAL II is registered with

7    the California Secretary of State to conduct business in the State of California and is registered

8    with the State of California as a Financial Lender.  Upon information and belief, CFS established

9    CAL II as the entity for its California operations.  Like CFS, CAL II provides financing and other

10   resources to contingency fee plaintiff law firms.

11       23.    Defendant DiNardo is an individual residing in the State of New York.  Upon

12   information and belief, DiNardo is one of the founders, owners, and a managing member of CFS

13   and CAL II.  DiNardo's role at CFS is "Plaintiff Support."  Upon further information and belief,

14   DiNardo is a senior officer of CAL II and a member of its board of directors.  Upon further

15   information and belief, DiNardo is an attorney, licensed to practice in the State of New York,

16   whose practice focuses on representing clients with personal injury claims on a contingency fee

17   basis.  DiNardo is also doing business in the State of California although DiNardo is not licensed

18   to practice law in the State of California.

19       24.    The Trustee is informed and believes and based thereon alleges that defendants

20   CFS and CAL II are related and affiliated entities and are operated by the same officers, managers,

21   and directors, and are operated at the same address which calls into question whether CAL II and

22   CFS are independent companies, particularly so given that both are in the same field, to wit:

23   priority funding of complex personal injury mass tort claims (for example, Bextra, Vioxx and

24   Rezulin to name a few) and are owned, directly or indirectly, by the same individuals, DiNardo,

25   Weitz, and Luxenberg.

26       25.    The Trustee is informed and believes and based thereon alleges that, at all times

27   herein mentioned, the CFS Defendants, and DiNardo, and each of them, were acting as the agent,

28   servant, employee, partner, co-conspirator, and/or joint ventures of each other and that CFS, CAL

II, and DiNardo were acting in concert with each other in all matters herein alleged.  At all times

herein mentioned, defendants CFS, CAL II, and DiNardo were acting within the course and scope

of such agency, employment, partnership, and/or concert of action.  Plaintiff is informed and

believes and based thereon alleges that the CFS Defendants are jointly and severally liable for the

claims and damages sustained by Girardi Keese and/or the Girardi Keese Client Trust Account all

as hereinafter alleged.

**V.**

**STATEMENT OF FACTS**

26.      Girardi Keese was a law partnership founded and managed by legendary plaintiffs'

trial attorney, Thomas V. Girardi.  Thomas graduated from Loyola Law School in 1964, received

his LLM degree from New York University in 1965, and four years later had obtained the highest

medical malpractice judgment in California history.  He instantly became the "rock star" of the

plaintiff's bar.

27.      Over the next 50 years, Thomas proved himself to be deserving of his initial fame,

becoming one of the most successful plaintiff mass tort trial attorneys in the country.  Thomas was

often appointed "lead or co-lead counsel" in many of the nation's more significant Multi District

Litigation ("MDL") cases, a role coveted by those engaged in that arena as the "lead counsel" is

put in control of the litigation, doles out assignments, and provides the opportunity to forge

alliances that basically ensures significant positions in MDL actions for years to come.  The

position also means significant legal fees for the firm, typically in multiples of what other firms

participating in the litigation receive, as "leadership" attorneys are compensated for their efforts

off the top of any settlement or judgments (the "common fund") and separate and apart from any

fee arrangements the attorney had with its individual clients/claimants.  A listing of some of

Girardi Keese and Thomas's more significant cases is set forth on **Exhibit 4**.

28.      Thomas capitalized on the opportunities presented, in many cases achieving

remarkable results, recovering hundreds of millions of dollars either by way of settlement or trial

judgments.  His success brought even more public recognition.  Thomas became a power broker in

Los Angeles, and in the State of California, becoming the first trial lawyer to serve on the

California Judicial Council, the policymaking body of the California courts.  He was also a member of the Consumer Attorneys of California, The Inner Circle of Advocates, the American Trial Lawyers Association, the American Board of Professional Liability Lawyers, and the International Society of Barristers, Inc.  He served as the National President of the American Board of Trial Advocates and was elected to and later became the president of the International Academy of Trial Lawyers.  His marriage to reality television star Erika (Jayne) Girardi ("Erika") put his professional persona in the public limelight.

29.    Despite Thomas's apparent success, gravitas, money, fame, and his reputation for his prowess in the courtroom, over the years he frequently found himself a defendant in suits by former clients alleging they were defrauded by Thomas and Girardi Keese because they failed to receive the proper amount of money due from the resolution of their cases.  An example listing of the cases is attached as **Exhibit 5**.

30.    Girardi Keese and Thomas's treatment of Girardi Keese's co-counsel or referring attorneys who were to share in the fees earned was no better, as evidenced by some of the lawsuits brought by those attorneys.[8]

31.    The Trustee is informed and believes and based thereon alleges that at the same time the clients, co-counsel, and legitimate referral sources were not being paid, Thomas was living a lavish lifestyle, spending millions of dollars on cars, furs, clothes, trips, and jewelry and other items for himself, his celebrity "Real Housewives of Beverly Hills" wife, Erika, and other friends and Girardi Keese employees and partners.  His indulgences included five country club-golf memberships, memberships in city clubs, automobiles (Ferrari and Lamborghini sports cars), boats, two planes, houses in Malibu and in the Palm Springs area, luxury yachting trips in the Mediterranean, and a penchant for giving expensive gifts of jewelry and the like.

32.    The Trustee is informed and believes and based thereon alleges that notwithstanding the millions of dollars in attorneys' fees Girardi Keese recovered over the years,

---

[8] Trustee is informed and believes and thereon alleges that the cases presented may not be all the cases files against Thomas and Girardi Keese, and the Trustee's investigation is ongoing.

1    Girardi Keese's income was not sufficient to support its business operations, fund the costs of

2    prosecuting ongoing mass tort cases, and support the extravagant and opulent lifestyle Thomas

3    and Erika so publicly enjoyed.

4           33.     The Trustee is informed and believes and based thereon alleges that just over the

5    last seven (7) years, more than $500,000,000 flowed through Girardi Keese's IOLTA Trust

6    Account.  The Trustee is further informed and believes that Thomas often used the funds in the

7    Girardi Keese IOLTA Trust Account to pay his lifestyle expenses.  Indeed, during the last seven

8    (7) years in excess of $41,000,000 from the Girardi Keese IOLTA Trust Account were used to

9    support Thomas's lifestyle, the vast majority of which were settlement funds that should have

10   been paid to the Firm's clients.  The Trustee is further informed and believes that over the same

11   period of time, Thomas deposited $41,000,000 into the Girardi Keese IOLTA Trust Account.

12   However, as of the filing of this Complaint, Girardi Keese remained "out of trust" in the tens of

13   millions of dollars.

14          34.     Thomas's theft of millions of dollars from the Girardi Keese IOLTA Client Trust

15   Accounts was not of grand design.  In furtherance of the fraudulent scheme, Thomas would have a

16   check issued, record the payee in an incomplete manner, and designate the reason for the check as

17   being for "Costs" or for "co-counsel fees."  Examples include:

18        (1) The Diamond Earrings.  In 2007, Thomas purchased a pair of diamond earrings for

19   Erika for $750,000.  The check was drawn on the Rezulin Mass Tort client trust account.  The

20   entry on the Rezulin ledger shows that a check was paid to "M&M" in the amount of $750,000.

21   The description for the payment  is "Costs."  "M&M," it turns out, is M&M Jeweler's located in

22   downtown Los Angeles.[9]

23    

24   [9] Upon discovery of this transaction, the Trustee attempted to negotiate with Erika's lawyer an
     agreement for the turnover of the diamond earrings.  Ultimately, Erika declined the Trustee's

25   proposal and the Trustee was compelled to file a "turnover motion." *See*, Docket No. 28.  The
     turnover motion was approved. *See*, Docket No. 58.  Ever undaunted, and despite the Bankruptcy

26   Court's finding that the money used to purchase the earrings was stolen from the Girardi Keese
     Trust Account, Erika filed an appeal of the Court's order, but did not seek a stay pending appeal.

27   As a result, the Trustee has filed a motion to retain an auctioneer to sell the earrings, among other
     personal property.

28    

(2) <u>G&L Aviation</u>.[10]  In  2001, Thomas settled an "investment fee" case against Bank of America for $5,700,000.  *See, Murphy & Maconachy, Inc. v. Preferred Bank*, 2009 Cal. App. Unpub. LEXIS 4651 (2009).  Not only did Thomas attempt to deprive his co-counsel of their share of the contingent legal fees (Exhibit 5), but Girardi Keese's ledger for that case shows a payment made to "G&L Aviation" on November 2, 2001 for $150,000 for "Assoc Counsel Fees," and another payment on December 4, 2001, for $50,000.00 with a description of "co-counsel fees."

(3) <u>$300,000 Wire Payment</u>.  On June 3, 2015, a wire transfer was issued against a Girardi Keese client trust account for the sum of $300,000.  The ledger description was "costs." The wire amount was credited to a friend's personal account.

(4) <u>$2,500,000 in cash withdrawals from the Lockheed Toxic Waste Litigation Trust Account</u>.  Girardi Keese's ledger for this case includes five checks made payable to Thomas totaling $2,500,000:  two checks for $1,000,000 each; a check for $200,000; a check for $250,000; and a check for $50,000.  The notation on the ledger for each check indicates "no desc. on check." Thus, total dollar amount paid to Thomas equaled $2,500,000.[11] These payments are separate and apart from the millions of dollars in checks issued to Girardi Keese from the same trust account with the description "fees."

(5) <u>Jaime Ruigomez</u>.  Mr. Ruigomez suffered catastrophic personal injuries from the PG&E San Bruno natural gas explosion and was represented by Girardi Keese in his action against PG&E.  The Trustee is informed and believes and based thereon alleges that the case settled for $50,750,000.  $25,000,000 of the proceeds was used to purchase an annuity for Mr. Ruigomez and the balance was delivered to Girardi Keese.  Girardi Keese deducted and paid itself $12,687,500 in fees and costs.  Girardi Keese, however, did not turn over the balance to Mr. Ruigomez, save and

---

[10] G&L Aviation ("G&L") was a general partnership owned 50-50 by Thomas and Walter Lack. G&L held title to cars, boats, airplanes, and 75% of an office building located at 1122 Wilshire Boulevard, Los Angeles, California.  Girardi Keese officed in the building.

[11] This discovery substantiates the claims of the Lockheed clients who for years attempted to present this issue in a trial.  Unfortunately, their efforts were thwarted by a series of decisions based upon the statute of limitations, or other procedural barriers.  *See, e.g.*, *Gutierrez v. Girardi*, 2017 Cal. App. Unpub. LEXIS 60 (2nd Dist. Court of Appeal, August 31, 2017).

1   except for a few payments made after Mr. Ruigomez started complaining about not receiving the

2   balance of his money.  The amount not paid to Mr. Ruigomez totaled $10,568,051.97.  Eventually,

3   Mr. Ruigomez filed suit against Girardi Keese and Thomas.  The lawsuit was resolved by a

4   stipulated judgment and was secured by service of a "Notice of Judgment Debtor Examination"

5   filed more than 90 days prior to the filing of the bankruptcy case.

6        (6) <u>Judy Selberg</u>.  A former employee of Girardi Keese, Ms. Selberg's husband was

7   killed in a boating accident.  The case settled for $500,000.  Ms. Selberg was never paid.

8        (7) <u>Erika Girardi's Use of Girardi Keese American Express Account</u>.  Erika was given

9   free use of the Girardi Keese American Express charge account.  Over the years, Erika charged

10  over $12,000,000 against the Firm's account all of which was paid by Girardi Keese.

11                    **[THE GIRARDI-DINARDO-CFS FEE SHARING RELATIONSHIP]**

12       35.    The Trustee is informed and believes and based thereon alleges that the relationship

13  between Girardi Keese, Thomas, and Weitz & Luxenberg commenced when the parties started

14  working with each other as co-lead counsel in several mass tort, pharmaceutical cases (Bextra and

15  Celebrex) in or around 2005, where the two firms were appointed co-lead counsel.  *See*, **Exhibit 6**

16  for a listing of cases in which Girardi Keese and Weitz & Luxenberg represented plaintiffs and

17  shared the role as co-lead counsel.

18       36.    The Trustee is informed and believes and based thereon alleges that commencing in

19  or around 2005, and continuing thereafter through 2019, DiNardo would refer potential personal

20  injury plaintiff clients to Girardi Keese for which DiNardo was to receive 50% of the fees earned

21  on the case.  The Trustee is informed and believes and based thereon alleges that some or all of the

22  retention agreements used by Girardi Keese did not appropriately disclose to the client the Firm

23  and/or Thomas's pre-existing relationship with DiNardo, or the fee DiNardo was to be paid, either

24  as a referring lawyer or as co-counsel in the case, in the manner required by former California

25  Rules of Professional Conduct, Rule 2-200.  *See, e.g.*, Exhibits 2-3, **Exhibit 7**, Letter of April 6,

26  2011, re fee split, payment to George Hatcher; **Exhibit 8**, Email of February 21, 2020, from

27

28

DiNardo demanding payment of $180,000 on "Balagot."[12]

**[GIRARDI KEESE BECOMES THE LIQUIDATING AGENT FOR THE CFS DEFENDANTS
TO ASSIST THEM IN RECOUPING THEIR $25,000,000 PLUS FUNDING LOANS
MADE TO MASRY & VITITOE]**

37.    In 1996, attorney Ed Masry, his firm Masry & Vititoe, together with his assistant, Erin Brockovich, investigated and brought to light the PGE/Hinkley Toxic Waste case.[13]  In 2005, Ed Masry died.  Four years later, in 2009, the firm filed for bankruptcy in the United States Bankruptcy Court for the Central District of  California, San Fernando Valley Division, bearing Case No. 1:09-bk-20447-MT, styled *In re Masry & Vititoe,*  The firm's largest secured creditor was CAL II.  *See*, Claim No. 22 filed in the amount of $25,784,026.11, accruing interest at 18% per annum.  The largest unsecured creditor was DiNardo.  *See*, Claim No. 18 filed in the amount of $675,000.

38.    In 2011, the Masry firm, acting as debtor-in-possession, filed a disclosure statement (Docket No. 278) describing its chapter 11 plan of reorganization/liquidation: a plan designed so that once confirmed the firm would exit bankruptcy.  [Docket No. 279]  The terms were presented in a Memorandum of Understanding ("MOU") described in the Disclosure Statement and attached to the plan.  The MOU provided for a division of the income the estate was to receive from the contingency fees earned by the Masry firm post-confirmation.  DiNardo then arranged for transfer of the vast majority of the Masry firm's cases to Girardi Keese for Girardi Keese to handle.  The

---

[12] Hatcher procured clients for Girardi.  *See*, *infra*, fn. 12, ¶56.

[13] When the cases were getting ready to go to trial, Masry brought in Girardi Keese as co-counsel. Girardi Keese, in turn, brought in another famed plaintiff's trial attorney, Walter Lack.  The cases settled in 1996 for $333,000,000, the largest settlement ever paid in a direct-action lawsuit in United States history to that date.  The case was made even more famous by the movie "Erin Brockovich."  The case, money, and publicity elevated Masry's standing in the plaintiff's bar, and Ed Masry later joined Girardi Keese and Weitz & Luxenberg in several mass tort cases.  *See, e.g.*, *Avila v. CNH America, LLC* (D.C. Nevada, Case No.: 4:04 CV 3384); *Schawn v. Cargill* (D.C. Nebraska, Case No.:4:07CV3170), and *Onoda Chem. Indus. Co., Ltd. v. Franco* (Case No. 2D07-1935).  The "elevation" created cash needs - enter CFS/CAL II, and Plaintiff Lawyer founder and CFS/CAL II board member, DiNardo.  CAL II provided Masry with a $25,000,000 line of credit. *See*, Claim No. 19 1-3.  DiNardo also loaned the firm $675,000.  *See*, Claim No. 18.

1   plan, as described in the disclosure statement, was confirmed by order of the court on May 27,

2   2011.  [Docket No. 317]   The Masry plan provided for Girardi Keese and the reorganized Masry

3   firm to split 50% of the contingency fees with the other 50% paid to the Masry firm's bankruptcy

4   estate.  That money, in turn, would be used to pay certain cash advances CAL II was to make to

5   the Masry firm and to pay the estate's administrative expenses with the balance divided 90% to

6   CAL II as the secured creditor and the remaining 10% to be paid to certain designated creditors,

7   including DiNardo.  In addition, CAL II and/or CFS was to serve as the disbursing agent for the

8   confirmed Masry plan.

9           39.     The Trustee is informed and believes and based thereon alleges that when DiNardo

10  approached Girardi Keese to take over the Masry firm's plaintiff files (collectively, the "Masry

11  Cases") DiNardo represented and warranted that Girardi Keese would not have any financial risk

12  (other than time) in prosecuting the Masry Cases, which in fact were being prosecuted for the

13  benefit of CAL II, who would likely not be repaid its $25,000,000 if the Masry Cases were not

14  litigated by a firm cooperating with it.

15          40.     The Trustee is informed and believes and based thereon alleges that DiNardo then

16  agreed to have CAL II provide additional monies to fund the litigation of the Masry Cases.  Based

17  thereon, on July 5, 2011, Girardi Keese and CAL II entered a transaction pursuant to which CAL

18  II provided Girardi Keese with a $3,500,000 litigation funding line of credit with an interest rate

19  of 18% per annum.

20          41.     The Trustee is informed and believes and based thereon alleges that DiNardo and

21  Girardi Keese soon recognized the original $3,500,000 was not sufficient to litigate the Masry

22  Cases so DiNardo agreed that Cal II would provide Girardi Keese an additional $1,500,000 to

23  cover the costs of the Masry's Cases among other cases.  The funding was memorialized in a

24  $5,000,000 "First Amended and Restated Revolving Promissory Note," and a "First Amended and

25  Restated Security Agreement," both dated August 12, 2011.  The Trustee is further informed and

26  believes and based thereon alleges that this funding agreement purports to give CAL II a security

27  interest in future attorney fee proceeds of certain of Girardi Keese's cases, including the Masry

28  Cases.  The same cases that were already subject to CAL II's lien from the Masry secured loan,

1  and the original funding pursuant to the Masry plan was, to reiterate, accruing interest at 18% per

2  annum.

3       42.     The Trustee is informed and believes and based thereon alleges that the Girardi

4  Keese-DiNardo client generating fee sharing arrangement also involved George Hatcher

5  ("Hatcher").  Upon further information and belief, Hatcher, a non-lawyer, would obtain clients for

6  Girardi Keese and DiNardo in exchange for the payment of money.  *See*, Exhibit 7.[14]

7  **[CAL II RENEWS GIRARDI KEESE'S FUNDING – 2013]**

8       43.     On or around August 1, 2013, CAL II renewed, but did not increase Girardi

9  Keese's funding agreement pursuant to a "Second Amended and Restated Revolving Promissory

10  Note" in the principal amount of $5,000,000.  In the concurrently executed "Second Amended and

11  Restated Security Agreement," Girardi Keese granted CAL II a blanket lien on all of its assets,

12  including the attorneys' fee proceeds from all its cases.

13       44.     On or around August 28, 2013, CAL II filed a UCC 3 (designated as Instrument

14  No. 1373755925) to evidence and perfect its security interest in all assets of Girardi Keese.

15       45.     The Trustee is informed and believes and based thereon alleges that, in 2015,

16  Girardi Keese and Weitz & Luxenberg became joint lead counsel in two additional "mass tort"

17  claims styled *In re Anthem Data Breach Litig.* (15-MD-02617-LHK (N.D. Cal. 2015)) and *In re*

18  *Testosterone Replacement Therapy Prods. Liab. Litig.* (15-cv-01340 (N.D. Ill. 2015)).  In so

19  doing, the principals were sharing in the profits from the representation, and jointly controlled the

20  management of the cases.

21  **[2016: STILLWELL MADISON FUNDING ]**

22       46.     In or around February 2016, Girardi Keese needed additional cash to pay the costs

23  of litigation and obtained additional third-party funding from Stillwell Madison ("Stillwell").  On

24  March 31, 2016, Stillwell provided Girardi Keese with a $5,110,440.38 loan pursuant to the terms

25  and conditions of a written agreement and security agreement (the "Stillwell Funding

26

27  [14] Hatcher played a role in the Lion Air Case in addition to assisting Girardi Keese in finding other

28  clients to represent in other airplane crashes.  Hatcher's skills and expertise are touted on his
website.  *See*, **Exhibit 9**.

1    Agreement"). The Trustee is informed and believes and based thereon alleges that Stillwell was

2    not and is not a licensed lender in the State of California.

3        47.    Girardi Keese assigned to Stillwell as collateral for the Stillwell Funding

4    Agreement the future attorney fees from those cases listed in Exhibit B-1 to the Stillwell Funding

5    Agreement. The largest of such cases was the so-called "Carson-Shell Oil" case which had been

6    settled prior to the time of the funding (November 10, 2014). Thomas personally guaranteed the

7    Stillwell Funding Agreement. All of the cases listed on Exhibit B-1 were subject to the first

8    priority lien of Cal II.

9        **[2017: LAW FINANCE GROUP FUNDING -$15,000,000;**
         **CAL II LOAN RENEWAL**
10       **VIRAGE SPV 1, LLC -$9,000,000]**

11        48.    The Trustee is informed and believes and based thereon alleges that, in 2017,

12   Girardi Keese again required additional cash and secured additional funding from litigation funder

13   Law Finance Group ("LFG") in the approximate amount of $15,000,000 (the "LFG Funding

14   Agreement"). The loan was secured by the same collateral as granted to CAL II in 2013 and to

15   Stillwell in 2016.

16        49.    The Trustee is informed and believes and based thereon alleges that just months

17   later, on or around July 11, 2017, CAL II renewed and increased its capital position in Girardi

18   Keese to $6,000,000 pursuant to a "Third Amended and Restated Revolving Promissory Note"

19   and a "Third Amended and Restated Security Agreement." The security agreement purportedly

20   continued the unlimited blanket security interests in all of the same assets which secured the

21   renewed 2013 loan. At this time, CAL II's "loan" to Girardi Keese had been outstanding since

22   2011 and had not been repaid in full or in part.[15]

23        50.    The Trustee is informed and believes and based thereon alleges that one month

24   later, in August, 2017, Girardi Keese secured a fourth litigation loan, this time for $9,000,000,

25   from litigation lender Virage SPV 1, LLC ("Virage"). To secure the loan, Virage filed a UCC-1

26

27   [15] The Trustee also notes that California has a five year statute of limitations to bring a case to
28   trial. Not one of the 8,000 Masry Cases should have been viable at this time.

against all of Girardi Keese's assets on August 18, 2017, the same assets which secured the loans from Cal II, Stillwell, and LFG.  The Trustee is further informed and believes and on that basis alleges thereon that Virage was formed in 2013 to provide "creative litigation finance solutions to established litigation lawyers and law firms, whether contingency or hourly."  The Trustee is further informed and believes that Virage does not have a lending license in the state of California.[16]

51.     The Trustee is informed and believes and based thereon alleges that in or around February 2018, DiNardo "suggested" that Girardi Keese hire Cohan to provide consulting services to the Firm for purposes of (i) identifying, screening, and engaging potential lenders, (ii) completing tax returns and other financial documents, (iii) negotiating and working with lenders; and (iv) similar tasks.

**[GIRARDI KEESE DEFAULTS ON ITS OBLIGATIONS TO LFG AND STILLWELL]**

52.     In  2018, Girardi Keese, again experiencing liquidity issues, borrowed $4,250,000 from a "start-up" bank, Nano Banc.

53.     The Trustee is informed and believes and based thereon alleges that, by August 28, 2018, the Stillwell loan was in default.  At that time Thomas proposed to Stillwell that Girardi Keese would make monthly payments to it in the amount of $500,000, plus interest, with the first payment due October 1, 2018, with Stillwell to be paid in full by September 2019.  Stillwell accepted Thomas's proposal (the "Forbearance Agreement") on or about August 30, 2018.

54.     The Trustee is informed and believes and based thereon alleges that at the time Thomas was negotiating with Stillwell on behalf of Girardi Keese, Girardi Keese was in default on the LFG Funding Agreement and, just weeks before, had entered into a forbearance agreement with LFG.

55.     The Trustee is informed and believes and based thereon alleges that Girardi Keese did not make the Stillwell payment on October 1, 2018, in accordance with the Forbearance Agreement, resulting in a breach.

---

[16] A California finance lender and broker's license is issued to Virage Master LP.

56.     The Trustee is informed and believes and based thereon alleges that prior to October 1, 2018, Girardi Keese was insolvent in that it was unable to pay its debts as they became due and owing as indicated by, among other things, its default on its payments to Stillwell and LFG.

57.     On November 19, 2018, the first case was filed in the Lion Air disaster styled *In re: Lion Air Flight JT 610 Crash*, bearing Case No. 1:18-cv-07686, before the Honorable Thomas M. Durkin, United States District Judge, presiding.

58.     The Trustee is informed and believes and based thereon alleges that Hatcher was involved in and did procure "clients" for Girardi Keese for this tragic lawsuit.  In all, Girardi Keese represented 22 families in the Lion Air Case.  The Trustee is further informed and believes and based thereon alleges that at the time Girardi Keese was engaged by the 22 families, it did not have available cash or funds available from its financings to support the case, particularly because Girardi Keese was already in, or was about to be in, default of its obligations to its lenders.  Based upon information and belief, at about this time, DiNardo and CFS/CAL II, in an effort to ensure funds flowed to the CFS Defendants, became involved in addressing Girardi Keese's financial situation so that Girardi Keese would have the financial resources to represent the plaintiffs in the Lion Air Case.

59.     The Trustee is informed and believes and based thereon alleges that, on December 2, 2018, Thomas contacted Stillwell with yet another proposal and offered that Girardi Keese would make three payments of $500,000 per month between December 2018 and February 2019, with the balance to be paid in full by March 17, 2019.  Stillwell agreed to Thomas's proposal.

60.     The Trustee is informed and believes and based thereon alleges that Girardi Keese made the December 2018 payment of $500,000 but only paid one-half, or $250,000, of its January 2019 payment.  The January 2019 payment was the last payment made by Girardi Keese to Stillwell.

61.     The Trustee is informed and believes and based thereon alleges that in or around January 17, 2019, LFG sued Girardi Keese for breach of the LFG Funding Agreement and Thomas's breach of his personal guaranty.  LFG sought recovery of approximately $15,000,000,

plus interest and attorneys' fees and costs.

62.     The Trustee is informed and believes and based thereon alleges that, on January 22, 2019, LFG sought a prejudgment writ of attachment and, to prevent the writ from being issued, Thomas entered into an agreement to personally make certain payments and he subsequently signed a stipulated judgment to secure performance.

63.     The Trustee is informed and believes and based thereon alleges that, on March 25, 2019, Stillwell gave Girardi Keese and Thomas written notice of default and gave Girardi Keese until April 5, 2019, to cure such default.

64.     The Trustee is informed and believes and based thereon alleges that neither Girardi Keese nor Thomas cured the Stillwell default.  Thereafter, on or about May 24, 2019, Stillwell filed suit against Girardi Keese in Arizona for breach of contract and fraud.  Shortly after it was filed, the presiding District Court ordered the case to arbitration.

**[COHAN AND DINARDO TAKE CONTROL OF GIRARDI KEESE'S FINANCINGS,
CAL II PROVIDES GIRARDI KEESE ANOTHER $1,500,000]**

65.     The Trustee is informed and believes and based thereon alleges that in or around February 2019, at the recommendation of DiNardo, Cohan began working with Girardi Keese to address its financial conditions including reviewing its financial records to understand Girardi Keese's liquidity issues and to develop a work-out program for the Firm.  On further information and belief, Cohan's efforts continued through September 2019.

66.     The Trustee is informed and believes and based thereon alleges that notwithstanding that Stillwell and LFG had declared their loans in default and started enforcement proceedings, CAL II and DiNardo did not institute actions to protect CAL II's interests.  Rather, in or around September 2019, DiNardo, on behalf of Girardi Keese, began negotiating with Girardi Keese's other lenders in an effort to settle the litigation and to work out terms and conditions of repayment.  The Trustee is further informed and believes and based thereon alleges that, at all times, DiNardo's goal was to keep Girardi Keese operating so as to protect CAL II's interests in Girardi Keese's collateral.  *See, e.g.*, **Exhibits 10-12**.

/ / /

67.    The Trustee is informed and believes and based thereon alleges that in September 2019, among other things, DiNardo offered to pay for the services of Cohan (the consultant CAL II/DiNardo instructed Girardi Keese to hire) and began communicating with other litigation funders with the goal of providing new financing for Girardi Keese's business operations because he was aware Girardi Keese was insolvent and unable to pay its bills as they came due, as evidenced by the LFG and Stillwell lawsuits.  DiNardo also was in almost daily communication with the lawyers for LFG, Stillwell, and Virage attempting to restructure Girardi Keese's financing obligations. *See*, Exhibits 2, 10-12.

68.    The Trustee is informed and believes and based thereon alleges that in September and October 2019, email communications were exchanged daily between DiNardo, the lawyer for LFG, Dan Zimmerman, and Cohan.  The emails evidence that DiNardo had assumed complete control of the negotiations regarding various workout scenarios, and was the only person engaged in those discussions on behalf of Girardi Keese, save and except for input by Cohan.  As such, the Trustee is further informed and believes that DiNardo was fully aware of Girardi Keese's defaults on its current funding obligations.

69.    The Trustee is informed and believes and based thereon alleges that between October and November 2019, DiNardo/CAL II offered to provide to Girardi Keese another $1,500,000 in funding, subject to certain conditions, one of which was an agreement that Boeing would send the money that represented the Girardi Keese fee from certain of the Lion Air Case client settlement(s) directly to CAL II, rather than having the fees go to Girardi Keese, as should have occurred in the ordinary course.

70.    The Trustee is informed and believes and based thereon alleges that DiNardo and CAL II knew or suspected that if the fees were first paid to Girardi Keese, Girardi Keese would not pay CAL II as required by the CAL II Financing Agreement.

71.    On November 8, 2019, CAL II and Girardi Keese entered into an agreement that extended and increased Girardi Keese's CAL II line of credit from $6,500,000 to $8,000,000.  As part of this transaction, DiNardo directed that Thomas pay off the LFG $15,000,000 funding.  The Trustee is informed and believes and based thereon alleges that a substantial portion of the funds

that were used to pay off the LFG loan came from a refinancing of Thomas's Pasadena's home. As of November 9, 2019, the total principal amount of the fundings owed by Girardi Keese to Cal II, LFG, Stillwell, and Virage was $27,750,000. DiNardo negotiated the entire transaction, including arranging for the payoff of the LFG loan. As of 2019, the CAL II loan had been outstanding since 2011 - over seven years with no formal action taken by CAL II to collect on the loan.

72.    The Trustee is informed and believes and based thereon alleges that in or about 2019, the defendants and the plaintiff's attorneys in the Lion Air Case entered into a mediation process to bring about a resolution of the claims presented in the action. The process, which was approved by the presiding court, provided that as the mediations were concluded, the resolved case would be dismissed, and Boeing would send the settlement proceeds to Girardi Keese. Girardi Keese was to deduct its fees and costs (which would include co-counsel and referral fees) from the settlement proceeds and then forward the balance to the client(s)).

73.    The Trustee is informed and believes and based thereon alleges that on January 24, 2020, CAL II and Girardi sent a letter to the attorney for Boeing advising Boeing of the CAL II lien against the fees Girardi Keese was to receive from the funding of the settlements, requesting that the entirety of Girardi Keese's fee in the amount of $3,500,000 be paid directly to CAL II. The agreement and direction to Boeing that the fees and cost portion of the settlement was to be paid to CAL II, altered the procedure as approved by the court and upon information and belief was implemented without obtaining court approval for the same.

74.    The Trustee is informed and believes and based thereon alleges that in or around January 31, 2020, CAL II notified Boeing in writing of a change in the original fee transfer direction, as CAL II had consented to have Girardi Keese's fee distribution on the $3,500,000 be made 50% to CAL II and 50% to Girardi Keese. As set forth in the letter, the amount to be paid for the four settled cases not previously paid was $3,445,000 so that the amount to be paid to CAL II was $1,722,500 and the amount to Girardi Keese was $1,722,500.

/ / /

/ / /

75.    The Trustee is informed and believes and based thereon alleges that in or about March 2020, Boeing wired to CAL II the sum of $1,772,500 and the other $1,772,500 was wired to Girardi Keese.

76.    The Trustee is informed and believes and based thereon alleges that at the time CAL II sent its demand to Boeing for payment, and at the time CAL II received the payment, Girardi Keese had already paid itself in full for all of the Boeing settlements, whether or not a settlement had been consummated and funded, all in direct violation of the court order that required a specific procedure to be followed by the parties once a settlement was finalized.

77.    The Trustee is informed and believes and based thereon alleges that the Boeing settlement funds paid directly to CAL II and Girardi Keese, in part, caused Girardi Keese to have a shortfall in the amount necessary to pay its clients.  As noted by the presiding District Court, the funds were stolen.  As such, there were insufficient settlement proceeds to pay the clients their share of the settlement.

78.    The Trustee is informed and believes and based thereon alleges that shortly after CAL II received the wire transfer from Boeing, Thomas advised DiNardo that the money should not have been sent to CAL II but should have been paid to Girardi Keese's co-counsel, Edelson P.C. ("Edelson"), who was yet to be paid their co-counsel fees by Girardi Keese notwithstanding that Girardi Keese had received the money to make such payment.  When so advised, DiNardo professed ignorance that Girardi Keese had co-counsel in the Boeing case, indicating he would return the money, if appropriate.  *See, e.g.*, **Exhibits 13-14**.  The money was never returned.[17]

**[EDELSON BRINGS THE ISSUE OF
NON-PAYMENT TO THE ATTENTION OF JUDGE DURKIN]**

79.    On or about December 2, 2020, Edelson, Girardi Keese's "local counsel" in the Lion Air Case, filed a lawsuit against Girardi Keese and Thomas in the United States District

_____

[17] Thomas was partially right.  However, none of the $3,500,000 should have been sent to Girardi Keese or to CAL II as Edelson was owed $2,500,000 and the clients were to receive $2,000,000. Whether DiNardo knew that Edelson was Girardi Keese's co-counsel or not is not relevant, as CAL II monitored the proceedings and Edelson's name appeared on all pleadings and on the service list.

1   Court for the Northern District of Illinois, bearing Case No. 20-CV-07115.  In its complaint,

2   Edelson alleges that Girardi Keese failed to pay Edelson its co-counsel fees from the Lion Air

3   Case.  On the same day, at the instruction of Judge Durkin, Edelson filed a "Verified Motion for

4   Rule to Show Cause" (Case No. 1:18-cv-07686, Docket No. 842) requiring Girardi Keese to show

5   cause why it should not be held in contempt for violating six orders of the court.

6       80.     On December 9, 2020, Judge Durkin conducted a hearing as to whether Girardi

7   Keese and Thomas should be held in civil contempt for not paying Girardi Keese's clients their

8   settlement funds.  Another hearing was held on December 14, 2020.

9       81.     Ultimately, Judge Durkin found Girardi Keese and Thomas to be in civil contempt

10  and issued orders for $2,000,000 in sanctions and freezing all of Girardi Keese's and Thomas's

11  assets.  *See*, **Exhibit 15**, Docket No. 848.

12      82.     After her appointment, the Trustee commenced her review of Girardi Keese's

13  books and records, including the IOLTA Trust Accounts.  Although yet to be completed, upon

14  information and belief Girardi Keese's Client Trust Accounts are out of trust by at least

15  $23,000,000.  The Trustee's review also disclosed that there was no adherence to the sanctity of

16  the trust accounts with funds flowing in and out of the trust accounts without regard to source of

17  the funds or the basis for the disbursement.  Upon information and belief, the Trustee alleges that

18  at all relevant times, the CFS Defendants knew or should have known that there were irregularities

19  involving Girardi Keese's trust accounts and yet it continued to support Girardi Keese's operations

20  by providing referrals (fees split 50-50) and funding Girardi Keese's ongoing business operations

21  as heretofore set forth.

## VI.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### [DECLARATORY RELIEF: LEGAL RELATIONSHIP OF GIRARDI KEESE AND THE CFS DEFENDANTS]

27      83.     The Trustee refers to and incorporates herein by reference paragraphs 1 through 82

28  above as though fully set forth herein.

84.     The Trustee is informed and believes and based thereon alleges that based upon the facts set forth above, the relationship between the CFS Defendants, and each of them, on the one hand, and Girardi Keese, on the other hand, went beyond that of a lender-borrower relationship. The Trustee is further informed and believes and on that basis alleges thereon that in equity and in law, the CFS Defendants and Girardi Keese were at all times relevant engaged in an "implied in fact" partnership business.  The Trustee is further informed and believes and based thereon alleges that this business relationship commenced as early as 2005 and continued to the filing of Girardi Keese's bankruptcy.

85.     The Trustee is informed and believes and based thereon alleges that the facts as set forth herein, support a legal determination that an implied in fact partnership existed between the CFS Defendants and Girardi Keese and that the CFS Defendants stepped into the shoes of Girardi Keese in engaging in conduct typically attributable to "insiders" of Girardi Keese as defined by 11 U.S.C. § 101(31)(B).

86.     The Trustee is informed and believes and on that basis alleges thereon that the facts as set forth herein include many of the factors which mandate a finding of recharacterization as set forth in *In re Autostyle Plastics, Inc.*, 269 F.3d 726, 747-48 (6th Cir. 2001).

87.     The Trustee is informed and believes and based thereon alleges that the following conduct of the CFS Defendants and Girardi Keese supports that the loan be recharacterized as equity pursuant to the *Autostyle* test:

i.     The CFS Defendants provided Girardi Keese a $5,000,000 line of credit that was extended for seven years without any attempt to enforce the loan notwithstanding that Girardi Keese was in default in the performance of the terms and conditions of the loan; *Autostyle* (2)-(3) (absences of a fixed maturity date and schedule of payments);

ii.     The CFS Defendants and Girardi Keese were to share in the fees recovered in cases on a 50-50 basis as the sole source of repayment; *Autostyle* (4) (source of repayments);

iii.     The CFS Defendants maintained and then increased the credit facility notwithstanding that they knew Girardi Keese was insolvent, and had debt in excess of $20,000,000 and notwithstanding that they knew the only source of repayment were fees in

contingency fee cases with no certainty as to the amount of the recovery, the costs of the litigation or the timing of any recovery, if any; *Autostyle* (4) (source of repayment), *Autostyle* (5) (inadequacy of capitalization); *Autostyle* (7) (security, if any, for advances);

      iv.    Arranging for the transfer of 8,000 plaintiff cases to Girardi Keese from the Masry firm, and then advancing the costs and expenses attributable to the prosecution of those cases in an effort to recover CAL II's $25,000,000 loan to the Masry firm; *Autostyle* (10) (advances used to acquire capital assets);

      v.    DiNardo, as an owner of CAL II, negotiated the pay-off of a $15,000,000 junior lienholder's loan, thus subordinating CAL II's claims to outside creditors; *Autostyle* (9) (subordinating advances to claims of outside creditors); and

      vi.    Allowing the Masry firm case funding loan to remain outstanding (with two additional contributions of capital) for seven years without attempting to collect on the loan.

88.    In addition, the Trustee is informed and believes and on that basis alleges thereon that the following facts and factors should be taken into consideration in determining the true character of the CAL II funding:

      i.    DiNardo stepping into the role of Girardi Keese's Chief Executive/Financing Officer to head up the negotiations with Girardi Keese's other litigation lenders;

      ii.    Continuing to do business with Girardi Keese in September 2019 and working to restructure Girardi Keese's funding arrangements, notwithstanding that Girardi Keese had failed to pay the CFS Defendants referral fees and other monies owed in an amount in excess of $1,800,000;

      iii.    Continuing to do business with Girardi Keese notwithstanding that the CFS Defendants had actual knowledge that Girardi Keese was out of trust by at least $2,000,000 owed to the Lion Air Case clients;

      iv.    DiNardo continuing in his efforts to restructure Girardi Keese's financing including soliciting other lenders even after Thomas accused him of fraud regarding the Boeing direct payment; and

/ / /

v.     DiNardo continuing to find additional sources of financing for Girardi Keese from January 2020 through August 2020, notwithstanding that Girardi Keese was insolvent, was in breach of the CFS Defendants' loan documents, and had failed to pay its co-counsel over $2,000,000 for their services performed for the Lion Air Case clients.

89.     The Trustee is informed and believes and based thereon alleges that the CFS Defendants deny and reject the facts and implications to be drawn thereof and further assert that the only relationship the CFS Defendants had with Girardi Keese was as a secured creditor.

90.     Defendants' denial of the Trustee's contentions set forth above creates a judiciable issue under the Federal Declaratory Relief Act, 28 U.S.C. § 2201, *et seq.*

WHEREFORE, the Trustee prays for a judgment finding that:

1.     Defendants Counsel Financial Services, California Attorney Lenders II, and Joseph DiNardo are, in law and in equity, implied in fact partners of Girardi Keese;

2.     Defendants Counsel Financial Services, California Attorney Lenders II, and Joseph DiNardo are and shall be deemed "insiders" as to Girardi Keese's bankruptcy case and as to all issues pertaining to the position or standing of the CFS Defendants;

3.     The CAL II claim shall be recharacterized as "equity;" and

4.     Defendants Counsel Financial Services, California Attorney Lenders II, and Joseph DiNardo, as partners-in-fact of Girardi Keese, are liable, jointly and severally, for the debts and obligations of Girardi Keese.

## SECOND CLAIM FOR RELIEF

**[DISALLOWANCE OF PROOFS OF CLAIM, OR IN THE ALTERNATIVE,
EQUITABLE SUBORDINATION OF CLAIMS AGAINST DEFENDANTS CFS AND CAL II;
11 U.S.C. § 510(C)(1); VALIDITY AND PRIORITY OF LIEN)]**

91.     The Trustee refers to and incorporates herein by reference paragraphs 1 through 82 above as though fully set forth herein.

92.     On or about June 22, 2021, CAL II filed a secured proof of claim (bearing Claim No. 71-1) in the Girardi Keese bankruptcy case in the amount of $6,668,484.21 (the "Secured Claim").

93.    Thereafter, the Trustee and CAL II entered into a settlement agreement pursuant to which the Trustee and CAL II agreed, among other things, that:

**1.  The Allowed CAL II Claim.**  CAL II shall have a single allowed claim of $6,508,361.55 as of the Petition Date (the "Allowed CAL II Claim").  The Allowed CAL II Claim is comprised of: (a) the judgment balance of $6,250,589.59; (b) interest of $89,049.50 at the California judgment interest rate of 10%; and (c) legal fees of $168,722.46, reduced from $266,270.75.  CAL II shall also have a first priority perfected security interest in substantially all of Girardi Keese's personal property assets (the "CAL II Collateral"), as reflected in CAL II's loan documents, filed UCC financing statements, and continuations and amendments thereto (the "CAL II Liens").

**2.  Post-Petition Interest and Reasonable Fees, Costs, or Charges.** CAL II reserves its right to later seek post-petition interest at the California judgment interest rate of 10%, along with reasonable fees, costs, or charges under 11 U.S.C. § 506(b).  The Trustee reserves all related rights including, without any limitation, the right to contest CAL II's entitlement to post-petition interest, fees, costs, or charges and the reasonableness of any fees, costs, or charges that CAL II asserts.  Any post-petition interest and/or reasonable fees, costs, or charges shall be added to the Allowed CAL II Claim, whether the parties agree or whether ordered by the Bankruptcy Court.  If a dispute about these issues and/or any issue relating to 11 U.S.C. § 506(b) arises, the dispute will be resolved by the Bankruptcy Court.

**3.  Distributions from the Abikzer Payments.**  As soon as practicable, the Trustee shall distribute the $2,990,337.00 first Abikzer payment as follows: (a) $2,093,235.90 (70%) will be distributed to CAL II and applied against the judgment balance principal; and (b) $897,101.10 (30%) will be retained by the Trustee for the benefit of the Estate, but will be subject to the CAL II Liens and judgment lien, as well as liens against the CAL II Collateral asserted by any other creditor of Girardi Keese and/or the Estate.  When the Trustee receives the second

Abikzer payment, the second payment will be distributed as follows: (a) 70% to be

distributed to CAL II to reduce the judgment principal balance; and (b) 30% to be

retained by the Trustee for the benefit of the Estate but subject to the CAL II Liens

and judgment lien, as well as liens against the CAL II Collateral asserted by any

other creditor of Girardi Keese and/or the Estate.

       **4.  Preservation of Surcharge Rights**. The parties are not waiving any

rights they may have under 11 U.S.C. § 506(c).  In addition, upon written

documentation provided by the Trustee to CAL II of the reasonable and necessary

costs and expenses to preserve or dispose of the CAL II Collateral for CAL II's

benefit, or for the benefit of any of Girardi Keese and/or Estate's creditors asserting

a lien(s) against the CAL II Collateral, CAL II shall consent to and support the

Trustee's and/or the Estate's surcharge of the CAL II Collateral under 11 U.S.C. §

506(c) as a subordination, but not a deduction of the Allowed CAL II Claim.  CAL

II shall not unreasonably withhold its consent and support.

94.     The motion of the Trustee to approve the Cal II settlement was approved by an

order of the Court.

95.     Based upon the allegations set forth herein, the Trustee is informed and believes

and based thereon alleges that the CFS Defendants' claims should be disallowed in full, or at a

minimum, equitably subordinated to a distribution category below that of the general unsecured

creditors.  The Trustee is further informed and believes and based thereon alleges that the

following conduct of the CFS Defendant is inequitable and injured Girardi Keese's creditors or

conferred an unfair advantage on the CFS Defendants requiring disallowance or subordination of

the CFS Defendants' claims:

     i.     Receiving fees and profits from Girardi Keese from 2005 through 2020 from illegal

referral fee splitting arrangements in violation of the California Rules of Professional Conduct and

California law, which agreements are void and unenforceable and against public policy, in a sum

to be proved at the time of trial of this matter but upon information and belief is in the millions of

dollars;

ii.    Obtaining and then refusing to return the $1,772,500 CAL II received from Boeing. *See, e.g.*, *Resner v. State Bar of California*, 52 Cal. 2d 605, 612 (1960) (misappropriation of funds entrusted to an attorney at law is a gross violation of general morality as well as professional ethics and, in addition, is likely to endanger the confidence of the public in the legal profession.  It deserves severe punishment).  In addition, the failure of CAL II to return the money that should have been paid to Girardi Keese's clients is a crime pursuant to, among other things, California Penal Code § 496(a) ("every person who withholds any property from the owner . . .  knowing the property to be stolen . . . shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170); and

iii.    Engaging in a client referral program with Hatcher to obtain clients in exchange for paying a fee to Hatcher who is not a licensed attorney, or otherwise authorized to obtain clients for an attorney as provided by California Rules of Professional Conduct and therefore participating in the crime of "capping."

96.    The CFS Defendants' inequitable conduct as hereinabove described, and by engaging in an unlawful fee sharing agreement with Girardi Keese has resulted in an unfair advantage to the CFS Defendants and has resulted in an injury to the creditors of Girardi Keese in an amount of at least $1,772,500, but believed to be in excess of $20,000,000 all as to be determined at the time of the trial of this matter.

97.    Based on the CFS Defendants' conduct, as set forth above, the CFS Defendants' claims, whether filed or unfiled, for amounts allegedly due should be appropriately disallowed.

98.    Based on the CFS Defendants' conduct, as set forth above, the CFS Defendants' claims, whether filed or unfiled, for amounts allegedly due should be equitably subordinated to all allowed unsecured claims, pursuant to, among other things, 11 U.S.C. § 510(c) and applicable case law.

99.    Based upon the CFS Defendants' conduct, as set forth above, a declaration of the Court declaring which property, if any, the CFS Defendants have liens on, and the amount, validity, extent and priority of those liens.

/ / /

100.    Based on the CFS Defendants' conduct, as set forth above, an order of the Court should be entered requiring the CFS Defendants to disgorge the Abikzer payments the Trustee made to the CFS Defendants;

WHEREFORE, the Trustee prays for a judgment finding that;

1.    The CFS Defendants are deemed "insiders" for all purposes in this bankruptcy case;

2.    The secured claims of the CFS Defendants shall be and are hereby be disallowed;

3.    Alternatively, the claims of CFS and CAL II be equitably subordinated to a priority position lower than that of the general unsecured creditors of the Estate;

4.    The CFS liens are null and void;

5.    Alternatively, a determination that the CFS lien is limited to certain specified property and a determination of the amount, validity and extent and priority of the CFS liens; and

6.    The CFS Defendants are required to disgorge the Abikzer payments previously made by the Trustee to the CFS Defendants.

## **THIRD CLAIM FOR RELIEF**

### **[CFS DEFENDANTS: DECLARATORY RELIEF - FEE SHARING AGREEMENTS; RETURN OF FEES PAID  11 U.S.C. § 542; ACCOUNTING]**

101.    The Trustee incorporates by reference paragraphs 1 through 82 above as though fully set forth herein.

102.     The Trustee is informed and believes and on that basis alleges thereon that the fee sharing agreements between Girardi Keese and the CFS Defendants were null and void as the same were against California law and violated the California Rules of Professional Conduct.

103.    The Trustee is informed and believes and on that basis alleges thereon that a finding that the fee sharing agreements were null and void entitles the Trustee to an order that the transfers made to the CFS Defendants were inherently improper and therefore all funds paid to the CFS Defendants must be returned to the Trustee in accordance with 11 U.S.C. § 542.

WHEREFORE, the Trustee prays for an order:

/ / /

1.    Declaring the fee sharing agreement(s) between the CFS Defendants and Girardi Keese to be null and void;

2.    That the CFS Defendants are to provide an accounting of all fees and other payments Girardi Keese paid to the CFS Defendants as a result of the "fee sharing agreements;" and

3.    For a judgment in the amount of proof as to all "fees" paid to the CFS Defendants.

## FOURTH CLAIM FOR RELIEF

### [CFS DEFENDANTS:  CONSTRUCTIVE TRUSTEE, BREACH OF FIDUCIARY DUTY]

104.    The Trustee incorporates by reference paragraphs 1 through 82 above as though fully set forth herein.

105.    The Trustee presents this claim in her capacity as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account as against the CFS Defendants.

106.    The Trustee is informed and believes and on that basis alleges thereon that the facts presented herein establish that Thomas paid to himself and others for their respective benefit, and to the detriment of Girardi Keese's clients, millions of dollars over a period of not less than twenty years which payments were made from Girardi Keese's IOLTA Client Trust Account and in breach of Thomas's fiduciary obligations to maintain the sanctity of the Girardi Keese Client Trust Account.  On information and belief, the Trustee asserts that a significant amount of the funds used by Thomas for his own personal expenses were funds received in settlement of Girardi Keese's clients' cases and that the losses from the Girardi Keese Client Trust Account is in excess of $14,000,000.

107.    The Trustee is informed and believes and on that basis alleges thereon that the CFS Defendants were implied partners-in-fact with Girardi Keese in the activities as set forth hereon and based thereon the CFS Defendants owe a fiduciary duty to the clients of Girardi Keese.

108.    The Trustee is informed and believes and on that basis alleges thereon that the CFS Defendants breached their fiduciary obligations owed to Girardi Keese's clients by accepting the payments from Boeing, which the CFS Defendants knew or should have known were funds due

and owing to Girardi Keese's clients and then refusing to return the funds upon demand of the same.

109.    Alternatively, that in obtaining the funds that should have been paid to Girardi Keese in trust for the Girardi Keese clients entitled to receive their share of the settlement funds from Boeing, the CFS Defendants were and are constructive trustees of the money, holding the same for the benefit of the Trustee as the Successor-in-Interest of the Girardi Keese Trust Account, for the benefit of the Girardi Keese clients entitled to receive the money as their recovery from the settlement.

110.    In withholding the Boeing payments and refusing to return the same, the CFS Defendants breach their trust obligations owed to the Trustee as the Successor-in-Interest to the Girardi Keese Client Trust.  Defendants acted intentionally, willfully, wantonly, and with a conscious disregard of the rights of the Trustee and Successor Trustee and Girardi Keese's clients as beneficiaries of Girardi Keese's Client Trust Account.  In this case, the CFS Defendants' refusal to return the Boeing payments to the Lion Air Case clients who lost their loved ones in the plane crash is a particularly cruel and unjust hardship in conscious disregard of those persons' rights.

111.    The CFS Defendants hold the Boeing payments as a constructive trustee for the Trustee and Successor Trustee of Girardi Keese's Client Trust Account, and by refusing to pay over the funds to the Trustee and the Successor Trustee the CFS Defendants continue to breach their obligation as a constructive trustee owed to Trustee of the Girardi Keese Client Trust Accounts for the benefit of those clients who are entitled to funds now in possession of the CFS Defendants.

WHEREFORE, the Trustee prays for judgment on this claim for relief as follows:

1.    For a determination that the CFS Defendants are holding the Boeing payments as constructive trustee for the benefit of the beneficiaries of the Girardi Keese Client Trust Account;

2.    That the CFS Defendants are constructive trustees of the funds received from Boeing;

3. That the CFS Defendants breached their obligations as the constructive trustee of the settlement funds owed to the Trustee of the Girardi Keese Client Trust Account;

4. That in conducting themselves as alleged herein, the CFS Defendants acted willfully, wantonly and in conscious disregard of the rights of the Trustee and the Girardi Keese clients as beneficiaries of the Girardi Keese Trust Account and therefore are subject to punitive damages in a sum according to proof;

5. For damages for breach of their duty as constructive trustees for refusing to return the Boeing payments to the Trustee as the Successor Trustee of the Girardi Keese Client Trust Account in the amount of $1,722,500;

6. For additional damages in a sum according to proof for the claims presented herein;

7. For such other and further relief as may be reasonable and appropriate;

8. For reasonable attorneys' fees; and

9. For costs of suit incurred.

## FIFTH CLAIM FOR RELIEF

### [CFS DEFENDANTS:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY – GIRARDI KEESE'S CLIENT TRUST ACCOUNT]

112. The Trustee incorporates by reference paragraphs 1 through 82 and 103 through 109 above as though fully set forth herein.

113. The Trustee presents this claim in her capacity as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account as against the CFS Defendants.

114. The Trustee is informed and believes and on that basis alleges thereon that for many years, going back to at least 2011, Girardi Keese and the CFS Defendants engaged in unethical, illegal, and immoral conduct by and through their fee sharing agreements that were in violation of the California Rules of Professional Conduct and California State law.

115. The Trustee is informed and believes and on that basis alleges thereon that the CFS Defendants knew or should have known that these agreements were illegal, unethical, and unenforceable.  The Trustee is further informed and believes that when and if the CFS Defendants received a payment from Girardi Keese (a distribution on a recovery-fee made) that the CFS

1    Defendants knew or should have known that the source of the payment was other than what was

2    contemplated by the terms of the fee sharing agreements or even the CFS financing agreement,

3    and thus were funds of another Girardi Keese client.

4        116.    The Trustee is informed and believes and on that basis alleges thereon that the CFS

5    Defendants knew or should have known of Thomas's mismanagement of the Girardi Keese Client

6    Trust Account and of his using trust funds to support his own lifestyle and of his misappropriation

7    of trust funds given their auditing of the books, records, and practices of Girardi Keese from time

8    to time over the years of their relationship.  The Trustee is further informed and believes and based

9    thereon alleges that the CFS Defendants knew that Thomas, as a regular business practice,

10   committed fraud as to Girardi Keese's clients by over-charging for costs and expenses in

11   litigation, and by intentionally and willfully not paying the clients their appropriate share of

12   recoveries made on their respective behalf.  The CFS Defendants knew all of the foregoing based

13   upon their audits of Girardi Keese's business records and upon the published decisions spanning

14   over twenty years of clients and co-counsel filing lawsuits against Thomas and Girardi Keese for

15   failing to pay them the proper amount of their recovery or co-counsel fees.

16       117.    The Trustee is informed and believes and on that basis alleges thereon that

17   notwithstanding the CFS Defendants' actual or constructive knowledge of Thomas and Girardi

18   Keese's business practices, the CFS Defendants continued to provide capital to Girardi Keese so

19   that Girardi Keese could continue its business operations which, in turn, provided Thomas the

20   ability to continue to practice law, to make recoveries on behalf of Girardi Keese's clients, and

21   thus continue to steal the funds paid to Girardi Keese on behalf of its clients in satisfaction of the

22   claims resolved; and by so doing, allowing the CFS Defendants to share in the fees received by

23   Girardi Keese pursuant to the CFS Defendants illegal fee sharing arrangements.

24       118.    The Trustee is informed and believes and on that basis alleges thereon that the CFS

25   Defendants had actual and constructive knowledge of Thomas's conduct, and his proclivities for

26   not paying Girardi Keese's clients the full amount due to them based upon the recoveries made,

27   and not paying Girardi Keese's co-counsel or referring attorneys, and, instead, taking those funds

28   for Thomas's personal use.

119.    The Trustee is informed and believes and on that basis alleges thereon that the CFS Defendants had actual and constructive knowledge of Thomas's conduct as alleged herein in that the CFS Defendants:

    i.    Conducted many audit reviews of Girardi Keese's files (the CFS Collateral) (*see*, **Exhibit 13**);

    ii.    Were aware of the bad press about Girardi Keese's debt structure (*Id.*);

    iii.    Knew that Girardi Keese almost never paid its obligations to others (clients and co-counsel) including the CFS Defendants as it was subject to the same conduct (*see,* Exhibit 2);

    iv.    Knew that client after client sued Thomas and Girardi Keese based upon allegations that Thomas and/or Girardi Keese either failed to pay the client the client's share of a recovery or failed to pay the client the full amount due to the client based upon the lawsuits filed against Thomas and Girardi Keese over the years (*see*, Exhibit 5);

    v.    Knew that Thomas and/or Girardi Keese would not pay referral fees to the referring lawyer, including the CFS Defendants (*see*, Exhibit 2);

    vi.    Knew that Thomas was dishonest and duplicitous as determined by the Ninth Circuit in *Franco v. Dow Chem. Co*, 611 F.3d 1027 (9th Cir. 2010);

    vii.    Had exercised their right as secured creditors and, under the terms of the respective loan agreements, to verify their collateral including, but not limited to, inspecting Girardi Keese's books and records, conducting such inspections and audits to determine whether the specific matter was being appropriately handled, and receiving or reviewing financial reports from Girardi Keese and Thomas.  As a result, the Trustee is informed and believes and based thereon alleges that at all times during their relationship, the CFS Defendants knew or should have known that Thomas was misappropriating client trust funds for his own use and benefit and to the detriment of Girardi Keese's clients; and

    viii.    Knew that Girardi Keese had defaulted on the loans issued by Stillwell, LFG, and Virage yet continued to fund Girardi Keese's operations.

120.    The Trustee is informed and believes and on that basis alleges thereon that during the time of their relationship from 2011 to the present, despite that they knew or should have

known that Thomas was inappropriately diverting money from Girardi Keese's Client Trust Account, the CFS Defendants continued to do business with Girardi Keese, providing the financial support necessary for Girardi Keese to continue in business and to continue its fee sharing program and, in so doing, aided and abetted Thomas's fraud, breach of fiduciary, and theft of trust funds.

WHEREFORE, the Trustee prays that:

1.    The Court enter an order finding that the CFS Defendants aided and abetted Thomas's fraud in the handling of the Girard Keese Client Trust Account; and

2.    For damages according to proof.

## SIXTH CLAIM FOR RELIEF

### [AGAINST CFS DEFENDANTS: AVOIDANCE OF FRAUDULENT TRANSFERS 11 U.S.C. § 544 AND CALIFORNIA CIVIL CODE §§ 3439.04 (b) or 3439.05 and 3439.07] (CONSTRUCTIVE FRAUD )

121.    The Trustee incorporates by reference paragraphs 1 through 82 above as though fully set forth herein.

122.    The Trustee presents this claim in her capacity as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account as against the CFS Defendants.

123.    The Trustee is informed and believes and on that basis alleges thereon that during the four-year period immediately preceding the Petition Date, Girardi Keese made transfers to or for the benefit of the CFS Defendants as to all payments that were received as to CFS's 50% share of Girardi Keese's clients' contingency fee and that said payments were made with the actual intent to delay, hinder, or defraud Girardi Keese's creditors.

WHEREFORE, the Trustee prays that:

1.   That the four-year transfers and the liens be avoided for the benefit of the Estate.

*[Continued on next page]*

# SEVENTH CLAIM FOR RELIEF

### [AGAINST CFS DEFENDANTS: AVOIDANCE OF FRAUDULENT TRANSFER
### 11 U.S.C. § 544 AND CALIFORNIA CIVIL CODE §§ 3439.04 (a) AND 3439.07]
### (ACTUAL FRAUD)

124.    The Trustee incorporates by reference paragraphs 1 through 82 above as though fully set forth herein.

125.    The Trustee presents this claim in her capacity as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account as against the CFS Defendants.

126.    The Trustee is informed and believes and on that basis alleges thereon that during the seven-year period immediately preceding the Petition Date, Girardi Keese made transfers to or for the benefit of the CFS Defendants as to all payments that were received as to CFS's 50% share of Girardi Keese's clients' contingency fee and that said payments were made with the actual intent to delay, hinder, or defraud Girardi Keese's creditors.

127.    The Trustee is informed and believes and on that basis alleges thereon that Girardi Keese made the fraudulent transfers (a) without receiving a reasonably equivalent value in exchange for the transfer, and Girardi Keese either (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of Girardi Keese were unreasonably small in relation to the business or transaction, or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

128.    By virtue of the foregoing the seven-year transfers and the liens are avoidable pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a) and 3439.07.

WHEREFORE, the Trustee prays:

1.    That the seven-year transfers and the liens be avoided for the benefit of the Estate.

# EIGHTH CLAIM FOR RELIEF

### (RECOVERY OF AVOIDED TRANSFER OR THE VALUE THEREOF PURSUANT TO
### 11  U.S.C. § 550(A))

129.    The Trustee incorporates by reference paragraphs 1 through 82 above as though fully set forth herein.

130.    The Trustee presents this claim in her capacity as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account as against the CFS Defendants.

131.    The fraudulent transfers alleged herein are transfers of Girardi Keese's property that should be avoided pursuant to California Civil Code §§ 3439.04(a)(1) and 3439.02(a)(2) and, based thereon, the Trustee is entitled to avoid the fraudulent transfers.

132.    The CFS Defendants are the transferees (initial, immediate, mediate and/or otherwise) of the fraudulent transfers alleged herein, and/or the entities or persons for whose benefit the fraudulent transfers were made, within the meaning of 11 U.S.C. § 550(a).  Based thereon, the Trustee is entitled to recover the property transferred or the value thereof, together with interest at the applicable rate from the date of the fraudulent transfers, for the benefit of Girardi Keese's Estate.

WHEREFORE, the Trustee prays for judgment as follows:

1.   For the value of the property transferred; and

2.   All interest recoverable thereon from the date of the fraudulent transfer.

## NINTH CLAIM FOR RELIEF

### [AGAINST CFS DEFENDANTS: AVOIDANCE OF FRAUDULENT TRANSFER 11 U.S.C. § 548(A)(1)(A) (ACTUAL INTENT)]

133.    The Trustee incorporates by reference paragraphs 1 through 82 above as though fully set forth herein.

134.    The Trustee is informed and believes and on that basis alleges thereon that during the two-year period immediately preceding the Petition Date, Girardi Keese made transfers for the benefit of the CFS Defendants for the Boeing payments, in a sum according to proof, with the actual intent to delay, hinder, or defraud Girardi Keese's creditors.

135.    By reason of the foregoing, the two-year transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

WHEREFORE, the Trustee prays:

1.    For a judgment in the amount of the fee sharing payments made within two years of the transfers in the amount of $1,772,500.

1

## TENTH  CLAIM FOR RELIEF

2

### (PRESERVATION OF TRANSFER AVOIDED PURSUANT TO 11 U.S.C. § 551)

3    136.    The Trustee incorporates by reference paragraphs 1 through 82 above as though

4    fully set forth herein.

5    137.    Pursuant to 11 U.S.C. § 551, the fraudulent transfers alleged herein are preserved

6    for the benefit of Girardi Keese's Estate as the fraudulent transfers are avoidable under California

7    Civil Code §§ 3439.04(a)(1) and 3439.02(a)(2) and 11 U.S.C. § 550 as set forth in this Complaint.

8    WHEREFORE, the Trustee prays:

9    1.    For a judgment that the fraudulent transfers are preserved for the benefit of Girardi

10    Keese's Estate as a voidable transfer.

11

## ELEVENTH CLAIM FOR RELIEF

12

### (FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(D))

13    138.    The Trustee incorporates by reference paragraphs 1 through 82 above as though

14    fully set forth herein.

15    139.    Pursuant to 11 U.S.C. § 502(d), to the extent the CFS Defendants filed, have filed,

16    or otherwise assert a claim in Girardi Keese's case, as the term "claim" is defined by 11 U.S.C. §

17    101(10), the Trustee requests that any such claim(s) be disallowed for the CFS Defendants' failure

18    to return or repay the fraudulent transfers, or the value thereof.

19    WHEREFORE, the Trustee prays :

20    1.    For judgment disallowing the CFS Defendants' filed claims, or the claims as they

21    may be amended, or to be filed.

22

## TWELFTH CLAIM FOR RELIEF

23

### [CONVERSION:  AS AGAINST THE CFS DEFENDANTS]

24    140.    The Trustee incorporates by reference paragraphs 1 through 82 above as though

25    fully set forth herein.

26    141.    The Trustee presents this claim in her capacity as the Successor-in-Interest Trustee

27    of the Girardi Keese Client Trust Account as against the CFS Defendants.

28    / / /

Complaint 8302022

142.    As alleged herein, the CFS Defendants wrongfully exercised and continue to exercise dominion and control over $1,772,500 that was earmarked for the Girardi Keese Client Trust Account as settlement proceeds which were to be paid to specified Girardi Keese clients.

143.    The CFS Defendants wrongfully took possession of the funds identified herein and refuse to pay over the earmarked funds to the Trustee, which funds should have been paid or transferred to the Girardi Keese Client Trust Account.  Based thereon, the CFS Defendants have wrongfully retained possession and control of Girardi Keese's trust funds and have refused to deliver the property to the Trustee although demand has been made.

144.    The Estate has been damaged as a direct and proximate result of the CFS Defendants' conversion of the earmarked funds in the amount of $1,772,500.

145.    The conduct of the CFS Defendants, as alleged herein, constitutes a "conversion" under California law and the CFS Defendants' conduct is oppressive, fraudulent, and malicious, entitling the Trustee to recover punitive damages in an amount to be determined at the time of trial under California Civil Code § 3294 and related provisions.

WHEREFORE, the Trustee prays for judgment on this claim as follows:

1.    For relief against the CFS Defendants in the amount of $1,772,500;

2.    For a finding of fraud, willfulness, malice, recklessness, oppression;

3.    For punitive damages according to proof;

4.    For reasonable attorneys' fees;

5.    For costs of suit incurred; and

6.    For such further and appropriate relief as the Court deems just and proper.

## THIRTEENTH CLAIM FOR RELIEF

### [MONEY HAD AND RECEIVED-DEFENDANT DINARDO]

146.    The Trustee incorporates by reference paragraphs 1 through 82 above as though fully set forth herein.

147.    Plaintiff is informed and believes and on that basis alleges thereon that during the four years preceding the Petition Date, DiNardo would, on a regular basis, refer contingency fee

1   clients to Girardi Keese on the condition that Girardi Keese and DiNardo share in the contingency

2   fee as they agreed from time to time.

3          148.    Plaintiff is informed and believes and on that basis alleges thereon that the sharing

4   of the contingency fees by DiNardo and Girardi Keese was an arrangement subject to State Bar of

5   California Rule 5.1 "Fee Division Among Lawyers."

6          149.    Plaintiff is informed and believes and on that basis alleges thereon that Girardi

7   Keese and DiNardo failed to obtain the consent of all of Girardi Keese's clients in writing or

8   otherwise comply with Rule 1.5.1(a)(2) and based thereon the understanding or agreement as

9   between Girardi Keese and DiNardo is null and void and of no force and effect, and all fees paid

10  to DiNardo must be repaid to the Trustee.

11         150.    The Trustee requests that the Court order that DiNardo render an accounting of all

12  payments received from Girardi Keese, either directly or indirectly, during the four years

13  preceding the Petition Date.

14         151.    As a direct and proximate result of the acts and conduct of DiNardo as alleged

15  herein, the Estate has been damaged in an amount to be proved at the time of trial of this matter.

16         WHEREFORE, the Trustee prays for judgment as follows:

17         1.     For an accounting for all monies received by DiNardo from Girardi Keese for the

18  four years preceding the Petition Date;

19         2.     For an award of damages in a sum according to proof;

20         3.     For attorneys' fees and costs; and

21         4.     For such other and further relief as the Court deems just and proper.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1                       **<u>PRAYER FOR RELIEF</u>**

2                     **(ALL CLAIMS FOR RELIEF )**

3     1.  For interest thereon as provided by law;

4     2.  For reasonable attorneys' fees as allowed by law or agreement;

5     3.  For costs of suit; and

6     4.  For such other and further relief as the court deems fair, just, and equitable.

7

8

9 Dated: August 31, 2022               JENKINS MULLIGAN & GABRIEL LLP

10

11

12

13                           By: _____

14                                Larry W. Gabriel
                    Special Litigation Counsel, for Elissa D. Miller,

15                     Chapter 7 Trustee, Estate of Girardi Keese

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 3   WELLY CHANDRA, et al.,              )
                                        )
 4                    Plaintiffs,       )
                                        )
 5   -vs-                               )
                                        )   Case No. 18 C 7686
 6   THE BOEING INTERNATIONAL SALES     )
     CORPORATION, a Washington          )   Chicago, Illinois
 7   State Profit Corporation, et       )   December 9, 2021
     al.,                               )   9:00 a.m.
 8                                      )
                      Defendants.       )
 9
```

```
10              TRANSCRIPT OF PROCEEDINGS - Volume 2
            BEFORE THE HONORABLE THOMAS M. DURKIN
11
     APPEARANCES:
12
     For Edelson PC:        MR. ALEXANDER G. TIEVSKY
13                          MR. JAY EDELSON
                            MR. J. ELI WADE-SCOTT
14                          MS. AMY B. HAUSMANN
                            Edelson PC
15                          350 North LaSalle Street, 14th Floor,
                            Chicago, Illinois  60654
16
     For Keith Griffin:     MR. RYAN D. SABA
17                          Rosen Saba, LLP
                            9350 Wilshire Boulevard, Suite 250
18                          Beverly Hills, California  90212

19
     For David Lira:        MS. EDITH R. MATTHAI
20                          MS. LEIGH ROBIE
                            Robie & Matthai
21                          350 South Grand Avenue, Suite 3950
                            Los Angeles, California  90071
22
     Court Reporter:        KELLY M. FITZGERALD, CSR, RMR, CRR
23                          Official Court Reporter
                            United States District Court
24                          219 South Dearborn Street, Room 1420
                            Chicago, Illinois  60604
25                          Telephone:  (312) 818-6626
                            kmftranscripts@gmail.com
```

# EXHIBIT 1

1   that people in Indonesia are being ripped off by someone who

2   is acting like a two-bit crook.  And that's how they're

3   acting.  That's how Mr. Girardi acted.  I'm not going to

4   restrain myself on this.  That's exactly how he acted.

5          This is an embarrassment, to let people who are

6   unsophisticated -- and that actually doesn't give them credit.

7   They're very sophisticated.  As soon as they didn't get their

8   checks, they're saying, "Where are they?"  And as soon as the

9   check came with half, they said, "What is going on?"  I give

10  credit to the plaintiffs.  They were all over Mr. Griffin and

11  Mr. Lira, I believe, but wherever the e-mails went to.  I

12  would have to go back at some of this.  But they were all over

13  people about where the money is.

14         They were respectful, "Sorry to bother you but

15  where's my money," as if it's a favor to get their money.

16         So that's what I've concluded from two days of

17  hearings.  And I don't think -- I'm going to want to hear from

18  Mr. Edelson and Mr. Scharg.  Not today.  I've had enough.  And

19  they're both local.  I won't require the parties, they're from

20  California, to come back in, unless they want to.  I'll allow

21  you to do questioning by some type of video hookup.  I'm going

22  to want Mr. Edelson and Mr. Scharg in my courtroom.  They're

23  down the block.  And all of you are free, of course, to come

24  to the courtroom, but I won't require you and your clients to

25  come back for that.  You can participate by asking questions

1   And, you know, beyond ethical issues, which is not really

2   my -- appropriately my focus, it may be, but at this point it

3   really isn't, it's a question of whether people allow -- as

4   you say, they aided and abetted, a direct case of aiding and

5   abetting Tom Girardi in violating that order.

6           You may be in the soup, too, over that.  Not quite as

7   early but at some point definitely.  Because this motion

8   didn't come to me in September which -- or in August.  It came

9   December 2nd.  And maybe it was a deference to Tom Girardi,

10  this so-called titan of the plaintiff's bar that how could he

11  ever lie, how could he ever do anything like this.  That's

12  really my call.

13          As I told Mr. Balabanian, you know, if this complete

14  ethical and legal abuse committed by Tom Girardi was something

15  that might be excused because of his age or because of an

16  illness or because of being mixed up or because of playing coy

17  with you on attorneys' fees, these poor folks in Indonesia,

18  they don't care.  They didn't get the money.  The e-mails they

19  sent to Mr. Griffin were heartbreaking.  We need the money.

20  We're not going to survive the pandemic without the money.  Me

21  and my kids can't survive it.

22          This is ridiculous.  You know, we send -- the ABA

23  sends lawyer over to Eastern Europe to teach them about the

24  American legal system.  These poor folks in Indonesia expect

25  integrity.  It's an embarrassment to the whole legal community

# EXHIBIT 2

**From:** Joe DiNardo <jdinardo@counselfin.com>
**Sent:** Thursday, September 5, 2019 7:27 AM
**To:** Shirleen Fujimoto <sfujimoto@girardikeese.com>; Tom Girardi <tgirardi@girardikeese.com>
**Cc:** robertjcohan@gmail.com; Megan Payne <mpayne@counselfinancial.com>; Paul Cody <pcody@counselfinancial.com>
**Subject:** FW: proposed response to Tom's letter

Tom:

I think there was a misunderstanding and I would like to clear it up.  The $1.8 million that we referenced as due to Masry & Vititoe is listed on the spreadsheet we received from your office.  It's a combination of several cases, the majority coming from TXI and Avandia.  This was not a number we came up with.

As for your payment of Rob Cohan that is between you and him.  We can pay him directly on your behalf with the new funding but that is up to you.

We'd like to move forward with the new funding as outlined in the term sheet; Megan and I are around today if you'd like to discuss.

Time seems to be of the essence. Rob has successfully stopped any action by LFG but if there is some delay in giving them the term sheet from Counsel I am not sure what their response will be. So let's clear up this confusion by having you check with Chris Kamon about the numbers.

Thanks,
Joe
716-568-0070

# EXHIBIT 2

**Fees As Of September 3, 2019**

| | GK Case# | Case Name | | Total Fees | | GK Fees | | Referring fees | | Dinardo Fees | | Due Counsel financial |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Outstanding fees due | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| A. | 27133 | Avandia(MV) | | $ 1,939,216.78 | $ | 969,608.39 | $ | 969,608.39 | | | | $ 969,608 |
| B. | 27133 | Avandia(Eisbroch) | $ | 481,179.45 | $ | 264,648.70 | $ | 216,530.75 | $ | 26,465 | | |
| C. | 27133 | Avandia(Chiari) | $ | 160,951.27 | $ | 80,475.63 | $ | 80,475.63 | $ | 8,048 | | |
| D. | 28127 | TXI(MV)* | | $ 1,283,677.81 | $ | 641,838.91 | $ | 641,838.90 | | | | $ 641,839 |
| E. | 2010239 | Balagot** | $ | 750,997.90 | $ | 284,704.14 | | | $ | 284,704 | | |
| F. | 28382 | Perry | $ | 288,000.00 | $ | 144,000.00 | $ | 144,000.00 | | | | $ 144,000 |
| G. | 28072 | Streeper*** | $ | 320,000.00 | $ | 160,000.00 | $ | 117,477.95 | | | | $ 117,478 |
| | | | | | | | | | | | | |
| | | | | Total Due | $ | 2,169,931.62 | $ | 319,217 | $ | 1,872,925.24 |
| | | | | | | | | | $ | 134,512 | Total Paid below |
| | | | | | | | | | | | | |
| | | | | Balance Due JD | $ | 184,704 | | |
| | A. 148 Settled cases | | | | | | | | | | | |
| B. 38 Settled cases | | | | | | | | | $ | 34,512 | Paid 09/01/2019 |
| C. 10 Settled cases | | | | | | | | | | | |
| D. 501 Settled cases | | | | | | | | | $ | 100,000 | Paid 09/01/2019 |
| E. $181,589.62 in costs | | | | | | | | | | | |
| F. $14,745.07 in costs | | | | | | | | | $ | 134,512 | Total Paid |
| D. $159,474.42 liens and $137,168.54 costs | | | | | | | | | | | |

# EXHIBIT 3

**Sent:** Thursday, August 15, 2019 1:40 PM
**To:** Rob Cohan <robertjcohan@gmail.com>
**Cc:** David Lira <dlira@girardikeese.com>; Chris Aumais <caumais@girardikeese.com>; Tom Girardi
<tgirardi@girardikeese.com>; Shirleen Fujimoto <sfujimoto@girardikeese.com>
**Subject:** Re: addendum

Couple of things:
We have not AGREED to supply the next 2.5mm. We/I will aggressively push forward to do it as long as
we get what we asked.
It is Masry & Vititoe. Actually Masry is passed and only Vititoe filed BK. We arranged and Tom agreed to
handle all cases and then pay all of Vititoe's share into the BK.
Thanks,

Joseph DiNardo Esq.
Counsel Financial/ Plaintiff Support
Founder and Director
716-568-0070



**EXHIBIT 3**

On Thu, Aug 15, 2019 at 4:33 PM Rob Cohan <robertjcohan@gmail.com> wrote:

There are 2 additional requirements I did not previously mention.

 We presently have a "Double Leg off" case Tom spoke about on the last call with Team
Counsel.  Counsel would want 50% of our fee on this case to be applied to P and Interest.

Secondly any fee's from Porter Ranch would be used to distinguish any remaining Debt Owed to
Counsel.

 Making some headway here with Counsel, spent a good hour with Joe, the more time I spend with him
the more comfortable he is getting with the transaction and Chris, David and myself.

 Just also received a text from Chris who spoke with Geoff, they are working on sending the 3.5 Million
directly to LFG, this should take a few days as outside counsel is being utilized.

 Counsel has agreed to supply the 2.5 Million by labor day.  They are trying to add to our existing facility
to expedite the transaction.  Ultimately they are prepared to take out Virage and anyone else if need be.
(Stillwell and Nano if we do not receive an inter creditor agreement.(remember they would not do it for
Virage previously) with that said we'll address this all after the 2.5 Million is secured.  The takeout would
be close to 20 Million, based on existing debt and other personal debt and fees owed to Joe Dinardo
personally.

 There are however several requests that Counsel has made to us considering technically we are in
default to them for not paying the last 2 months interest due them and securing all the additional
debt.  (all of this is fixable as I have insured them that we now have the internal controls in place not to
let this happen going further)

They want us to pledge the remaining Morgan Stanley Stock portfolio.  Pledge the accounts due to MS
not allowing it because the collateral is all attached to the 6 forward contracts expiring in 2020 and 2021
however the monthly statements will be forwarded timely.

Life Insurance we have identified a 5 Million dollar policy  and several others that still need to be tracked
down.(please see previous email yesterday to Shirleen  re Mass Mutual policies).   We will need to
obtain additional insurance to cover the face amount of any new facility.   Term insurance will suffice.

Lien on Residence once the LFG lien is released we will need to transfer the Lien to Counsel.  They have
pulled a UCC and state that there is a 2 million dollar mortgage on the property.  Is this accurate ? if it
has been transferred to an investment property lets clean this up and make sure it is free and clear as
Tom has stipulated.

Robert Cohan, For a period of no less than 6 Months I must be placed in a position as COO.  With
oversite to company finances including Budgets, forecasts and have a leadership voice in financial
decisions  (I did not by any means ask for this )

Joe Dinardo is insisting the following as well.   This will be addressed in the bigger facility but we must
acknowledge this:

Joe personally is owed fees on the Balagot Case  (min 350K) case settled Fees

Referral fees on 90 settled Avandia Cases

Fees on Masry-Fititoe

Bankruptcy Estate fees on TXI and Avandia ?


Let's get a value on this and address it immediately.



Let's circle back and have a team conference to discuss so we can move all of this forward immediately



**Robert Cohan**

**CEO**

**Simba Capital Inc.**

**28 Avenue at Port Imperial**
**Suite 309**
**West New York, NJ 07093**
**C 201 694 1958**
**Robert Cohan**
**CEO**
**Simba Capital Inc.**
**28 Avenue at Port Imperial**
**Suite 309**
**West New York, NJ 07093**
**C 201 694 1958**
**O 201 430 9852**
**F 201 829 0880**
**Conf Line (712) 832-8330 Pin 705371#**
**Skype rcohan61**
**RobertJCohan@GMAIL.COM**

# EXHIBIT 4

## Significant Girardi Keese Mass Tort Cases

### [Sampling]

1. In re Motor Fuel Temperature Sales Practices Litig

2. Avial v. Willits Envtl. Remediation Trust,

3. Rezulin Litig. Julia Sink v. Warner-Lambert Co.,

4. Nemet v. Volkswagen Grp. of Am., Inc. (In re Volkswagen "Clean Diesel"
   Mktg., Sales Practices, & Prods. Liab. Litig.)

5. In re Motor Fuel Temperature Sales Practices Litig.

6. Ahrens v. ConAgra Foods, Inc. (In re ConAgra Peanut Butter Prods. Liab. Litig.)

7. In re Boston Sci. Corp. Pelvic Repair Sys. Prods. Liab. Litig.

8. In re Mirena IUD Prods. Liab. Litig.

9. In re Katrina Canal Breaches Consol. Litig.\

10. Acklin v. Lockheed Martin Corp.

11. In re Air Crash Disaster near Palembang, Indo.

12. Continental Forge v. S. Cal. Gas Co. (In re Cal Retail Natural Gas & Elec. Antitrust
Litig.)

13. Michael v. Warner-Lambert Co.

14. In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.

15. In re Equifax, Inc.

16. In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.

17. In re Roundup Prods. Liab. Litig.

18. In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, & Prods. Liab.
Litig.

## EXHIBIT 4

# EXHIBIT 5

Sampling of Cases Against Thomas V. Girardi / Girardi Keese

1. *JuDay v. Rotunno & Rotunno,* 225 Cal.App.3d 1571 (1990).

   JuDay was referred to Girardi re wrongful death action against Stouffers Inc.[Husband killed in fire at hotel while away on business]   Case settled for $3.5 million. No written contingency fee agreement. Plaintiff contends Girardi represented he would charge a contingency fee of 20%. Girardi took 40%. Client filed a lawsuit against the lawyer that referred her to Girardi.

2. *Cavalier v. Lira,* 2006 Cal. App. Unpub. LEXIS 5936 (2006)

   Lira made unauthorized settlement proposal, client refused Lira forced clients into a mediation.

3. *Franco v. Dow Chem. Co*, 611 F.3d 1027 (9th Cir. 2010)

   Girardi and co-counsel Walter Lack attempted  to register unenforceable $400 million foreign judgment in California against the wrong corporate entity.  The Ninth Circuit found that Girardi and Lack's content contemptable, and imposed sanctions, including for f ailing to verify truth of statements made in declarations they submitted to the District Court in support of their fraudulent motion. Girardi was sanctioned $150,000 and received a public reprimand.  Lack was sanctioned $250,000 and suspended from the practice before the Ninth Circuit for six months.  Both were referred to the California State Bar.

4. *Gutierrez v. Girardi*, 2011 Cal. LEXIS 745 (2011)
   *Gutierrez v. Girardi*, 2011 Cal. LEXIS 7836 (2011)
   *Gutierrez v. Girardi*, 194 Cal.App. 4th 925 (2011)
   *Gutierrez v. Girardi*, 2015 Cal. App. Unpub. LEXIS 169 (2015)
   *Gutierrez v. Girardi*, 2017 Cal. App. Unpub. LEXIS  6007 (2015)

   Series  of cases by clients (class action) against the Girarid Keese and Thomas Girardi based upon allegations the defendants  misappropriated part of the settlement funds paid by the settling defendants in the underlying action for the benefit of plaintiff and other class members.

   Girardi represented the former employees of Lockheed corporation alleged that the plaintiffs sustained personal injuries from their exposure to toxic chemicals while working at Lockheed's facilities.  It further alleged that the defendants manufactured, formulated, supplied, distributed or sold the toxic chemicals that caused the plaintiffs' injuries. The complaint set forth fraudulent concealment, strict liability and negligence causes of action.. Between approximately 1991 and 2001, the plaintiffs reached "general settlements" with

**Exhibit 5**

various defendants (the settling defendants) in the Lockheed Action. The settlements totaled approximately $131 million. G&K received the settlement funds and controlled all disbursements. From October 1991 to February 2001, Gutierrez received 13 settlement checks from G&K totaling $81,310.41.

Gutierrez sued  years later in 2008, representing the former clients against the Firm and Girardi in a class action.

5. *Salant v. Girardi,* 51 Cal. 4th 1164 (2011)

   Co-counsel sued Girardi for failure to pay full amount of co-counsel fees.

6. *Salerno v. Girardi & Keese,* 2014 Cal. App. Unpub. LEXIS 2724 (2014)

   Suit for malpractice for withdrawing from representation on the day of trial.

7. *Allen v. Keese,* 2014 U.S. Dist. LEXIS 206827 (2014)

   Claim: re HRT (hormone replacement therapy) mass tort clients sued for failure to disclose amount of settlement, refusal to provide clients their files, fraud in distribution of settlement proceeds.

8. *In re Avandia Marketing, Sales Practices and Products Litigation,*  Case No. 14-cv-1701 (E.D. Pa. 1014)

   Girardi subject to order to show cause for refusal to pay lead counsel cost contribution per agreement and order of court.

9. *Britton v Girardi,* 235 Cal. App. 4th 721 (2015)

   *Claim:*  Misappropriation of Settlement Funds

10. *Gutierrez v. Girardi,* 2015 Cal.App. Unpub. LEXIS 169 (2015)

    Claim: Mishandling settlement proceeds re Lockheed Litigation

11. *Shalant v. Girardi*, 2015 Cal.App. Unpub. LEXIS 4597 (2015)

12. Kranich v. Girardi, 2016 U.S. Dist. LEXIS 107150 (2016)

    Claim:Charging excessive costs and using settlement proceeds from lawsuit to pay individuals in unrelated cases, personal and unrelated business debts.

13. *Gruber & Gruber v. Girardi,* LASC Case No.: BC615458 (2016)

**Exhibit 5**

Failure to pay co-counsel fees.

14. *Richard Fair v. Girardi*, BC 665472

Failure to pay co-counsel fees.

15. *Selberg v. Girardi,* LASC Case No.:  20 ET CV 4154 (2020)

Girardi refused to pay client settlement proceeds re claim for wrongful death (her husband). Plaintiff former employee of Girardi Keese

16. *Keese v. Girardi*, *LASC Case No.:* 20 ST CV 47657(2020)

Failure to pay former partner retirement funds.

17. *Sheldon v. Girardi,*  LASC Case No.: 2021 Cal.Super LEXIS 41805.

Failure to pay co-counsel fees.

18. *Ruigomez v Girardi*

Claim: Stealing over $10 million from client re San Bruno PG&E Gas Explosion.

**Exhibit 5**

# EXHIBIT 6

**Girardi & Keese and Weitz & Luxenberg Common/Joint  Representations**

Girardi & Keese and Weitz & Luxenberg Common/Joint  Representations

1. *In re Roundup Prods. Liab. Litigation*, (2016) U.S. Dist. Ct. N.D. Cal. MDL No. 2741; Case No. 16-md-02741-VC.

2. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices and Prods Liab. Litig. V.* Volkswagen AG. MDL No. 2672 CRB (JSC); Case No. 16-cv-295 (N.D. Cal.)

3. *In re Bextra & Celebrex Mktg. Sales Practices  & Prod. Liab. Litig*. CASE NO. M:05-CV-01699-CRB; MDL No. 1699 (N.D. Cal. 2005)

4. *In re Vioxx Prods*. *Liab. Litig.* MDL NO. 1657 SECTION (E.D. Louisiana 2005) (2011 Order re Fees: Girardi & Keese= $18,200,000. Weitz & Luxenberg: $17,836,121.78.

5. *In re Anthem Data Breach Litig*. 15-MD-02617-LHK (N.D. Cal. 2015)

6. *In re Testosterone Replacement Therapy Prods*. Liab. Litig. 15-cv-01340 (N.D. Ill. 2015)

7. *In re Johnson & Johnson Talcum P*owder *Prods. Mktg.Sales Practices, & Prods. Liabl. Litig.* MDL No. 16-2738 (FLW) (LHG) (D.C. New Jersey 2016)

8. *Roberts. V. Bayer Corp. (In re Trasylol Prods. Liab. Litig.* CASE NO. 08-MD-1928-MIDDLEBROOKS/JOHNSON (D.C. So.Dist. Florida 2008)

9. *In re Trasylol Prods. Liab. Litig*. MDL-1928 (S.D. May 2010)

10. *Ruden v*. C.R. Bard, Inc. (Inre Bard IVC Filters Prods. Liab. Litig. (D.C. Ariz. )

11. *Ray v*. DePuy Orthopaedics Inc. (In re DePuy Orthopaedics, Inc.ASR Hip Iimplan Prods. Liab. Litig. (N.D. Ohio) MDL Docket No. 1:10-md-2197; Case No. 1:12-dp 23759

**EXHIBIT**    6

# EXHIBIT 7

April 6, 2011

Joseph DiNardo, Esq.
Founder & CEO
Counsel Financial Services
The Power of Attorney Funding
6400 Main Street, Suite 120
Williamsville, NY  14221

Dear Joe:

I am enclosing our trust check in the amount of $64,154.06.  This constitutes half the legal fees minus a charge of $8,000 to George Hatcher.  I'm also enclosing a breakdown of the checks.  Our firm received half of the fees.

With kind regards,

THOMAS V. GIRARDI

TVG:sf

Enclosures

EXHIBIT 7

# EXHIBIT 8

**From:** Joe DiNardo [mailto:jdinardo@counselfinancial.com]
**Sent:** Friday, February 21, 2020 8:24 AM
**To:** Kim Cory
**Subject:** Re: Message from Tom Girardi re: Trust Funds

TOM, I AM OUT ILL TODAY. FIRST TIME IN 8 YRS.

PAUL AND MEGAN ARE BOTH AWAY AND OUT OF COUNTRY W THEIR FAMILIES FOR WINTER BREAK.

THEY ARE GOING TO PUSH BACK ON THIS SO I NEED COUPLE SIMPLE THINGS TO WORK WITH.

1. WHAT EXACTLY ARE U ASKING FOR? WHAT TRUST ARE U REFERRING TO?

2. OUT OF YOUR 1/2 OF FEE WILL U AGREE TO SEND THE 3 MONTHS OF INTEREST PAYMENTS

TO PUT U BACK IN COMPLIANCE.

3. PAY ME THE REMAINING 180K ON BALAGOT THAT HAS NOT BEEN PAID FOR YEARS.


PLEASE SIGN ANY RESPONSE IN BLOOD SO THEY WILL HOPEFULLY BE CONVINCED THAT

YOU WILL COMPLY.

Joseph DiNardo Esq.

Counsel Financial/ Plaintiff Support

Founder

716-568-0070



**EXHIBIT 8**

# EXHIBIT 9

# George Hatcher, Sr

*Making the connection; Bridging the gap*

**George In a Nutshell**

Select Language ▼ Select Language ▼

I am a strategist for a number of big law firms.

I didn't start out in aviation. It's something I grew into, after working shoulder to shoulder with lawyers for the past 45 years. I don't want to overwhelm you with the list, but I have been doing this a long time, and it is a long list. I have worked small cases, huge cases, wrongful death cases, product liability cases, pharmaceutical cases, train crashes, bus crashes, ship injuries and many others, including of course, aviation cases. In fact, in the past 30 months or so, I have consulted and/or been involved in over 30 air tragedies involving airliners, helicopters, single engine dual engine aircraft.

When a client lawyer of mine is contacted about a foreign crash, they call me.

When a foreign lawyer, or family or family association, or a source outside of the United States needs me, they find me, they call me. I can't tell you how many times an overwhelmed family member has fled from the insurer's negotiating table and called me.

That's when I get on the plane.

I consult with my aviation lawyers about what may be a possible U. S. case. Sometimes the case does not fit US criteria and at that point, if the client has hired us, we team up with local lawyers who are licensed to practice law in that particular country. Either way the family will benefit either here in the United States, or by having our aviation experience move the case along in the country of origin. I go to the scene, meet the families. I get teams on the ground, for communicating, for researching, for coordinating with clients, for handling meetings, for coordinating press teams, for dealing with issues as they come up.

Lawyers pay me for my strategy and for my experience. Lawyers do a lot, but they can't do everything or be everywhere at the same time. Sometimes I am the bridge.When logistics prevent immediate meetings, I am the clients' immediate bridge to the lawyers or the lawyers' immediate bridge to the clients.

So they hire me to help, to advise, to support the client, to intermediate between clients and/or partnering firms, whether the case goes to the U.S., or my client lawyers are retained to empower the local lawyer with the benefit of their extensive experience in aviation.

Client confidentiality is crucial. And I only can discuss what my lawyers tell me is available for public consumption. But I am up front about what I do. If you have a question, ask me. I'll answer you.

**EXHIBIT 9**

# EXHIBIT 10

**From:** Joe DiNardo <jdinardo@counselfinancial.com>
**Sent:** Monday, August 5, 2019 10:34 AM
**To:** David Lira <dlira@girardikeese.com>
**Cc:** Tom Girardi <tgirardi@girardikeese.com>; Megan Payne <mpayne@counselfinancial.com>; Shirleen
Fujimoto <sfujimoto@girardikeese.com>
**Subject:** Re: RE:

Who r u working w on a bridge loan.
We tried to explain to u that if u fully cooperated w us that we might b able to do it all.
Under the terms of our loan u violate it when u do loans w other companies using our collateral.
U are not listening to us.
I know u r busy but this is how big mistakes r made.

Sent from my iPhone

**EXHIBIT 10**

# EXHIBIT 11

**From:** Joe DiNardo <jdinardo@counselfinancial.com>
**Sent:** Wednesday, September 25, 2019 6:33 PM
**To:** Tom Girardi <tgirardi@girardikeese.com>; David Lira <dlira@girardikeese.com>; Chris Aumais
<caumais@girardikeese.com>; Robert Cohan <robertjcohan@gmail.com>
**Cc:** Megan Payne <mpayne@counselfinancial.com>; Paul Cody <pcody@counselfinancial.com>
**Subject:** Fwd: Girardi Keese Payoff

Tom and team, u see the gun we are working under. I am simply at a loss to understand why we do not have everything requested when we should have received it last week. I need to be able to tell Alan tomorrow by days end that we are committed to funding. The document from the bank is nothing special. It is the way  we perfect our lien when it comes to a bank account like this. Just like filing a UCC perfects our lien on your cases this document perfects our lien on this account. If u want to replace it w a life ins policy at some point we can do that and lift the control document from this account. Each bank has their own document they use that is why Tom needs to call them to get it done. Given the long history and all the issues here we certainly are not doing this just for "over kill".  Stillwell is out there waiting for me to call them next week w a plan, Virage still has some kind of lien on Porter Ranch even though we should be in first place ahead of them and u then have the bank lines which may get switched to the office building now.  **We did not create this problem but we are trying to solve this problem for you.**

Tom called me a while ago and was still in a meeting. Said he would call me in an hour. I am waiting up for the call now. But if for any reason he does not reach me be sure he reads this tonight.

Joseph DiNardo Esq.

Counsel Financial/ Plaintiff Support

Founder and Director

716-568-0070



**Exhibit 11**

# EXHIBIT 12

**From:** Joe DiNardo <jdinardo@counselfinancial.com>
**Date:** September 30, 2019 at 2:07:02 PM GMT+1
**To:** Tom Girardi <tgirardi@girardikeese.com>, "Christopher T. Aumais" <caumais@girardikeese.com>, David Lira <dlira@girardikeese.com>, Robert Cohan <robertjcohan@gmail.com>, Shirleen Fujimoto <sfujimoto@girardikeese.com>, Paul Cody <pcody@counselfinancial.com>, Megan Payne <mpayne@counselfinancial.com>
**Subject: Law Finance**

Gentlemen, as u know I reached out to Alan Z again to assure him we were still very interested in working all of this out and paying them off in full. I told him we hit a technical bump that we were trying to resolve fast. Not sure what they will do today.

So, when I last spoke to everyone last week I had suggested that Tom create another account of 5mm and allow us a control agreement on that account. It would be replaced if and when u obtain life insurance for 5mm. We have no plans to touch the account at all. Given all the new revelations that keep cropping up our asking for this is clearly not out of line.

Please remember that Stillwell is still out there at 5mm owed and are awaiting my call to discuss.

No one seems concerned about Virage but they are owed 5mm+or-. They are only on the Porter Ranch case but they are out there.

I hope someone is up early in Ca. and call soon. A great deal of this confusion is because Rob Cohan is not at the steering wheel as we were told he would be. He could get u organized fast but u all need to get on board.


Joseph DiNardo Esq.

Counsel Financial/ Plaintiff Support

Founder and Director

716-568-0070



**EXHIBIT 12**

# EXHIBIT 13

**From:** Joe DiNardo <jdinardo@counselfinancial.com>
**Sent:** Friday, March 6, 2020 6:24 AM
**To:** Shirleen Fujimoto <sfujimoto@girardikeese.com>; David Lira <dlira@girardikeese.com>
**Subject:** Re: Message from Tom Girard re Boeing Case

Tom, I have always tried to befriend you and the firm. I have high regard for you personally as well as David and Chris. Accusing me or CFS of FRAUD is just crazy. We have conducted many reviews of your firm's collateral. We were very familiar with the Lion Air Case. Never once were we told of any other attorneys that would be paid. Never.

This letter about direct pay was sent to u and David for your approval and edit. You sent it back to us  with your revisions. We re did the letter and YOU signed it not me or CFS. At any time you or David could have told us of the referring and local attorney claim for fees. So how u would expect us to know about them is crazy. There is no lien filed by them nor would I expect one. We do expect you to tell us everything about the fee structure and you did not.

But I am not here or trying to name call or accuse. If there is a problem, let's fix it. We are not trying to take anything we do not deserve. I take any accusation of fraud very seriously as u should. So let's not throw the word around without examining the real facts. Again, I have personally worked tirelessly on your behalf. But with all the bad press about your debt structure and failure to pay back lenders there is no entity I have found that wants to assist even on a post deal. I am still looking.

What is the status of 500mm dollar fee. I have never received anything from you that independently supports you entitlement to the fee. As I read all the emails the owner does not seem poised to pay u at all. If that has changed please let me know. In the meantime try and recognize who your real friends are given the financial mess u have created. Not me. I am on your side.


Joseph DiNardo Esq.

Counsel Financial/ Plaintiff Support

Founder

716-568-0070



**EXHIBIT 13**

# EXHIBIT 14

### UNITED STATES DISTRICT COURT
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.3**
**Eastern Division**

Welly Chandra, et al.

Plaintiff,

v.

Case No.:
1:18−cv−07686
Honorable Thomas M. Durkin

BOEING INTERNATIONAL SALES
CORPORATION, a Washington State Profit
Corporation, et al.

Defendant.

### NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, December 14, 2020:

    MINUTE entry before the Honorable Thomas M. Durkin: Motion hearing held by telephone on 12/14/2020 regarding motion for rule to show cause [842]. A civil contempt is entered against the law firm of Girardi Keese and against Tom Girardi individually, for the reasons stated on the record. Judgment is entered in the amount of $2,000,000.00, plus interest, as to Girardi Keese and Tom Girardi, for the reasons also stated on the record. By 12/15/2020, parties are to submit a proposed order as to the appointment of a trustee. A redacted copy of the under seal Girardi Keese filing [847] should be placed on the public record. Any future filings made under seal should also be provided to Boeing. Keith Griffin and David Lira are to file responses to the motion for rule to show cause [842] by 12/21/2020. Mailed notice. (ecw, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# EXHIBIT 14

# EXHIBIT 15

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.3
### Eastern Division

Welly Chandra, et al.

                                                    Plaintiff,

v.                                                  Case No.:
                                                    1:18−cv−07686
                                                    Honorable Thomas M.
                                                    Durkin

BOEING INTERNATIONAL SALES
CORPORATION, a Washington State Profit
Corporation, et al.

                                                    Defendant.

_____

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, December 14, 2020:

> MINUTE entry before the Honorable Thomas M. Durkin: Motion hearing held by
telephone on 12/14/2020 regarding motion for rule to show cause [842]. A civil contempt
is entered against the law firm of Girardi Keese and against Tom Girardi individually, for
the reasons stated on the record. Judgment is entered in the amount of $2,000,000.00, plus
interest, as to Girardi Keese and Tom Girardi, for the reasons also stated on the record. By
12/15/2020, parties are to submit a proposed order as to the appointment of a trustee. A
redacted copy of the under seal Girardi Keese filing [847] should be placed on the public
record. Any future filings made under seal should also be provided to Boeing. Keith
Griffin and David Lira are to file responses to the motion for rule to show cause [842] by
12/21/2020. Mailed notice. (ecw, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

# EXHIBIT 15

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**

Elissa D. Miller, Chapter 7 Trustee,
Estate of Girardi Keese

**DEFENDANTS**
COUNSEL FINANCIAL SERVICES, LLC, a Delaware limited liability company, CALIFORNIA ATTORNEY LENDING II, INC. a New York Corporation, JOSEPH D. DiNARDO, an individual,

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
LARRY W. GABRIEL [SBN 68329] 818.943.8992
JENKINS MULLIGAN & GABRIEL LLP
Email: lgabrielaw@outlook.com
585 Lorna Lane, LA 90049

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☒ Creditor        ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Declaratory Relief, (28 U.S.C. 2201),  Equitable Subordination (11 USC 510(c); Validity of lien; Aiding and Abetting Breach of Fiduciary Duty ; Fraudulent Conveyances, 11 U.S.C 544,550, 548, Preservation of Transfer 11 USC 551; Disallowance of Claim 11 USC 502(D); Conversion,  Money Had and Received, Accounting

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☒ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ $20 million |

Other Relief Sought
 Monetary damages for aiding an abetting breach of fiduciary duty, conversion,

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>In re Girardi Keese | BANKRUPTCY CASE NO.<br>2:20-bk-21011-BR | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District | DIVISION OFFICE<br>Los Angeles Division | NAME OF JUDGE<br>Barry Russell |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF<br>Joseph Ruigomez, Kathleen Ruigomez, Jamie Ruigomez | DEFENDANT<br>Elissa D. Miller, et al. | ADVERSARY<br>PROCEEDING NO.<br>2:22-ap-01168-BR |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Central District | DIVISION OFFICE<br>Los Angeles Division | NAME OF JUDGE<br>Barry Russell |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br>August 31, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Larry W. Gabriel | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.