1   LARRY W. GABRIEL [SBN 68329]
    JENKINS MULLIGAN & GABRIEL LLP
2   5743 Corsa Avenue, Suite 110
    Westlake Village, CA 91362
3   Telephone: 818.943.8992
    Email:    lgabrielaw@outlook.com
4
    SCOTT J. BOGUCKI, ESQ.
5   [NY SBN 4747366]
    GLEICHENHAUS, MARCHESE &
6   WEISHAAR, P.C.
7   [Pro Hac Vice (Proposed)]
    43 Court Street, Suite 930
8   Buffalo, New York 14202-3100
    Tel. 716/ 845-6446
9   Email:    sbogucki@gmwlawyers.com
10
    Special Litigation Counsel for Plaintiffs
11  ELISSA D. MILLER, chapter 7 Trustee for the
    Estate of Girardi Keese, WENDY J.
12  CHRISTOPHERSEN, chapter 7 Trustee for the
    Estate of The DiNardo Law Firm, and MARK
13  J. SCHLANT, chapter 7 Trustee for the Estate
    of Joseph DiNardo,
14
                    **UNITED STATES BANKRUPTCY COURT**
15
                    **CENTRAL DISTRICT OF CALIFORNIA**
16
                    **LOS ANGELES DIVISION**
17

| In re | Case No.: 20-bk-21022-BR |
|---|---|
| GIRARDI KEESE, | |
| Debtor, | Adv. Case No.: |
| ELISSA D. MILLER, chapter 7 Trustee for the Estate of Girardi Keese, WENDY J. CHRISTOPHERSEN, chapter 7 Trustee for the Estate of The DiNardo Law Firm, and MARK J. SCHLANT, chapter 7 Trustee for the Estate of Joseph DiNardo, | **COMPLAINT** FOR: |
| | 1. DECLARATORY RELIEF [28 USC § 2201]; |
| Plaintiffs, | 2. TURNOVER OF PROPERTY [11 USC § 542]; |
| vs. | 3. RECOVERY OF PROPERTY OBTAINED THROUGH THEFT [Cal. Penal Code § 496]; |
| CHRISTOPHER DIAMANTIS, an individual, D&D FUNDING, II, LLC, a Delaware Limited Liability Company, CDBD HOLDINGS, INC., a Tennessee Corporation, and DOES 1-20, inclusive, | 4. AVOIDANCE OF FRAUDULENT TRANSFER, ACTUAL INTENT [11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.04(a)(1)]; |
| | 5. AVOIDANCE OF FRAUDULENT TRANSFER, CONSTRUCTIVE |

| | |
|---|---|
| Defendants. | INTENT<br>[11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.05];<br><br>6. AVOIDANCE OF FRAUDULENT TRANSFER, CONSTRUCTIVE INTENT<br>[11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.04(a)(2)(A)];<br><br>7. AVOIDANCE OF FRAUDULENT TRANSFER, CONSTRUCTIVE INTENT<br>[11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.0(a)(2)(B)];<br><br>8. RECOVERY OF AVOIDED TRANSFER<br>[11 USC § 550];<br><br>9. ACCOUNTING. |

Plaintiffs, Elissa D. Miller, solely in her capacity as the duly appointed, qualified and acting chapter 7 trustee (the "**GK Trustee**")**, for the bankruptcy estate of *In re Girardi Keese* pending before the United States Bankruptcy Court for the Central District of California (the "**GK Bankruptcy Court**"), Case No. 20-bk-21022-BR (the "**GK Bankruptcy Case**"),Wendy J. Christophersen, solely in her capacity as the duly appointed, qualified and acting chapter 7 trustee ("**TDLF Trustee**"), for the bankruptcy estate of *In re The DiNardo Law Firm,* pending before the United States Bankruptcy Court for the Western District of New York (the "**TDLF Bankruptcy Court**") Case No. 23-10865-CLB ("**TDLF Bankruptcy Case**"), and Mark J. Schlant, solely in his capacity as the duly appointed, qualified and acting chapter 7 trustee ("**JD Trustee**"), for the bankruptcy estate of *In re Joseph DiNardo,* Case No.: 23-10316-CLB ("**DiNardo Bankruptcy Case**" and collectively with the GK Trustee, and the TDLF, the "**Trustees**"), by and through their undersigned counsel, as and for their complaint (as amended, restated, supplemented, or otherwise modified from time to time, the "**Complaint**"), against Defendants Christopher Diamantis ("**Diamantis**"), D&D Funding, II, LLC ("**D&D II**"), CDBD Holdings, Inc. ("**CDBD**"), and Does 1–20, inclusive, respectfully allege as follows:

## JURISDICATION AND VENUE

1.      The Bankruptcy Court (the "Court") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.

2.      The Trustees consent to the entry of a final judgment in this matter by the Bankruptcy Court.

3.      This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A). (H). and (O).

4.      Venue properly lies in this judicial district because this proceeding arises in and relates to a case pending in this district under 11 of the United States Code as provided in 28 U.S.C. § 1408 and 1409.

5.      This adversary proceeding arises out of and is related to the bankruptcy case of In re Girardi Keese (the "Debtor"), Case No. 2:20-bk-21022-BR.

6.      This adversary proceeding is brought pursuant, *inter alia*, to sections 510, 542, 544, 548, and 550 of title 11 of the United States Code (the "**Bankruptcy Code**"), and any applicable state law made applicable under section 544, and Rule 7001(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## STATEMENT OF STANDING

7.      The Trustees have standing to bring this action pursuant to 11 U.S.C. §§ 323, 362, 541, and applicable California law.

## PARTIES TO THE ACTION

A.      **Plaintiffs**

8.      Plaintiff Elissa D. Miller is the chapter 7 Trustee for the GK Bankruptcy Case.

9.      Plaintiff Wendy J. Christophersen is the chapter 7 Trustee for the TDLF Bankruptcy Case.

10.     Plaintiff Mark J. Schlant is the chapter 7 Trustee for the DiNardo Bankruptcy Case.

11.     The Trustees were appointed following the commencement of their respective Bankruptcy Cases.  As a result, the Trustees may not have personal knowledge of all facts alleged in this Complaint, and thus such facts are set forth upon information and belief.  The Trustees

expressly reserve the right to amend this Complaint as additional facts and evidence become available.

12.    The Trustees further reserve the right to amend this Complaint to allege additional claims against the named Defendants, to name additional defendants, and/or to seek to avoid or recover other transfers beyond those presently alleged.

13.    The Trustees have brought this action as joint Plaintiffs, based upon a "Joint Prosecution Agreement," entered into between the Trustees, which agreement was approved by the Bankruptcy Courts presiding over the Trustees' respective bankruptcy estates.  The gravamen of their claims is based upon the original fraudulent transfer claim from GK to TDLF, and the subsequent transfer from TDLF or DiNardo to the Defendants.  Based upon the joint prosecution agreement and the terms thereof, the Trustees have consolidated their claims as presented below.

**B.    Defendants**

14.    The Trustees allege, upon information and belief, that Defendant Christopher Diamantis is a resident of Fulton County, Georgia.

15.    The Trustees allege, upon information and belief, that Defendant D&D II is a Delaware Limited Liability Company with its principal place of business located in Tallahassee, Florida.  The Trustees further allege, upon information and belief, that D&D II is owned in part by Diamantis and DiNardo and that Diamantis is the managing member of D&D II.

16.    The Trustees allege, upon information and belief, that Defendant CDBD is a corporation organized and existing under the laws of Tennessee, with its principal place of business located at Suite 200, 40 Burton Hills Blvd, Nashville, Tennessee 37215.

17.    The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants DOES 1 through 20, inclusive, are unknown to the Trustees at this time. The Trustees are informed and believe and based thereon allege that each of the defendants designated as a DOE is legally responsible for the events and happenings referred to in this Complaint and unlawfully participated in the conduct of the defendants as hereinafter alleged and are legally obligated for the damages alleged in this Complaint.

Adversary Complaint

4

## NATURE OF THE ACTION

18.　　The Trustees seek to recover $3,162,500 in transfers (the "**Subsequent Transfers**" or, the "**Subsequent Transferred Funds**") made to Defendants Diamantis or D&D II, a company owned and controlled by Diamantes and Joseph DiNardo ("**DiNardo**"), in or around May or June 2013.  These transfers were made by either The DiNardo Law Firm ("**TDLF**") or its sole owner, DiNardo, and represent one-half (½) of the total $6,325,000 transferred to TDLF from Girardi Keese ("**GK**") on (i) February 12, 2013, in the amount of $5,825,000, and (ii) May 20, 2013, in the amount of $500,000 (together, the "**Initial Transfers**" and, collectively with the Subsequent Transfers, the "**Transfers**" or, the "**Transferred Funds**").  The Trustees allege that the Initial Transfers were a portion of $10 million embezzled by GK's managing partner, Thomas Girardi ("**Girardi**"), from settlement funds that should have been paid to GK client Joseph Ruigomez who retained GK to represent him for the damages he sustained from a gas explosion at a Pacific Gas & Electric ("**PG&E**") plant located in San Bruno, California.  The Initial Transfers were made to TDLF pursuant to an illegal fee-sharing agreement DiNardo and Girardi devised to avoid California Professional Rules of Responsibility's prohibition against fee-sharing agreements and to evade California commercial lender licensing laws.  The Initial Transfers originated from GK's IOLTA trust accounts holding client settlement proceeds and were misappropriated in violation of Girardi and DiNardo's fiduciary duties owed to Joseph Ruigomez.

19.　　The Initial Transfers were a component of a wire fraud scheme orchestrated by Girardi from approximately 2004 to 2020, for which Girardi was indicted, tried and convicted on four counts of wire fraud.  Girardi was then sentenced to 87 months in federal prison.[1]

---

[1]　　A true and correct copy of the January 31, 2023 Indictment (*USA v. Girardi,* Cr. No. 23-00047,C.D.Cal.) is attached hereto as **Exhibit 1** and incorporated herein by reference as though fully set forth.  The Verdict and Judgement entered on August 27, 2024 is attached hereto as **Exhibit 2** and incorporated herein by reference as though fully set forth.  The Sentencing Order entered on June 4, 2025 is attached hereto as **Exhibit 3** and is incorporated herein by reference as though fully set forth.

On February 1, 2023 Girardi was indicted by the Illinois Grand Jury on twelve (12) counts of wire fraud and for criminal forfeiture arising out of this embezzlement of over $3 million from GK clients' settlement proceeds derived from the Indonesian Lions Air Flight 610 air crash (the "**02/01/2023 Illinois Grand Jury Indictment**"), in the case, *USA v. Joseph DiNardo,* 23-cr-00054 (N.D. Ill.)  All 189 people on board the aircraft were killed.  The aircraft was manufactured by

20.     The Trustees are informed and believe, and based thereon allege that DiNardo, individually and through TDLF, knowingly, willfully, and intentionally participated in Girardi's wire fraud scheme and aided and abetted the same by, among other acts:

    i.     Devising and implementing an illegal fee sharing agreement with Girardi, and sharing in funds received by Girardi or GK that were the property of clients, other than clients for which the fee sharing agreement related to;

    ii.     Sharing legal fees from GK client representations without having performed any legal services;

    iii.     Sharing legal fees from GK client representations, notwithstanding the clients were neither informed of nor consented to the involvement of DiNardo or TDLF in the client representations;

    iv.     Sharing in legal fees from GK client representations that were paid to DiNardo or TDLF without first obtaining the written consent of the impacted clients; and,

    v.     Arranging or attempting to arrange third party financing for GK, notwithstanding DiNardo having actual knowledge that Girardi and GK had perpetrated a fraud upon those lenders, including a lending company founded by DiNardo, Counsel Financial Services ("**CFS**"), in an attempt to secure funding that would be used to pay DiNardo for fees allegedly owed to DiNardo from the illegal fee sharing arrangements.

21.     The Trustees are informed and believe and based thereon allege that following the Initial Transfers, Diamantis, either individually or as the managing member of D&D II, subsequently transferred $3,162,500.00 of the Transferred funds to Defendant CDBD Holdings Inc. ("**CDBD**") a company owned and operated by Diamantis (the "**CDBD Transfers**").

22.     The Transfers and the CDBD Transfers were made with actual intent to hinder, delay, or defraud creditors, or were made for less than reasonably equivalent value at a time when the transferors were insolvent, or became insolvent as a result of the transfers.  Accordingly, the

---

Boeing.  A true and correct copy of the 02/01/2023 Illinois Grand Jury Indictment is attached hereto as **Exhibit 4** and is incorporated herein by reference as though fully set forth.

Trustees seek to avoid and recover the Subsequent Transfers and the CDBD Transfers as fraudulent conveyances pursuant to Bankruptcy Code sections 544, 548, and 550, and any applicable state law incorporated through Bankruptcy Code section 544.

23.    The Trustees also seek turnover of the property acquired by the Defendants in exchange for the Subsequent Transfers and the CDBD Transfers, including, but not limited to, any equity interest in CDBD, pursuant to Bankruptcy Code section 542.  This includes the Subsequent Transfers and the CDBD Transfers.

## THE BANKRUPTCY PROCEEDINGS

### A.    GK Bankruptcy Proceedings

24.    GK is the debtor in the GK Bankruptcy Case 2:20-bk-21022-BR, which case was initiated by the filing of an involuntary petition for relief under Chapter 7 of the Bankruptcy Code on December 18, 2020.  [Main Case Dkt. No. 1].

25.    Plaintiff Elissa D. Miller is the duly appointed, qualified and acting Chapter 7 Trustee of the GK Estate, having been so appointed on January 5, 2021, and having accepted the appointment on January 6, 2021.  [Main Case Dkt. No. 45, 48].

26.    On January 13, 2021, the GK Bankruptcy Court entered an Order for Relief Under Chapter 7 on the involuntary petition.  [Main Case Dkt. No. 69].

27.    On January 5, 2022, the Internal Revenue Service filed Claim No. 161 in the amount of $54,571 in the GK Bankruptcy Proceeding.

28.    On August 23, 2023, the GK Bankruptcy Court entered its order approving the GK Trustee's Motion Authorizing the Trustee to Close and Consolidate the Trust and the IOLTA Bank Accounts based upon the Court's findings that the Debtor had so commingled the funds in the IOLTA trust accounts and GK general accounts that all funds in the IOLTA Trust Accounts are property of the GK Estate.  [Main Case Dkt. # 1787, Order Dkt. # 1898].

29.    On October 23, 2024, the GK Bankruptcy Court entered its Findings of Fact and Conclusions of Law and Order, in the adversary action, *Miller v. Erika Girardi,* Adv. Case No.: 2:21-ap-01155-BR finding, among other things, that GK has so commingled its funds with its clients' funds in GK's IOLTA trust account at Comerica Bank between April 22, 2002 through

1    January 2018, that the funds in the Comerica IOLTA trust account was property of the GK Estate.

2    [Adv. Dkt. # 137].  A true and correct copy of the Findings of Fact and Conclusions of Law and

3    Order is attached hereto as **Exhibit 5** and incorporated herein by reference.

4        **B.      DiNardo Bankruptcy Proceedings**

5        30.      On April 10, 2023, DiNardo voluntarily commenced the DiNardo Bankruptcy Case

6    by filing a petition under Chapter 11 of the Bankruptcy Code.  [Main Case Dkt. No. 1].

7        31.      On October 29, 2024, the DiNardo Bankruptcy Case was converted to a case under

8    Chapter 7 pursuant to an order of the Court.  [Main Case Dkt. No. 178].

9        32.      On October 31, 2024, Plaintiff Mark Schlant was appointed as the DiNardo

10   Trustee.  [Main Case Dkt. No. 180].

11       33.      On April 21, 2023, the Internal Revenue Service filed Claim No. 2 in the amount of

12   $1,880,483.11 in the DiNardo Bankruptcy Proceedings.

13       **C.      TDLF Bankruptcy Proceedings**

14       34.      On September 8, 2023, TDLF voluntarily commenced the TDLF Bankruptcy Case

15   by filing a petition under Chapter 11 of the Bankruptcy Code.  [TDLF Case Dkt. No. 1].

16       35.      On September 9, 2024, the TDLF Bankruptcy Case was converted to Chapter 7 by

17   order of the Court.  [TDLF Case Dkt. No. 69].

18       36.      On September 11, 2024, Plaintiff Wendy J. Christophersen was appointed as the

19   TDLF Trustee of the TDLF Bankruptcy Estate.  [TDLF Case Dkt. No. 72].

20       37.      On October 4, 2023, the Internal Revenue Service filed Claim No. 3 in the amount

21   of $58,741.86 in the TDLF Bankruptcy Proceedings.

22                        **STATEMENT OF FACTS**

23       **A.      DiNardo's Background**

24       38.      DiNardo is an attorney who was first licensed to practice law in the State of New

25   York 1973.  In or about 1997, DiNardo was charged with tax fraud.  In 2000, he pleaded guilty

26   to a lesser offense, was fined, and sentenced to two years' probation.  As part of his sentence, he

27   was suspended from the practice of law and required to pay a $20,000 fine.  *See, United States v.*

28   *DiNardo*, 2000 U.S. Dist. LEXIS 82 (W.D.N.Y. 2000).

8

39.     In or around 2000, DiNardo, along with attorneys Perry Weitz and Arthur Luxenberg, co-founded CFS, a company providing litigation funding to plaintiff-side law firms. Around the same time, DiNardo acquired Plaintiff Support Services, Inc., which loaned funds to individual plaintiffs in anticipation of resolving their personal injury claims.

40.     On or about July 11, 2011, California Attorney Lending II, Inc. ("**CAL II**"), was formed as a Delaware corporation and subsequently obtained a California commercial lending license.  CAL II operated in affiliation with CFS.  In the years that followed, DiNardo also formed, owned, operated, or managed a number of other litigation finance entities including, but not limited to, the following: Blue Ocean, LLC; Blue Ocean Partners, LLC, d/b/a Plaintiff Support Services;[2] D&D Funding, LLC; and PS Funding, LLC; as well as forming, owning, operating, or managing Defendant D&D II with Defendant Diamantis.

41.     In 2004, DiNardo's license to practice law in New York was reinstated.  However, he did not resume active legal practice.  Instead, he utilized TDLF as a vehicle for referring clients to other attorneys and for offering litigation financing to law firms handling certain contingency fee cases.  In exchange, DiNardo or TDLF received a percentage of the attorneys' earned fees. The Trustees are informed and believe and based thereon allege that neither DiNardo nor TDLF were licensed by the State of New York or the State of California to engage in any commercial lending business.

42.     The Trustees are informed and believe and based thereon allege that between 2002 and 2020 DiNardo and Girardi entered into several fee-sharing arrangements as to GK client representations, without the knowledge or written consent of the clients involved including, but not limited to, GK's representation of Joseph Ruigomez, as hereinafter alleged.  The Trustees further allege that the fee sharing arrangement related to the representation of Joseph Ruigomez and the Initial Transfers were paid in violation of California and New York Rules of Professional Conduct prohibiting the sharing of fees as between separate law firms, both of which require

---

[2]     Blue Ocean Partners, LLC, d/b/a Plaintiff Support Services, also filed a petition under Chapter 7 which is pending in the United States Bankruptcy Court for the Western District of New York as case No. 1-23-10245-CLB.

9

Adversary Complaint

1   informed client consent for fee-sharing agreements between attorneys not in the same firm.[3]  The

2   Trustees are further informed and believe and based thereon allege that the fee-sharing

3   arrangements were also entered into to avoid New York and California commercial lending license

4   requirements.

5          43.    The Trustees are informed and believe and, on that basis, allege that at all times

6   relevant DiNardo was not licensed to practice law in the State of California nor was admitted "*pro*

7   *hac vice*" as to any of the Girardi representations applicable to the fee sharing agreements between

8   Girardi Keese and TDLF.

9      **B.     DiNardo's Relationship with Girardi**

10                **1. Background on Girardi**

11         44.    Girardi was admitted to the California State Bar on January 13, 1965 (State Bar No.

12  36603).  In or around 1976, Girardi founded the law firm GK.  Over the decades, GK gained

13  national recognition for its role in complex litigation and mass torts, with Girardi frequently

14  serving as lead or co-lead counsel in high-profile cases.  Girardi also served as a member of the

15  California Judicial Council Advisory Committee.

16                **2. Girardi and DiNardo's Fee-Sharing Agreements**

17         45.    The Trustees are informed and believe and based thereon allege that Girardi and

18  DiNardo began a professional relationship around 2004, which continued until approximately

19  2020.  During this period, Girardi and DiNardo—acting individually and/or through their

20  respective law firms—entered into a series of agreements pursuant to which Girardi and DiNardo

21  agreed to share in the legal fees earned by GK in multiple personal injury matters in which GK

22  represented clients (the "**Fee Sharing Agreements**").  These Fee Sharing Agreements were

23  entered into despite DiNardo not being counsel of record or otherwise appearing in the cases or

24  providing any legal services for the clients impacted by the Fee Sharing Agreements.  As

25  hereinabove alleged, the Fee Sharing Agreements were entered into without the written consent of

26  GK's clients and GK's clients whose cases were subject to Fee Sharing Agreements did not

27

28  _____
    [3]   *See.* Cal. Rule of Professional Conduct, 1.5.1, formerly Rule 220; NY Rules of Professional
          Conduct, Rule 1.5.

consent in writing to the payment of fees to TDLF or DiNardo as required by both California's and New York's Rules of Professional Conduct.  Examples of writings reflecting the Fee Sharing Agreements are reflected in the following correspondence between DiNardo and Girardi.

      i.     **Letter April 6, 2021, Girardi to DiNardo,** which states in relevant part:

Dear Joe:

I am enclosing our check in the amount of $64,154.06.  This constitutes half of the legal fees minus a charge of $8,000 to George Hatcher.[4]

A true and correct copy of the Letter April 6, 2021, Girardi to DiNardo is attached hereto as **Exhibit 6** and incorporated herein by reference as though fully set forth.

      *ii.*     **Letter November 1, 2011, DiNardo to Girardi,** re: *San Bruno PG&E Fires on September 9, 2010, Victims:  James Ruigomez, Joseph Ruigomez, and Katheleen Ruigomez,* which states in relevant part:

With reference to the above cases we have agreed to the following terms for our association in this matter.
...
3.  Girardi will receive 50% of the gross fees.
5.  Girardi Keese will pay The DiNardo Law Firm the remaining balance of fees after deducting 50% and the $300,000."

A true and correct copy of the Letter November 1, 2011, DiNardo to Girardi, is attached hereto as **Exhibit 7** and incorporated herein by reference as though fully set forth.

      *iii.*     **Letter November 2, 2011, DiNardo to Girardi,** re *Xu v. TBE International Bus Crash in Kingman, Arizona on October 17, 2010,* which states in relevant part:

With reference to the above cases we have agreed to the following terms for our association in this matter.

1.  The retainer for this case is a fifty-fifty split with the Clients.
2.  From the 50% split to the attorneys, Girardi Keese will reimburse itself     for all costs and expenses it advanced.
4.  Girardi Keese will receive 50% of the gross fees
5.  Girardi Keese will receive $300,000.
6. Girardi Keese will pay The DiNardo Law Firm the net sum after the above deductions.

---

[4] George Hatcher was engaged in procuring clients for GK in a number of cases for fees or a percentage of the fees earned by G&K.

A true and correct copy of the Letter November 2, 2011, DiNardo to Girardi, is attached hereto as **Exhibit 8** and incorporated herein by reference as though fully set forth.

      iv.        **Email, November 11, 2011, Girardi to DiNardo,** re *Streeper v. City of Perris,* which states in relevant part:

> Good news:  After a week in trial we settled Streeper v. City of Perris for $800,000. . . . Total legal fees in the case will be $320,000.  Our fees to you will be $160,000, minus anything Hatcher claims.

A true and correct copy of the Email of November 2, 2011, DiNardo to Girardi, is attached hereto as **Exhibit 9** and incorporated herein by reference as though fully set forth.

      v.        **Email, November 16, 2011, Girardi to DiNardo**, which states in relevant part:

> Dear Sweet Pea:

> If the $75,000 and $12,500 are costs of the client, clearly we should pay those. It was my understanding that we have paid every penny of the costs on the case, but I will abide by whatever you say.  If the funds were involved in client procurement, probably that would have to be in cost of a referring attorney.

A true and correct copy of the Email of November 2, 2011, DiNardo to Girardi, is attached hereto as **Exhibit 10** and incorporated herein by reference as though fully set forth.

      vi.        **Letter, February 26, 2019, Girardi to DiNardo** re "*Metro Flight 9268 Air Crash on October 31, 2015, Flydubai Flight FZ Air Crash on March 19, 2016,*" which states in relevant part:

> Dear Joe:

> This letter will confirm our mutual agreement regarding an association fee for Metrojet Flight 9286, which broke up in the air shortly after takeoff from Sharm el Sheikh International Airport on October 31, 2015, and Flydubai Flight FZ-981, which imparted airport terrain during a second approach attempt to Rostove-On-Don Airport on March 19, 2016.

> We have agreed that our office will associate with you in connection with these aviation cases.  The DiNardo Law Firm, P.C. will receive one third (33.33%) of the net attorney fees received by Girardi|Keese on the listed cases of Metroject and Flydubai.  For purposes of this agreement "net attorney fees" means the amount of fees received by Girardi|Keese after paying associate attorneys in Russia and Egypt, when applicable.

A true and correct copy of the Letter of February 26, 2019 from Girardi to DiNardo, is attached hereto as **Exhibit 11** and incorporated herein by reference as though fully set forth.

Adversary Complaint

vii.        **Email, August 05, 2019 from DiNardo to David Lira, cc: Thomas Girardi,** which states in relevant part: [5]

> Lastly, there is the matter of all of my referral fees. Still unpaid. Avandia is 2 yrs old, Balagut is older than that. Need some real help from you and Tom and Chris.

A true and correct copy of the Email of August 5, 2019 from DiNardo to David Lira, cc Girardi, is attached hereto as **Exhibit 12** and incorporated herein by reference as though fully set forth.

viii.        **Email February 21, 2020 from DiNardo to Girardi,** which states in relevant part:

> 3. PAY ME THE REMAINING 180K ON BALAGOT THAT HAS NOT BEEN PAID FOR YEARS.

A true and correct copy of the Email of February 21, 2020 from DiNardo to Girardi, is attached hereto as **Exhibit 13** and incorporated herein by reference as though fully set forth.

**C.        GK's Representation of Joseph Ruigomez, and His Parents Jamie and Kathleen Ruigomez; the GK and TDLF Ruigomez Fee Sharing Agreement; and Girardi's Embezzlement of the Ruigomez Settlement Funds[6]**

46.        On September 9, 2010, Joseph Ruigomez was severely burned over 90% of his body at his family's San Bruno, California home as a result of the Pacific Gas and Electric corporation ("**PG&E**") natural gas pipeline explosion at PG&E's San Bruno facility.  Ruigomez was left in a coma.  His girlfriend, who was sitting next to him on a couch watching a football game, was killed.  His parents, Jamie and Kathleen Ruigomez suffered severe trauma as a result of the foregoing.

---

[5] David Lira was an attorney with the Girardi Keese law firm.  He is also Thomas Girardi's son-in-law.  Mr. Lira was indicted along with Girardi for wire-fraud by the federal grand jury sitting in the Northern District of Illinois on February 1, 2023. *See, USA v. Thomas Girardi, Christopher K. Kamon, and David R. Lira,* Case no.: 1:23-cr-00054 ("Illinois Indictment"). On November 15, 2023 the USA filed its Superseding Indictment against Girardi, Kamon, and Lira.  [Dkt. # 69]  On June 5, 2025 Mr. Lira entered a plea of guilty to Count Nine of the Superseding Indictment, "willfully disobeying a lawful order of a Court of the United States issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim A as required by that order, in violation of Title 18 U.S.C. §§ 401(3) and 2."

[6] The allegations presented in Sections D through G are based upon the GK Trustee's information and belief formed after an inquiry reasonable under the circumstances and that there is a basis for the allegations.  The allegations are supported by a number of public documents including pleadings filed in other actions, the facts presented in Girardi's California Indictment and upon documents available to the Trustees as custodian of each of the estates' books and records.

47.    On October 1, 2010, Joseph Ruigomez and his parents retained GK to represent them in a personal injury action against PG&E, with GK agreeing to be compensated based upon a contingency fee of twenty-five (25%) percent of the total recovery after costs.

48.    A year later, Girardi and DiNardo, on behalf of their respective law firms, entered into a fee sharing agreement as to GK's representation of Ruigomez as reflected in a writing dated November 1, 2011 (the "**Ruigomez Fee Sharing Agreement**"), which provides in relevant part:

> Re:  San Bruno PG&E Fires on September 9, 2010
>         Victims:  James Ruigomez. Joseph Ruigomez, and Kathleen Ruigomez
>
> Dear Tom:
>
> With reference to the above case, we have agreed to the following terms for our association in this matter.
>
> 1.    The Clients will pay Girardi Keese for costs/expenses as provided for in retainers.
>
> 2.    Girardi Keese will reimburse The Dinardo Law Firm for any costs/expenses that The Dinardo Law Firm advanced that are covered in the retainer to be paid by the Clients.
>
> 3.    Girardi Keese will receive 50% of the gross fees.
>
> 4.    Girardi Keese will receive $300,000 in addition to 50% of the gross fees.
>
> 5.    Girardi Keese will pay The Dinardo Law Firm the remaining balance of fees after deducting 50% and $300,000.
>
> 6.    Girardi Keese from its own funds will pay The Dinardo Law Firm the sum of $75,000 and $12,500 as reimbursement for funding paid by The Dinardo Law Firm.

A true and correct copy of the November 1, 2011 letter agreement is attached hereto as **Exhibit 7** and is incorporated herein by reference as though fully set forth.

49.    On January 10, 2013, PG&E and Ruigomez attended a mediation conducted by former California Supreme Court Justice, the Hon. Edward Panelli (1931-2024) with Girardi and another GK lawyer, Robert Finnerty ("**Finnerty**").  At or about the same time, Girardi falsely represented to Joseph Ruigomez that the total settlement amount was approximately $7,250,000 and concealed from him that the true amount of the settlement was $53,000,000 (the "**Ruigomez Settlement**").  Girardi further falsely represented that the Ruigomez Settlement would be

structured as an annuity for Joseph Ruigomez for the rest of his life when, as Girardi then knew, the settlement terms did not require the creation of an annuity or any other structured settlement, and Girardi had not obtained Joseph Ruigomez's consent to so structure the settlement.

50. At the mediation, Girardi and Finnerty also only gave Joseph Ruigomez signature pages to sign and did not give him a complete copy of the settlement agreement. Further, although Girardi represented to Ruigomez that the settlement funds would be placed in trust with Girardi and Kathleen Ruigomez as co-trustees, Kathleen Ruigomez never saw a trust instrument and never had access to the settlement funds, or any accounting of the funds.

51. Girardi and Finnerty concealed the Ruigomez Settlement amount because they both knew GK would ultimately use the settlement monies for improper and unlawful purposes without their client's consent.

52. On January 24, 2013, unbeknownst to Ruigomez, PG&E wired $28,000,000 of the Ruigomez Settlement to the GK client IOLTA trust account at Torry Pines Bank. Girardi was provided notice of the incoming wire that same day. Girardi then misappropriated and embezzled a portion of the Ruigomez Settlement funds and caused those funds to be used to pay other expenses and liabilities of GK unrelated to the Ruigomez representation, including making payments to other GK clients whose own settlement funds had previously been misappropriated by Girardi.

53. In order to lull Joseph Ruigomez and prevent him from discovering that Girardi had embezzled the Ruigomez Settlement funds, Girardi committed and caused to be committed the following acts, among others:

i. Falsely informing Ruigomez that the settlement "should be tax free," and that delays in payment of settlement funds to Ruigomez were due to Girardi's efforts to remove any tax liability for Ruigomez when, as Girardi then knew, the settlement was not taxable;

ii. Falsely informing Ruigomez that the settlement funds had been transferred into a separate interest-bearing account when, in fact, no such transfers had been made and no such separate interest-bearing account containing the Ruigomez Settlement funds existed;

Adversary Complaint

iii.      Falsely informing Ruigomez that the settlement funds were "locked up" for a six-month period due to their deposit into the separate interest-bearing account, when no such separate interest-bearing account existed;

iv.      Sending and causing to be sent lulling payments to Ruigomez as purported "interest payments" derived from the supposed separate interest-bearing account;

v.      Sending and causing to be sent letters to Ruigomez falsely claiming that "we worked magic so far in getting these huge interest rates and getting the first two years tax free;"

vi.      Sending and causing to be sent letters to Ruigomez falsely attributing delays in the payment of settlement funds to Ruigomez to supposed court oversight of the distribution of settlement funds when, in fact, no such court oversight was required or existed; and

vii.      Sending and causing to be sent, on July 1, 2019, a check for $2,500,000 to Ruigomez purportedly as a disbursement of settlement funds, which funds were, as Girardi then knew, settlement proceeds belonging to other GK clients and were not the Ruigomez Settlement proceeds, which Girardi had already spent and caused to be spent through disbursements unrelated to the Ruigomez representation.

**D.      GK's Initial Transfers to TDLF**

54.      On February 12, 2013, Girardi issued a $5,825,000 check ("**February 12, 2013 Payment**"), drawn against a GK IOLTA trust account, purportedly from the Ruigomez Settlement monies, payable to TDLF with a notation, "Assoc Counsel Fees."  This, notwithstanding that neither DiNardo nor TDLF provided any legal services for the Ruigomez representation.  A true and correct copy of the check representing the February 12, 2013 Payment is attached hereto as **Exhibit 14** and is incorporated herein by reference as though fully set forth.

55.      Joseph Ruigomez and his parents never retained DiNardo or TDLF to represent their interests, nor did they consent in writing to any fee sharing agreement between TDLF and GK or to the February 12, 2013 Payment.

56.      On May 20, 2013, further unknown to Ruigomez, Girardi issued a $500,000 check (the "**May 20, 2013 Payment**"), drawn against a GK IOLTA trust account, purportedly from the Ruigomez Settlement monies payable to TDLF with a notation, "Assoc Counsel Fees."  A true and

1    correct copy of the check representing the May 20, 2013 Payment is attached hereto as **Exhibit 15**

2    and is incorporated herein by reference as though fully set forth.

3        57.    Again, Joseph Ruigomez and his parents never retained DiNardo or TDLF, to

4    represent their interests, nor did they consent in writing to any fee sharing agreement between

5    TDLF and GK or to the May 20, 2013 Payment.  Nor did DiNardo or TDLF perform any legal

6    services for the Ruigomez representation.

7        **E.    DiNardo's Subsequent Transfer of $3,162,500 to Diamantis or to D&D II**

8        58.    The Trustees are informed and believe and based upon DiNardo's testimony during

9    his December 5, 2024 session of his 341(a) examination allege that (i) the Ruigomez Fee Sharing

10   Agreement was a disguised financing agreement, (ii) that neither he nor TDLF provide any legal

11   services relating to the Ruigomez representation, and (iii) DiNardo was not licensed to practice in

12   California or admitted *pro hac vice*.  DiNardo also admitted and disclosed that he was not licensed

13   as a commercial lender in the State of California and that he had transferred one-half of the

14   $6,300,000 ($3,162,500) he received from GK to Diamantis or D&D II for their participation in

15   Girardi Keese litigation financings. DiNardo also testified that he was unaware of the reason for

16   The Transfers and believed that The Transfers were made to reimburse DiNardo for losses

17   sustained from other GK-DiNardo financing arrangements.

18       **F.    Diamantis and D&D II Use of the Subsequent Transferred Funds**

19       59.    D&D II is a Delaware limited liability company formed in 2010 with its principal

20   place of business at 3500 Financial Plaza, 4th Floor, Tallahassee, Florida 32312.

21       60.    D&D II membership includes Diamantis, who holds a majority membership

22   interest, and DiNardo, who holds a significant minority membership interest.  At all times relevant

23   Diamantis was and is the managing member of D&D II.

24       61.    The Trustees are informed and believe and based thereon allege that between 2013

25   and April 2015, D&D II made a series of unsecured loans in the aggregate original principal

26   amount of $2,550,000 (the "**Blue Dog Financing**"), to Blue Dog at 399 Inc. and several related

27   and affiliated companies (collectively, "**Blue Dog Borrowers**"), all of which were in the food and

28   beverage business and owned and operated by an Elizabeth Slavutsky.  The Trustees are further

Adversary Complaint

17

1    informed and believe and based thereon allege that the source of the funding for the Blue Dog

2    Financing was the Subsequent Transferred Funds.

3         62.    The Trustees are informed and believe and based thereon allege that between April

4    17, 2015 and November 7, 2017, D&D II advanced additional sums to the Blue Dog Borrowers

5    increasing the Blue Dog Financing to $5,859,500.  The Trustees are further informed and believe

6    and based thereon allege that the balance of the Subsequent Transferred Funds was used by D&D

7    II to fund, in part, the balance of the Blue Dog Financing.

8         63.    The Trustees are informed and believe and based thereon allege that on November

9    7, 2017, D&D II, as lender, and the Blue Dog Borrowers executed a Promissory Note and Security

10    Agreement in favor of D&D II (the "**Blue Dog Note**"), pledging all of the Blue Dog Borrowers'

11    assets to D&D II.

12         64.    The Trustees are informed and believe and based thereon allege that the Blue Dog

13    Borrowers defaulted on their loan obligations specified in the Blue Dog Note and on September

14    19, 2022, D&D II issued a Demand for Immediate Payment and/or Turnover of Collateral to the

15    Blue Dog Borrowers.  The demand for payment was in the amount of $9,038,484.43, plus

16    additional interest at $1,618.05 per diem, plus costs and expenses including, but not limited to,

17    legal expenses and attorneys' fees.

18         65.    The Trustees are informed and believe and based thereon allege that on November

19    21, 2022, D&D II entered into an assignment agreement with CDBD (the "**Blue Dog Assignment**

20    **Agreement**").  The Blue Dog Assignment Agreement purports to assign all of D&D II's right,

21    title and interest in and to the Blue Dog Note to CDBD, notwithstanding that CDBD did not

22    provide any consideration to D&D II for the assignment.  Diamantis executed the Blue Dog

23    Assignment Agreement as the manager for D&D II, and as the President of CDBD.

24         66.    On January 5, 2023, CDBD filed an action against the Blue Dog Borrowers in the

25    United States District Court for the Southern District of New York (the "**SDNY District Court**"),

26    titled *CDBD Holdings, Inc. v. Elizabeth Slavutsky, et al.,* Case No. 7:23-cv-00071.  By this action,

27    CDBD sought an order requiring surrender of and/or to replevy personal property in the

28    possession of the Blue Dog Borrowers (the "**Blue Dog Collateral**") that is subject to the security

1  interest in favor of CDBD pursuant to the Blue Dog Assignment Agreement, which collateral

2  included, *inter alia*, all equipment, goods, inventory, trade names, commercial tort claims,

3  contracts, and ownership interests in businesses, and for damages in the amount exceeding

4  $9,179,254.46, which sum includes principal and accrued interest through December 15, 2022.

5      67.    On March 14, 2025, the SDNY District Court entered an order granting CDBD's

6  motion for default judgment against the Blue Dog Borrowers in the amount of $10,506,052.43.

7      **G.    The GK Trustee's Demand for the Return of the Subsequent Transferred**

8  **Funds or the Property Derived From the Use of the Subsequent Transferred Funds**

9      68.    On December 11, 2024, counsel to the GK Trustee sent a letter to Diamantis

10  advising of the GK Trustee's position that the Subsequent Transfers D&D II received from TDLF

11  that represented one half of the Transferred Funds are property of the GK Estate, requesting a

12  return of the Subsequent Transferred Funds, and setting forth the basis for the demand (the

13  "**December 11, 2024 Letter**").  A true and correct copy of the December 11, 2024 Letter is

14  attached hereto, as **Exhibit 16**, and is incorporated herein by reference as though fully set forth.

15      69.    On December 19, 2024, Diamantis responded by email to the December 11, 2024

16  Letter stating:

17  > I will be happy to discuss the matter with you, but if counsel is required to be on
18  > the call, I will need time to secure such counsel.  In the meantime, the payment you
   > reference was made to a corporate entity in exchange for the investment made in
19  > that case.  It was not paid to me personally, so Mr. DiNardo was mistaken in his
   > characterization of the payment.

20  A true and correct copy of the email is attached hereto as **Exhibit 17** and is incorporated herein by

21  reference as though fully set forth.

22      70.    On January 6, 2025, counsel to the GK Trustee sent an email to Diamantis

23  requesting that he provide the information previously requested as set forth in the December 11,

24  2024 Letter.  Diamantis responded by email dated January 6, 2025:

25  > D&D Funding II, LLC is the name of the entity that was paid.  The entity is still
   > active but primarily for tax purposes.  There is no active business activity
26  > remaining.

27  A true and correct copy of the emails of January 6, 2024 are attached hereto as **Exhibit 18** and

28  incorporated herein by reference as though fully set forth.

Adversary Complaint

19

71.     Diamantis never provided any of the written documents requested by the GK Trustee in the December 11, 2024 Letter nor did D&D II return the Subsequent Transferred Funds, notwithstanding the GK Trustee's demand for the same.

## FIRST CLAIM FOR RELIEF

### [Declaratory Relief – 28 USC § 2201]

72.     The Trustees reallege each and every allegation contained in paragraphs 1–71 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

73.     An actual controversy exists between the Trustees and the Defendants. Specifically, the Trustees contend that the Subsequent Transferred Funds are an asset of either or all of the GK, DiNardo, or TDLF Bankruptcy Estates (collectively the "**Bankruptcy Estates**"). The Defendants presumably contend that the Subsequent Transferred Funds are not an asset of the Bankruptcy Estates.  Similarly, the Trustees contend that Diamantis or D&D II utilized the Subsequent Transferred Funds for the Blue Dog Financing for the benefit of the Blue Dog Borrowers as hereinabove alleged.  The Defendants presumably contend that the Subsequent Transferred Funds are not property of the Bankruptcy Estates.

74.     An actual controversy exists between and among the Trustees and the Defendants which entitles the Trustees to this Court's declaratory judgment under 28 USC §§ 2201 and 2202, which declaratory judgment would terminate the controversy as presented in paragraph 73 above.

## SECOND CLAIM FOR RELIEF

### [Turnover of Property of the Estate – 11 USC § 542]

75.     The Trustees reallege each and every allegation contained in paragraphs 1–74 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

76.     The Trustees are informed and believe and based thereon allege that the Ruigomez Fee Sharing Agreement was void *ab initio* as Ruigomez did not approve in writing the Ruigomez Fee Sharing Agreement or the $6,350,000 transferred to TDLF as required by California and New York Rules of Professional Conduct.

Adversary Complaint

20

77.    The Trustees are further informed and believe and based thereon allege that the Ruigomez Fee Sharing Agreement was a ruse to circumvent and avoid the California Rules of Professional Conduct, Rule 1-320 prohibition on sharing fees with non-lawyer entities, including D&D II, and therefore was void *ab initio*.

78.    The Trustees are further informed and believe and based thereon allege that the Ruigomez Fee Sharing Agreement was a ruse to circumvent and avoid California commercial lending licensing laws required by California Financial Code § 22100, *et seq*., and was entered into willingly, knowing the Ruigomez Fee Sharing Agreement violated California licensing laws thus rendering the Ruigomez Fee Sharing Agreement null and void.  The Trustees are further informed and believe and based thereon allege that the Ruigomez Fee Sharing Agreement was one of several such agreements between GK and TDLF thus precluding TDLF or DiNardo from claiming an exemption to California Licensing Laws.

79.    The Trustees are further informed and believe, and based thereon allege that the Transferred Funds of $6,325,000 and thus the Subsequent Transferred Funds of $3,162,500 originated from the commingled Girardi Keese IOLTA trust account or are the funds stolen by Girardi from the Ruigomez Settlement proceeds and therefor is either property of the Bankruptcy Estates or property of Joseph Ruigomez, which by assignment the rights thereto belong to the GK Trustee, including any property obtained as a benefit of the Transferred Funds and the Subsequent Transferred Funds.  The Trustees are further informed and believe and based thereon allege that the Defendants have been or are in possession, custody and control of the Subsequent Transferred Funds or the property interest obtained by the use thereof, during the Bankruptcy Estates proceedings, which property the Trustees may use, sell or lease under Bankruptcy Code section 363 and such property is not of inconsequential value or benefit to the Bankruptcy Estates.

80.    The Trustees are informed and believe that, based upon the foregoing allegations set forth in paragraphs 1–79 above, the Defendants, either individually or jointly, owe a debt that is property of the Bankruptcy Estates in the amount of $3,125,000 that has matured, is payable on demand, or payable on order and that such debt may not be offset under Bankruptcy Code section 553 against a claim against the GK, DiNardo or the TDLF Debtors.

## **THIRD CLAIM FOR RELIEF**

**[Recovery of Property Obtained Through Theft – California Penal Code § 496]**

81.    The Trustees reallege each and every allegation contained in paragraphs 1–80 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

82.    California Penal Code § 496 provides in relevant part:

(a)    Every person who . . . receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, . . .  who withholds any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170.

…

(c)    Any person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees.

83.    As previously alleged on December 11, 2024, the GK Trustee made an inquiry of Diamantis as to the Subsequent Transferred Funds.  Diamantis responded to the inquiry by email transmissions contending that the Subsequent Transferred Funds represented a return on D&D II's participation in the financing arrangement for the Ruigomez litigation.

84.    The Trustees allege that Diamantis' failure to acknowledge the Defendants' liability or obligation to repay the $3,125,000 received for their participation in the Ruigomez representation, which funds were a portion of the funds embezzled by Girardi from the Ruigomez Settlement funds for which Girardi was indicted, tried and convicted, violates § 946 (a) of the California Penal Code. Consequently, pursuant to California Penal Code § 946(c), the Defendants are jointly or severally liable to the Trustee for $9,487,500 (three times the amount owed), plus interest, legal costs, and reasonable attorneys' fees.

/ / /

/ / /

Adversary Complaint

## FOURTH CLAIM FOR RELIEF

**[Avoidance of Fraudulent Transfer, Actual Intent –**

**11 USC §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(1)]**

85.     The Trustees reallege each and every allegation contained in paragraphs 1–84 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

86.     The Trustees are informed and believe and based thereon allege that the Initial Transfers and the Subsequent Transfers were made with the actual intent to hinder, delay or defraud the Debtor's creditors.

87.     By reason of the foregoing, the Transfers are avoidable pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(1).

## FIFTH CLAIM FOR RELIEF

**[Avoidance of Fraudulent Transfer, Actual Intent – 11 USC §§ 544(b)**

**and 548 and Cal. Civ. Code § 3439.05]**

88.     The Trustees reallege each and every allegation contained in paragraphs 1–87 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

89.     The Trustees are informed and believe and based thereon allege that the Initial Transfers and the Subsequent Transfers were made for less than reasonably equivalent value at a time when GK was insolvent or as a result of which GK became insolvent.

90.     By reason of the foregoing, the Transfers are avoidable pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code § 3439.05.

## SIXTH CLAIM FOR RELIEF

**[Avoidance of Fraudulent Transfer, Constructive Intent –**

**11 USC §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(A)]**

91.     The Trustees reallege each and every allegation contained in paragraphs 1–90 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

Adversary Complaint

23

92.     The Trustees are informed and believe and based thereon allege that the Transfers were made without the Debtors receiving reasonably equivalent value in exchange for the Transfers, and that at the time of the Transfers, the Debtors were engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

93.     By reason of the foregoing, the Transfers are avoidable pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(A).

## SEVENTH CLAIM FOR RELIEF

### [Avoidance of Fraudulent Transfer, Constructive Intent –

### 11 USC §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(B)]

94.     The Trustees reallege each and every allegation contained in paragraphs 1–93 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

95.     The Trustees are informed and believe and based thereon allege that the Transfers were made without the Debtors receiving reasonably equivalent value in exchange for the Transfers, and that the Debtors intended to incur, or reasonably should have believed that the Debtors would incur debts beyond the Debtors ability to pay as they became due.

96.     By reason of the foregoing, the Transfers are avoidable pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(B).

## EIGHTH CLAIM FOR RELIEF

### [Recovery of Avoided Transfer – 11 USC § 550]

97.     The Trustees reallege each and every allegation contained in paragraphs 1–96 above of this Complaint and by this reference, incorporate said allegations herein as though fully set forth.

98.     By reason of the foregoing, the Trustees are entitled to recover the Transfers or their value of the Transfers and the increased value of the Transfers from the Defendants pursuant to Bankruptcy Code section 550(a).

/ / /

Adversary Complaint

1

2

## NINTH CLAIM FOR RELIEF

### [Accounting]

3      99.      The Trustees reallege each and every allegation contained in paragraphs 1–98

4  above of this Complaint and by this reference, incorporate said allegations herein as though fully

5  set forth.

6      100.      As heretofore alleged, the Defendants are in possession of money and property that

7  rightfully belongs to the Bankruptcy Estates that were fraudulently obtained by the Defendants.

8  The amount owed by the Defendants to the Trustees cannot be easily ascertained without an

9  accounting of the money and property received by the Defendants.

10

11      **WHEREFORE,** the Trustee prays for judgment as follows:

12

## FIRST CLAIM FOR RELIEF

13

### [Declaratory Relief – 28 USC § 2201]

14      1.      For a declaratory judgment that the $3,162,500 transferred by DiNardo to

15  Diamantis or D&D II is an asset of the Bankruptcy Estates, and that such property or the property

16  obtained by the use of the $3,162,500 is an asset of the Bankruptcy Estates, or in the alternative,

17  that the Trustees are entitled to an equitable interest in the assets obtained by the use of the

18  $3,162,500 or a monetary award representing the value of  the property obtained by the use of the

19  $3,162,500 by Defendants.

20      2.      For such other and necessary or proper relief to be determined upon the

21  adjudication of the merits of this action.

22

## SECOND CLAIM FOR RELIEF

23

### [Turnover of Property – 11 USC § 542]

24      3.      For a judgment that the $3,125,000 transferred to the Defendants as alleged in the

25  Complaint is property of the Bankruptcy Estates, and that the Defendants have no ownership

26  interest in the Transferred Funds or in the property obtained by the use of the Transferred Funds

27  and that the same be turned over to the Trustees.

28      4.      For a judgment against the Defendants in the amount of $3,125,000.00.

Adversary Complaint

1      5.      For attorney fees as may be awarded to Plaintiffs by law or equity.

2      6.      For such other and necessary or proper relief to be determined upon the

3  adjudication of the merits of this action.

4                      **THIRD CLAIM FOR RELIEF**

5      **[Damages for Failure to Turnover Stolen Property – California Penal Code § 496]**

6      7.      For judgment against the Defendants, jointly or severally in the amount of

7  $9,175,000.00.

8      8.      For interest on the amount of $9,175,000.00 as permitted by California Penal Code

9  § 496 (c).

10     9.      For reasonable attorney fees.

11     10.     For costs of suit incurred.

12     11.     For such other and necessary or proper relief to be determined upon the

13  adjudication of the merits of this action.

14                     **FOURTH CLAIM FOR RELIEF**

15     **[Avoidance of Fraudulent Transfer, Actual Intent –**

16     **11 USC §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(1)]**

17     12.     For judgment against the Defendants, jointly or severally in the amount of

18  $3,125,000.00 pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code §

19  3439.04(a)(1)

20     13.     For interest on the amount due and owing from the date of the Subsequent

21  Transfers.

22     14.     For costs of suit incurred.

23     15.     For such other and necessary or proper relief to be determined upon the

24  adjudication of the merits of this action.

25                      **FIFTH CLAIM FOR RELIEF**

26     **[Avoidance of Fraudulent Transfer, Actual Intent –**

27     **11 USC §§ 544(b) and 548 and Cal. Civ. Code § 3439.05]**

28

Adversary Complaint

16.     For judgment against the Defendants, jointly or severally in the amount of $3,125,000.00 pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code § 3439.05.

17.     For interest on the amount due and owing from the date of the Subsequent Transfers.

18.     For costs of suit incurred.

19.     For such other and necessary or proper relief to be determined upon the adjudication of the merits of this action.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**[Avoidance of Fraudulent Transfer, Constructive Intent –**

**11 USC §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(A)]**

20.     For judgment against the Defendants, jointly or severally in the amount of $3,125,000.00 pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(A).

21.     For interest on the amount due and owing from the date of the Subsequent Transfers.

22.     For costs of suit incurred.

23.     For such other and necessary or proper relief to be determined upon the adjudication of the merits of this action.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**[Avoidance of Fraudulent Transfer, Constructive Intent –**

**11 USC §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(B)]**

24.     For judgment against the Defendants, jointly or severally in the amount of $3,125,000.00 pursuant to Bankruptcy Code sections 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(B).

25.     For interest on the amount due and owing from the date of the Subsequent Transfers.

26.     For costs of suit incurred.

Adversary Complaint

1     27.     For such other and necessary or proper relief to be determined upon the

2    adjudication of the merits of this action.

3                **EIGHTH CLAIM FOR RELIEF**

4            **[Recovery of Avoided Transfer – 11 USC § 550]**

5     28.     For judgment against the Defendants requiring a turnover of the Transfers or the

6    value thereof pursuant to Bankruptcy Code section 550(a).

7     29.     For interest on the amount due and owing from the date of the Subsequent

8    Transfers.

9     30.     For costs of suit incurred.

10     31.     For such other and necessary or proper relief to be determined upon the

11   adjudication of the merits of this action.

12               **NINTH CLAIM FOR RELIEF**

13                    **[Accounting]**

14     32.     For a judgment requiring an accounting of the money and property received by the

15   Defendants and used by the Defendants to acquire additional assets.

16               **ON ALL CLAIMS FOR RELIEF**

17     33.     For interest on the amounts due and owing.

18     34.     For reasonable attorney fees.

19     35.     For such other and necessary or proper relief to be determined upon the

20   adjudication of the merits of this action.

21

22

23

24               ***SIGNATURES ON FOLLOWING PAGE***

25

26

27

28

Adversary Complaint

Dated:  October 23, 2025



**JENKINS, MULLIGAN & GABRIEL LLP**

/s/ Larry W. Gabriel

---

By:   Larry W. Gabriel, Esq.
       5743 Corsa Avenue, Suite 110
       Westlake Village, CA 91362
       Tel. 818/ 943-8992
       Email  lgabrielaw@outlook.com


**GLEICHENHAUS, MARCHESE & WEISHAAR, P.C.**


/s/ Scott J. Bogucki

---

By:   Scott J. Bogucki, Esq.
       43 Court Street, Suite 930
       Buffalo, New York 14202-3100
       Tel. 716/ 845-6446
       Email   sbogucki@gmwlawyers.com

*Special Litigation Co-Counsel to the Trustees*

Adversary Complaint

29

# EXHIBIT 1

**F I L E D**
CLERK, U.S. DISTRICT COURT

1/31/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____vav_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No.   2:23-cr-00047-JFW |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| THOMAS VINCENT GIRARDI and CHRISTOPHER KAZUO KAMON, | |
| Defendants. | |

The Grand Jury charges:

COUNTS ONE THROUGH FIVE

[18 U.S.C. §§ 1343, 2(a)]

A.   INTRODUCTORY ALLEGATIONS

    1.   At times relevant to this Indictment:

        a.   Defendant THOMAS VINCENT GIRARDI was a resident of Pasadena, California.

        b.   Defendant GIRARDI was an attorney licensed to practice law in the State of California.

        c.   Defendant GIRARDI was the 100 percent owner and managing partner of Girardi Keese, a law firm located in Los Angeles, California, that primarily represented plaintiffs in personal injury

Exhibit 1                                    0031

1    cases.  On or about December 18, 2020, after a series of civil

2    lawsuits publicly alleged that Girardi Keese had misappropriated

3    client funds, certain creditors of Girardi Keese commenced an

4    involuntary petition for relief under Chapter 7 of Title 11 of the

5    United States Code against Girardi Keese.  On or about January 13,

6    2021, the Bankruptcy Court entered an Order for Relief Under Chapter

7    7 and ordered the appointment of a Chapter 7 Trustee.

8          d.    Defendant GIRARDI was a signatory on and exercised

9    control over the following bank accounts, which were opened and

10   maintained in Los Angeles, California:

11              i.    A Girardi Keese attorney-client trust account,

12   also called an "Interest on Lawyer's Trust Account" or "IOLTA"

13   account, at Torrey Pines Bank, bearing an account number ending in

14   5859 (the "Torrey Pines IOLTA Account"); and

15              ii.   A Girardi Keese IOLTA account, at Nano Banc,

16   bearing an account number ending in 0567 (the "Nano Banc IOLTA

17   Account").

18          e.    Defendant GIRARDI became a member of the State Bar of

19   California in 1965 and was obligated to comply with the California

20   Rules of Professional Conduct.  Defendant GIRARDI knew that the

21   California Rules of Professional Conduct required him to, among other

22   things, promptly notify a client of the receipt of any funds the

23   client was entitled to receive, and promptly pay or deliver to the

24   client or such payees as designated by the client any such funds that

25   defendant GIRARDI and Girardi Keese held in trust for the client upon

26   the client's request.

27          f.    Defendant CHRISTOPHER KAZUO KAMON was a resident of

28   Palos Verdes and Encino, California.  From in or about 2004 until in

2

0032

or about December 2020, defendant KAMON was the Controller and Chief Financial Officer ("CFO") of Girardi Keese, from which position he oversaw the law firm's financial affairs, supervised its accounting department, and was in charge of paying the firm's expenses. As Girardi Keese's Controller and CFO, defendant KAMON had a duty to maintain books and records that accurately reflected the firm's finances, including the disposition of monies held in its attorney-client trust accounts.

g.    "Client 1" was an individual who resided in San Bruno, California. Beginning on or about October 1, 2010, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 1. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 1 in connection with a lawsuit against a public utility related to significant injuries Client 1 sustained as a result of an explosion that caused severe burns all over his body.

h.    "Client 2" was an individual who resided in Lake Havasu City, Arizona. Beginning as early as in or around May 2019, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 2. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 2 in connection with potential litigation related to a boating accident where the boat unexpectedly sped up to 120 miles per hour, flipped, and ejected all three occupants, and as a result of which Client 2's husband died.

i.    "Client 3" was an individual who resided in Castaic, California. Beginning as early as 2012, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 3. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 3 in connection with a lawsuit against a medical

3

1  device provider related to severe injuries, including organ damage,

2  Client 3 sustained as a result of a defective medical device.

3         j.   "Client 4" and "Client 5" were individuals who resided

4  in Los Angeles, California.  Beginning as early as in or around

5  December 2019, defendant GIRARDI and Girardi Keese had a formal

6  attorney-client relationship with Client 4 and Client 5.

7  Specifically, defendant GIRARDI and Girardi Keese agreed to represent

8  Client 4 and Client 5 in connection with a lawsuit related to

9  injuries Client 4, Client 5, and their minor son, who was paralyzed

10 from the neck down, sustained in an automobile collision.

11 B.   THE SCHEME TO DEFRAUD

12        2.   Beginning at least as early as in or around 2010 and

13 continuing through at least in or around December 2020, in Los

14 Angeles County, within the Central District of California, and

15 elsewhere, defendants GIRARDI and KAMON, together with others known

16 and unknown to the Grand Jury, knowingly and with intent to defraud,

17 devised, participated in, and executed a scheme to defraud victim

18 clients to whom defendant GIRARDI and Girardi Keese had agreed to

19 provide legal services including, but not limited to, Client 1,

20 Client 2, Client 3, Client 4, and Client 5, as to material matters,

21 and to obtain money and property from such victim clients by means of

22 material false and fraudulent pretenses, representations, and

23 promises, and the concealment of material facts, including material

24 facts that defendant GIRARDI had a duty to disclose.

25        3.   The fraudulent scheme operated, in substance, in the

26 following manner:

27

28

1          a.    Defendant GIRARDI would negotiate a settlement on

2    behalf of a client that would require the payment of funds to the

3    client.

4          b.    Defendant GIRARDI would misrepresent, conceal, and

5    falsely describe to the client the true terms of the settlement

6    and/or the disposition of the settlement proceeds.

7          c.    Defendants GIRARDI and KAMON would cause the

8    settlement proceeds to be deposited in or transferred to attorney

9    trust accounts, including the Torrey Pines IOLTA Account and the Nano

10   Banc IOLTA Account, that defendants GIRARDI and KAMON controlled.

11          d.    Defendants GIRARDI and KAMON would thereafter embezzle

12   and misappropriate settlement funds from the Torrey Pines IOLTA

13   Account and the Nano Banc IOLTA Account belonging to Girardi Keese

14   clients for improper purposes.  The improper purposes included, among

15   other things, paying other Girardi Keese clients whose own settlement

16   funds previously had been misappropriated, paying Girardi Keese's

17   payroll, and paying other Girardi Keese's expenses, including its

18   American Express Card bills encompassing charges for defendant

19   GIRARDI's and defendant KAMON's personal expenses.

20          e.    As part of their scheme and to conceal the

21   embezzlements and misappropriations from the victim clients,

22   defendants GIRARDI and KAMON would send and cause to be sent lulling

23   communications to the clients that, among other things, falsely

24   denied that the settlement proceeds had been paid and falsely claimed

25   that Girardi Keese could not pay the settlement proceeds to clients

26   until certain purported requirements had been met, such as addressing

27   supposed tax obligations, obtaining supposedly necessary

28

1   authorizations from judges, and satisfying medical liens and other

2   debts.

3           f.   As further part of their scheme and to conceal the

4   embezzlements and misappropriations from the victim clients,

5   defendants GIRARDI and KAMON would also send and cause to be sent

6   lulling payments to the clients, falsely representing and maintain

7   the false pretense that such payments were "advances" on the

8   purportedly yet-to-be received settlement proceeds, or "interest

9   payments" on the settlement proceeds that purportedly could not be

10  paid to the clients until the fabricated requirements were satisfied.

### Embezzlement of Client 1's Funds

12      4.   In or about January 2013, defendant GIRARDI negotiated a

13  settlement of the lawsuit related to Client 1's injuries without

14  obtaining prior approval of the settlement terms from Client 1.  The

15  terms of the settlement provided that Client 1 would be paid

16  $53,000,000 to release all of Client 1's claims.  Pursuant to Client

17  1's retainer agreement with Girardi Keese, Girardi Keese's attorneys'

18  fees, in the amount of 25% of the settlement amount, costs, and

19  expenses were to be deducted from the settlement proceeds and paid to

20  Girardi Keese.

21      5.   On or about January 10, 2013, defendant GIRARDI told Client

22  1 that the case had settled.  Defendant GIRARDI had not previously

23  informed Client 1 of the settlement or obtained Client 1's consent to

24  the terms of the settlement and concealed the true terms of the

25  settlement from Client 1.  Defendant GIRARDI falsely represented to

26  Client 1 that the total settlement amount was approximately

27  $7,250,000, and concealed from Client 1 that the true amount of the

28  settlement was $53,000,000.  Defendant GIRARDI further falsely

0036

represented that the settlement would be structured as an annuity to be paid to Client 1 for the rest of Client 1's life when, as defendant GIRARDI then knew, the settlement terms did not require the creation of an annuity or any other structured settlement, and defendant GIRARDI had not obtained Client 1's consent to so structure the settlement.

6.   On or about January 24, 2013, over half of Client 1's settlement, namely, $28,000,000, was wire transferred to the Torrey Pines IOLTA Account.  Defendants GIRARDI and KAMON were provided notice of the incoming wire that same day.  Defendants GIRARDI and KAMON then misappropriated and embezzled a portion of Client 1's settlement funds and caused those funds to be used to pay other expenses and liabilities of Girardi Keese unrelated to Client 1, including payments to other Girardi Keese clients whose own settlement funds had previously been misappropriated by defendants GIRARDI and KAMON, and others.

7.   In order to lull Client 1 and prevent Client 1 from discovering that defendants GIRARDI and KAMON had embezzled Client 1's settlement funds, defendant GIRARDI and KAMON, aiding and abetting each other, committed and caused to be committed the following acts, among others:

a.   Falsely informing Client 1 that Client 1's settlement "should be tax free," and that delays in payment of settlement funds to Client 1 were due to defendant GIRARDI's efforts to remove any tax liability for Client 1 when, as defendant GIRARDI then knew, Client 1's settlement was not taxable;

b.   Falsely informing Client 1 that Client 1's settlement funds had been transferred into a separate interest-bearing account

7

when, in fact, no such transfers had been made and no such separate
interest-bearing account containing Client 1's settlement funds
existed;

      c.  Falsely informing Client 1 that Client 1's settlement
funds were "locked up" for a six-month period due to their deposit
into the separate interest-bearing account, when no such separate
interest-bearing account existed;

      d.  Sending and causing to be sent lulling payments to
Client 1 as purported "interest payments" deriving from the supposed
separate interest-bearing account;

      e.  Sending and causing to be sent letters to Client 1
falsely claiming that "we worked magic so far in getting these huge
interest rates and getting the first two years tax free";

      f.  Sending and causing to be sent letters to Client 1
falsely attributing delays in the payment of settlement funds to
Client 1 to supposed court oversight of the distribution of
settlement funds when, in fact, no such court oversight was required
or existed; and

      g.  Sending and causing to be sent, on July 1, 2019, a
check for $2,500,000 to Client 1 purportedly as a disbursement of
Client 1's settlement funds, which funds were, as defendant GIRARDI
then knew, settlement proceeds belonging to Client 4 and Client 5 (as
described below), and not Client 1's settlement proceeds, which
defendants GIRARDI and KAMON had already spent and caused to be spent
through disbursements unrelated to Client 1.

### Embezzlement of Client 2's Funds

8.  In or about April 2020, defendant GIRARDI negotiated a
settlement of legal claims related to the death of Client 2's spouse.

0038

On or about June 24, 2020, defendants GIRARDI and KAMON received a settlement check for $504,400 as payment on Client 2's claims. Pursuant to Client 2's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 33.3% of the settlement amount, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.

9.   On or about June 25, 2020, defendant GIRARDI caused Client 2's settlement funds to be deposited into the Torrey Pines IOLTA Account.   Prior to that deposit, and in violation of the California Rules of Professional Conduct governing the management of attorney-client trust accounts, defendants GIRARDI and KAMON transferred and caused the transfer of approximately $183,605.45 from the Torrey Pines IOLTA account to a Girardi Keese operating account, as "fees" owed to Girardi Keese from Client 2's settlement, when defendants GIRARDI and KAMON then knew that the funds in fact came from settlement funds belonging to other Girardi Keese clients. Defendants GIRARDI and KAMON used the transferred funds to pay Girardi Keese payroll expenses and fund a $50,000 check written on the operating account to defendant GIRARDI, which defendant GIRARDI then used to make payments to two exclusive country clubs.

10.   In order to lull Client 2 and prevent Client 2 from discovering that defendant GIRARDI had embezzled Client 2's settlement funds, defendants GIRARDI and KAMON committed and caused to be committed the following acts, among others:

a.   In response to Client 2's repeated efforts to obtain the settlement funds, defendant GIRARDI falsely told Client 2 that he was working on the "last signature from a judge" and that defendant GIRARDI would send Client 2 a "personal check" for $50,000 as an

9

1  "advance" on Client 2's settlement, when, as defendant GIRARDI then

2  knew, there was no need for any "signature from a judge" before

3  Client 2's settlement proceeds could be disbursed, and there was no

4  need for an "advance" because Girardi Keese had already received

5  Client 2's settlement payment;

6         b.   On July 24, 2020, approximately one month after

7  receiving Client 2's settlement check and after being informed that

8  Client 2 still had not received her settlement payment and was

9  contemplating filing a complaint with the State Bar of California,

10 defendants GIRARDI and KAMON sent and caused to be sent, for the

11 purpose of lulling Client 2, a $50,000 check drawn on the Torrey

12 Pines IOLTA Account;

13        c.   In order to further lull Client 2, and to falsely

14 assure Client 2 that Client 2 did not need to take any further steps

15 to obtain full payment of her settlement, defendants GIRARDI and

16 KAMON caused a $100,000 payment to be made to Client 2 in the form of

17 a check drawn on the Nano Banc IOLTA Account;

18        d.   In order to further lull Client 2, defendant GIRARDI

19 falsely told Client 2 and an attorney Client 2 had hired to help

20 Client 2 obtain the settlement funds from Girardi Keese that

21 defendant GIRARDI was working to mitigate the taxes purportedly owed

22 by Client 2 on the settlement funds and, separately, that Girardi

23 Keese had only received a portion of Client 2's settlement when, in

24 fact, as defendant GIRARDI then knew, no taxes were owed on the

25 settlement funds and Girardi Keese had received Client 2's full

26 settlement amount approximately five months earlier; and

27        e.   In order to further lull Client 2, defendant GIRARDI

28 falsely claimed to have arranged for a check for the balance of the

10

1  settlement to be available for Client 2 to pick up.  In fact, when

2  the messenger sent to get the check arrived, defendant GIRARDI caused

3  the messenger to be falsely told, among other things, that defendant

4  GIRARDI was not available and that Client 2's check was inaccessible

5  because it was purportedly locked in the Girardi Keese accounting

6  office.

7  ### Embezzlement of Client 3's Funds

8  11.  In or about October 2018, defendant GIRARDI negotiated a

9  settlement of Client 3's lawsuit related to injuries caused by a

10  defective medical device.  Pursuant to Client 3's retainer agreement

11  with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of

12  40% of the settlement amount, costs, and expenses were to be deducted

13  from the settlement proceeds and paid to Girardi Keese.  Disbursement

14  of Client 3's settlement funds required approval by the bankruptcy

15  trustee and bankruptcy court, which was obtained in March 2020.

16  12.  On or about May 22, 2020, defendants GIRARDI and KAMON

17  received a wire for $128,250 into the Torrey Pines IOLTA Account as

18  settlement payment on Client 3's claims.  Defendants GIRARDI and

19  KAMON then misappropriated and caused to be misappropriated Client

20  3's settlement funds, including by using amounts in excess of any

21  money due to Girardi Keese to pay for leases of luxury cars.

22  13.  In order to lull Client 3 and prevent Client 3 from

23  discovering that defendants GIRARDI and KAMON had embezzled Client

24  3's settlement funds, defendant GIRARDI committed and caused to be

25  committed the following acts, among others:

26       a.   Causing a letter to be sent to Client 3, on or about

27  July 31, 2020, falsely stating, in part, "We are trying desperately

28  to get everything figured out.  Since there is a Bankruptcy Trustee,

0041

1  we have to get an understanding of how much goes to the Trustee and

2  how much goes to you . . . I am not getting much of a response from

3  the Trustee."  In truth, as defendant GIRARDI then knew, defendant

4  GIRARDI and the bankruptcy trustee had already negotiated the

5  apportionment of Client 3's settlement funds, which the bankruptcy

6  court had approved approximately four months earlier, in or around

7  March 2020; and

8      b.  Falsely stating in voicemail messages to Client 3 that

9  the settlement funds could not be disbursed until "certain orders"

10  were signed, when, as defendant GIRARDI then knew, no further court

11  orders were necessary, and falsely stating that "we'd like our money

12  just like you'd like yours," despite the fact that defendants GIRARDI

13  and KAMON had already received (and misappropriated) all of Client

14  3's settlement proceeds.

15                **Embezzlement of Client 4's and Client 5's Funds**

16      14.  In or about July 2019, defendant GIRARDI negotiated a

17  settlement of the lawsuit related to the injuries sustained by Client

18  4, Client 5, and their minor child in an automobile accident.  The

19  terms of the settlement provided for a total payment of $17,500,000,

20  a portion of which would be paid to the paralyzed minor child with

21  the remaining funds due to Client 4 and Client 5.  Pursuant to Client

22  4's and Client 5's retainer agreement with Girardi Keese, Girardi

23  Keese's attorneys' fees, in the amount of 25% of the settlement

24  amount for the minor and 40% of the settlement amount for Client 4

25  and Client 5, costs, and expenses were to be deducted from the

26  settlement proceeds and paid to Girardi Keese.

27      15.  The settlement agreement specified that the minor's portion

28  of the settlement proceeds would be placed in a trust and an annuity

                                      12

1  to be controlled and administered by a third party, neither of which

2  could be accessed by defendants GIRARDI and KAMON.  The remaining

3  settlement funds were to be paid directly to Girardi Keese for the

4  benefit of Client 4 and Client 5.

5      16.  On or about June 17, 2019, the first installment of the

6  settlement payment, namely, $4,000,000, was wired transferred to the

7  Nano Banc IOLTA Account.  Prior to that deposit, and in violation of

8  rules governing the management of funds in attorney client-trust

9  accounts, defendants GIRARDI and KAMON transferred and caused the

10  transfer of approximately $1,450,000 purportedly as an "advance" from

11  Client 4's and Client 5's settlement funds, which amount was

12  deposited into Girardi Keese operating accounts, when defendants

13  GIRARDI and KAMON then knew that the funds in fact came from

14  settlement funds belonging to other Girardi Keese clients.

15  Defendants GIRARDI and KAMON used the transferred funds to pay

16  Girardi Keese operating expenses unrelated to the representation of

17  Client 4 and Client 5.

18      17.  On or about July 1, 2019, defendants GIRARDI and KAMON

19  caused a $2,500,000 check drawn on the Nano Banc IOLTA Account and

20  comprised in large part of Client 4's and Client 5's settlement

21  funds, to be issued to Client 1 as a partial payment of Client 1's

22  settlement funds owed to Client 1 but which had been misappropriated

23  by defendants GIRARDI and KAMON.

24      18.  On or about August 2, 2019, a further payment of Client 4's

25  and Client 5's settlement, namely, a check for $5,119,449.61, was

26  deposited into the Nano Banc IOLTA Account.

27      19.  In order to lull Client 4 and Client 5 and prevent them

28  from discovering that defendants GIRARDI and KAMON had embezzled

13

0043

their settlement funds, defendants GIRARDI and KAMON committed and caused to be committed the following acts, among others:

a. Providing incremental lulling payments to Client 4 and Client 5, which comprised only a fraction of the total settlement due to Client 4 and Client 5;

b. Falsely informing Client 4 and Client 5 that the remaining settlement funds could only be paid after medical liens had been satisfied when, as defendant GIRARDI then knew, all medical expenses related to Client 4's and Client 5's claims had already been paid;

c. Falsely informing Client 4 and Client 5 that disbursement of their settlement proceeds was delayed due to court proceedings related to their minor child when, as defendant GIRARDI then knew, payment of settlement funds to Client 4 and Client 5 was not dependent on any court proceedings;

d. Falsely informing Client 4 and Client 5 that delays in payment of their settlement funds were due to defendant GIRARDI's purported efforts to remove any tax liability for Client 4 and Client 5, including defendant GIRARDI's travel to Washington, D.C., to meet with government officials to remove tax liability for the settlement when, as defendant GIRARDI then knew, Client 4's and Client 5's settlement funds were not taxable; and

e. Falsely informing Client 4 and Client 5 that their settlement funds could not be disbursed until additional court approvals were received when, as defendant GIRARDI then knew, no further court orders were necessary.

20. Between at least in or about 2010 and in or about December 2020, as a result of this scheme to defraud, defendants GIRARDI and

14

0044

KAMON obtained money and property belonging to victim Clients 1-5 in excess of $15,000,000.

C.   USE OF THE WIRES

21.  On or about the following dates, within the Central District of California, and elsewhere, defendants GIRARDI and KAMON, aiding and abetting each other, for the purpose of executing the above-described scheme to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce the following items:

| COUNT | DATE | WIRE |
|---|---|---|
| ONE | 6/17/19 | Wire Transfer of approximately $4,000,000 from City National Bank, in Los Angeles, California, through the Fedwire system to the Nano Banc IOLTA Account, in Los Angeles, California, from the settlement related to Client 4 and Client 5, which defendants GIRARDI and KAMON caused to be spent, in part, for costs and expenses unrelated to Client 4 and Client 5. |
| TWO | 7/1/19 | Wire clearing an approximately $2,500,000 check drawn on the Nano Banc IOLTA Account, in Los Angeles, California and deposited into First Century Bank, in Los Angeles, California, which wire traveled via a server located in Oklahoma City, Oklahoma, for the benefit of Client 1, the source of which funds was, in part, the settlement proceeds belonging to Client 4 and Client 5. |
| THREE | 5/22/20 | Wire Transfer of approximately $128,250 from Bank of America, in New York, New York, through the Fedwire system to the Torrey Pines IOLTA Account, in Los Angeles, California, from the settlement related to Client 3, which defendants GIRARDI and KAMON spent, in part, for costs and expenses unrelated to Client 3. |
| FOUR | 6/25/20 | Wire clearing a check of approximately $504,400 by drawing upon a JPMorgan Chase Bank account in Fort Washington, New York, and crediting funds to the Torrey Pines IOLTA Account in Los Angeles, California, representing Client 2's settlement proceeds, spent, in part, for costs and expenses unrelated to Client 2. |

0045

| COUNT | DATE | WIRE |
|-------|------|------|
| FIVE | 7/9/20 | Wire transfer of approximately $15,000 from a Girardi Keese operating account in Los Angeles, California, to American Express via a server located in Phoenix, Arizona, as payment for charges incurred on the Girardi Keese Corporate American Express Card issued to defendant KAMON, the source of which funds was, in part, the settlement proceeds belonging to Client 2 |

//

//

//

16

1

FORFEITURE ALLEGATION

2

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3      1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Section 981(a)(1)(C) and Title 28, United States

7  Code, Section 2461(c), in the event of defendant THOMAS VINCENT

8  GIRARDI's and/or defendant CHRISTOPHER KAZUO KAMON's conviction of

9  and of the offenses set forth in any of Counts One through Five of

10  this Indictment.

11      2.   Any defendant so convicted shall forfeit to the United

12  States of America the following:

13          (a)   All right, title, and interest in any and all

14  property, real or personal, constituting, or derived from, any

15  proceeds traceable to the offense; and

16          (b)   To the extent such property is not available for

17  forfeiture, a sum of money equal to the total value of the property

18  described in subparagraph (a).

19      3.   Pursuant to Title 21, United States Code, Section 853(p),

20  as incorporated by Title 28, United States Code, Section 2461(c), any

21  defendant so convicted shall forfeit substitute property, up to the

22  value of the property described in the preceding paragraph if, as the

23  result of any act or omission of said defendant, the property

24  described in the preceding paragraph or any portion thereof (a)

25  cannot be located upon the exercise of due diligence; (b) has been

26  transferred, sold to, or deposited with a third party; (c) has been

27  placed beyond the jurisdiction of the court; (d) has been

28

17

1   substantially diminished in value; or (e) has been commingled with

2   other property that cannot be divided without difficulty.

3                                    A TRUE BILL

4

5                                    /S/
                                     _____
6                                    Foreperson

7   E. MARTIN ESTRADA
    United States Attorney
8

9

10  MACK E. JENKINS
    Assistant United States Attorney
11  Chief, Criminal Division

12  RANEE A. KATZENSTEIN
    Assistant United States Attorney
13  Chief, Major Frauds Section

14  SCOTT PAETTY
    Assistant United States Attorney
15  Deputy Chief, Major Frauds Section

16  ALI MOGHADDAS
    Assistant United States Attorney
17  Major Frauds Section

18

19

20

21

22

23

24

25

26

27

28

                                    18

# EXHIBIT 2



FILED
CLERK, U.S. DISTRICT COURT

AUG 27 2024

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 23-00047-JLS |
|---|---|
|       Plaintiff, | <u>VERDICT</u> |
|         v. | |
| THOMAS V. GIRARDI, | |
|       Defendant. | |

We, the jury in the above-entitled action, present the following unanimous verdict:

EXHIBIT 2

COUNT ONE

(Wire Fraud, 18 U.S.C. § 1343)

We, the jury in the above-entitled action, unanimously find the defendant, Thomas V. Girardi (*check one*):

\_\_\_\_  NOT GUILTY

X  GUILTY

of the offense charged in Count One of the Indictment relating to client E.S.

(*Please proceed to next count*)

2

1

2                               COUNT TWO

3                      (Wire Fraud, 18 U.S.C. § 1343)

4        We, the jury in the above-entitled action, unanimously find the

5    defendant, Thomas V. Girardi (*check one*):

6

7                    ___    NOT GUILTY

8

9                     X     GUILTY

10

11   of the offense charged in Count Two of the Indictment relating to

12   client J.R.

13

14   (*Please proceed to next count*)

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    3

1

2

3                              COUNT THREE

4                       (Wire Fraud, 18 U.S.C. § 1343)

5       We, the jury in the above-entitled action, unanimously find the

6    defendant, Thomas V. Girardi (*check one*):

7

8                     ____    NOT GUILTY

9

10                     ✗      GUILTY

11

12   of the offense charged in Count Three of the Indictment relating to

13   client J.H.

14

15   (*Please proceed to next count*)

16

17

18

19

20

21

22

23

24

25

26

27

28

4

COUNT FOUR

(Wire Fraud, 18 U.S.C. § 1343)

We, the jury in the above-entitled action, unanimously find the defendant, Thomas V. Girardi (*check one*):

_____ NOT GUILTY

__X__ GUILTY

of the offense charged in Count Four of the Indictment relating to client J.S.

(*Please sign and date this form and return it to the Court*)

Dated:

08/27/2024

5

# DEFENDANT'S PROPOSED
# VERDICT FORM

## COUNT ONE

### (Wire Fraud, 18 U.S.C. § 1343)

We, the jury in the above-entitled action, unanimously find the defendant, Thomas
V. Girardi (check one):

_____ NOT GUILTY

✗ GUILTY

of wire fraud as charged in Count One of the Indictment, relating to a wire transfer
on June 17, 2019 of approximately $4,000,000 from City National Bank, in Los
Angeles, California, through the Fedwire system to the Nano Banc IOLTA Account,
in Los Angeles, California.

## COUNT TWO

### (Wire Fraud, 18 U.S.C. § 1343)

We, the jury in the above-entitled action, unanimously find the defendant, Thomas
V. Girardi (check one):

_____ NOT GUILTY

✗ GUILTY

of wire fraud as charged in Count Two of the Indictment, relating to a wire on July 1,
2019 clearing an approximately $2,500,000 check drawn on the Nano Banc IOLTA
Account, in Los Angeles, California and deposited into First Century Bank, in Los
Angeles, California

## COUNT THREE

### (Wire Fraud, 18 U.S.C. § 1343)

We, the jury in the above-entitled action, unanimously find the defendant, Thomas
V. Girardi (check one):

_____ NOT GUILTY

✗ GUILTY

of wire fraud as charged in Count Three of the Indictment, relating to a wire transfer
on May 22, 2020 of approximately $128,250 from Bank of America, in New York,

New York, through the Fedwire system to the Torrey Pines IOLTA Account, in Los Angeles, California.

## COUNT FOUR

### (Wire Fraud, 18 U.S.C. § 1343)

We, the jury in the above-entitled action, unanimously find the defendant, Thomas V. Girardi (check one):

___ NOT GUILTY

X GUILTY

of wire fraud as charged in Count Four of the Indictment, relating to a wire on June 25, 2020 clearing a check of approximately $504,400 by drawing upon a JPMorgan Chase Bank account in Fort Washington, New York, and crediting funds to the Torrey Pines IOLTA Account in Los Angeles, California

# EXHIBIT 3

**United States District Court**
**Central District of California**

| | |
|---|---|
| **UNITED STATES OF AMERICA vs.** | **Docket No.**    LA CR 23-00047-JLS |

**Defendant**   Thomas Vincent Girardi     **Social Security No.** 5 1 3 4

akas:   none     (Last 4 digits)

---

**JUDGMENT AND PROBATION/COMMITMENT ORDER**

In the presence of the attorney for the government, the defendant appeared in person

| MONTH | DAY | YEAR |
|---|---|---|
| **JUNE** | **3** | **2025** |

**COUNSEL**     Charles Snyder and Sam Cross, DFPD

(Name of Counsel)

**PLEA**    ☒ **GUILTY,** and the court being satisfied that there is a factual basis for the plea.    ☐ **NOLO CONTENDERE**    ☐ **NOT GUILTY**

**FINDING**    There being a verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of: Wire Fraud in violation of 18 U.S.C. § 1343 as charged in Counts 1 – 4 of the Indictment.

**JUDGMENT AND PROB/ COMM ORDER**    The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Thomas Vincent Girardi, is hereby committed on Counts 1, 2, 3, and 4 of the Indictment to the custody of the Bureau of Prisons for a term of **87 MONTHS**. This term consists of 87 months on each of Counts 1, 2, 3, and 4 of the Indictment, to be served concurrently.

It is ordered that the defendant shall pay to the United States a special assessment of $400, which is due immediately. Any unpaid balance shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

It is ordered that the defendant shall pay restitution in the total amount of $2,310,247.26 pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid as follows:

| Victim | Amount |
|---|---|
| J.S. | $34,294.55 |
| J.H.'s bankruptcy trustee | $35,000.00 |
| E.S. and A.M. | $978,967.37 |
| V.A. | $1,261,985.34 |

EXHIBIT 3

---

| USA vs. | Thomas Vincent Girardi | Docket No.: | LA CR 23-00047-JLS |
|---------|------------------------|-------------|---------------------|

Restitution shall be paid in full immediately. The Court finds from a consideration of the record that the defendant's economic circumstances allow for a full and immediate payment of restitution.

If the defendant makes a partial payment, each payee shall receive approximately proportional payment unless another priority order or percentage payment is specified in the judgment.

The defendant shall be held jointly and severally liable with co-participants, Christopher K. Kamon, for the amount of restitution ordered in this judgment. The victims' recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victims receive full restitution.

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest. Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

The defendant shall comply with Second Amended General Order No. 20-04.

It is ordered that the defendant shall pay to the United States a total fine of $35,000, consisting of the following: Count 1, a fine of $8,750; Count 2, a fine of $8,750; Count 3, a fine of $8,750; and Count 4, a fine of $8,750. The total fine shall bear interest as provided by law.

The fine shall be paid in full immediately.

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the fine is waived as it is found that the defendant does not have the ability to pay interest. Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

The Court has found that the property identified in the preliminary order of forfeiture is subject to forfeiture. The preliminary order is incorporated by reference into this judgment and is final.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of **three (3) years**. This term consists of three years on each of Counts 1, 2, 3, and 4 of the Indictment, all such terms to run concurrently under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the United States Probation & Pretrial Services Office and Second Amended General Order 20-04, including the conditions of probation and supervised release set forth in Section III of Second Amended General Order 20-04.

2. During the period of community supervision, the defendant shall pay the special assessment, fine, and restitution in accordance with this judgment's orders pertaining to such payment.

3. The defendant shall not be employed in any capacity wherein the defendant has custody, control, or management of clients' funds.

4. The defendant shall not engage, as whole or partial owner, employee or otherwise, in any business involving settlements without the express approval of the Probation Officer prior to engaging in such employment. Further, the defendant shall provide the Probation Officer with access to any and all business records, client lists, and other records pertaining to the operation of any business owned, in whole or in part, by the defendant, as directed by the Probation Officer.

USA vs.   Thomas Vincent Girardi                    Docket No.:   LA CR 23-00047-JLS

---

5.  The defendant shall cooperate in the collection of a DNA sample from the defendant.

6.  The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any other financial gains to the Court-ordered financial obligation.

The drug testing condition mandated by statute is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

It is further ordered that the defendant surrender himself to the institution designated by the Bureau of Prisons on July 17, 2025, at or before 12 noon to the United States Marshal located at the First Street U.S. Courthouse 350 W. First Street, Suite 3001, Los Angeles, CA 90012.

The Court advised the defendant of his right to appeal. The Court recommends that the Bureau of Prisons conduct a medical evaluation immediately upon the defendnat's arrival at their facility. The defendant's bond will be exonerated upon surrender.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed.  The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

June 4, 2025
_____
Date

_____
U. S. District Judge Josephine L. Staton

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

June 4, 2025
_____
Filed Date

By   /s/ Kelly Davis
_____
Deputy Clerk

| USA vs. | Thomas Vincent Girardi | Docket No.: | LA CR 23-00047-JLS |
|---|---|---|---|

The defendant must comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant must not commit another federal, state, or local crime;
2. The defendant must report to the probation office in the federal judicial district of residence within 72 hours of imposition of a sentence of probation or release from imprisonment, unless otherwise directed by the probation officer;
3. The defendant must report to the probation office as instructed by the court or probation officer;
4. The defendant must not knowingly leave the judicial district without first receiving the permission of the court or probation officer;
5. The defendant must answer truthfully the inquiries of the probation officer, unless legitimately asserting his or her Fifth Amendment right against self-incrimination as to new criminal conduct;
6. The defendant must reside at a location approved by the probation officer and must notify the probation officer at least 10 days before any anticipated change or within 72 hours of an unanticipated change in residence or persons living in defendant's residence;
7. The defendant must permit the probation officer to contact him or her at any time at home or elsewhere and must permit confiscation of any contraband prohibited by law or the terms of supervision and observed in plain view by the probation officer;
8. The defendant must work at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons and must notify the probation officer at least ten days before any change in employment or within 72 hours of an unanticipated change;

9. The defendant must not knowingly associate with any persons engaged in criminal activity and must not knowingly associate with any person convicted of a felony unless granted permission to do so by the probation officer. This condition will not apply to intimate family members, unless the court has completed an individualized review and has determined that the restriction is necessary for protection of the community or rehabilitation;
10. The defendant must refrain from excessive use of alcohol and must not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
11. The defendant must notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12. For felony cases, the defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon;
13. The defendant must not act or enter into any agreement with a law enforcement agency to act as an informant or source without the permission of the court;
14. The defendant must follow the instructions of the probation officer to implement the orders of the court, afford adequate deterrence from criminal conduct, protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

| CR-104 (docx 12/20) | JUDGMENT & PROBATION/COMMITMENT ORDER | Page 4 of 6 |
|---|---|---|

USA vs. Thomas Vincent Girardi          Docket No.: LA CR 23-00047-JLS

---

| X | The defendant must also comply with the following special conditions (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant must pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment under 18 U.S.C. § 3612(f)(1). Payments may be subject to penalties for default and delinquency under 18 U.S.C. § 3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed before April 24, 1996. Assessments, restitution, fines, penalties, and costs must be paid by certified check or money order made payable to "Clerk, U.S. District Court." Each certified check or money order must include the case name and number. Payments must be delivered to:

United States District Court, Central District of California
Attn: Fiscal Department
255 East Temple Street, Room 1178
Los Angeles, CA 90012

or such other address as the Court may in future direct.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant must pay the balance as directed by the United States Attorney's Office. 18 U.S.C. § 3613.

The defendant must notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence address until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. § 3612(b)(l)(F).

The defendant must notify the Court (through the Probation Office) and the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. § 3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution under 18 U.S.C. § 3664(k). See also 18 U.S.C. § 3572(d)(3) and for probation 18 U.S.C. § 3563(a)(7).

Payments will be applied in the following order:

1. Special assessments under 18 U.S.C. § 3013;
2. Restitution, in this sequence (under 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid):
   Non-federal victims (individual and corporate),
   Providers of compensation to non-federal victims,
   The United States as victim;
3. Fine;
4. Community restitution, under 18 U.S.C. § 3663(c); and
5. Other penalties and costs.

## CONDITIONS OF PROBATION AND SUPERVISED RELEASE PERTAINING TO FINANCIAL SANCTIONS

As directed by the Probation Officer, the defendant must provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant must not apply for any loan or open any line of credit without prior approval of the Probation Officer.

When supervision begins, and at any time thereafter upon request of the Probation Officer, the defendant must produce to the Probation and Pretrial Services Office records of all bank or investments accounts to which the defendant has access, including any business or trust accounts. Thereafter, for the term of supervision, the defendant must notify and receive approval of the Probation Office in advance of opening a new account or modifying or closing an existing one, including adding or deleting signatories; changing the account number or name, address, or other identifying information affiliated with the account; or any other modification. If the Probation Office approves the new account, modification or closing, the defendant must give the Probation Officer all related account records within 10 days of opening, modifying or closing the account. The defendant must not direct or ask anyone else to open or maintain any account on the defendant's behalf.

The defendant must not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

CR-104 (docx 12/20)                 JUDGMENT & PROBATION/COMMITMENT ORDER                 Page 5 of 6

| USA vs. | Thomas Vincent Girardi | Docket No.: | LA CR 23-00047-JLS |
|---|---|---|---|

---

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

_____            By _____
Date                                              Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

_____            By _____
Filed Date                                        Deputy Clerk

---

## FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____            _____
            Defendant                                          Date

_____            _____
U. S. Probation Officer/Designated Witness          Date

0064

# EXHIBIT 4



FILED

FEB 01 2023 SMB

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Judge Guzman
Magistrate Judge Cummings

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEB 1 2023

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. |
| | ) | |
| v. | ) | |
| | ) | Violations: Title 18, United States |
| THOMAS V. GIRARDI, | ) | Code, Sections 1343 and 401(3) |
| CHRISTOPHER K. KAMON, and | ) | |
| DAVID R. LIRA | ) | |

## COUNT ONE

The SPECIAL OCTOBER 2022 GRAND JURY charges:

1.     At times material to this indictment:

### *Individuals and Entities Involved*

a.     Defendant THOMAS V. GIRARDI was a lawyer who owned and operated a law firm called Girardi Keese ("GK"). GIRARDI was licensed to practice law in the State of California and was admitted to the general bar of the United States District Court for the Northern District of Illinois.

b.     Defendant DAVID R. LIRA was a lawyer who worked at GK. LIRA was licensed to practice law in the State of California and was admitted to the general bar of the United States District Court for the Northern District of Illinois.

c.     Defendant CHRISTOPHER K. KAMON was employed as GK's head of accounting and finance.

d.     GK Lawyer A was a lawyer who worked at GK.

e.    Lender A was a litigation financing firm. GK and GIRARDI owed Lender A approximately $8 million for amounts that Lender A loaned to GK, which GIRARDI had personally guaranteed.

*GK's Bank Accounts*

f.    IOLTA Trust Account: In California, all funds received by a lawyer or law firm for the benefit of a client, including settlement funds, must be deposited into a client trust account at a bank. Such funds can be deposited into a non-segregated trust account known as an "IOLTA" account only if the deposited funds are nominal in amount or are to be held for a short period of time. GIRARDI and LIRA were authorized signatories on an IOLTA account maintained by GK, and LIRA was identified as a "Partner" of GK on that account. KAMON was authorized to initiate wire transfers from GK's IOLTA account, and KAMON had online access to all information regarding that account.

g.    Other Bank Accounts: GK maintained separate checking accounts from which to pay GK's business and operational expenses and its payroll. GIRARDI and KAMON were authorized signatories on those accounts.

*California Rules of Professional Conduct for Lawyers*

h.    Lawyers licensed to practice law in California are required to comply with the California Rules of Professional Conduct ("CRPC").

i.    Under the CRPC, lawyers must: (1) promptly notify their clients when they receive funds in which their clients have an interest; (2) promptly distribute to their clients any undisputed funds that the clients are entitled to receive;

2

0067

and (3) take reasonable remedial measures once they became aware that a person is or was engaged in criminal or fraudulent conduct with respect to a legal proceeding in which the lawyer was involved.

*GK's Representation of Victims of the Lion Air Crash*

j.      On October 29, 2018, Lion Air Flight 610 crashed in the Java Sea shortly after takeoff from Jakarta, Indonesia. All 189 people on board the aircraft were killed. The aircraft was manufactured by Boeing.

k.      Victims A through E are relatives of passengers who died in the Lion Air crash.

l.      GIRARDI, LIRA, and GK Lawyer A, through GK, represented Victims A through E, and certain of their family members, including their minor children (collectively, "the Client Victims"), in lawsuits against Boeing (the "Lion Air cases"). Those lawsuits were filed in Chicago in the United States District Court for the Northern District of Illinois (the "Court"). GK engaged Law Firm A, a law firm based in Chicago, to act as co-counsel in those cases.

m.      After filing the Lion Air cases, LIRA and GK Lawyer A participated in mediations on behalf of the Client Victims with counsel for Boeing. As a result of those mediations, LIRA and GK Lawyer A recommended to Victims A through D that they and their family members agree to settle their cases with Boeing for an aggregated total of approximately $11,000,000. Victims A through D agreed. Because certain of the Client Victims were minors, those agreements required Court approval.

3

n.    In or about February and March 2020, the Court issued orders approving each of those settlement agreements. Each of those orders required GK to distribute the settlement funds to Victims A through D and their family members from the IOLTA "as soon as practicable" after receiving those funds from Boeing's counsel.

o.    In or about April 2020, after an additional mediation involving Victim E's case, LIRA and GK Lawyer A recommended to Victim E that he settle his case with Boeing for approximately $1,550,000. Victim E agreed.

p.    After each of the settlement agreements were reached for the Client Victims, the Court entered orders dismissing their respective cases.

q.    On or about the dates set forth below, in the approximate amounts indicated, Boeing's counsel wired settlement funds into GK's IOLTA account pursuant to the terms of the settlement agreements with the Client Victims:

| CLIENT VICTIM | DATE | AMOUNT WIRED INTO GK'S IOLTA | AMOUNT DUE TO CLIENT VICTIM |
|---|---|---|---|
| A | March 4, 2020 | $2,105,000 | $1,710,000 |
| B | March 11, 2020 | $2,530,000 | $2,060,000 |
| C | March 27, 2020 | $2,112,500 | $1,725,000 |
| D | March 30, 2020 | $2,530,000 | $2,060,000 |
| E | June 9, 2020 | $1,317,500 | $1,069,500 |

Those wire transfers were net of GK's attorneys' fees. Specifically, under the terms of the settlement agreements for each of the Client Victims, the attorneys' fees to which GK was entitled were separately wired by Boeing's counsel directly to Lender A as partial payments toward GK's and GIRARDI's $8 million loan from Lender A. As a result, GK was not entitled to retain any attorneys' fees from those settlements.

4

Instead, except for attorneys' fees owed to Law Firm A, any costs incurred by GK (up to 1% of the settlement amount), and any advances that GK had made to the Client Victims, all the funds that Boeing's counsel wired into GK's IOLTA were required to be distributed to the Client Victims, as indicated in the above column labeled "Amount Due to Client Victim."

2. Beginning in or about 2019, and continuing until in or about December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, and others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud the Client Victims and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3. It was part of the scheme that GIRARDI, KAMON, and LIRA knowingly misappropriated and caused to be misappropriated settlement funds belonging to the Client Victims by diverting those funds or causing those funds to be diverted from GK's IOLTA account for improper purposes. Those improper purposes included, among other things: (1) paying GK's business and operating expenses; (2) funding GK's payroll; (3) paying American Express Card bills; and (4) funding settlements to other GK clients, whose own settlement funds previously had been misappropriated by GK. The defendants accomplished the misappropriation of the Client Victims' funds by, among other things, making false statements and causing false statements

0070

to be made to the Client Victims regarding the status of their settlement funds, and concealing and causing those misappropriations to be concealed from the Client Victims, Law Firm A, and the Court.

*Misappropriation of the Client Victims' Settlement Funds*

4.     It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently misappropriated millions of dollars of the Client Victims' settlement funds from the IOLTA account by preparing checks from that account payable to GK and causing those checks to be deposited into one of GK's business accounts.

5.     It was further part of the scheme that KAMON caused false descriptions to be written in the memorandum section of those checks, including:

  a.     that the misappropriated funds were "fees" owed to GK from the Lion Air cases, when, as the defendants knew, GK was not entitled to retain those funds as fees from those cases; and

  b.     that the misappropriated funds were for "miscellaneous case costs," when, as the defendants knew, those funds did not represent expenses relating to any case.

6.     It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently used the Client Victims' funds that had been misappropriated to GK's business account to pay GK's business and operating expenses, to fund GK's payroll, and to pay American Express Card bills.

7.     It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently misappropriated additional amounts of the Client Victims' settlement funds from the IOLTA account by preparing checks from that account payable to other clients of GK, whose own settlement funds previously had been misappropriated by GK.

*False Statements about and Concealment of
the Misappropriation of the Client Victims' Funds*

8.     It was further part of the scheme that GIRARDI, KAMON, and LIRA fraudulently concealed and caused to be concealed from the Client Victims, Law Firm A, and the Court that GK had received the Client Victims' funds in its IOLTA account and had failed to distribute those funds to the Client Victims as required.

9.     It was further part of the scheme that, in response to repeated inquiries by the Client Victims regarding the status of their funds, GIRARDI, KAMON, and LIRA fraudulently concealed and caused to be concealed from the Client Victims, Law Firm A, and the Court that the Client Victims' funds were being misappropriated.

10.    It was further part of the scheme that GIRARDI, KAMON, and LIRA falsely stated and caused to be stated to the Client Victims that the COVID-19 pandemic prevented and delayed GK from distributing the settlement funds to the Client Victims. In fact, as the defendants knew, GK remained able to process financial transactions into and out of the IOLTA account during the pandemic and the reason the settlement funds could not be promptly distributed to the Client Victims was because those funds were being misappropriated.

7

11.    It was further part of the scheme that, on or about April 6, 2020, in response to an email from Victim B to LIRA and GK Lawyer A requesting a "loan" of $40,000, KAMON, at GIRARDI's direction and with LIRA's and GK Lawyer A's knowledge, wired $40,000 to Victim B as a purported "advance." In fact, as the defendants knew, GK previously had received all of Victim B's settlement funds in its IOLTA account, GK was required to distribute those funds to Victim B without conditions and not as a loan or an advance, and the funds were being misappropriated.

12.    It was further part of the scheme that, on or about May 14, 2020, GIRARDI emailed a letter to Victim B falsely stating:

> We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%.

LIRA and GK Lawyer A received GIRARDI's letter before it was sent to Victim B, and LIRA reviewed and approved that letter. KAMON received that letter shortly after it was sent to Victim B. Each of the defendants knew that there was no agreement with Boeing that prevented GK from distributing the settlement funds to Victim B until "all of the cases" are resolved, that no "special authorization" was required from Boeing to distribute those funds to Victim B, and that the reason the funds had not been distributed to Victim B was because they were being misappropriated.

13.    It was further part of the scheme that, on or about May 14, 2020, GIRARDI emailed a letter to Victim C falsely stating:

8

> I got enough of the problem taken care of so we were able to
> release 50% of the settlement.

LIRA and GK Lawyer A received GIRARDI's letter before it was sent to Victim C,

and LIRA reviewed and approved that letter. KAMON received that letter shortly

after it was sent to Victim C. Each of the defendants knew that there was no

"problem" that prevented GK from distributing the settlement funds to Victim C, and

that the reason the settlement funds had not been distributed to Victim C was

because they were being misappropriated.

14.    It was further part of the scheme that, on or about May 19, 2020,

GIRARDI, with the knowledge of KAMON, LIRA, and GK Lawyer A, sent a letter to

Victim D, in which GIRARDI stated, "I think you are going to love me in 30 days,"

falsely implying and promising that GK and GIRARDI would distribute the balance

of Victim D's settlement funds within 30 days and further concealing that those funds

were being misappropriated.

15.    It was further part of the scheme that, on or about June 19, 2020,

GIRARDI sent letters to Victims A through D falsely stating:

> There are some serious issues. I have been back east four times
> to get everything resolved. I think I need two more weeks. I
> will insist that, at least, we get the interest in two weeks, if I
> cannot resolve it.

KAMON and GK Lawyer A subsequently received a copy of the letter sent to

Victim D. As each of GIRARDI, KAMON, and GK Lawyer A knew, there were no

"serious issues" preventing GK from distributing the settlement funds to Victims A

through D, GIRARDI had not been back east four times to get any such purported

9

0074

issues resolved, and the reason the settlement funds had not been distributed to the Client Victims was because those funds were being misappropriated.

16.    It was further part of the scheme that the defendants fraudulently concealed from Law Firm A and the Court that GIRARDI sent the letters to Victims A through D containing the false statements described above.

17.    It was further part of the scheme that, on or about December 4, 2020, GIRARDI left a voicemail message for a lawyer at Law Firm A, in which GIRARDI falsely stated, "I think we got clearance to send money out today."

*Partial Lulling Payments to Victims A through D*

18.    It was further part of the scheme that, in response to repeated inquiries by Victims A through D about, and demands for, their settlement funds, and to hinder or delay Victims A through D from discovering and reporting the misappropriation of those funds, the defendants made partial payments and caused partial payments to be made to Victims A through D, as follows:

a.    on or about May 11, 2020, wire transfers from GK's IOLTA account to Victim A of approximately $855,000; to Victim B of approximately $1,010,000; to Victim C of approximately $862,500; and to Victim D of approximately $1,030,000;

b.    on or about July 6, 2020, wire transfers from GK's IOLTA account of $50,000 to each of Victims A through D; and

c.    on or about September 3, 2020, wire transfers from GK's IOLTA account to Victim A of approximately $305,000; to Victim B of approximately

10

$460,000; to Victim C of approximately $312,500; and to Victim D of approximately $460,000.

19.    As a result of the scheme, the defendants caused the Client Victims to suffer losses of over $3 million.

20.    It was further part of the scheme that GIRARDI, KAMON, and LIRA concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence, purpose, and acts done in furtherance of the scheme.

21.    On or about March 2, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GK Lawyer A, using the email address "[GKLawyerA]@girardikeese.com," received by, among others, a lawyer at Law Firm A and LIRA, using the email address "dlira@girardikeese.com," which email attached a settlement release signed by Victim B;

In violation of Title 18, United States Code, Sections 1343 and 2.

0076

## COUNT TWO

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about April 6, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transfer of $40,000, purportedly as an "advance" to Victim B, from GK's IOLTA trust account to Victim B's bank account in Indonesia;

In violation of Title 18, United States Code, Sections 1343 and 2.

12

## COUNT THREE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about April 22, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA, using the email address "dlira@girardikeese.com," to Victims A through D, falsely stating that their settlement payments were delayed because of the pandemic, including that "[w]e are still under the government mandate to stay at home";

In violation of Title 18, United States Code, Sections 1343 and 2.

0078

## COUNT FOUR

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about May 12, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA, using the email address "dlira@girardikeese.com," received by, among others, lawyers from Law Firm A, which email concealed and omitted material facts, including that: (1) all settlement funds for Victims A through D had been received in GK's IOLTA trust account; (2) GK had failed to distribute those funds to the Client Victims as required; and (3) GK was misappropriating settlement funds belonging to Victims A through D;

In violation of Title 18, United States Code, Sections 1343 and 2.

14

0079

## COUNT FIVE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.    On or about May 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

THOMAS V. GIRARDI,
CHRISTOPHER K. KAMON, and
DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GIRARDI's legal assistant to Client B in Indonesia, attaching a letter from GIRARDI containing the false statements: "We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%";

In violation of Title 18, United States Code, Sections 1343 and 2.

15

## COUNT SIX

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about May 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GIRARDI's legal assistant to Client C in Indonesia, attaching a letter from GIRARDI containing the false statement: "I got enough of the problem taken care of so we were able to release 50% of the settlement";

In violation of Title 18, United States Code, Sections 1343 and 2.

16

### COUNT SEVEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about May 15, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA using the email address "dlira@girardikeese.com," received by, among others, lawyers from Law Firm A, which email concealed and omitted material facts, including that: (1) all settlement funds for Victims A through D had been received in GK's IOLTA trust account; (2) GK had failed to distribute those funds to the Client Victims as required; (3) GK was misappropriating settlement funds belonging to Victims A through D; and (4) GIRARDI had sent letters to Victims B and C on or about May 14, 2020, which letters included false explanations for why those victims had not been sent their settlement funds;

In violation of Title 18, United States Code, Sections 1343 and 2.

17

## COUNT EIGHT

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about May 19, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GK Lawyer A, using the email address "[GKLawyerA]@girardikeese.com," received by, among others, a lawyer at Law Firm A and LIRA, using the email address "dlira@girardikeese.com," which email attached a settlement release signed by Victim E;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT NINE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.    The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.    Beginning on or about March 4, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated February 24, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim A as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

## COUNT TEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.      Beginning on or about March 11, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

>       THOMAS V. GIRARDI,
>       CHRISTOPHER K. KAMON, and
>       DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 4, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim B as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

20

## COUNT ELEVEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.    The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.    Beginning on or about March 27, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 9, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim C as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

21

## COUNT TWELVE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.      Beginning on or about March 30, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 4, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim D as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

22

## FORFEITURE ALLEGATION

The SPECIAL OCTOBER 2022 GRAND JURY further alleges:

1.      Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in this Indictment, defendants GIRARDI, KAMON, and LIRA shall forfeit to the United States of America any property which constitutes and is derived from proceeds obtained directly and indirectly as a result of the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      The property to be forfeited includes but is not limited to: a personal money judgment in the amount of approximately $3,069,500.

3.      If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code Section 853(p).

A TRUE BILL:

_____

FOREPERSON

_____
Signed by Jason Yonan on behalf of the
UNITED STATES ATTORNEY

23

# EXHIBIT 5

1  Larry W Gabriel, State Bar No. 68329
   JENKINS MULLIGAN & GABRIEL LLP
2  585 Lorna Lane
   Los Angeles, California 90049
3  Tel: 818.943.8992
   Email: lgabrielaw@outlook.com
4

5  Special Litigation Counsel for Plaintiff
   Elissa D. Miller, Chapter 7 Trustee,
6  Estate of Girardi Keese

FILED & ENTERED

OCT 23 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fortier      DEPUTY CLERK

7              **UNITED STATES BANKRUPTCY COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9              **LOS ANGELES DIVISION**

10

11 | In re                                              | Case No. 2:20-bk-21022-BR
12 | GIRARDI KEESE,
13 |                      Debtor,                       | Chapter 7
14 |
15 | ELISSA D. MILLER, chapter 7 trustee for the        | Adv. No. 2:21-ap-01155-BR
   | estate of Girardi Keese,
16 |
17 |                      Plaintiff,                     | **FINDINGS OF FACT AND**
   |                                                    | **CONCLUSIONS OF LAW**
18 |                 vs.
19 | ERIKA J. GIRARDI, an individual; EJ Global         | **Judge: Hon. Barry Russell**
   | LLC, a limited liability company; and PRETTY
20 | MESS, INC., a corporation,
21 |
   |                      Defendants.
22

23         Pursuant to the Court's Order of September 24, 2024, Plaintiff Elissa D. Miller, Chapter 7

24 Trustee, Estate of Girardi Keese, submits the following proposed findings of fact and conclusions

25 of law for the Court's consideration.

26

27                              EXHIBIT 5

28
                                       -1-
   Trustee's Findings of Fact and Conclusions of Law

                                                                      0090

| UF # | UNDISPUTED FACTS | EVIDENCE |
|---|---|---|
| | **A.  Procedural Background: Girardi Keese Bankruptcy** | |
| 1. | Girardi Keese ("Girardi Keese" or "Debtor") is the debtor in the Bankruptcy Case 2:20-bk-21022-BR, which case was initiated by the filing an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code on December 18, 2020 (the "Petition Date"). | Bankr. ECF Doc. 1. |
| 2. | Plaintiff Elissa D. Miller is the duly appointed, qualified and acting Chapter 7 Trustee of the Girardi Keese bankruptcy estate (the "Estate") having been so appointed on January 5, 2021, and having accepted the appointment on January 6, 2021. | Bankr. ECF Docs. 45, 48. |
| 3. | The Court entered an Order for Relief Under chapter 7 on the involuntary petition on January 13, 2021. | Bankr. ECF Doc. 69. |
| | **B.  The Trustee's Adversary Action** | |
| 4. | The Trustee initiated this adversary action, *Miller v. Erika J. Girardi, et al.,* Adversary Case No.: 2:21-ap-01155-BR on July 14, 2021. | Adv. ECF Doc. 1. |
| 5. | On August 26, 2021, the Trustee filed an Amended Complaint. | Adv. ECF Doc. 12. |
| 6. | The Defendants named in the Amended Complaint are ERIKA J. GIRARDI, an individual; EJ Global, LLC, a limited liability company; and PRETTY MESS, INC., a corporation. | *Id.* |
| 7. | The Defendants answered the Amended Complaint on November 11, 2021. | Adv. ECF Doc. 20. |

-2-

| 8. | Defendant Erika Jayne Girardi ("Erika Girardi") is a resident of Los Angeles County, State of California. | Admitted, Defendants Amended Answer, Adv. ECF Doc. 20, ¶ 4:26-27 |
|---|---|---|
| 9. | Defendant EJ Global, LLC, ("EJ Global") is a California limited liability company. | Admitted, Defendants Amended Answer, Adv. ECF Doc. 20, ¶ 5:1-2. |
| 10. | Defendant Pretty Mess, Inc. ("Pretty Mess"), is a California corporation. | Admitted, Defendants Amended Answer, Adv. ECF Doc. 20, ¶ 6:9-10 |

### C. Thomas V. Girardi and Erika Girardi's Relationship

| 11. | Thomas V. Girardi ("Girardi" or "TVG") was an attorney at law admitted to practice in the State of California on January 13, 1965. | Trustee's Request for Judicial Notice, Adv. ECF Doc. 29, p. 5, Exhibit 1. |
|---|---|---|
| 12. | Erika Girardi and Girardi were married on January 7, 2000. At the time of their marriage Erika Girardi was 27 years old. Girardi was 60 years old. | Declaration of Erika Girardi in Support of Opposition to Trustee's Motion, executed June 14, 2022, Adv. ECF Doc. 47-1, p. 2 ¶ 2. |
| 13. | On March 30, 2021, the California State Bar Association filed and served a Notice of Disciplinary Charges upon Thomas V. Girardi. | Trustee's Request for Judicial Notice, Adv. ECF Doc. 29, p. 7, Exhibit 3. |
| 14. | On June 1, 2022, the California Supreme Court entered its order disbarring Girardi from the practice of law in the State of California. | *Girardi on Discipline*, 2022 Cal. LEXIS 3753 (June 1, 2022). |
| 15. | As of June 14, 2022, Erika Girardi and Girardi remained married. | Declaration of Erika Girardi in Support of Opposition to Trustee's Motion, executed June 14, 2022, Adv. ECF Doc. 47-1, p. 2 ¶ 3-4. |

Trustee's Findings of Fact and Conclusions of Law

0092

| 16. | On January 31, 2023, Girardi was indicted by the Grand Jury, United States District Court, Central District of California, CR No. 2:23-cr-00047-JFW. | Trustee's Request for Judicial Notice, Adv. ECF Doc. 99, Exhibit 2 |
|---|---|---|
| 17. | The indictment charged Girardi with five counts of violating 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 981(a)(1)(C); Criminal Forfeiture. | *Id.* |
| 18. | On August 27, 2024, the District Court in *USA v. Girardi,* Cr. No. 23-00047-JLS entered the verdict of the jury in this action. The jury found Girardi guilty on four counts of wire fraud, 18 U.S.C. § 1343. | Trustee's Supplemental RFJN, ECF Doc. 130, Exhibit 1. |
| **D. The Trustee's Turnover Motion** | | |
| 19. | On January 25, 2022, the Trustee filed her "NOTICE OF MOTION AND MOTION FOR ORDER FOR TURNOVER OF PERSONAL PROPERTY ("Turnover Motion") and Request for Judicial Notice ("RFJN") requesting an order requiring Girardi to turnover to the Trustee a certain pair of diamond earrings TVG purchased for Erika Girardi on March 2, 2007 (the "Turnover Motion" or "Motion"). | Adv. ECF Docs., 28-29. |
| 20. | On January 26, 2022, Erika Girardi filed a preliminary opposition to the Turnover Motion. | Adv. ECF Doc. 31. |
| 21. | On June 14, 2022, Erika Girardi filed her opposition to the Turnover Motion ("Opposition") and Declaration of Erika Girardi. | Adv. ECF Docs. 47, 47-1. |
| 22. | In the Opposition, Erika Girardi alleged that: (1) the statute of limitations and statute of repose had expired and barred the Trustee's claims based on the 2007 earrings transaction; and (2) the Turnover Motion was improper because the GK Client | Id. |

-4-

Trustee's Findings of Fact and Conclusions of Law

| | | | |
|---|---|---|---|
| 1 2 | | Trust Account and, in turn, the earrings were indisputably not property of the GK bankruptcy estate. | |
| 3 4 | 23. | The Trustee filed her reply brief ("Reply") on June 21, 2022. | Adv. ECF Doc. 48. |
| 5 6 7 | 24. | On June 28, 2022, the Bankruptcy Court held a hearing on the Turnover Motion and, on July 11, 2022, entered its Order granting the Turnover Motion. | Adv. ECF Docs. 53 (Transcript) and 58 (Order). |
| 8 | 25. | Erika Girardi timely filed a Notice of Appeal on July 25, 2022. | Adv. ECF Doc. 60. |
| 9 10 11 12 | 26. | Erika Girardi did not file a bond on appeal, nor did she seek a stay of implementation of the Court's Order granting the Motion.  The Diamond Earrings were sold at auction on December 7, 2022. | Bankr. ECF Doc. 1543, Exhibit 6. |
| 13 14 | 27. | The Court approved the sale of the diamond earrings on January 23, 2023. | Bankr. ECF Doc. 1568. |
| 15 16 17 18 19 20 21 22 23 24 25 26 | 28. | On May 1, 2023, the District Court issued its order, reversing in part the order of this Court granting the Trustee's Turnover Motion requiring Erika Girardi to turn over to the Trustee diamond earrings that Girardi bought for $750,000 using settlement funds from the Rezulin litigation trust account ("Earrings App. Order"). In so doing, the District Court made the following determinations: (1) that Erika Girardi had standing to prosecute the appeal, because "standing is a doctrine that limits who can bring a suit, and does not limit a party's ability to defend herself when sued; (2) the appeal was not equitably moot; (3) the Turnover Motion was not barred by the statute of limitations or the statute of repose; and the | District Court Case No.: 2:22-CV-05176-DSF; DC ECF Doc. 35, Adv. Doc. 79. *Miller v. Girardi, (In re Keese),* 671 F. Supp. 1053 (2023). |
| 27 28 | | | |

Trustee's Findings of Fact and Conclusions of Law

0094

| | | Trustee had not met her burden to show that the earrings were estate property because of commingling. | |
|---|---|---|---|
| | 29. | The Trustee filed her Opening Brief Addressing Issues Presented by District Court's Remand Order, Declaration of Nicholas R. Troszak, (ECF Doc. 98) and Request for Judicial Notice, (ECF Doc. 99) on October 24, 2023. | Adv. ECF Docs. 98, 99. |
| | 30. | Erika Girardi filed her Opposition to Trustee's Opening Brief Addressing Issues Presented by the District Court's Remand Order, Declaration of Nicholas R. Troszak [Doc.98] and Request for Judicial Notice [Doc. 99] on November 4, 2023. | Adv. ECF Doc. 102. |
| | 31. | The Trustee filed her Reply Brief to Erika Girardi's Opposition on November 11, 2023. | Adv. ECF Doc. 105 |
| | 32. | On January 3, 2024, the Court entered its order continuing the hearing on the Remand Order, allowing Defendant additional time to conduct discovery and setting a briefing schedule for the parties to file Supplemental Briefs and Evidence addressing the issue presented by the Remand Order. | Adv. ECF Docs. 108-110. |
| | 33. | The Trustee filed her Supplemental Brief and Supplemental Declaration of Nicholas R. Troszak in support of her Turnover Motion on August 16, 2024. | Adv. ECF Doc. 124 |
| | 34. | Erika Girardi filed her Opposition of Defendant Erika Girardi to: Trustee's Supplemental Memorandum of Points and Authorities Addressing Issues Presented by District Court's Remand Order [DOC. 124], Declaration Evan Borges and Evidentiary Objections on September 2, 2024. | Adv. ECF Docs. 125, 125-1, 125-2. |
| | 35. | The Trustee filed her Reply to Erika Girardi's Supplemental Opposition, Supplemental RFJN and Responses to Erika | Adv. ECF Docs. 129, 130, 131. |

| | | |
|---|---|---|
| | Girardi's Evidentiary Objections (Doc. 131) on September 16, 2024. | |
| 36. | The hearing on the Remand Order was held on September 24, 2024 at 10 a.m. All parties appeared at the hearing. | |
| **E. The Girardi Keese Comerica IOLTA Trust Account # 6674** | | |
| 37. | On March 26, 2002, Girardi Keese started using a California required IOLTA Trust Account at Comerica Bank, Account # ending in "6674" ("Comerica IOLTA Account # 6674"). | Trustee's Opening Brief Addressing Issues Presented by the District Court's Remand Order; Declaration of Nicholas R. Troszak, executed October 24, 2023. Adv. ECF Doc. 98, ¶ 3. |
| 38. | The Comerica IOLTA Account # 6674 was Girardi Keese's primary IOLTA Account for the vast majority of Girardi Keese cases. | Trustee's Opening Brief Addressing Issues Presented by the District Court's Remand Order; Declaration of Nicholas R. Troszak, executed October 24, 2023 Adv. ECF Doc. 98, ¶ 4. |
| 39. | The Comerica IOLTA was not a single purpose trust account but was one of Girardi Keese's primary IOLTA Trust accounts. | Trustee's Supplemental Memorandum of Points and Authorities Addressing Issues Presented by District Court's Remand Order, Supplemental Declaration of Nicholas R. Troszak, executed August 15, 2024, ECF Doc. 124, Exhibit 6, "Declaration of Nicholas R. Troszak" executed October 24, 2023. |

-7-

Trustee's Findings of Fact and Conclusions of Law

0096

## F.  Girardi Keese Commingled Girardi Personal Funds in the Use of Comerica IOLTA Account # 6674

| | | |
|---|---|---|
| 40. | Between January 14, 2002, to January 29, 2007 (the day prior to the receipt of the Rezulin settlement funds) deposits were made into the Comerica IOLTA in the amount of $17,631,673.00 attributable to Thomas V. Girardi ("TVG") or his related or affiliated entities. | Trustee's Supplemental Memorandum of Points and Authorities Addressing Issues Presented by District Court's Remand Order, Supplemental Declaration of Nicholas R. Troszak, executed August 15, 2024, Exhibit 4. |
| 41. | During the time period April 22, 2002, through December 31, 2010, $29,131,673.47 was deposited into the Comerica IOLTA Account # 6674 that were credited as deposits made by Thomas V. Girardi ("TVG"), or as a TVG loan, or accounted for under the case number 10001, the case number used for Girardi personal transactions. | Trustee's Opening Brief Addressing Issues Presented by District Court's Remand Order and Declaration of Nicholas R. Troszak executed October 24, 2023, Adv. ECF Doc. 98, Exhibit 1. |
| 42. | During the same time period (April 22, 2002, through December 31, 2010), $31,579,332.25 was disbursed from the Comerica IOLTA Account # 6674 described as payments made to TVG, TVG loan, or accounted for under the case number of 10001, the case number used for Girardi personal transactions. | *Id*. Adv. ECF Doc. 98, ¶ 5, Exhibit 1. |
| 43. | The differential between the payments in and payments out of the Comerica IOLTA Account # 6674 attributable to TVG is a negative $ 2,447,658.78. None of the transactions in this calculation were described as a payment for fees or costs. | *Id*. |
| 44. | For the period of time between January 30, 2007, (the date the first settlement payment on the Rezulin matter was received) | *Id*. Adv. ECF Doc. 98, ¶ 6, Exhibits 2-3. |

-8-

Trustee's Findings of Fact and Conclusions of Law

0097

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7 | | through October 27, 2014 (the date of the last payment attributable to Rezulin), checks were issued to G&L Aviation, an entity owned by TVG and Walter Lack. The total amount paid to G&L Aviation was $2,082,849.59. Two of the four payments are accounted for as relating to TVG and GK miscellaneous. The remaining two payments are accounted for as relating to certain GK client cases. | |
| 8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17 | 45. | The following payments were made directly from the Comerica IOLTA Account # 6674 prior the receipt of the Rezulin settlement funds:<br><br>    a.  Check # 40420 dated 4/26/05 payable to G&L Aviation in the amount of $500,000.00.<br><br>    b.  Check # 13916 dated 06/22/06 payable to G&L Aviation in the amount of $750,000.00.<br><br>    c.  Check # 13917 dated 06/22/06 payable to Pac Ten Scott Road Associates LLC in the amount of $3,200,000.00. | *Id.* Exhibit 3. |
| 18<br>19 | | **G. Receipt of the Rezulin Settlement Funds and Relevant Transactions After Receipt of the Rezulin Settlement Funds** | |
| 20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 46. | On January 30, 2007, a wire transfer deposit was credited to the IOLTA Comerica Trust Account # 6674 in the amount of $64,845,728.14 (January 30, 2007 Deposit"). The description for the deposit, Rezulin Settlement Proceeds. | Trustee's Supplemental Memorandum of Points and Authorities and Declaration of Declaration of Nicholas R. Troszak Adv. ECF Doc. 124, executed August 15, 2024, Exhibit 7.1 Trust Account System (Comerica Trust 6674) Activity Register, p. 193. |

Trustee's Findings of Fact and Conclusions of Law

| 47. | Prior to the Rezulin Settlement Funds deposit, the IOLTA Comerica Trust Account # 6674 had a positive balance of $2,237,179.62. | *Id.* |
|---|---|---|
| 48. | After receipt of the January 30, 2007 deposit, the IOLTA Comerica Trust Account # 6674 had a positive balance of $67,082,907.76. | *Id.* |
| 49. | On January 30, 2007, Girardi Keese withdrew $4 million from the IOLTA Comerica Trust Account # 6674 as reimbursements for costs attributable to Rezulin matter. | Trustee's Supplemental Memorandum of Points and Authorities and Declaration of Nicholas R. Troszak Adv. ECF Doc. 124, executed August 15, 2024, Exhibit 7.1, Comerica IOLTA Register, at p. 571; Exhibit 5, p.1. |
| 50. | On February 13, 2007, Girardi Keese withdrew $1,000,000 from the IOLTA Comerica Trust Account # 6674 as reimbursements for costs. | *Id.* Exhibit 7.1, Comerica IOLTA Register, at p. 571; Exhibit 5, p. 1 |

**Girardi's Use of IOLTA Comerica Trust Account # 6674 to Purchase the Diamond Earrings and his Cover-Up of the Same**

| 51. | On March 2, 2007, a check was drawn against the IOLTA Comerica Trust Account # 6674 payable to M&M in the amount of $750,000. The description for the check, "Costs" relating to GK case name *Rezulin,* case number 21101. | Declaration of Nicholas R. Troszak executed October 24, 2023, Adv. ECF Doc. 98, Exhibit 3. Trustee's Exhibits and RJFN, (Adv. ECF Doc. 29) Exhibit 5. |
| 52. | The check made payable to M&M was used to purchase a pair of diamond earrings for Erika Girardi. | Trustee's Exhibits and RJFN, (Adv. ECF Doc. 29) Exhibit 5. |
| 53. | TVG represented to the California Franchise Tax Board that he paid $750,000 for the earrings to replace those stolen | Trustee's Exhibits and RJFN, (Adv. ECF Doc. 29) Exhibit 4. |

| | | | |
|---|---|---|---|
| | | from his home, and that he "took the funds from my line of credit at Comerica . . . . M&M Jewelers signed an affidavit attesting to the replacement of the stolen earrings. | |
| | 54. | Girardi Keese first withdrew fees for the Rezulin matter from the IOLTA Comerica Trust Account # 6674 on May 24, 2007, or approximately 120 days after Girardi Keese received the Rezulin settlement proceeds and withdrew $5 million as reimbursement for costs. | Trustee's Supplemental Memorandum of Points and Authorities and Declaration of Nicholas R. Troszak Adv. ECF Doc. 124, executed August 15, 2024, p. 6 ¶ 14, Exhibit 5, p. 276, Exhibit 7.1 Trust Account System (Comerica Trust 6674) Activity Register, p. 487. |
| | 55. | The last withdrawal from the IOLTA Comerica Trust Account # 6674 for Girardi Keese fees for the Rezulin matter was made on October 7, 2008, in the amount of $250,000, a year and a half after the Rezulin Settlement Funds had been received. | *Id*., Exhibit 5, p. 317; Exhibit 7.1. |
| | 56. | Depending on the period of time, many Girardi Keese client accounts were out of trust.  As presented in Mr. Troszak's Supp. Decl. (Exhibit 2, page 1) case 29048 *Estate of Mong Qui Sun v DW Tours* was negative in the amount of $4,875,000 (Grand Total "net" negative amount of $7,094,900); case 21101 *Rezulin* was negative in the amount of $2,831,788 (Grand total "net" negative amount of $2,833,663); and, case 25198 *Bextra/Celebrex* was negative in the amount of $1,233,620 (Grand total "net" negative amount of $1,851,279). | Trustee's Supplemental Memorandum of Points and Authorities and Declaration of Nicholas R. Troszak Adv. ECF Doc. 124, executed August 15, 2024, pp. 016-017, ¶ 12, Exhibit 2. |

-11-

| | | | |
|---|---|---|---|
| 57. | During the time period (January 1, 2002, through November 30, 2013), there are 68 total transactions (16 deposits and 52 disbursements), which indicate commingling of personal TVG funds and disbursements of client trust funds for the benefit of TVG. The transactions are accounted for as associated or relating to TVG under the case number "10001," case name "TVG," or includes TVG within the transaction description. The Trust Database accounting records indicate 16 deposits totaling $29,680,472 relating to TVG and 52 disbursements totaling $45,079,332 relating to TVG during this period. | *Id.*, p. 017, ¶ 13, Exhibit 4. | |
| 58. | From the settlements reached in the Rezulin matter, case number 21101, a total of $66,380,270 in deposits were received, and a total of $69,213,933 of disbursements were made and assigned to the Rezulin matter. The disbursements assigned to the Rezulin matter exceeded the deposits assigned to the Rezulin matter by $2,833,663. | *Id.*, p. 18, ¶ 14, Exhibits 2, 5. | |
| 59. | All cash transactions for the Rezulin matter, into or out of the IOLTA Comerica Trust Account # 6674 occurred between January 1, 2002, through November 30, 2013, except for two transactions totaling $1,825 in disbursements, which took place during 2014. | *Id.*, p. 17, ¶ 14, Exhibit 5. | |
| 60. | The Rezulin Case Card Register is a separate ledger for the case and was part of the Girardi Keese trust accounting system. All but three transactions totaling approximately $51,000 attributable to the Rezulin matter occurred from the Girardi Keese IOLTA Comerica Trust Account # 6674. | *Id.*, p. 17, ¶ 15, Exhibit 5. | |

-12-

| | | |
|---|---|---|
| 61. | During the period April 22, 2002, through January 2018, $17,631,673 was deposited into the IOLTA Comerica Trust Account # 6674 relating to Girardi or Girardi related entities; and, $21,479,073 was disbursed from the IOLTA Comerica Trust Account # 6674 relating to Girardi or Girardi related entities. | *Id.*, p. 18, ¶ 16, Exhibit 7.1. |
| 62. | There were 90 GK client cases that have a "net' negative balance totaling $24,682,028.  For example, the 99140 Friendly Valley matter has a "net" negative balance of $4,429,524 (Exhibit 7, page 1).  The "net" negative balance decreases to $4,375,522, when including all other Girardi Keese trust accounts.  Also, the 21101 Rezulin matter has a "net" negative balance of $ 2,833,662.83. | *Id.*, p. 18, ¶ 16, Exhibit 7.1; Exhibit 5. |
| 63. | Between January 30, 2007 (the date the first settlement payment on the Rezulin matter was received) through October 27, 2014 (the date of the last payment attributable to Rezulin), Girardi Keese issued checks to G&L Aviation, an entity owned by TVG and Walter Lack from the IOLTA Comerica Trust Account # 6674 in the total amount of $2,082,849.59. | *Id.*, p. 19, ¶ 18, Exhibit 8. |
| 64. | Between July 2006 through December 2008, 42 payments from Magnet Consulting Inc. were deposited into the IOLTA Comerica Trust Account # 6674 in the amount of $2,580,000.00.  These deposits were accounted for under accounts "10004 Exchange -s/b zero balance" and "10208 MISCELLANEOUS (2008)." | *Id.*, p. 19, ¶ 19, Exhibit 9. |

-13-

| 65. | During the same approximate time period (July 2006 through December 2008) Girardi Keese issued 40 checks from the IOLTA Comerica Trust Account # 6674 totaling $2,580,000 payable to Girardi Financial, Inc., for the same amounts (except for the initial payment to Girardi Financial, Inc., in the amount of $240,000) as the money received from Magnet Consulting Inc.  These disbursements were accounted for similarly to the Magnet Consulting deposits, under accounts "10004 Exchange -s/b zero balance" and "10208 MISCELLANEOUS (2008)." | Id. Exhibit 10. |
|---|---|---|

## CONCLUSIONS OF LAW

**A. California Rules of Professional Conduct**

1.   The California Rules of Professional Conduct ("Rules") regulate professional conduct of attorneys licensed by the State Bar. The Rules are adopted by the Board of Trustees and approved by the California Supreme Court pursuant to statute to protect the public and to promote respect and confidence in the legal profession. The Rules and any related standards adopted by the Board are binding on all attorneys licensed by the State Bar. *See*, State Bar of California website, Rules of Professional Conduct (ca.gov), Introduction.

2.   Current Rule 1.15 "Safekeeping Funds and Property of Clients and Other Persons" was approved by the California Supreme Court effective January 1, 2023.  The current rule superseded Rule 1.15 that became effective November 1, 2018.   Rule 1.15 replaced former Rule 4-100 "Preserving Identity of Funds and Property of a Client" which was enacted in 1992 and remained effective until October 31, 2018.  *See*, Rules, at https://www.calbar.ca.gov/Portals/0/documents/ethics/Publication-250-Volume-1.pdf.

3.   For purposes of addressing the issues presented in the Turnover Motion, Rule 4-100 is controlling.

4.   Rule 4-100 provides in relevant part:

-14-

1     <u>Rule 4-100 of a Client Preserving Identity of Funds and Property</u> (A) All funds

2     received or held for the benefit of clients by a member or law firm, including

3     advances for costs and expenses, shall be deposited in one or more identifiable bank

4     accounts labeled "Trust Account," "Client's Funds Account" or words of similar

5     import, maintained in the State of California, or, with written consent of the client,

6     in any other jurisdiction where there is a substantial relationship between the client

7     or the client's business and the other jurisdiction. No funds belonging to the member,

8     or the law firm shall be deposited therein or otherwise commingled therewith except

9     as follows:

10         (1) Funds reasonably sufficient to pay bank charges.

11         (2) In the case of funds belonging in part to a client and in part presently or

12         potentially to the member or the law firm, the portion belonging to the

13         member or law firm must be withdrawn at the earliest reasonable time after

14         the member's interest in that portion becomes fixed.

15 California Rules of Professional Conduct, Appendix 2, 1992 Rules, p. 205.

16   **B. The Remand Order**

17     5. This Motion presents a mix of issues involving federal bankruptcy law and California state

18 law.

19     6. Federal law applies to the interpretation and application of 11 U.S.C. §§ 502, 542, 544,

20 548, 550, 551, and to issues of federal jurisdiction.

21     7. On May 1, 2023, the District Court issued its order, [2:22-CV-05176-DSF; DC ECF Doc.

22 35; Adv. Doc. 79. ("D.C. Order") reversing in part and affirming in part the order of this Court

23 granting the Trustee's Turnover Motion [Adv. Doc. 58].

24     8. The D.C. Order contains the following determinations: (1) that Erika Jayne (Girardi) had

25 standing to prosecute the appeal, because "standing is a doctrine that limits who can bring a suit,

26 and does not limit a party's ability to defend herself when sued (D.C. Order, p. 4); (2) the appeal

27 was not equitably moot (D.C. Order at p. 7);  (3) the Turnover Motion was not barred by the

28

Trustee's Findings of Fact and Conclusions of Law

1   statute of limitations or the statute of repose (*Id*.); and (4) the Trustee had not met her burden to

2   show that the earrings were estate property because of commingling.  [D.C. Order at p. 11]

3       9.   The D.C. Order remanded the Turnover Motion to this Court for further evidentiary

4   proceedings to address the issue of commingling.

5       10. In its order, the District Court made the following factual findings:

6           Trustee has failed to meet her burden to show that the earrings are estate property.

7           The $750,000 used to purchase the earrings came from the RTA. Reply at 20,

8           Turnover Mot. at 6, 8. This was an express trust account that Girardi Keese managed

9           for its Rezulin clients. *Id*. Money that Girardi Keese held in trust for the Rezulin

10          clients was not estate property. *Begier v. I.R.S.*, 496 U.S. 53, 59, 110 S. Ct. 2258, 110

11          L. Ed. 2d 46 (1990) ("Because the debtor does not own an equitable interest in

12          property, he holds in trust for another, that interest is not 'property of the estate.'").

13  *Girardi v. Miller,* 671 F. Supp. 3d 1053 1063-1064 (2023) ("Girardi").

14  **C.  The Rezulin Settlement Funds Were Deposited into Girardi Keese IOLTA Comerica**

15      **Trust Account # 6674, Not in a Separate Trust Account**

16      6.   The District Court's factual finding a separate Rezulin Trust Account exceeded the District

17  Court's authority in its role as a reviewing court.  *Anderson v. City of Bessemer,* 470 U.S. 564,

18  573-74, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (Reviewing court oversteps the bounds of its

19  duty under Fed. R. Civ. P. 52(a) if it undertakes to duplicate the role of the lower court. . . .

20  Reviewing courts must constantly have in mind that their function is not to decided factual issues

21  *de novo*.")  *In re Mankin*, 823 F.2d 1296, 1305 (9th Cir. 1987) (citing 28 U.S.C. §§ 157(b)(1), 158(a),

22  (c)) (The decision of a bankruptcy judge is reviewable by an Article III judge only by an appeal governed

23  by the same rules applicable to appeals taken to the courts of appeals from the district courts.")  The

24  District Court's finding of fact is not binding on this Court.

25      7.   The IOLTA Comerica Trust Account # 6674 was not a single purpose trust account.

26      8.    The IOLTA Comerica Trust Account # 6674 was not an express trust account that Girardi

27  Keese used solely for the Rezulin clients.

28

-16-

Trustee's Findings of Fact and Conclusions of Law

9.   The IOLTA Comerica Trust Account # 6674 was the account used by Girardi Keese for all of the cash transactions for the Rezulin matter # and for the vast majority of Girardi Keese client transactions for the period of time 2002 through 2018.

10.   All deposits for the Rezulin matter, and payments accounted for as payments from the Rezulin matter went into or out of the IOLTA Comerica Trust Account # 6674 between January 30, 2007, through November 30, 2013, except for two transactions totaling $1,825 in disbursements, which took place during 2014.

11.   The District Court's factual determination that there was an "express trust account that Girardi Keese managed for its Rezulin clients" is not supported by the evidence presented on Remand.

**D.  The Doctrine of Judicial Estoppel is Not Applicable as a Defense to the Turnover Motion**

12.   Erika Girardi's argument is that this Court should use its discretion and adopt the doctrine of judicial estoppel as a bar to the Trustee's evidence is not well taken and is rejected.

13. Judicial estoppel, also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local* 343, 94 F.3d 597, 600 (9th Cir. 1966).  It is an equitable doctrine invoked by a court at its discretion to protect against a litigant playing fast and loose with the courts. Id. (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)). In determining whether to apply the doctrine, a court should consider: "(1) whether a party's later position is 'clearly inconsistent' with its original position; (2) whether the party has successfully persuaded the court of the earlier position; and (3) whether allowing the inconsistent position would allow the party to 'derive an unfair advantage or impose an unfair detriment on the opposing party.'" *In re Hoopai*, 581 F.3d 1090, 1097 (9th Cir. 2009) quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) ("*New Hampshire*"). A key inquiry is whether allowing a party to take inconsistent positions would threaten judicial integrity. *See*, *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783–86 (9th Cir.2001) (invoking

-17-

judicial estoppel "to protect the integrity of the bankruptcy process"); *see also*, *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993, (9th Cir.2012) (explaining that judicial estoppel protects "the dignity of judicial proceedings"). These factors are not "inflexible prerequisites" or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." *New Hampshire* at 532 U.S. at 751.

14. Judicial Estoppel is an equitable doctrine that is "invoked by a court at its discretion." *New Hampshire,* 532 U.S. at 750 (emphasis added). "[C]ourts have uniformly recognized that the purpose of judicial estoppel is 'to protect the integrity of the judicial process,' ... by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment." [*Id.*]

15. An evidentiary hearing was contemplated by the District Court's remand order for further proceedings.

16. There was nothing in anything submitted to this Court by the Trustee that causes prejudice to the Court. This is not a prior case but the same case after a remand.

17. The Trustee did not take inconsistent positions in this case. However, even assuming *arguendo* that occurred, which it did not, the allegedly inconsistent positions offered by Erika Girardi do not seriously threaten judicial integrity. *New Hampshire*, 532 U.S. at 750–51 (citation omitted ") (Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,'... and thus poses little threat to judicial integrity."); *see also*, *Masayesva v. Hale,* 118 F.3d 1371, 1382 (9th Cir.1997) (affirming District Court's rejection of judicial estoppel where "no court ever adopted the original ... position").

18. The District Court specifically remanded for further evidentiary proceedings. In contrast, the "textbook case" for judicial estoppel occurs when a party gains a financial advantage by successfully taking one position in litigation and then later taking an inconsistent position to obtain another financial advantage in a different litigation. *See*, *Milton H. Greene Archives, Inc.*, 692 F.3d at 1000.

-18-

1    19. Given the District Court reversed and remanded this Court's approval of the Turnover

2  Motion, there is no risk that inconsistent court determinations will allow the Trustee to have it

3  both ways on the merits or obtain inconsistent financial or legal advantages.  Having not accepted

4  either position yet, courts are loathe to foreclose a resolution on the merits. Cf. *Eitel v. McCool*,

5  782 F.2d 1470, 1472 (9th Cir.1986) (noting "the strong policy ... favoring decisions on the merits")

6  (citation omitted). This factor weighs against judicial estoppel.

7    20. Erika Girardi's argument that statements made by counsel during argument are admissions

8  is without legal support. *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589,

9  593 n.4 (9th Cir. 2002) (Statements made by counsel during hearings are not evidence); *EOTT*

10  *Energy Operating Ltd. Partnership v. Winterthur Swiss Ins. Co.,* 257 F.3d 992, 999 (9th Cir. 2001)

11  (Counsel's assertions made at oral argument are not part of the factual record).

12    21. To the extent that Trustee's counsel made statements during oral argument that are

13  contrary to the evidence presented during the remand hearings, the statements are not evidence.

14    22. The Court finds the facts of this case do not meet any of the requirements for judicial

15  estoppel.  Further, given the nature of these proceedings, and finding no harm would result from

16  allowing additional evidence on the issue of commingling, the Court exercises its discretion and

17  will not apply the doctrine judicial estoppel to these proceedings.

18    **C.  The Preponderance of Evidence Established Commingling Between 2006 through**

19       **2008 in the Use of the IOLTA Comerica Trust Account # 6674**

20    23. Commingling occurs when a client's money is intermingled with that of his attorney and its

21  separate identity lost so that it may be used for the attorney's personal expenses or subjected to the

22  claims of his creditors. Cal. State Bar Rule of Prof. Conduct Rule 4-100(A) requires that all funds

23  received or held for the benefit of clients by an attorney be deposited in one or more identifiable

24  bank accounts labelled Trust Account, Client's Funds Account or words of similar import and,

25  with limited exceptions, no funds belonging to the attorney should be deposited therein or

26  otherwise commingled therewith.

27

28

Trustee's Findings of Fact and Conclusions of Law

24.  The rule absolutely bars use of the trust account for personal purposes, even if client funds are not on deposit. *Arm v. State Bar,* 50 Cal. 3d 763 (1990).

25.  Commingling occurs when an attorney deposits his personal funds into a trust account together with funds belonging to his clients. *Jackson v. State Bar,* 25 Cal.3d 398, 404 (1979). *Vaughn v. State Bar,* 6 Cal.3d 847, 858 (1972) (Commingling, is established where a client's money is intermingled with that of his attorney in such a way that it may be used by the attorney for his personal expenses). *Doyle v. State Bar,* 32 Cal. 3d 12 (1982) (Rule absolutely bars use of the Trust Account for personal purposes).

**i.   Girardi Keese Commingle Funds in the IOLTA Comerica Trust Account # 6674 when it deposited Girardi's Personal Funds in the IOLTA Comerica Trust Account # 6674 and then Made Payments to Girardi Personally and his Related and Affiliated Entities**

26.  Commingling in the use of the IOLTA Comerica Trust Account # 6674 occurred when Girardi Keese deposited Girardi's personal funds into the IOLTA Comerica Trust Account # 6674 unrelated to fees and costs before and after receipt of the Rezulin funds.

27.  Commingling in the use of the IOLTA Comerica Trust Account # 6674 occurred when Girardi Keese made payments from the IOLTA Comerica Trust Account # 6674 to Girardi or Girardi related or affiliated entities, unrelated to fees and costs before and after receipt of the Rezulin funds. *Jackson v. State Bar,* 25 Cal.3d 398, 404 (1979). *Vaughn v. State Bar,* 6 Cal.3d 847, 858 (1972) (Commingling, is established where a client's money is intermingled with that of his attorney in such a way that it may be used by the attorney for his personal expenses).

**ii.   Girardi Keese Failure to Withdraw Its Fees and Costs for the Rezulin Matter Within a Reasonable Period of Time**

28.  All funds in an IOLTA Trust Account that belong to the attorney for payment of fees and costs must be withdrawn at the earliest reasonable time after the attorney's right to payment becomes fixed. Cal. State Bar Rule of Prof. Conduct rule 4-100(A)(2)  *In re the Matter of Heiner, 1 Cal. State Bar. Ct. Rptr. 301, 311, 315 (1990) ("Heiner").*

-20-

Trustee's Findings of Fact and Conclusions of Law

29.  Girardi Keese withdrew $4 million for repayment of costs incurred in the Rezulin matter on January 30, 2007.  The withdrawal creates the inference that January 30, 2007 was the date when Girardi Keese was entitled to withdraw its fees and costs from the Rezulin Settlement Proceeds.  *Giacalone v. Malget (In re Malget),* 165 B.R. 933, 937 (Bankr. S.D. Cal. 1994), citing Cal. Ev. Code § 600(b) (West 1994) (An inference is a fact which the court may find as the logical result of other facts.)  *In re Heath,* 2008 Bankr. LEXIS 2926, *11 (Bankr. E.D. Cal. 2008) citing to *In re Malget*, 165 B.R. at 937 (Inferences are an indispensable tool of logical analysis, and a finder of fact may draw reasonable inferences that are supported by evidence of sufficient probative value to form a rational basis for the court's conclusion.

30.  Commingling is assumed where an attorney did not withdraw his fees for five months after receipt and then withdrew his fees over a four-month period of time (April through July 1985).  *Heiner* at 315.

31.  Girardi Keese withdrew $6 million in costs attributable to the Rezulin Settlement between January 30, 2007 and February 16, 2007.  This evidence establishes January 30, 2007 as the date Girardi Keese believed it was entitled to receive payment for its Rezulin representation.

32.  Girardi Keese first withdrew fees for the Rezulin matter from the IOLTA Comerica Trust Account # 6674 on May 24, 2007, ($500,000), approximately 120 days after Girardi Keese received the Rezulin settlement proceeds and withdrew $6 million as reimbursement for costs.

33. GK then withdrew the balance of its fees in several installments over a year and a half time period, with the last withdrawal occurring on October 7, 2008 ($250,000).

34.  This extended retention by Girardi Keese of its Rezulin Settlement fees in the IOLTA Comerica Trust Account # 6674, is commingling as a matter of law. *See, e.g.*, *Arm, Heiner.*

35.  Erika. Girardi's argument that evidence of commingling must be limited to a showing that the commingling occurred on March 2, 2007, the day the check was issued for the diamond earrings is not supportable and is rejected.  Erika Girardi failed to cite any 9th Circuit authority for her position. Rather, her only legal authority is a Massachusetts bankruptcy court decision, *Weiner v. A.G. Minzer Supply Corp. (In re UDI Corp),* 301 B.R. 104 ("Weiner"). This decision is not

-21-

precedent and cannot be used for such purposes. *Hasbrouck v. Texaco, Inc.,* 663 F.2d 930,933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit . . . no matter how egregiously in error they may feel their own circuit to be.")

36. Contrary to *Weiner,* the California Supreme Court uses an expanded time period for determining commingling. *In re the Matter of Michael A. Doran*, 3 Cal. State Bar Ct. Rptr. 871, 876, (1998) ("*Doran*") cited with approval by Mrs. Girardi (SO at 18:9-16):

> The evidence is clear and convincing that respondent is culpable of repeated violations of rule 4-100. From September 1992 through August 1995 he deposited personal funds in CTA1 and CTA2 and used those accounts for his personal expenses. Such conduct constituted commingling within the meaning of rule 4-100 even where there were no client funds in the trust account.

37. The test for commingling is not limited to a single date as Mrs. Girardi argues. Rather, as presented in *Doran*, commingling can take place over an extended period of time, as is the case at bar.

38. The Trustee's evidence establishes that GK failed to withdraw its fees earned for the Rezulin matter for four months after receiving the funds, and then withdrew its fees for the Rezulin matter in installments over a year and a half time period. *Doran* compels a finding that systematic commingling occurred before and after the Rezulin settlement funds were received and when TVG used $750,000 in Trust Account funds to purchase the diamond earrings. *See, e.g.*, *In re the Matter of Heiner*, 1 Cal. State Bar. Ct. Rptr. 301, 311 ("Heiner") (Commingling is presumed to have taken place where the attorney first started to withdraw his fees from a trust account four months after receipt of the funds; and, then withdrew fees over a five-month period of time).

39. Girardi Keese failed to comply with the mandate of Rule 4-100 when it failed to withdraw its fees within a reasonable period of time as interpreted by the California Supreme Court in *Heiner*, given it waited four months to first withdraw fees earned on the Rezulin matter (May 25, 2007) from the IOLTA Comerica Trust Account # 6674.  Girardi Keese then took the remainder of

-22-

1 its fees from time to time over 1-1/2 years.  The last withdrawal from the IOLTA Comerica Trust

2 Account # 6674, that was recorded as a payment for fees for services performed for the Rezulin

3 matter occurred on October 7, 2008 ($250,000).  Accordingly, Girardi Keese failed to withdraw its

4 Rezulin fees and costs within a reasonable period of time. *Heiner* at 315.  Girardi Keese

5 commingled its funds with its clients before the receipt of the Rezulin Settlement Funds and after

6 receipt of the Rezulin Settlement Funds, by failing to withdraw its fees and costs for the Rezulin

7 Matter within a reasonable period of time.

8  40. The preponderance of the evidence demonstrates that commingling occurred in the

9 administration of the IOLTA Comerica Trust Account # 6674 before and after receipt of the

10 Rezulin Settlement Funds.  Further the IOLTA Comerica Trust Account # 6674 had a positive

11 balance of $2,237,179.62 just prior to the receipt of the Rezulin Settlement Funds.  Accordingly,

12 the burden of tracing the Rezulin funds to the payment of the diamond hearings fell on Erika

13 Girardi to establish.  *Danning v. Bozek (In re Bullion Reserve of N. Am.*), 836 F.2d 1214, 1217-

14 1218 (9th Cir. 1988) (Holding a creditor bore the burden to trace commingled funds from a trust

15 and show they were not property of the debtor) (citations omitted); *see also*, *Taylor Assocs. v.*

16 *Diamant (In re Advent Mgmt. Corp.),* 104 F.3d 293, 294 (9th Cir. 1997) ("Under the strict tracing

17 standard applicable to bankruptcy cases involving commingled funds, the [creditor] bears the

18 burden of tracing the alleged trust property . . . . If the appellant fails to trace the funds, the court

19 must presume that the funds constitute an interest of the debtor in property").

20  41. Erika Girardi did not present any evidence on the issue of tracing.  She failed to present

21 any expert testimony whatsoever.  Erika Girardi's only effort to refute the Trustee's evidence and

22 testimony of the Trustee's expert, Nicholas R. Troszak, was by way of the evidentiary objection

23 Erika Girardi filed with her Supplemental Memorandum of Points and Authorities in Opposition

24 to the Trustee's Turnover Motion.  [Adv. ECF Doc. 124].  As presented by the Trustee in her

25 Response to Erika Girardi's Evidentiary Objections, (Adv. ECF Doc. 131) and based upon this

26 Court's independent review of the evidentiary objections, the Court finds Erika Girardi's

27 evidentiary objections and each and every one are denied in their entirety.

28

Trustee's Findings of Fact and Conclusions of Law

42.   Erika Girardi also reprises her argument that the Statute of Limitations and Statute of Repose precludes the granting of the Trustee's Turnover Motion. This Court previously rejected this argument.  The Court's decision on these issues was affirmed on appeal by the District Court. *See*, District Court Order, DC ECF Doc. 35, p. 17-18, Adv. ECF Doc. 80.  Erika Girardi's further argument on these issues is subject to the doctrine of the law of the case.  For the doctrine [of law of the case] to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" *Lower Elwha Band of S'Klallams v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000) (citation omitted).  Moreover, "[a]pplication of the doctrine is discretionary." *Id*. (citation omitted). "The 'law of the case acts as a bar only when the issue in question was actually considered and decided by the first court.'" *United Steelworkers of America v. Retirement Income Plan for Hourly-Rated Employees of ASARCO, Inc*., 512 F.3d 555, 564 (9th Cir. 2008) (citation omitted).  Independent of the "law of the case" Erika Girardi's position on the Statute of Limitations and Statute of Repose is rejected. Neither preclude the Trustee from pursuing the relief requested by the Trustee in the Turnover Motion.

43. The Court, having been fully advised in the premises as established by the findings of fact and conclusions of law presented above, the Court hereby finds that the proceeds from the sale of the Diamond Earrings are property of the estate.

The Trustee's Turnover Motion is hereby granted.

* * *

-24-

Trustee's Findings of Fact and Conclusions of Law

0113

Dated:  October 9, 2024

Respectfully Submitted,

JENKINS MULLIGAN & GABRIEL LLP

By: _____
    Larry W. Gabriel
Special Litigation Counsel for Plaintiff, Elissa D. Miller
Chapter 7 Trustee for the Estate of Girardi Keese

Date: October 23, 2024

_____
Barry Russell
United States Bankruptcy Judge

-25-

Trustee's Findings of Fact and Conclusions of Law

# EXHIBIT 6

April 6, 2011

Joseph DiNardo, Esq.
Founder & CEO
Counsel Financial Services
The Power of Attorney Funding
6400 Main Street, Suite 120
Williamsville, NY   14221

Dear Joe:

I am enclosing our trust check in the amount of $64,154.06.  This constitutes half the
legal fees minus a charge of $8,000 to George Hatcher.  I'm also enclosing a breakdown
of the checks.  Our firm received half of the fees.

With kind regards,

THOMAS V. GIRARDI

TVG:sf

Enclosures

Exhibit 6

# EXHIBIT 7

# The DiNardo Law Firm, P.C.

November 1, 2011

Tom Girardi
Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, California 90017

Re:   San Bruno PG&E Fires on September 9, 2010
      Victims: James Ruigomez, Joseph Ruigomez, and Kathleen Ruigomez

Dear Tom:

With reference to the above case, we have agreed to the following terms for our association in this matter.

1. The Clients will pay Girardi Keese for costs/expenses as provided for in retainers.

2. Girardi Keese will reimburse The Dinardo Law Firm for any costs/expenses that The Dinardo Law Firm advanced that are covered in the retainer to be paid by the Clients.

3. Girardi Keese will receive 50% of the gross fees.

4. Girardi Keese will receive $300,000 in addition to 50% of the gross fees.

5. Girardi Keese will pay The Dinardo Law Firm the remaining balance of fees after deducting the 50% and the $300,000.

6. Girardi Keese from its own funds will pay The Dinardo Law Firm the sum of $75,000 and $12,500 as a reimbursement for funds paid by The Dinardo Law Firm.

We look forward to working with you on this case and also look forward to a long working relationship with you on other cases in the future.

Sincerely,

Joe Dinardo

I, Tom Girardi, and my firm, Girardi Keese, agree to the above terms and conditions:

Signed: _____
For the firm

Dated: _____

6400 Main Street, Suite 120 Williamsville, NY 14221
(716) 636-0340   Fax: (716) 639-8382

Exhibit 7

# EXHIBIT 8

# The DiNardo Law Firm, P.C.

November 2, 2011

Tom Girardi
Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, California 90017

Re:    Xu v. TBE International
       Bus Crash in Kingman, Arizona on October 17, 2010

Dear Tom:

With reference to the above case, we have agreed to the following terms for our association in this matter.

1.  The retainer for this case is a fifty-fifty split with the Clients.

2.  From the 50% split to the attorneys, Girardi Keese will reimburse itself for all costs and expenses it advanced.

3.  From the 50% split to the attorneys, Girardi Keese will pay medical providers all sums due for services provided to the Clients.

4.  Girardi Keese will receive 50% of what is left after deducting the above.

5.  Girardi Keese will receive $300,000 of the balance left after deducting the 50%.

6.  Girardi Keese will pay The Dinardo Law Firm the net sum after the above deductions.

We look forward to working with you on this case and also look forward to a long working relationship with you on other cases in the future.

If you have any questions, please do not hesitate to call me.

Sincerely,

Joe Dinardo

I, Tom Girardi, and my firm, Girardi Keese, agree to the above terms and conditions:

Signed: _____
For the firm

Dated: 11-16

# EXHIBIT 9



November 11, 2011

*Via Email:*
*jdinardo@counseljin.com*

Joseph DiNardo, Esq.
Founder & CEO
COUNSEL FINANCIAL SERVICES
6400 Main Street, Ste. 120
Williamsville, NY

14221 Dear Joe:

Good news. After a week in trial, we settled Streeper vs. City of Perris for $800,000. This truly was a very difficult case. The plaintiffs boyfriend (uninsured) pulls a left turn in front of the other vehicle. It was a construction site so our claim was that it was a dangerous situation. The judge made some great ruling in our favor and caused the defendants to rethink the situation. Total legal fees in the case will be $320,000. Our fees to you will be $160,000 minus anything Hatcher claims.

As I indicated to you, we have made some small settlements on a few cases. Although the amounts are not great, I want to make sure we get a proper accounting to you. The matters have been slowed down because of Medicare liens.

With kind regards,

THOMAS V. GIRARDI

TVG:sf

1126 WILSHIRE BOULEVARD• LOS ANGELES, CALIFORNIA• 90017-1904
TELEPIIONE: 213-977-021 I• FACSIMILE: 213-481-1554
WWW.GI RA RDIKEESE.COM

Exhibit 9

Case 1-25-01007-CLB,   Doc 1-8,   Filed 02/03/25   Entered 02/03/25 18:10:48,
Description: Exhibit 7 - Letter dated 11/1/11, Page 2 of 2
0122

# EXHIBIT 10



November 16, 2011

*Via Email: jdinardo@counselfin.com*

Joseph DiNardo, Esq.
Founder & CEO
COUNSEL FINANCIAL SERVICES
6400 Main Street, Ste. 120
Williamsville, NY  14221

Dear Sweet Pea:

Enclosed are the signed documents.

If the $75,000 and $12,500 are costs of the client, clearly we should pay those.  It was my understanding that we have paid every penny of the costs on the case, but I will abide by whatever you say.  If the funds were involved in client procurement, probably that would have to be in cost of a referring attorney.

Once again, whatever you say is right, is right with me.

With kind regards,

TOM

/sf

Attachments


Exhibit 10

1126 WILSHIRE BOULEVARD • LOS ANGELES, CALIFORNIA • 90017-1904
TELEPHONE: 213-977-0211 • FACSIMILE: 213-481-1554
WWW.GIRARDIKEESE.COM

0124

# EXHIBIT 11

February 26, 2019

*Via E-mail: jdinardo@counselfinancial.com)*

Joe Dinardo, Esq.
The Dinardo Law Firm, P.C.
6400 Main Street, Suite 120
Williamsville, NY 14221

*Re:    Metrojet Flight 9268 Air Crash on October 31, 2015
        Flydubai Flight FZ-981 Air Crash on March 19, 2016*

Dear Joe:

This letter will confirm our mutual agreement regarding an association fee for Metrojet Flight 9268, which broke up in the air shortly after takeoff from Sharm el Sheikh International Airport on October 31, 2015, and Flydubai Flight FZ-981, which impacted airport terrain during a second approach attempt to Rostov-On-Don Airport on March 19, 2016.

We have agreed that our office will associate with you in connection with these aviation cases. The Dinardo Law Firm, P.C. will receive one third (33.33%) of the net attorney fees received by GirardiKeese on the listed cases of Metrojet and Flydubai. For the purposes of this agreement, "net attorney fees" means the amount of fees received by GirardiKeese after paying associate attorneys in Russia and Egypt, when applicable.

If you have any questions, please do not hesitate to call me.

With kind regards,

THOMAS V. GIRARDI

TVG:sf

EXHIBIT 11

1126 WILSHIRE BOULEVARD • LOS ANGELES, CALIFORNIA • 90017-1904
TELEPHONE: 213-977-0211 • FACSIMILE: 213-481-1554

# EXHIBIT 12

**From:** David Lira <dlira@girardikeese.com>
**Sent:** Monday, August 5, 2019 2:19 PM
**To:** 'Joe DiNardo' <jdinardo@counselfinancial.com>
**Cc:** Tom Girardi <tgirardi@girardikeese.com>; Megan Payne <mpayne@counselfinancial.com>;
Shirleen Fujimoto <sfujimoto@girardikeese.com>
**Subject:** RE: Re:

Joe: you are first in line. I will get more details. David

**From:** Joe DiNardo [mailto:jdinardo@counselfinancial.com]
**Sent:** Monday, August 05, 2019 2:18 PM
**To:** David Lira
**Cc:** Tom Girardi; Megan Payne; Shirleen Fujimoto
**Subject:** Re:

David, does this "new" lender know that CFS has a first lien against ALL of the firms collateral?
You need to fully disclose that to them.
They should be taking us out as well. If u are hell bent on moving forward w them even after we
met then they need to take us out.
If they do not want to do that then we are going to require that Tom put up that stock he has
talked about (value 38mm) as additional collateral for the
CFS line. I love you guys, I really do and I consider you friends but you cannot simply trample
over the CF line of credit, undermine our collateral
by agreeing to let LF take a judgement if u did not make second payment and now they will
stand ahead of us for their 6mm. It is because you as a
firm just do whatever u want to and think no one is going to get upset about it. Then suddenly the
wheels come off and u compound your mistake
by rushing to make another one. Frankly, if I didn't know better one could make a case for u
taking advantage of my good nature toward Tom and the firm.
Lastly, there is the matter of all of my referral fees. Still unpaid. Avandia is 2 yrs old, Balagut is
older than that. Need some real help from you and Tom and
Chris. Thanks,
Joseph DiNardo Esq.
Counsel Financial/ Plaintiff Support
Founder and Director
716-568-0070

Exhibit 12

# EXHIBIT 13

**From:** Joe DiNardo [mailto:jdinardo@counselfinancial.com]
**Sent:** Friday, February 21, 2020 8:24 AM
**To:** Kim Cory
**Subject:** Re: Message from Tom Girardi re: Trust Funds

TOM, I AM OUT ILL TODAY. FIRST TIME IN 8 YRS.
PAUL AND MEGAN ARE BOTH AWAY AND OUT OF COUNTRY W THEIR FAMILIES
FOR WINTER BREAK.
THEY ARE GOING TO PUSH BACK ON THIS SO I NEED COUPLE SIMPLE THINGS TO
WORK WITH.

1. WHAT EXACTLY ARE U ASKING FOR? WHAT TRUST ARE U REFERRING TO?
2. OUT OF YOUR 1/2 OF FEE WILL U AGREE TO SEND THE 3 MONTHS OF INTEREST
PAYMENTS
TO PUT U BACK IN COMPLIANCE.
3. PAY ME THE REMAINING 180K ON BALAGOT THAT HAS NOT BEEN PAID FOR
YEARS.

PLEASE SIGN ANY RESPONSE IN BLOOD SO THEY WILL HOPEFULLY BE
CONVINCED THAT
YOU WILL COMPLY.
Joseph DiNardo Esq.
Counsel Financial/ Plaintiff Support
Founder
716-568-0070



Exhibit 13

# EXHIBIT 14

101721 - $5,825,000.00 - 02/14/2013



101722 - $260,000.00 - 02/14/2013

Exhibit 14

# EXHIBIT 15

STATE BAR OF CALIFORNIA 4110425859 Page 15

102324 - $500,000.00 - 05/22/2013



**GIRARDI | KEESE**
CLIENT TRUST ACCOUNT
1126 WILSHIRE BOULEVARD
LOS ANGELES, CALIFORNIA 90017

102324

TORREY PINES BANK

Five Hundred Thousand & 00/100

DATE 5/20/2013    AMOUNT $500,000.00

PAY TO THE ORDER OF  DINARDO LAW FIRM, P.C.

Case # 2010225
Assoc Counsel Fees

102325 - $15,000.00 - 05/29/2013

Exhibit 15                                    0134

# EXHIBIT 16

# JENKINS MULLIGAN & GABRIEL LLP

Larry W. Gabriel                                                                        585 Lorna Lane
A Professional Corp.                                                                    Los Angeles, Ca 90049
Email: lgabrielaw@outlook.com                                                          Tel: 818.943.8992

December 11, 2024

Via Email:  chris@structures.com

Christopher Diamantis, CSSC
Executive Chairman
Structures
3060 Peachtree Road | Suite 1150
Atlanta, GA 30305

*In re Girardi Keese,* U.S. Bankr., C.D. Cal. Case No. No.: 2:20-BK-21022-BR

Mr. Diamantis:

I am Special Litigation Counsel for Elissa D. Miller, the Chapter 7 Trustee ("Trustee") for the bankruptcy estate of the California law firm Girardi Keese. The Girardi Keese bankruptcy is pending in the United States Bankruptcy Court, Central District of California, styled *In re Girardi Keese,* Bankr. Case No.: 2:20-BK-21022-BR. The Girardi Keese law firm was owned and operated by Thomas V. Girardi, who is also subject to a separate Chapter 7 bankruptcy proceeding, *In re Thomas V. Girardi*, C.D. Cal, Bankr. Case No.: 2:20-BK-21020.

As you may know, Mr. Joseph DiNardo ("Mr. DiNardo") and The DiNardo Law Firm ("DLF") are also subject to Chapter 7 bankruptcy proceedings  pending in the United States Bankruptcy Court for the Western District of New York.  The Trustee holds claims against Mr. DiNardo and DLF, which she intends to pursue in their respective bankruptcy proceedings. This letter is to notify you that the Trustee is of the opinion that a claim exists against you based on a $3 million payment made to you by Mr. DiNardo in 2013.

The facts underlying this claim were discussed during Mr. DiNardo's 341(a) examination on December 5, 2024, conducted by Mark J. Schlant, the Chapter 7 bankruptcy trustee for Mr. DiNardo.

During the examination, Mr. DiNardo testified under oath that in 2013 he received a $6 million payment from Girardi Keese. This payment purportedly represented one-half (1/2) of the fees Girardi Keese earned from representing the Ruigomez family in a suit related to injuries sustained during the September 2010 PG&E San Bruno gas explosion. The payment was made pursuant to a fee-sharing agreement entered into on November 1, 2011, between Thomas Girardi and Mr. DiNardo. A copy of this agreement is attached for your reference.

However, Mr. DiNardo testified that, despite the agreement's language, the arrangement was not a fee-sharing agreement but rather a litigation funding arrangement. He further stated that he paid you $3 million from the $6 million he received from Girardi Keese based on your participation in this funding arrangement.

Regardless of how the agreement is characterized, the fee-sharing/funding agreement is unenforceable and void *ab initio* under California law because it constitutes an illegal fee-sharing agreement in violation of California Rule of Professional Conduct 2-200. Alternatively, the transaction could be viewed as a commercial loan made by an individual (Mr. DiNardo) not licensed in California as a

1

Exhibit 16                                                                              0136

# J E N K I N S   M U L L I G A N   &   G A B R I E L   L L P

Larry W. Gabriel
A Professional Corp.
Email: lgabrielaw@outlook.com

585 Lorna Lane
Los Angeles, Ca 90049
Tel: 818.943.8992

commercial lender. In his testimony, Mr. DiNardo acknowledged that he often engaged in such agreements, apparently to circumvent licensing requirements.

Based on the foregoing, the Trustee asserts the following:

- The arrangement is void under California law.

- Mr. DiNardo willfully and knowingly participated in fraud perpetrated against the Ruigomez clients.

- The payment you received from Mr. DiNardo, DLF, or Mr. DiNardo's funds as a result of the Ruigomez representation is property of the Girardi Keese bankruptcy estate and must be returned to the Trustee.

Before instituting legal proceedings to recover the payment, we would welcome the opportunity to discuss this matter with you and/or your counsel. If you have any documentation supporting your right to retain the funds paid, please provide it to me within **five (5) days** of the date of this letter. You may email the requested documents to me at **lgabrielaw@outlook.com**.

Please do not hesitate to contact me with any questions or to discuss this matter further. I look forward to your prompt response.

Sincerely,

Larry Gabriel
Special Litigation Counsel for Elissa D. Miller,
Chpt.7 Trustee, Estate of Girardi Keese.

Cc:
Elissa D. Miller, Esq.
Scott J. Bogucki, Esq.
Gleichenhaus, Marchese & Weishaar, PC

Attachments

2

0137

# EXHIBIT 17

0138

**From:** Chris D. <noleman90@gmail.com>
**Sent:** Thursday, December 19, 2024 6:30 AM
**To:** Larry Gabriel <lgabrielaw@outlook.com>
**Subject:** Girardi Matter

Mr. Gabriel,

I am now in receipt of an email you sent on Tuesday to an old email address of a Company I am no longer associated with.  However, they did forward your message.

I will be happy to discuss the matter with you, but if counsel is required to be on the call, I will need time to secure such counsel.  In the meantime, the payment you reference was made to a corporate entity in exchange for the investment made in that case.  It was not paid to me personally, so Mr. DiNardo was mistaken in his characterization of the payment.

Chris Diamantis

Exhibit 17

# EXHIBIT 18

**From:** Larry Gabriel <lgabrielaw@outlook.com>
**Sent:** Monday, January 6, 2025 12:58 PM
**To:** Chris D. <noleman90@gmail.com>
**Cc:** Elissa Miller <Elissa.Miller@gmlaw.com>
**Subject:** RE: Girardi Matter

Following up on my email below.  We would appreciate greatly if you would provide us with the information requested below.

Thank you.


Larry W. Gabriel
JENKINS MULLIGAN & GABRIEL, LLP
585 Lorna Lane, Los Angeles, CA 90049
Tel: 818.943.8992
Email: lgabrielaw@outlook.com


**From:** Larry Gabriel
**Sent:** Thursday, December 19, 2024 9:11 AM
**To:** Chris D. <noleman90@gmail.com>
**Subject:** RE: Girardi Matter

Thank you for your prompt response. I would appreciate if you will provide the name of the company so that the Trustee can continue to evaluate the facts. Is the company still in business?

Appreciate your cooperation.


Larry W. Gabriel
JENKINS MULLIGAN & GABRIEL, LLP
585 Lorna Lane, Los Angeles, CA 90049
Tel: 818.943.8992
Email: lgabrielaw@outlook.com


Exhibit 18

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>ELISSA D. MILLER, Ch. 7 Trustee for the Estate of Girardi Keese, WENDY J. CHRISTOPHERSON, Ch. 7 Trustee for the Estate of The DiNardo Law Firm (CONT.) | DEFENDANTS<br>CHRISTOPHER DIAMANTIS, an individual, D&D FUNDING, II, LLC, a Delaware Limited Liability Co., CDBD HOLDINGS, INC., a Tennessee  (CONT.) |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br><br>LARRY W. GABRIEL and SCOTT BOGUCKI<br>(CONT. on attached sheet) | ATTORNEYS (If Known)<br>Unknown |

| PARTY (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor     □ Other<br>x□ Trustee | PARTY (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor     x□ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
See attached sheet.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
        (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $9,000,000 |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>GIRARDI KEESE | BANKRUPTCY CASE NO.<br>20-bk-21022-BR | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Hon. Barry Russell |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>See attached sheet. | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>October 23, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>LARRY W. GABRIEL | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# **Continuation Sheet**

**PLAINTIFFS**

ELISSA D. MILLER, chapter 7 Trustee for the Estate of Girardi Keese, WENDY J. CHRISTOPHERSEN, chapter 7 Trustee for the Estate of The DiNardo Law Firm, and MARK J. SCHLANT, chapter 7 Trustee for the Estate of Joseph DiNardo, **and MARK J. SCHLANT, chapter 7 Trustee for the Estate of Joseph DiNardo**

**ATTORNEYS**

LARRY W. GABRIEL [SBN 68329]
JENKINS MULLIGAN & GABRIEL LLP
5743 Corsa Avenue, Suite 110
Westlake Village, CA 91362
Telephone:   818.943.8992
Email:        lgabrielaw@outlook.com

SCOTT J. BOGUCKI, ESQ.
[NY SBN 4747366]
GLEICHENHAUS, MARCHESE & WEISHAAR, P.C.
[Pro Hac Vice (Proposed)]
43 Court Street, Suite 930
Buffalo, New York 14202-3100
Tel. 716/ 845-6446
Email:    sbogucki@gmwlawyers.com

**DEFENDANTS**

CHRISTOPHER DIAMANTIS, an individual, D&D FUNDING, II, LLC, a Delaware Limited Liability Company, CDBD HOLDINGS, INC., a Tennessee **Corporation, and DOES 1-20, inclusive.**

## CAUSE OF ACTION

1. DECLARATORY RELIEF
   [28 USC § 2201];

2. TURNOVER OF PROPERTY
   [11 USC § 542];

3. RECOVERY OF PROPERTY OBTAINED THROUGH THEFT
   [Cal. Penal Code § 496];

4. AVOIDANCE OF FRAUDULENT TRANSFER, ACTUAL INTENT
   [11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.04(a)(1)];

5. AVOIDANCE OF FRAUDULENT TRANSFER, CONSTRUCTIVE INTENT
   [11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.05];

6. AVOIDANCE OF FRAUDULENT    TRANSFER, CONSTRUCTIVE INTENT
   [11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.04(a)(2)(A)];

7. AVOIDANCE OF FRAUDULENT TRANSFER, CONSTRUCTIVE INTENT
   [11 USC §§ 544(b) and 548; Cal. Civil Code § 3439.0(a)(2)(B)];

8.  RECOVERY OF AVOIDED TRANSFER
   [11 USC § 550];

9.  ACCOUNTING

**RELATED ADVERSARY PROCEEDING**:

U.S. District Court-Central District of California

Case No: 2:22-cv-08513-GW-RW – Hon. George H. Wu

ELISSA D. MILLER, Ch. 7 Trustee, Estate of Girardi Keese, as assignee of the claims of Joseph Ruigomez, Kathleen Ruigomez and Jamie Ruigomez v. THE DINARDO LAW FIRM, P.C. a New York Corporation, JOSEPH DINARDO, an individual; and DOES 1-20, inclusive.